# EXHIBIT D

Charles Covington    –    February 11, 2005

1

10:09:06  1        IN THE UNITED STATES DISTRICT COURT

         2        FOR THE DISTRICT OF MASSACHUSETTS

         3   RALPH G. MCKENNA, GLENROY      )
             A. DEANE, ILENE               )
         4   WILGOREN-DEANE, CHRISTOPHER   )
             J. LILLIE, and LAURA A.       )
         5   LILLIE,                       )
                                           )
         6        Plaintiffs,              )
                                           )
         7   VS.                           )   NO. 04-10370-RCL
                                           )
         8   FIRST HORIZON HOME LOAN       )
             CORPORATION,                  )
         9                                 )
                  Defendant.               )
        10

        11           TELEPHONIC DEPOSITION OF

        12            CHARLES COVINGTON

        13           FEBRUARY 11, 2005

        14                COPY

10:09:06 15

        16        TELEPHONIC DEPOSITION of CHARLES

        17   COVINGTON, produced as a witness at the instance of

        18   the Plaintiffs, and duly sworn, was taken in the

        19   above-styled and numbered cause on the 11th of

        20   February, 2005, from 10:09 a.m. to 12:09 p.m., before

        21   Audra B. Paty, CSR in and for the State of Texas,

        22   reported by machine shorthand, at the offices of First

        23   Horizon Home Loans, 4000 Horizon Way, in the City of

        24   Irving, County of Dallas, State of Texas, pursuant to

        25   Notice and the Federal Rules of Civil Procedure.

2

10:09:06  1                    A P P E A R A N C E S

         2        FOR THE PLAINTIFFS:
                      Mr. Christopher M. Lefebvre (Via Phone)
         3        LAW OFFICES OF CLAUDE LEFEBVRE & SONS
                  P.O. Box 479
         4        Pawtucket, RI 02862

         5

         6        FOR THE DEFENDANT:
                      Mr. Thomas M. Hefferon
         7        GOODWIN PROCTER, L.L.P.
                  901 New York Avenue, N.W.
         8        Washington, D.C. 20001

         9

        10

        11

        12        ALSO PRESENT:
                      Ms. Barbara Brown Eddy

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

3

10:09:06    1                        I N D E X

            2    WITNESS                                    PAGE

            3    CHARLES COVINGTON

            4    EXAMINATION BY MR. LEFEBVRE                    4

            5

            6

            7    EXHIBITS                              IDENTIFIED

            8     1 - Notice of Depositions               5

            9     2 - Tabares Notice of Right to Cancel      33

           10     3 - Notice of Right to Cancel FH 001047   35

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

4

|            |    |                                                           |
|------------|----|-----------------------------------------------------------|
| 10:09:06   | 1  | P R O C E E D I N G S                                     |
|            | 2  | CHARLES COVINGTON,                                        |
|            | 3  | having been first duly sworn, testified as follows:       |
|            | 4  | EXAMINATION                                               |
|            | 5  | BY MR. LEFEBVRE:                                          |
|            | 6  | Q.  Good morning.                                         |
|            | 7  | A.  Hello.                                                |
|            | 8  | Q.  Hi.  I'm Chris Lefebvre, and I'm here in              |
|            | 9  | Rhode Island conducting a deposition on behalf of         |
|            | 10 | Ralph McKenna, Glenroy Deane, Ilene Deane, and            |
|            | 11 | Christopher and Laura Lillie regarding a federal          |
|            | 12 | lawsuit that is pending in the United States District     |
|            | 13 | Court for the District of Massachusetts.                  |
|            | 14 | And what is your name, sir?                               |
| 10:09:29   | 15 | A.  Charles Stephen Covington.                            |
|            | 16 | Q.  Now, I'm going to be asking you a series of           |
|            | 17 | questions, and I just want to briefly go over the         |
|            | 18 | ground rules.  I'm going to assume that if you answer     |
|            | 19 | my question, two things, number one, that you             |
|            | 20 | understood the question, and, number two, that you        |
|            | 21 | answered the question truthfully and honestly to the      |
|            | 22 | best of your ability.  Okay?                              |
|            | 23 | A.  Okay.                                                 |
|            | 24 | Q.  Now, have you ever been deposed before?               |
|            | 25 | A.  No.                                                   |

5

10:10:00  1       Q.  This is the first time?

2       A.  Yes.

3               MR. LEFEBVRE:  Okay.  Madam Court

4  Reporter, could we have the notice of deposition --

5  that I believe Mr. Hefferon should have a copy --

6  marked as an exhibit for this deposition?

7               MR. HEFFERON:  I'm pulling it out, Chris.

8               MR. LEFEBVRE:  Thanks, Tom.

9               MR. HEFFERON:  Okay.  Chris, I have the

10  notice of deposition.  Like I said, it is my copy and

11  it has some highlighting on it, but we'll have the

12  court reporter mark it, and when we copy it, it will

13  just copy clean, I believe.

14               MR. LEFEBVRE:  Beautiful.

10:11:08  15               MR. HEFFERON:  All set.  She is just

16  going to mark it now.

17               (Exhibit No. 1 marked.)

18       Q.  Now, Mr. Covington, you have in front of you

19  what I believe has been marked as Plaintiff's Exhibit

20  1.  I'm going to ask you if you have seen this

21  document before.

22       A.  I have not seen this document before.

23       Q.  Okay.  I want you to take a moment.  It is

24  not a very lengthy document.  It should be really only

25  two substantive pages.  Take a moment to look at it,

10:11:36    1    and when you are done, let me know because I would

2    like to just ask you a few questions about it.

3               MR. HEFFERON:   It is really the listing

4    here, the various topics that I have highlighted.   And

5    he wants you to read them over quickly once to

6    yourself, and then he may ask you a question or two

7    about it.

8        A.   Okay.

9        Q.   Do you understand that this is what is

10   known -- what I'm doing today is conducting a 30(b)(6)

11   deposition of First Horizon Home Loans?   You

12   understand that?

13       A.   Yes, I understand it is a deposition.   I

14   don't know about those citations, but, yes, I do

10:12:21   15   understand this is a deposition.

16       Q.   Okay.   Well, I want to make clear that

17   pursuant to this notice, I'm going to be asking First

18   Horizon --

19              MR. LEFEBVRE:   Can we for the record

20   abbreviate when I say First Horizon that I'm referring

21   to the defendant in this case?   Is that an acceptable

22   stipulation, Tom?

23              MR. HEFFERON:   Sure.

24       Q.   Mr. Covington, I want to make sure that you

25   understand that I'm conducting a deposition of First

7

10:12:48   1  Horizon today.

2     A.  Yes.

3     Q.  Not of you.  Do you understand that?

4     A.  I understand that.

5     Q.  Okay.  And that it is my understanding you

6  have been designated by First Horizon to answer

7  various questions -- what we call areas of inquiry --

8  as outlined in the two-page notice of deposition,

9  which I believe you have just reviewed.  Do you

10  understand that?

11     A.  Yes.

12     Q.  And you believe that you are competent and

13  knowledgeable to answer questions regarding the

14  various areas of inquiry contained in this notice of

10:13:26  15  deposition?

16     A.  I believe so.

17     Q.  Okay.  Now, you are presently employed by

18  First Horizon, correct?

19     A.  Yes.

20     Q.  Can you tell me your capacity, what type of

21  work you do for First Horizon?

22     A.  I am the director of quality control and

23  compliance for the company.

24     Q.  Okay.  Can you tell me, what does a director

25  of quality control and compliance do in a general

8

10:13:50  1  sense?

2       A.  Okay.  I manage our quality control testing

3  review function.  I manage our compliance function,

4  which is an advisory risk management type role.  I

5  manage a fraud investigation group for the company.  I

6  manage our HMDA data review and preparation and filing

7  function.  And I also manage our broker approval

8  function for the company.

9       Q.  Now, you are -- you actually work in Texas, I

10  assume?

11       A.  Yes.

12       Q.  At the corporate headquarters?

13       A.  Yes.

14       Q.  And how long have you held this title or had

10:14:32  15  this job?

16       A.  Since August of 2001.

17       Q.  Now, I'm going to call it in a general sense

18  the compliance quality control department.  Is that a

19  separate area or a separate department of First

20  Horizon?

21       A.  Well, collectively it is one department under

22  my management, which has those various operational

23  units.

24       Q.  And how many people actually work under your

25  supervision?

9

10:15:02    1            MR. HEFFERON:  You mean directly or

         2    indirectly?

         3        Q.  Let's start directly first.

         4        A.  Directly I have five managers and an

         5    administrative assistant that report to me.

         6        Q.  And how about indirectly that work under you?

         7        A.  35 people.

         8        Q.  Did you say 35?

         9        A.  35.

        10            MR. LEFEBVRE:  Now, Tom, what I wanted to

        11    do at this point --

        12        Q.  Because I believe in simplifying things, Mr.

        13    Covington.

        14            MR. LEFEBVRE:  I don't want to make this

10:15:35   15    deposition three hours long when we can probably get

        16    it done in an hour.  What I would like to do is have a

        17    stipulation, Tom, relative to the right to cancel that

        18    when I ask questions about the right to cancel form,

        19    that I'm referring to the form which was attached as

        20    Exhibit D, H, and L of the amended complaint that has

        21    been filed in this case.  Is that an acceptable

        22    stipulation, Tom?

        23            MR. HEFFERON:  Yes.  I also point out

        24    that we have produced those documents as well as part

        25    of the loan files and also 1047, if you have it there,

10

10:16:17   1   Chris, is the actual form.

2                   MR. LEFEBVRE:   1...

3                   MR. HEFFERON:   1047.  Probably the last

4   document that we produced to you.

5                   MR. LEFEBVRE:   Oh, 1047, yes.  I saw

6   that.  That's basically the same as Exhibit, D, H, and

7   L, but it doesn't have the identifying information.

8                   MR. HEFFERON:   That's correct.  It does

9   actually have an address here of Pittsburgh,

10  Pennsylvania as a place.

11                  MR. LEFEBVRE:   You are right.  I saw

12  that.

13                  MR. HEFFERON:   Yeah, but, anyway, if you

14  wanted to mark 1047, you could do that.  I don't care

10:16:49  15  what you do.

16                  MR. LEFEBVRE:   I think we can have an

17  agreement that 1047 speaks for itself if we need it

18  somehow in some pleading before Judge Lindsey.  We can

19  attach it.  I don't think we need to mark it.

20                  MR. HEFFERON:   Okay.  But I'm putting it

21  before the witness so that when you are talking about

22  the right to cancel form that you described and I

23  agree is D, H, and L, I'm putting 1047 before the

24  witness in case he has to refer to it.

25                  MR. LEFEBVRE:   Certainly.  That's fine.

Charles Covington    -    February 11, 2005

11

10:17:13   1           MR. HEFFERON:  Okay.  Go ahead.

        2       Q.  Okay.  Now, Mr. Covington --

        3           MR. HEFFERON:  So just to make sure

        4   Mr. Covington understands, so when he talks about the

        5   right to cancel form, he is talking about this

        6   document here that is before you, 1047, unless he

        7   makes it clear otherwise.  And you should feel free --

        8   and I'm sure Chris agrees with this -- if you are not

        9   sure which form he is talking about, to ask him to

       10   clarify.

       11           THE WITNESS:  Okay.

       12       Q.  Can you tell me a little bit about the

       13   residential foreclosure portfolio of First Horizon?

       14   I'm mainly interested in getting a general sense about

10:17:50  15   the various depositions.  I understand through the

       16   documents there is a retail and wholesale.  Can you

       17   tell me the different divisions?

       18       A.  I don't understand.  Residential foreclosure

       19   division?

       20           MR. HEFFERON:  You said, foreclosure,

       21   Chris.

       22       Q.  I'm sorry.  I meant -- not foreclosure.  I

       23   met consumer mortgages, refinances.

       24           MR. HEFFERON:  Lending?

       25       Q.  Lending.

10:18:14    1        A.   You are talking about the channels that we

2    originate loans?

3        Q.   Absolutely.

4        A.   Well, we have a retail origination channel.

5    We have a wholesale broker origination channel.  We

6    have a correspondent origination channel.  We have a

7    nonprime business, which is lending center that can be

8    an origination channel.  Consider that separately.

9    And then within that, we have telemarketing-type

10   origination channels, direct marketing, and things

11   like that, both inbound and outbound.

12       Q.   Okay.  Can you tell me in a general sense

13   about the retail channel?  And I'm talking about -- I

14   want to stay focused.  I'm talking about consumer

10:19:02   15   mortgage loans.  That's what I'm talking about.

16   Either refinance or purchase loans.

17            MR. HEFFERON:  You mean how it is

18   organized?

19            MR. LEFEBVRE:  Yes.

20       A.   Okay.  How it is organized?  It is organized

21   on a regional level.  We have 11 or 12 regions, and

22   within those regions, there are various branches.  And

23   within those branches, there is a branch manager to

24   whom the -- what we call relationship managers, loan

25   officers report to.  Is that what you had in mind?

Charles Covington    -    February 11, 2005

13

10:19:35     1        Q.   Yes.   Thank you.

2                    And how about the wholesale?   That, I

3    assume, is different than the retail?

4        A.   It is fairly similar.   We don't have our --

5    from an organizational standpoint, retail and

6    wholesale report into the same senior executive.   So

7    within these regions, you'll have both retail branches

8    and wholesale branches.   And in a wholesale branch, it

9    is very similar.   We have a branch manager.   You don't

10   have relationship managers.   You have what we call

11   account executives who actually are the ones that sign

12   up new brokers, but a fairly similar structure

13   otherwise.

14       Q.   Just so I'm clear, why would a consumer --

10:20:25    15   let me withdraw the question.   So in the retail area,

16   you actually have what might be considered storefront

17   where, you know, people know it is a First Horizon

18   building and if you want a mortgage, you can go.

19   That's a retail division, correct?

20       A.   Well, in our retail -- we do have retail

21   offices that would accept, you know, walk-up customer

22   business.

23       Q.   Okay.

24       A.   Which would not be the case in wholesale, if

25   that's what you mean.

Charles Covington    -    February 11, 2005

10:20:52  1       Q.  Right.  Now, wholesale, I assume they must

2    deal with various independent mortgage brokers in the

3    particular region, correct?

4       A.  That's true.  Yes.

5       Q.  Okay.

6               MR. LEFEBVRE:  Tom, I'm having a hard

7    time hearing.  Hold on a second.  I'm just going to

8    make an adjustment.

9               MR. HEFFERON:  Okay.

10              MR. LEFEBVRE:  Okay.  Can you hear me

11   okay now?

12              MR. HEFFERON:  Yeah.

13              MR. LEFEBVRE:  You don't have a problem

14   on my end?

10:21:26  15              MR. HEFFERON:  No.

16              MR. LEFEBVRE:  I'm just having a little

17   bit of a problem.  I can hear you, Tom, very, very

18   well, but I'm having a hard time hearing

19   Mr. Covington.  I don't know if it is his location to

20   the speaker or not or maybe, Mr. Covington, if you

21   could just speak up a little bit for me, that might be

22   helpful and might expedite the process for me.

23              THE WITNESS:  Okay.

24              MR. HEFFERON:  Go ahead, Chris.

25       Q.  What state is First Horizon licensed to do

Charles Covington    -    February 11, 2005

10:21:53   1  business in the residential mortgage arena?

2              MR. HEFFERON:  Chris, let me just suggest

3  that because of the various rules about licensing, I

4  assume that you really just want to know where they

5  make loans.

6              MR. LEFEBVRE:  Absolutely.

7              MR. HEFFERON:  So why don't you just

8  answer that question, Steve.  Residential mortgage

9  loans.

10             MR. LEFEBVRE:  Absolutely.

11     Q.  That's what we are talking about for this

12  deposition, residential mortgage loans.  I want to

13  know where you pretty much do business.

14     A.  Well, we do business in most states.  We

10:22:18  15  don't have offices in every state, but in most states

16  in the U.S. we have offices.

17     Q.  Okay.  And how long has First Horizon

18  actually been doing residential mortgages?  How many

19  years now?

20     A.  Well, I mean, that's a complex question.

21  First Horizon is an aggregation of a lot of different

22  businesses that have been acquired over time and

23  really branded under the name First Horizon just

24  within the last few years.

25     Q.  When you say, few years, how many is it?

```
10:22:56   1        A.   I think the name change occurred in -- let me
           2    think for a second.  Well, 2000 I think is when we
           3    went to the overall First Horizon branding.  Prior to
           4    that these various companies were owned by First
           5    Horizon, but they operated under their previous names.
           6        Q.   Now, getting back to the retail and wholesale
           7    segments, I assume that the documentation involving a
           8    First Horizon residential mortgage is the same other
           9    than, obviously, the interest rate and the consumer
          10    and the property.  I'm talking about the form
          11    documentation is the same in both divisions?
          12                 MR. HEFFERON:  You mean currently?
          13                 MR. LEFEBVRE:  Yes.
          14                 MR. HEFFERON:  Objection, compound
10:23:55  15    question.
          16                 Go ahead.  You can answer it.
          17        A.   Well, I guess you mean -- what documents are
          18    you talking about?  I don't -- disclosures or forms or
          19    what do you mean?
          20        Q.   Well, I guess what I'm asking is if there is
          21    a residential mortgage closing that is generated from
          22    the retail division, there is a set of documentation
          23    that generally has to be signed by the homeowner when
          24    they want to take out a mortgage with First Horizon,
          25    correct?
```

17

10:24:30  1      A.   True, yes.

2      Q.   And assume that another scenario, a mortgage

3   that ultimately is going to be generated, still a

4   consumer residential with First Horizon that comes

5   from the wholesale division, I assume there is also a

6   set of documentation that the consumer has to sign at

7   the time of the closing, correct?

8      A.   Yes, some documents would be principally the

9   same.  For example, we would use a standard conforming

10  Fannie Mae note.  Other documents coming from

11  wholesale may be different because some of the

12  documents may have been generated by the wholesale

13  broker.

14     Q.   Oh, okay.  But in the retail division, is it

10:25:15 15 fair to say that all of the documentation is generated

16  by First Horizon or is that not a correct assumption?

17     A.   Well, that depends on what you mean.  We have

18  various origination systems that create documents and

19  there is flexibility given to our branches for what

20  system is selected, and there are some differences

21  among those systems.

22     Q.   And can you explain to me what some of those

23  differences might be in a general sense?

24     A.   Well, in a general sense we have our own

25  in-house origination system, which would generate a

18

10:25:52    1   doc set that would look one way whereas we have some

2   doc prep vendors that would prepare documents for us

3   which may appear differently.  In some states, I think

4   we have to have even attorneys prepare the documents

5   because of certain state laws and things like that.

6       Q.  Okay.  Now, I want to ask you a few questions

7   about the right to cancel form that we were talking

8   about earlier.  It is my understanding reviewing

9   responses of First Horizon that the right to cancel

10  form, which is the subject of this litigation was --

11  began to be used by First Horizon in April of '03; is

12  that correct?

13      A.  Yeah, the form was created in April of '03.

14  I think it was actually implemented in May of '03.

10:26:48   15       Q.  And if you just take a look at the document

16  that you should in have in front of you -- and I'm

17  referring to the document that Tom referenced, the

18  number 1047 that was provided to me.  Do you have that

19  in front of you?

20      A.  Yes, I do.

21      Q.  I noticed in the left-hand corner there is

22  some type of -- left-hand bottom corner.

23      A.  Yes.

24      Q.  There is some type of letter and numerical

25  combination which appears to me to be some type of

Charles Covington    -    February 11, 2005

19

| 10:27:17 | 1 | identifying feature, CV6D016. Do you see what I'm |

```
10:27:17    1   identifying feature, CV6D016.  Do you see what I'm
            2   referring to?
            3        A.   Yes.
            4        Q.   Okay.  Does that have any type of
            5   significance, that code or combination of letters in
            6   the 4/03 date thereafter?
            7        A.   I don't really know what that is.  That is
            8   probably a reference number for this doc residing on
            9   our TMO system.
           10        Q.   Now, you said that this document was created
           11   or -- in April of '03?
           12        A.   Created in April of '03, yes.
           13        Q.   Okay.  And did you personally or anyone under
           14   your supervision or control participate in the
10:28:01   15   creation of this document?
           16        A.   Yes.
           17        Q.   Okay.  And First Horizon started to use this
           18   document in May of '03, correct?
           19        A.   I believe so, yes.
           20        Q.   Okay.  Now, earlier we were talking about the
           21   retail division.  Is it fair for me to assume that
           22   this document, the number 1047, the right to cancel
           23   that we have been talking about, would have been
           24   utilized by all of the retail component of First
           25   Horizon after May of '03?
```

Charles Covington    -    February 11, 2005

20

| | | |
|---|---|---|
| 10:28:38 | 1 | MR. HEFFERON:  Objection, vague. |
| | 2 | You can answer if you understand it. |
| | 3 | A.  Well, let me think about that. |
| | 4 | Q.  Do you understand what I'm asking? |
| | 5 | A.  Maybe repeat the question. |
| | 6 | Q.  Okay.  We were talking about the retail |
| | 7 | division.  I just want to understand if there is |
| | 8 | uniformity of documents throughout the retail consumer |
| | 9 | residential mortgage division of First Horizon.  So my |
| | 10 | question is:  Is it fair to say that after May of '03 |
| | 11 | that this right to cancel, which you have in front of |
| | 12 | you, is the form that was utilized by all of the |
| | 13 | retail branches or outfits of First Horizon? |
| | 14 | MR. HEFFERON:  Objection, asked and |
| 10:29:28 | 15 | answered. |
| | 16 | Go ahead. |
| | 17 | A.  I would say that -- well, I think I would |
| | 18 | have to answer no because we have various doc prep |
| | 19 | vendors and other types of avenues in which closing |
| | 20 | documents are prepared.  So it wouldn't be -- I |
| | 21 | couldn't say that this is the form that has been used |
| | 22 | every single time, no. |
| | 23 | Q.  Oh, so some of the vendors that you were |
| | 24 | talking about a little bit earlier, they may have used |
| | 25 | a different version of the right to cancel? |

10:30:02    1        A.   Some potentially different version.

           2        Q.   Okay.  I assume that the various versions

           3   that may have been used of the right to cancel would

           4   have been approved by First Horizon?

           5        A.   Yes.

           6        Q.   Okay.  And I assume that First Horizon would

           7   have copies of the various right to cancel forms that

           8   may have been used by those entities or divisions

           9   within the retail division of First Horizon?

          10            MR. HEFFERON:  During this period, you

          11   mean?

          12            MR. LEFEBVRE:  Yes.  I'm talking about

          13   after May of '03.

          14        A.   I'm assuming so.  I mean, do we have a handy

10:30:42  15   record of how it may have changed over time, I'm not

          16   sure.  For sure, those disclosures would be in any

          17   given loan file, and we do have a record of that.  So

          18   from that standpoint, yes.

          19        Q.   Okay.  Now, do you know why -- well, strike

          20   that.

          21            I assume before April of '03 that First

          22   Horizon used a different notice of right to cancel

          23   form for residential consumer mortgages.  Is that a

          24   fair statement?

          25        A.   That's true.

February 11, 2005

22

February 11, 2005

10:31:16   1        Q.   Okay.   Can you -- are you familiar with the

          2    form that was used prior to April of '03?

          3             MR. HEFFERON:   You mean the predecessor

          4    to the form 1047?

          5             MR. LEFEBVRE:   Absolutely, yes.

          6        A.   Yes, I am.

          7        Q.   Okay.   Can you tell me about that form in a

          8    general sense, how it may be different from 1047?

          9        A.   The previous form had a selection check box

         10    type of presentation where depending on the rescission

         11    right, there was a requirement for an affirmative

         12    checking of a box.

         13        Q.   So just so I'm clear, looking at paragraph

         14    number 1 of document 1047, would it be fair to say

10:32:06  15    that there would be some type of marking either to

         16    reflect that either the first two paragraphs apply of

         17    paragraph one or the second paragraph applied

         18    depending on the nature of the refinancing?

         19        A.   I don't have that document in front of me.

         20    Are we going to look at that document?

         21             MR. LEFEBVRE:   It was not produced.   We

         22    never had it.   We had asked for some form documents,

         23    Tom.

         24        Q.   Otherwise, if I had the document, I would

         25    gladly have referred you to it, sir.

10:32:46  1              MR. HEFFERON:  Why don't you actually ask

2  him his recollection of how -- the format of the check

3  boxes --

4              MR. LEFEBVRE:  Sure.

5              MR. HEFFERON:  -- as to that difference.

6              MR. LEFEBVRE:  Sure.

7    Q.  You can answer Tom's question and pretend

8  it's mine.

9    A.  Okay.  Yeah, I mean, the way that form was

10  designed, is was a check box -- there was a check box

11  that would be checked depending on the rescission

12  rights that the customer had.  So it was -- if you

13  have these rights, you would check this box.  If you

14  have those rights, you would check that box to denote

10:33:17  15  the rights that were available to the customer.

16    Q.  Okay.  Now, do you know why there was -- why

17  the form changed?

18    A.  Yes.

19    Q.  Okay.  Can you tell me why?

20    A.  We became aware -- actually, it was brought

21  to my attention from our legal department that there

22  was some concern about the form and the checking of

23  the boxes.  And in looking at the form -- and whether

24  the boxes are being checked.  And from an operational

25  perspective, after looking at the form, we felt like

10:33:56   1    would it not be better operationally if we had a form

2    which removed the boxes, which in our viewpoint was

3    just removing one less opportunity for a branch to

4    make a mistake.  They could check a wrong box.  They

5    could not check a box at all.  We are always trying to

6    simplify the process so we get it right.  So our

7    thought was, if we eliminate the boxes, maybe we would

8    eliminate an opportunity to make a mistake.

9         Q.  Okay.  And from your recollection, the prior

10    form, the content of the prior form was the same in

11    relation to paragraph 1?  That is, looking at 1047,

12    paragraph -- well, what is identified as number one on

13    the document says, your right to cancel, and

14    underneath that there are four separate paragraphs.

10:34:48  15    Do you see what I'm talking about?

16         A.  Yes.

17         Q.  Okay.  The prior form, prior to April of '03,

18    still had four paragraphs in this area identified as

19    your right to cancel; is that correct?

20              MR. HEFFERON:  If you recall.

21         A.  I believe so.  I don't have that form in

22    front of me.  But if you say so, I will concede that,

23    I guess.

24         Q.  Well, and I'm not trying to trick you.  I

25    recall seeing it in a few other cases that I had

```
10:35:18   1   brought against First Horizon.  And my recollection
           2   was that it was the same paragraph just with a box.
           3   Either the first two paragraphs apply to the
           4   transaction or the last two paragraphs.
           5        A.  Okay.
           6        Q.  Is that your recollection?
           7        A.  Yes.
           8        Q.  Okay.  So who made the final decision to
           9   change the form?  Was that your decision or did
          10   someone with you make that decision?
          11        A.  The final decision -- the ultimate decision
          12   was made by our, at that time, head of production
          13   operations.
          14        Q.  And what was his or her name?
10:35:55  15        A.  Annalee Myers.
          16        Q.  Did you say Annmarie?
          17        A.  Annalee.
          18        Q.  Annalee.  And her position is what -- or was
          19   what when this form was changed?
          20        A.  At the time, she was executive vice president
          21   over origination risk management.
          22        Q.  And is she still employed with the company
          23   now?
          24        A.  Yes.
          25        Q.  And what is her capacity now?
```

10:36:16   1      A.   She is now in branch -- I guess it would be

2    considered kind of branch support.  She has dropped

3    off the risk management role and really just branch

4    support now.

5      Q.   Okay.  Now, you were talking about the prior

6    form.  Would you agree with me that but for the area

7    to check off in the first paragraph or this first

8    portion of the right to cancel, was the prior form

9    similar to 1047 that you have in front of you?

10              MR. HEFFERON:  Objection, vague.

11              Chris, he doesn't have the form in front

12   of him, and I think it is unfair to ask him how they

13   compared them.  Besides, you have the form because you

14   have written letters to my client in the past and sued

10:37:07  15   my client about the form.  So it seems --

16              MR. LEFEBVRE:  Well, I know that, Tom,

17   and I'm not trying to be difficult, but we had asked

18   for sample forms in discovery, and they were objected

19   to.  And I'm just, you know, trying to probe this

20   individual's recollection.  If it becomes an issue, we

21   can deal with it then.

22              MR. HEFFERON:  Yeah.  You know, I think

23   at this point if he doesn't have the form in front of

24   him and all he is giving you is his personal -- not

25   the company's testimony, his personal recollection, it

```
10:37:36   1   is just -- I mean, one can take out the form and take

           2   out this form and just compare them, but go ahead.

           3                    MR. LEFEBVRE:  Well, Tom, just to follow

           4   up, so if, in fact, there -- you mentioned that I had

           5   brought some other lawsuits.  Would it be fair for me

           6   to assume that the forms that were attached to the

           7   other two complaints that I have filed, I believe in

           8   the Rhode Island Federal District Court, would have

           9   been indicative of the form that was used in

          10   residential consumer mortgage closings prior to April

          11   of '03?

          12                    MR. HEFFERON:  I think the answer to that

          13   is that those forms -- are you referring to the Morin

          14   case and Tabares case?

10:38:19  15                    MR. LEFEBVRE:  Exactly, yes.

          16                    MR. HEFFERON:  I'll have to write you a

          17   letter after this deposition, but I believe the answer

          18   is, yes, that that form is indicative of the

          19   predecessor to form recognizing the witness' prior

          20   testimony already that there may well be and were, in

          21   fact, other forms out there, but in terms of --

          22                    MR. LEFEBVRE:  Right.  That's fair.  Now,

          23   do you have access -- is there a printer or a scanner

          24   there if I actually -- I mean, I have the Tabares file

          25   literally right at the corner of my desk.  I could fax
```

Charles Covington    -    February 11, 2005

29

| 10:38:47 | 1 | a copy of that and maybe that may assist Mr. Covington |
| | 2 | in answering my questions.  Is that a problem if I |
| | 3 | were to do that? |
| | 4 | MR. HEFFERON:  No, you can do that. |
| | 5 | MR. LEFEBVRE:  Can you tell me where I'm |
| | 6 | going to send it to?  Do you want me to scan it, |
| | 7 | e-mail it?  I don't know what facilities you have |
| | 8 | right available to you. |
| | 9 | MR. HEFFERON:  Hold on a second.  Fax it. |
| | 10 | (Recess 10:38 to 10:42.) |
| | 11 | MR. LEFEBVRE:  Madam Court Reporter, |
| | 12 | could you please read the last question back before |
| | 13 | the discussion about the fax? |
| | 14 | (Record read.) |
| 10:41:39 | 15 | MR. LEFEBVRE:  Okay.  Thank you. |
| | 16 | Q.  Mr. Covington, the form -- the right to |
| | 17 | cancel form used prior to April of '03, had New |
| | 18 | Century ever received any complaints from either |
| | 19 | mortgage brokers or consumers about the content of the |
| | 20 | right to cancel form used at that time? |
| | 21 | MR. HEFFERON:  You mean First Horizon? |
| | 22 | Q.  First Horizon.  I'm sorry. |
| | 23 | A.  Okay.  Have we ever received any complaints |
| | 24 | about that form prior to the issue being brought to my |
| | 25 | attention that we talked about earlier? |

Charles Covington    -    February 11, 2005

29

| | | |
|---|---|---|
| 10:42:07 | 1 | Q. No, I guess what I'm -- let Me withdraw the |
| | 2 | question. You told me that in April the form was |
| | 3 | changed. I guess during the time frame when the other |
| | 4 | form was in existence, had you received any complaints |
| | 5 | from either brokers or consumers about the content of |
| | 6 | the right to cancel form that was used? |
| | 7 | A. Not that I'm aware of. |
| | 8 | Q. Not that you are aware of? |
| | 9 | A. No. |
| | 10 | Q. And you said that you had received some |
| | 11 | correspondence from your legal department about the |
| | 12 | form, correct? |
| | 13 | MR. HEFFERON: Objection. I don't think |
| | 14 | that's what he said. |
| 10:42:43 | 15 | Q. All right. Can you tell me how the legal |
| | 16 | department got involved with the new form 1047, if at |
| | 17 | all? |
| | 18 | MR. HEFFERON: You mean in terms of |
| | 19 | initiation of the change? |
| | 20 | MR. LEFEBVRE: Exactly. |
| | 21 | A. Yes. I think what I said is it was brought |
| | 22 | to my attention by the legal department that we had an |
| | 23 | issue with the form. And, apparently, it was -- I |
| | 24 | believe it was -- I have learned today that it was you |
| | 25 | that had complained about the design of the form |

10:43:14  1   and --

2              MR. HEFFERON:  And don't talk about what

3   your lawyer told you about the form.

4              THE WITNESS:  Right.

5       A.  And then stemming from that, then, as I said

6   earlier, we thought we would re-evaluate the form and

7   if the check boxes were problematic, could we design a

8   form that would be easier and better for our branches

9   to execute and fulfill the rescission requirements,

10   and that was how we came to design this form.

11       Q.  Okay.  Now, who at First Horizon actually

12   reviewed the 1047 right to cancel form before it was

13   decided to implement it in its residential mortgage

14   foreclosing packet?

10:44:11  15             MR. HEFFERON:  Objection.

16              You mean reviewed after it was drafted

17   and before it was implemented?

18              MR. LEFEBVRE:  Right.

19              MR. HEFFERON:  Go ahead, if you know.

20       A.  That would have been Annalee Myers.  If you

21   want to separate the drafters and designers from the

22   approvers and reviewers.

23       Q.  And that's what I'm getting at.  I'm really

24   asking for who the approvers of this form are.

25       A.  The ultimate approvers of the form would have

10:44:36    1    been Annalee Myers.  She was head of -- this is a

2    branch operations issue, and she was head of branch

3    operations at that time.

4    Q.  Now, was the form -- and I'm talking about

5    1047.  Was the form reviewed by any state or federal

6    regulatory agency prior to its implementation, if you

7    know?

8    A.  In other words, are you asking did we submit

9    it to them for their review?

10    Q.  Yes.

11    A.  We did not submit it to any of those type of

12    individuals for review.

13    Q.  Did the board of directors of First Horizon

14    have to review this form?

10:45:23    15    A.  No.

16    Q.  Were they aware that the form had changed?

17    When I say, they, I'm referring to the board of

18    directors.

19    A.  I don't know if they were aware of this issue

20    or not.

21    MR. LEFEBVRE:  Okay.  Now, Tom, I want to

22    just briefly talk about -- prior to this deposition we

23    discussed the stipulation and the discovery.  To make

24    it simple, I'm assuming that numerosity for purposes

25    of the class definition as outlined in the amended

Charles Covington                    February 11, 2005

32

10:45:57   1   complaint is not being contested by First Horizon at

           2   this time?

           3              MR. HEFFERON:   That's correct.

           4              MR. LEFEBVRE:   Okay.

           5       Q.  Now, Mr. Covington, do you know how many

           6   loans subsequent to April of '03 -- and I'm referring

           7   to nonpurchase money refinance transactions that were

           8   secured by a consumer's residence -- had this loan

           9   form executed at the time of closing?

          10       A.  I do not know specifically how many have this

          11   form.

          12       Q.  Okay.  You are aware that this lawsuit was

          13   filed in February of 2004?

          14       A.  I was not aware of that.  I guess I'm aware

10:46:47  15   of that now.

          16       Q.  Okay.  Would you agree that there were more

          17   than 100 nonpurchase money loans that were secured by

          18   residence -- principal residences that had a form 1047

          19   executed at the time of closing?

          20       A.  Yes, I would believe that would be true.

          21       Q.  Okay.  Same question, but instead of 100,

          22   250?

          23       A.  I would believe that to be true.

          24       Q.  And not to belabor it, but just one final

          25   number, 500.  Do you think there were 500 people,

Charles Covington    -    February 11, 2005

| | | |
|---|---|---|
| 10:47:24 | 1 | residential nonpurchase money loans secured by their |
| | 2 | principal residence that had form 1047 in their packet |
| | 3 | subsequent to '03? |
| | 4 | A.  Yes. |
| | 5 | Q.  Okay. |
| | 6 | MR. HEFFERON:  Chris, we have the other |
| | 7 | form now. |
| | 8 | MR. LEFEBVRE:  Oh, you do?  Oh, great. |
| | 9 | Q.  Now, Mr. Covington -- |
| | 10 | MR. LEFEBVRE:  Why don't we mark that, |
| | 11 | Tom? |
| | 12 | MR. HEFFERON:  Which one? |
| | 13 | MR. LEFEBVRE:  I guess that would be 2. |
| | 14 | MR. HEFFERON:  The Tabares one? |
| 10:48:03 | 15 | MR. LEFEBVRE:  Yeah.  You know what, Tom, |
| | 16 | it probably makes sense since we have been referring |
| | 17 | to it, why don't we also have the court reporter |
| | 18 | mark -- |
| | 19 | MR. HEFFERON:  1047? |
| | 20 | MR. LEFEBVRE:  Yeah. |
| | 21 | MR. HEFFERON:  Okay.  She'll mark that as |
| | 22 | 3. |
| | 23 | (Exhibit Nos. 2 and 3 marked.) |
| | 24 | MR. HEFFERON:  Okay.  Now, of course, |
| | 25 | Chris, what we have done here is we have marked as |

10:48:23    1    Exhibit 2 what you faxed in from the Tabares file, and

2    on the assumption that I'm operating under certainly

3    that although Tabares is an existing lawsuit, that you

4    are not trying to take discovery of Tabares through

5    this case, but you are just using this form because

6    you want to ask him things about Exhibit 3 and how it

7    is different and...

8                    MR. LEFEBVRE:  Absolutely that's a fair

9    statement.  That is not my intention.  I think

10    having -- you raised the issue I had used the form,

11    and I think it makes sense -- or I had seen the form,

12    rather, and it makes sense to have Mr. Covington have

13    both so we are not speculating how -- the April of '03

14    changes to the form versus what the form was before.

10:49:07    15        Q.  Mr. Covington, you have both forms in front

16    of you, correct?

17        A.  Yes.

18        Q.  Okay.  Looking at Exhibit 2, which I believe

19    is a notice of right to cancel in a transaction --

20    consumer transaction that is totally unrelated to this

21    case, does that form appear to be the -- indicative of

22    the right to cancel form that was utilized by First

23    Horizon prior to the changes that were implemented in

24    April or May of '03?

25        A.  Yes.

Charles Covington    -    February 11, 2005

35

```
10:49:43   1        Q.  Okay.  Now, you also have -- we have just

           2   marked Exhibit 3, which is the First Horizon form 1047

           3   which is the form that is part of this lawsuit, the --

           4   of this lawsuit.  Having looked at both forms, other

           5   than the little line contained in Exhibit 2, is there

           6   any difference between the content of paragraph one,

           7   which states, your right to cancel, the paragraphs

           8   below that?  Are they both the same in Exhibit 2 and

           9   Exhibit 3?

          10               MR. HEFFERON:  He is going to have to --

          11   he is going through it right now so...

          12               MR. LEFEBVRE:  All right.  Take a minute.

          13               THE WITNESS:  Does he want me to read it

          14   word for word and answer that?

10:50:38  15               MR. HEFFERON:  Yeah, if there is any

          16   differences.  And when you find any differences, you

          17   should probably then recite them at that point rather

          18   than trying to remember them.

          19        A.  I don't see any differences in that

          20   paragraph, the first paragraph.

          21               MR. HEFFERON:  The first paragraph of

          22   section 1.

          23        Q.  Okay.  So basically both forms, Exhibit 2 and

          24   3, have the four separate paragraphs underneath?

          25        A.  Yes.
```

10:51:12  1        Q.  And the Exhibit 2 just has a line to either

          2    apply the first two paragraphs or the second two

          3    paragraphs contained in the big paragraph number one?

          4                MR. HEFFERON:  No, Chris.  Because you

          5    are not here, you didn't see what he did.  He actually

          6    just testified there is no difference between the

          7    first of the four paragraphs.

          8                MR. LEFEBVRE:  Oh, I'm sorry.  Okay.

          9                MR. HEFFERON:  If you were here, you

         10    would have seen that.  If you want him to compare all

         11    of the four paragraphs --

         12                MR. LEFEBVRE:  Yeah, I would like him to

         13    compare all of the four paragraphs under the generic

         14    paragraph number 1 called your right to cancel.

10:51:51 15                MR. HEFFERON:  He is looking at the

         16    second one.

         17                MR. LEFEBVRE:  Okay.  Sorry.

         18                THE WITNESS:  Okay.  We want to talk

         19    about the second paragraph?

         20                MR. HEFFERON:  Sure.

         21        A.  I don't see any difference in the wording

         22    absent on Exhibit 3, there is not a place to mark or

         23    check that paragraph.

         24                MR. HEFFERON:  Okay.  Why don't you go on

         25    to the third paragraph.

10:52:30    1        A.   Well, we are going to have to parse through

          2    this.   This paragraph is going to have some

          3    differences.   The first sentence is different between

          4    the two.   The second sentence -- the second sentence

          5    seems to be the same.   The third sentence appears to

          6    be the same.   The fourth sentence is the same, and the

          7    last sentence of that paragraph, the fifth sentence,

          8    is the same.

          9        Q.   Okay.

         10             MR. HEFFERON:   Do you want him to look at

         11    the last?

         12             MR. LEFEBVRE:   Yeah, please.

         13             MR. HEFFERON:   Look at the fourth

         14    paragraph.

10:53:41   15        A.   Okay.   I believe the fourth paragraph is the

         16    same between the two notices.

         17        Q.   So other than you -- you mentioned there was

         18    a slight change in one of the sentences, the four

         19    paragraphs contained in the big paragraph number one,

         20    pretty close between the two forms, correct?

         21             MR. HEFFERON:   Objection to the

         22    characterization.   He testified that there was

         23    differences.   You added the slight and pretty close

         24    characterizations.

         25             MR. LEFEBVRE:   Okay.   All right.

| | | |
|---|---|---|
| 10:54:07 | 1 | MR. HEFFERON:  As well as the lines.  He |
| | 2 | pointed out the lines are not there. |
| | 3 | MR. LEFEBVRE:  Right.  Okay. |
| | 4 | Q.  Now, Mr. Covington, looking at Exhibit 2, the |
| | 5 | Tabares right to cancel, is it fair to say -- or I |
| | 6 | want to make sure I understand your testimony -- that |
| | 7 | it was brought to your attention that there was some |
| | 8 | problems about checking off the line, which line |
| | 9 | applies? |
| | 10 | A.  Yes. |
| | 11 | Q.  Okay.  Can you be more specific when you say |
| | 12 | problem?  What was the problem that you became aware |
| | 13 | of? |
| | 14 | A.  These boxes or lines not being checked. |
| 10:54:43 | 15 | Q.  Okay.  And are you familiar with what is |
| | 16 | known as the H-8 right to cancel model form under |
| | 17 | Truth in Lending? |
| | 18 | A.  Yes. |
| | 19 | Q.  And are you familiar with what is known as |
| | 20 | the H-9 form. |
| | 21 | A.  Yes. |
| | 22 | Q.  And what is your understanding of the H-9 |
| | 23 | form?  What type of transaction is the H-9 form |
| | 24 | utilized in? |
| | 25 | A.  If I can look at this.  The H -- the H-9 form |

10:55:20    1    is used when you are refinancing a loan already

2    secured by the creditor and there is an increase of

3    that credit amount.

4        Q.  Okay.  And how about the H-8 form?

5        A.  H-8 is where you have no existing lien on the

6    property and the refinancings occur, you use this

7    right of rescission form meaning that the customer has

8    the right to rescind the entire amount of the money

9    versus just the new amount under H-9.

10        Q.  Okay.  Now, looking at Exhibit 2, the Tabares

11    form, is it fair to say that when this form was

12    utilized by First Horizon at the time of the actual

13    closing, it was standard practice and procedure to

14    have the closing individual to check off one of the

10:56:16    15    two lines, either the line that begins if you cancel

16    the transaction, the second subparagraph of -- big

17    paragraph one or the third subparagraph which begins

18    if you cancel the new transaction?

19        A.  Well, I'm not exactly sure I know what you

20    mean by the closing individual.  That could be -- are

21    you talking about the closer in our branch who

22    prepares these documents or the title agent or the

23    closing attorney that executes them with the customer?

24        Q.  You told me there was a problem with these

25    boxes.

10:56:50  1              MR. HEFFERON:  Objection.  He testified

2    that you had claimed there was a problem with these

3    boxes.

4              MR. LEFEBVRE:  Okay.  That's a fair

5    question.

6       Q.  Well, were you aware that there were any

7    problems with these boxes but for me?

8       A.  No.

9       Q.  Okay.  So I was the only person who ever

10   lodged a complaint -- when I say, myself, myself on

11   behalf of my client -- that there was a problem with

12   boxes not being checked?

13      A.  To my knowledge, yes.

14      Q.  Oh, okay.  Other than this lawsuit that is

10:57:32  15   pending in Massachusetts, has anyone filed any type of

16   complaint relative to the content of Exhibit 3?

17              MR. HEFFERON:  Define what you mean by

18   filed a complaint.

19      Q.  Well, has it been brought to the attention of

20   New Century that there were any type of problems with

21   the right to cancel the contents of the right to

22   cancel form, which is referenced in Exhibit 3, the

23   form they are using now?

24              MR. HEFFERON:  You referred to New

25   Century again.

Charles Covington    -    February 11, 2005

41

10:58:04    1            MR. LEFEBVRE:  I'm sorry.  You know who I

2   have got on my mind, right?

3            MR. HEFFERON:  Apparently.  Maybe you

4   should spend your time suing them and not First

5   Horizon.

6            MR. LEFEBVRE:  I'll comment after the

7   testimony about that.

8     Q.  I meant First Horizon.  I'm sorry.

9            MR. HEFFERON:  So the question is:  Other

10   than this lawsuit, is Mr. Covington aware of other

11   complaints being made concerning Exhibit 3?

12     A.  I am not aware of any other complaints

13   concerning Exhibit 3.

14     Q.  Okay.  Now, where are the -- after a loan is

10:58:36   15   closed -- and, once again, I'm staying focused on

16   residential consumer either purchase loans or

17   refinancing -- where are the loan files actually kept?

18            MR. HEFFERON:  Objection, compound.

19            I think it might be helpful to the

20   witness if you say when in time, Chris.  Where did

21   they eventually go or where are they kept in the

22   process.

23            MR. LEFEBVRE:  I want to focus -- I mean,

24   obviously, in this lawsuit, there has been an issue

25   about document retrieval.

Charles Covington    -    February 11, 2005

42

10:59:08   1        Q.   And I want to know where do they ultimately

          2    go, Mr. Covington.

          3            MR. HEFFERON:   Go ahead.

          4        A.   Ultimately, they -- we maintain all of our

          5    loan records on an imaging system.  So there -- our

          6    permanent record is maintained on imaging, so they are

          7    on electronic media.

          8        Q.   Okay.  And can you tell me what -- let's back

          9    up a minute.  So is there any paper, actual hard paper

         10    file, kept anywhere?

         11        A.   There may be some kept for a period of time.

         12    The branches sometimes keep a backup copy.  There may

         13    be a paper copy in our post-closing area here or

         14    there, but officially our record retention is through

10:59:58  15    this electronic media storage mechanism.

         16        Q.   Okay.  Tell me a little bit about the

         17    electronic storage.  What actually is electronically

         18    stored, the entire closing file or certain portions of

         19    the closing file?

         20        A.   The entire loan file.

         21        Q.   Okay.  And what documents would -- in a

         22    general sense would be included in the entire closing

         23    file?

         24        A.   All documents related to the loan.

         25        Q.   So would it be fair to say that the note,

Charles Covington    —    February 11, 2005

43

| | | |
|---|---|---|
| 11:00:28 | 1 | mortgage, HUD 1 statement, right to cancel form, would |
| | 2 | be included in the file that is ultimately imaged? |
| | 3 | A.  Yes. |
| | 4 | Q.  Now, is there some type of computer system |
| | 5 | that allows access to retrieve the files? |
| | 6 | A.  Yes. |
| | 7 | Q.  Can you tell me what that -- tell me about |
| | 8 | that computer system.  Does it have a particular name? |
| | 9 | A.  We call it Workflow.  It is a web-based |
| | 10 | browser. |
| | 11 | Q.  And does that computer system allow you to |
| | 12 | retrieve individual documents that can be identified? |
| | 13 | For example, let me give you a hypothetical.  If you |
| | 14 | wanted a right to cancel form -- to look at a right to |
| 11:01:21 | 15 | cancel form in a loan -- three-year-old loan that was |
| | 16 | originated and closed in the state of Nebraska, could |
| | 17 | you punch a code in and have that document be |
| | 18 | retrieved, or would you have to pull up the whole |
| | 19 | closing file? |
| | 20 | A.  You have to access the entire file. |
| | 21 | Q.  Okay.  So someone would have to -- and I just |
| | 22 | want to understand.  It is not a trick question. |
| | 23 | Someone would actually have to pull up the whole file |
| | 24 | on a screen and manually move the mouse or whatever to |
| | 25 | the particular document you were looking for? |

Charles Covington    -    February 11, 2005

44

11:01:57   1      A.  That's correct.

           2      Q.  Okay.  And where is the imaging actually

           3   done?  Is it done in a central location or done by the

           4   individual branches or --

           5      A.  You mean now or historically because that

           6   procedure has changed over time.

           7      Q.  All right.  Let's talk about what the

           8   procedure was two years ago.

           9      A.  I don't know for sure.  Back in that time, it

         10   was a mix of some branches did their scanning at the

         11   branch; others sent their documents in to our

         12   post-closing area here in Dallas.  So it was a

         13   mishmash of some branches were on -- we call that

         14   distributive capture.  I mean, they have scanning

11:02:41  15   material -- scanning machines in their branches.  They

         16   do the scanning themselves.  Others didn't.  So it is

         17   just a mishmash.  We have now gone to primarily a

         18   totally a decentralized scanning process where now all

         19   of the branches scan their own documents by and large.

         20   It is not exactly perfect because every once in a

         21   while a file may get missed.  They can still send it

         22   into our back office for scanning and trailing

         23   documents are scanned here.  So, I mean, that's not

         24   exact, but that's principally how it works.

         25      Q.  And when did that change?  When was that

Charles Covington   -   February 11, 2005

11:03:13  1  change?

2      A.  We probably completed the rollout of

3  distributing capture concept, I would say -- I would

4  say in '03.  I don't know the dates exactly.  It was a

5  phased rollout over time.  We do a few branches a

6  month kind of thing, but I would say throughout '03,

7  if I recall.

8      Q.  Okay.  But regardless of -- right now the

9  goal is that every file is ultimately scanned,

10  correct?

11      A.  Yes, every -- the question is, do we scan

12  every file?  Yes, we do.

13      Q.  Okay.  Now, I want to --

14          MR. LEFEBVRE:  Tom, do you have that

11:04:01  15  packet of the -- I'm sorry.  I'm having a mental

16  block.  The documents you produced about quality

17  control that we talked about prior to the deposition?

18          MR. HEFFERON:  Yes, we do.

19          MR. LEFEBVRE:  Okay.

20          MR. HEFFERON:  Can we take -- Chris,

21  before we move on, can we take a break?

22          MR. LEFEBVRE:  Okay.  Sure.

23          (Recess 11:04 to 11:23.)

24          MR. HEFFERON:  Mr. Covington does have

25  the documents numbered First Horizon 936 through First

11:23:13    1    Horizon 1043.

2        Q.  Okay.  Great.  Just during the break I went

3    back just so I can wrap up a few loose ends.  I'm

4    going to hold off for a minute.  I want to go back to

5    some of the areas of inquiry.

6            Mr. Covington, just so I'm clear, does

7    First Horizon have all of the nonpurchased money

8    mortgage files available on its imaging system for the

9    period February 1st, 2000 through February 1st, 2004?

10        A.  Yes, we should.  I mean, could I say that

11    every single loan we have originated is on the imaging

12    system during that period of time, I couldn't say

13    that, but they certainly should be and our expectation

14    is that they are.

11:24:07    15        Q.  Okay.  Now, earlier you had -- I had asked

16    you some questions about what we have called

17    numerosity, you know, the number of potential members

18    of this potential class action.  And I had asked

19    you -- I had used the number 500, if there were 500 --

20    at least 500 people who received the form referenced

21    in Exhibit 3, and I believe you said yes; is that

22    correct?

23        A.  Yes, that's true.

24        Q.  All right.  Now, if I wanted to know how many

25    people actually received the Exhibit 3, the form

11:24:51    1  referenced in this lawsuit, which is the subject of

2  this lawsuit during the four-year period prior to the

3  filing of the lawsuit, what would I have to do to

4  retrieve that information?

5      A.  If you wanted to know specifically who

6  received this notice?

7      Q.  If I want to know how many -- first, let's be

8  real simple so there is no trick.  If I want to know

9  how many First Horizon customers who had a nonpurchase

10  money mortgage during that four-year period, went to a

11  closing, wherever the closing was, and received this

12  form, the form that we have been talking about at

13  length this morning, Exhibit 3, what would I have to

14  do to get that information?

11:25:37    15              MR. HEFFERON:  And the period for this

16  deposition that the discovery is directed towards is

17  the 1st of February 2000 through the 1st of February

18  2004?

19              MR. LEFEBVRE:  Yeah, I believe in our

20  complaint -- the complaint was filed in February, and

21  I believe all of the discovery was during that time

22  frame going back four years, obviously, because the

23  Massachusetts nuance and three years for everyone

24  else.

25              MR. HEFFERON:  Okay.  So I just want to

Charles Covington    -    February 11, 2005

48

```
11:26:04   1  make sure I'm clear.  The class period you are

           2  conducting discovery about goes from February 1, 2000,

           3  to February 1, 2004?

           4               MR. LEFEBVRE:  Well, Massachusetts only

           5  goes to 2004.  Everyone else goes to 2003.  I stand

           6  corrected.  I'm looking at the amended complaint, Tom.

           7               MR. HEFFERON:  Okay.

           8               MR. LEFEBVRE:  I'm looking at the class

           9  definition, and what we did is -- bear with me one

          10  second because there is no sense wasting time on

          11  irrelevant issues.

          12               MR. HEFFERON:  Yeah, I'm trying to make

          13  sure that the witness when giving his testimony about

          14  this case talks about the period of time you want to

11:26:47  15  conduct discovery about.

          16               MR. LEFEBVRE:  Okay.  In our class

          17  definition, our class definition is defined --

          18     Q.   And this is the period I'm asking the

          19  question, Mr. Covington, about, getting access to the

          20  right to cancel form, for all natural persons

          21  involving nonpurchase money loans secured by their

          22  residence on or after three years prior to the filing,

          23  so the filing was February of 2004, and for four years

          24  prior to the filing for just Massachusetts residents.

          25  So three years for every other state but
```

Charles Covington    -    February 11, 2005

49

11:27:26   1   Massachusetts.  So February 1, 2001 to February 1st of

2   2004 for every state but Massachusetts.

3            MR. HEFFERON:  Okay.  And so your

4   question, Mr. Covington, is if -- if he was to assign

5   some of the tasks of figuring out how many people

6   there were who got this form between February 1 of '01

7   to February 1 of '04 in all 49 states except

8   Massachusetts plus Massachusetts for February '00 to

9   February of '04, how would he do that?

10           MR. LEFEBVRE:  Brilliant question.

11           MR. HEFFERON:  Okay.  Go ahead.

12      A.  Well, if you wanted to know for sure, we

13   would need to review all of those files.

14      Q.  And how would you actually go about doing

11:28:19  15   that?

16      A.  We would have to pull up each individual loan

17   file and review the notice of right to cancel that was

18   provided.

19      Q.  Okay.  So just so I'm clear, there is no

20   computer software as part of this imaging system that

21   could help you somehow correlate and group various

22   documents in the particular loan files during the

23   period that we just placed before you?

24      A.  No, there is not.  Just so you'll understand,

25   the documents appear like PDF files.  They are

Charles Covington    -    February 11, 2005

```
11:28:53   1   basically photographs of the document, so they are not

           2   electronic in themselves.  They are images.  They are

           3   photographs.  It is an imaging system.  They appear

           4   like what a PDF file would appear to you to look like.

           5       Q.  Okay.  That helps.  Thank you.  Just a few

           6   more follow-up questions before we get on to the other

           7   packet of documents.

           8                 Exhibit 2, what I'm going to call the

           9   Tabares form and the form that was utilized prior to

          10   April of '03, how long has that form been in

          11   existence, if you know?

          12       A.  I don't know exactly how long this form has

          13   been in existence.

          14       Q.  More than a year?

11:29:36  15       A.  Well, I see that it has got a date of 7-01,

          16   so I would assume it is at least from that time

          17   period.

          18       Q.  Okay.  Now, just so I'm clear, I was looking

          19   through my notes.  When you told me originally -- you

          20   talked about the different -- what I'm going to

          21   characterize as lending division, retail, wholesale,

          22   and I believe you mentioned correspondent lending?

          23       A.  Yes.

          24       Q.  And I don't know what that is.  Could you

          25   tell me what correspondent lending is?
```

Charles Covington    -    February 11, 2005

51

11:30:09    1          A.   Correspondent loans are loans that are

         2    originated and closed and funded by a third party, and

         3    then we buy the loan, the entire whole loan in what we

         4    call a closed loan purchase.   So they are purchase

         5    transactions.   They are not originations meaning we

         6    are not doing the underwriting on the loan.   We are

         7    just buying the loan, the originated loan.

         8          Q.   Oh, okay.

         9          A.   So they are funded and closed on the

        10    documents of that corresponding lender.

        11          Q.   Okay.   So First Horizon wouldn't have

        12    anything to do with the preparation of the documents

        13    that were utilized in any of the correspondent loans;

        14    is that correct?

11:30:48   15          A.   I wouldn't say that entirely because we have

        16    our documents on doc prep vendors, and I believe some

        17    of the correspondence to make it easy for them, if

        18    they want to go out and obtain our closing documents,

        19    they can do that.   So there is that option or

        20    capability to them, I believe.

        21          Q.   Okay.   Fine.   And then just one final point.

        22    When you were talking about the retail and the

        23    wholesale lending division, I had asked you about, you

        24    know, Exhibit 3, the form, the right to cancel form,

        25    and you mentioned that there could be some variations

11:31:27  1  based on the loan originators in those two divisions.

2  Did I understand your testimony correct?

3     A.  I think that what I was saying is that

4  rather -- if a document was on our front-end system,

5  which we call TMO -- versus one of these doc prep

6  vendors, therein could be some differences in the

7  document.

8     Q.  And what does TMO stand for?

9     A.  It actually stands for The Mortgage

10  Originator.

11     Q.  Okay.  I couldn't hear the first one.  It

12  didn't come over the telephone.

13     A.  The.  The.  The Mortgage Originator.

14     Q.  Okay.  So The Mortgage Originator was a

11:32:13  15  program utilized by First Horizon to generate what I'm

16  going to call in a generic sense closing documents?

17     A.  Yes.

18     Q.  Okay.  And The Mortgage Originator would

19  have -- if it were used, would have generated Exhibit

20  3, the form 1047?

21     A.  Yes.

22     Q.  Okay.  Now, if you didn't use TMO, you could

23  use some other type of software?  Is that what you are

24  telling me?

25     A.  Yes.

11:32:44    1        Q.  And do you know what the other types of

2    software were during the time frame that we are

3    talking about, either three years prior to the lawsuit

4    or four years in Massachusetts?

5        A.  There were -- that's a multiple question, a

6    complex questions.  There were various front-end

7    systems we used during that time, and we also used

8    Guardian, which is a doc prep vendor also.  So it

9    could be a mix of any of those things.

10        Q.  Okay.  Now, focusing just on the right to

11    cancel form -- either Exhibit 3 or we called it

12    1047 -- would either -- using the front end or the

13    Guardian -- what I'm going to call software -- made

14    any substantive changes to the right to cancel form?

11:33:30    15                    MR. HEFFERON:  Objection.

16                    You mean using -- are you asking him

17    whether or not those other front-end systems and/or

18    Guardian used Exhibit 3?

19                    MR. LEFEBVRE:  Yes.

20                    MR. HEFFERON:  Okay.

21                    MR. LEFEBVRE:  Thank you.

22        A.  Our system, TMO, used Exhibit 3, and I'm not

23    exactly sure because I haven't really looked at it

24    this closely under this exercise to see if Guardian's

25    notice was the exact same, but it could be somewhat

Charles Covington    -    February 11, 2005

54

11:34:04   1   different.  There could be some variations to it.

           2       Q.  Okay.  Could Guardian have used a notice of

           3   right to cancel that was similar to Exhibit 2?

           4       A.  Well, I guess what I'm saying is, is Guardian

           5   would have programmed into their system these

           6   documents in principal.  There could be some minor

           7   format changes, but we submit the documents to them

           8   for use -- for use for our purposes.

           9       Q.  Okay.  And, finally, the variations that

          10   could have been in existence or were in existence

          11   during the time frame of this litigation, I assume

          12   that you do have some file or folder or some computer,

          13   document that could produce the different right to

          14   cancel forms that were used or generated during the

11:34:55  15   time frame of this lawsuit?

          16       A.  I do not have such a file.

          17       Q.  Okay.  Now, and I'm not talking about you

          18   personally.  I'm asking the same question, but more

          19   direct to First Horizon.  Is there someone at First

          20   Horizon that does?

          21       A.  I don't know.  Sherri Rye, our office person,

          22   docs person, may have such a file, but I'm not sure.

          23       Q.  And her name is Sherri?

          24       A.  Rye.

          25       Q.  And what is her capacity at First Horizon?

Charles Covington    -    February 11, 2005

55

11:35:25    1        A.   At the time, she was over policies and

2    procedures.

3        Q.   Okay.   When you say at the time, are you

4    talking about either the three-year window prior to

5    the lawsuit or four-year window?

6        A.   Yes.

7        Q.   Okay.   Where is Sherri now?

8        A.   She still works for the company.

9        Q.   I assume in a different capacity?

10        A.   Somewhat different capacity.   Now she manages

11    our documents.

12        Q.   Okay.   Fine.   Now, I assume -- is it fair to

13    say that you are the person that is most familiar with

14    the regulatory compliance in relation to TIL for

11:36:16    15    nonpurchase money loans during the time frame of this

16    lawsuit?

17             MR. HEFFERON:   Objection, speculation

18    about what other people know.

19        Q.   Okay.   Are you -- let me say, are you one of

20    the persons that is knowledgeable about the compliance

21    procedures of First Horizon during this time period?

22        A.   Yes.

23        Q.   Okay.   Are you familiar with the documents

24    that have been produced to me which your attorney

25    referenced, I believe, documents 936 through 1000,

Charles Covington    -    February 11, 2005

56

```
11:36:53   1   whatever the ending number is?

           2       A.  Yes, I have got them here.

           3       Q.  Okay.  I assume you have seen these documents

           4   before?

           5       A.  Yes.

           6       Q.  Okay.  Now, I notice -- let me ask you this:

           7   There are a lot of areas in the document that have

           8   been redacted.

           9       A.  Yes.

          10       Q.  Okay.  And is it fair to say that the

          11   redacted areas deal with compliance outside of the

          12   Truth in Lending area?

          13       A.  They deal with compliance outside of the

          14   right of rescission rights of the Truth in Lending.

11:37:36  15       Q.  So basically what has been produced to me are

          16   the documents that deal with Truth in Lending

          17   compliance, correct?

          18       A.  Well, what you have been provided deal with

          19   right of rescission under Truth in Lending.

          20       Q.  Okay.  That's a fair correction.  I notice on

          21   number 941 and 943 -- 941 is earmarked as retail

          22   closing disclosure and 943 is wholesale disclosures.

          23       A.  Uh-huh.

          24       Q.  Does this deal with regulatory compliance?

          25   What is the nature of these documents?  What do they
```

Charles Covington    -    February 11, 2005

57

11:38:22  1  deal with?

2    A.   These deal with regulatory compliance.

3    Q.   Is there different regulatory compliance

4  issues for retail versus wholesale closings?

5    A.   There are different procedures, yes.

6    Q.   Can you tell me what the different procedures

7  are in a general sense?

8    A.   The different procedures are:  In a wholesale

9  transaction, we don't actually interact with the

10  customer.  The wholesale broker does.  So there are

11  some disclosures that are delivered by the broker,

12  which a less disclosure requirement on it; whereas, in

13  retail, we are dealing with the customer from the very

14  beginning, and we have all disclosure requirements.

11:39:13  15    Q.   Okay.  Now, I'm looking at document 949.

16    A.   949.  Okay.  949.  All right.  Got that.

17    Q.   I want to make sure that I understand Section

18  I of document First Horizon 000949, review cycle.

19    A.   Yeah.

20    Q.   Am I correct in assuming that the quality

21  control of these files, the nonpurchase money loans,

22  are done usually within 60 days after, let's say, the

23  loan is complete?

24    A.   They are completed within -- we do the QC

25  work on a monthly cycle basis.  So the reviews and

11:40:06  1  everything and the reporting of it is complete within

2  60 days of month end of the closing month in which we

3  are quality control reviewing.

4      Q.  Okay.  Can you walk me through the -- in

5  relation to the TIL rescission, the quality control

6  steps First Horizon goes though to ensure that there

7  is compliance with the right to cancel issue in the

8  loan?

9          MR. HEFFERON:  Chris, let me just jump

10  in.  I don't know if there is any difference, but

11  since this deposition is about the period '00 to '04,

12  February 1, '00 to February 1 of '04, I don't know

13  if -- your question was really a current question, but

14  I'm assuming that you really wanted to find out what

11:40:53  15  was done at that prior time.

16          MR. LEFEBVRE:  That's a good point.  I

17  didn't clarify.  That's the time frame and that may

18  lead to a follow-up question.

19          MR. HEFFERON:  That's fine.  I just want

20  to make sure the witness understands that his

21  testimony should be about what you did from February

22  '00 to February of '04.

23          MR. LEFEBVRE:  That's the hard part, not

24  seeing the facial expression when I ask a question

25  that is horrible and the witness doesn't know.  What

Charles Covington    -    February 11, 2005

59

11:41:20  1  I'm talking about, when you are sitting there, you can

2  kind of tell it is time to try again.

3          MR. HEFFERON:  Yeah, and it is hard for

4  the witness to remember sometimes that the discovery

5  in the case is limited to the four-year window up

6  until the filing of the complaint.  So I want to make

7  sure his testimony is relevant.  So go ahead.

8      Q.  After you have heard the lawyer speak, Mr.

9  Covington, do you understand what I have asked you?

10     A.  I think you were asking me, if I recall, what

11 was our QC procedures around right of rescission

12 notices.

13     Q.  Right.  During the time frame of this

14 lawsuit, which was three years prior to February of

11:41:54 15 '04 or possibly four years for Massachusetts?

16     A.  Okay.  Yes, the materials you have been

17 provided show what those procedures were, but in

18 brief, what we would do is we would review a sample of

19 files to see if the rescission notice was there.  We

20 would check to make sure that the rescission period,

21 the three-day rescission period, was observed based

22 upon the funding of a loan.  We would review the

23 notice to see if it was complete primarily focusing on

24 signatures and dates, make sure the dates were there,

25 the dates were correct and was executed by the

Charles Covington    -    February 11, 2005

11:42:30  1    borrowers.  I mean, that was the principal steps.

2         Q.  Now, I assume that during the period prior to

3    April 3rd when -- what I'm calling Exhibit 2, the

4    Tabares right to cancel form was in use, that you were

5    checking to make sure that one of the lines was

6    checked off in the two paragraphs that have lines?

7                   MR. HEFFERON:  Objection.  I don't know

8    how that is relevant to this case, Chris.

9                   MR. LEFEBVRE:  Well, I'm just asking.

10                   MR. HEFFERON:  Well, I know, but, again,

11   we talked about the fact that...

12                   MR. LEFEBVRE:  Fine, Tom.  Fine.  That's

13   not a problem.

14                   MR. HEFFERON:  Yeah.  Okay.

11:43:12 15                   MR. LEFEBVRE:  I can live without that

16   answer.

17                   MR. HEFFERON:  Okay.  Fine.  Thank you.

18   I appreciate that.

19        Q.  And then after you do your quality control, I

20   gather looking at 949, that reports are generated?

21        A.  Uh-huh.

22                   MR. HEFFERON:  You have to say yes or no.

23   You can't just say uh-huh.

24        A.  I'm sorry.  Could you repeat the question?

25        Q.  I assume based upon the documents that I

Charles Covington    -    February 11, 2005

61

11:43:29   1   reviewed that after you do your quality control that

2   certain reports are generated?

3        A.   Yes.

4        Q.   And is it fair to say that those reports --

5   what has been provided to me as document 988 through

6   document 1043 would be a sample quality report for the

7   various time frames contained in the document?

8        A.   Yes.

9        Q.   Now, who sees the quality control reports,

10   documents 988 through 1043?  Who saw them during the

11   time period of this lawsuit?

12        A.   Well, to keep it simple, if you look on

13   document 949 under L, it has the list of the people we

14   distribute the report to.

11:44:20  15        Q.   Okay.

16        A.   From the president and CEO all the way down

17   to the branch managers and other operation managers,

18   even external parties.  That's the listing of who gets

19   the report.

20        Q.   Now, has there been any changes to the

21   quality control procedures that you have just briefly

22   outlined for me over the past few moments subsequent

23   to the filing of the lawsuit relative to the TIL

24   disclosure?

25                  MR. HEFFERON:  Changes in the quality

Charles Covington    -    February 11, 2005

62

| | |
|---|---|
| 11:44:50 | 1 |

control procedures?

2           MR. LEFEBVRE:  Yes.

3           MR. HEFFERON:  Go ahead.

4    A.  We have changed our QC procedures because we

5 have changed our compliance procedures.

6    Q.  Okay.  And what changes have been made to the

7 compliance procedures?

8           MR. HEFFERON:  Object to that question

9 because it is beyond the scope of the case, so I don't

10 think it is relevant to what the discovery in the case

11 is about.

12           MR. LEFEBVRE:  Are you instructing him

13 not to answer?

14           MR. HEFFERON:  No, I'm not going to

11:45:18   15 instruct him not to answer, but...

16           MR. LEFEBVRE:  You have made your

17 objection.

18           MR. HEFFERON:  Yeah, I know, but you are

19 asking about what happened after June of '04 -- or

20 after February of '04.  So I'm going to object to that

21 on the grounds that it is not within the scope of the

22 case.

23           MR. HEFFERON:  You can answer.

24    Q.  You can answer.

25           MR. HEFFERON:  The question is:  What

Charles Covington    -    February 11, 2005

63

11:45:41   1   quality control procedures have changed?

2        A.   Well, I mean, we are constantly tweaking and

3   enhancing our procedures, so there is a variety of

4   changes.  Everything from sample sizes to new

5   regulations coming on, like the Fact Act, for example,

6   where we have -- now have testing surrounding and

7   those types of things.

8        Q.   Okay.  Any substantive changes in relation to

9   TIL rescission or TIL in general?

10              MR. HEFFERON:   Objection, relevance.

11   Also vague.  I don't know what you mean by

12   substantive.  I don't know that the witness knows.

13       Q.   Do you understand my question?

14       A.   Are you asking me have we changed how we

11:46:22  15   quality control the right of rescission notice

16   document?

17       Q.   Yes.

18       A.   Yes, we have.

19       Q.   Can you tell me how?

20              MR. HEFFERON:   Same objection.

21   Continuing objection.

22              MR. LEFEBVRE:   I understand, Counsel.

23              MR. HEFFERON:   And also object to it on

24   the grounds of subsequent remedial measures.

25       A.   Well, we have different documents now, so

Charles Covington    -    February 11, 2005

11:46:48    1    there is different quality control standards around

2    those documents, different procedures because there is

3    different rescission notices being used now.

4        Q.  Anything else?  I didn't mean to cut you off.

5        A.  No, that is the substantive piece of it.

6        Q.  Okay.  Now, I'm looking at document 945.  You

7    mentioned -- or alluded about the size of the sample.

8    Can you just explain -- I'm having a hard time

9    understanding Subsection C.  Am I reading that to say

10   that 105 files are tested for the retail area and 65

11   for the wholesale?  I don't know how to interpret

12   those numbers.

13       A.  That's true.  The review type is compliance.

14   The area -- the category is closed loans for retail.

11:47:39   15   We do some testing around nonclosed loans, denials and

16   things, so that's a differentiation there.  Closed

17   loans for retail, closed loans for wholesale.  We use

18   a statistically based random sampling approach, and

19   based on that random sampling approach, these are the

20   target, our kind of estimated populations we look at

21   each month.  They are not exact.  It depends on

22   various factors when you do random statistically

23   sampling, but those are kind of target samples.

24       Q.  So the random sample would be naturally the

25   states that First Horizon did business in during the

Charles Covington    -    February 11, 2005

11:48:15  1    few months prior to the quality control being

2    conducted?

3        A.    Yes.    We randomly sample all of our loan

4    production.

5        Q.    So this 105 figure and the 65 figure, that's

6    on a monthly basis that this sampling is done?

7        A.    Yes.

8        Q.    Okay.    Now, Mr. Covington, do you have the

9    nonredacted documents in front of you or do you just

10   have what has been provided to me?

11              MR. HEFFERON:    He just has what has been

12   provided to you.    I do have the nonredacted regulatory

13   compliance plan and origination quality control

14   report.    I do not have the nonredacted documents

11:49:09 15   higher up in this stack.    That is I don't have the

16   nonredacted 936 through 944.

17              MR. LEFEBVRE:    Okay.    All right.    Fine.

18              MR. HEFFERON:    And if you have further

19   questions about redaction, Chris, I'm sure we can tell

20   you what it was we redacted, but my belief is that

21   Mr. Covington testified accurately, that is that we

22   redacted things that did not relate to the TIL

23   rescission.

24              MR. LEFEBVRE:    Okay.    And he doesn't have

25   the full thing in front of him, in any event, if I

11:49:36    1  were to ask him some questions about a particular

2  page, correct?

3              MR. HEFFERON:  Correct.  But I can

4  certainly tell you the answer to that.

5              MR. LEFEBVRE:  Okay.  If it becomes an

6  issue, most certainly I can follow up with a letter if

7  there is substance that piques my subsequent

8  curiosity.

9              MR. HEFFERON:  Or just call New Century.

10    Q.  Mr. Covington, document 989.  This is the

11  statistics original quality control report for June of

12  '03?

13    A.  Yes.

14    Q.  Okay.  I want to -- I have to confess I was

11:50:16   15  not a math person.  I got a D in algebra and just

16  about flunked basic math in the fifth grade.  So I'm

17  not good with numbers.  Can you just try to interpret

18  for me the -- appear to be 1, 2, 3, 4 categories of

19  statistics, right of rescission notice missing,

20  rescission period not observed, notice of right to

21  cancel, and expiration date and then various numbers.

22  Could you just walk me through each line so I

23  understand what this data means?

24              MR. HEFFERON:  Go ahead.

25    A.  Lines or columns or both?

| | | |
|---|---|---|
| 11:50:54 | 1 | Q.  Why don't we go through, for example, TIL |
| | 2 | notice of rescission, notice missing.  I see goal 5 |
| | 3 | percent.  What does that mean? |
| | 4 | A.  What we do is we have set up various quality |
| | 5 | control testing steps for auditors, and each one of |
| | 6 | these steps is what you are seeing here.  In other |
| | 7 | words, this is the aspect of compliance that the QC |
| | 8 | auditor is testing for.  And what they are testing for |
| | 9 | here is based on their observance of the file, is |
| | 10 | there a notice or is there not a notice. |
| | 11 | Q.  Okay. |
| | 12 | A.  We manage under a risk management |
| | 13 | perspective.  Like any company, we have tolerances and |
| | 14 | benchmarks upon which we try to achieve, and that's |
| 11:51:43 | 15 | what this goal is, 5 percent error rate.  The next is |
| | 16 | the error rate for the aggregate company.  The small |
| | 17 | number, the 251, is the number of files we looked at |
| | 18 | to derive that error rate.  And then all of the other |
| | 19 | percentages running across towards the right is a |
| | 20 | breakdown of error rates by each of our regions.  And |
| | 21 | the number underneath each region name is the number |
| | 22 | of files looked at for that region. |
| | 23 | Q.  Okay.  So like CA at the top -- I assume if |
| | 24 | it says 12, you looked at -- they reviewed 12 files |
| | 25 | from California? |

Charles Covington    -    February 11, 2005

11:52:16    1        A.    That's correct.

2        Q.    And then what is the E1 region?

3        A.    That is New England 1 -- at the time -- the

4    regions have all changed now, but at the time, that

5    was New England 1 and New England 2.

6        Q.    E1 and E2?

7        A.    Yes.

8        Q.    And that would comprise all of the New

9    England states?   You actually did business in all of

10    them?

11        A.    I don't know.   I mean, principally.   I can't

12    recall.   I would have to go and look and see what

13    exactly states that was all in, but, yeah, it was the

14    New England states.

11:52:48    15        Q.    And then I see Mass?

16        A.    No, that is Mid-Atlantic.

17        Q.    Oh, all right.   Mid-Atlantic.   Midwest?

18        A.    Midwest.

19        Q.    Nebraska?

20        A.    Northeast, which is lower down that New

21    England.

22        Q.    Okay.

23        A.    Northeast is more like Pennsylvania, New

24    Jersey, Baltimore, Maryland, that area.

25        Q.    Northwest?

Charles Covington    -    February 11, 2005

69

```
11:53:13   1        A.   Northwest.

           2        Q.   SA?

           3        A.   South Atlantic.

           4        Q.   Southeast?

           5        A.   Southeast.

           6        Q.   Southern?

           7        A.   Which is Texas.  And then Southwest, which is

           8   like Arizona, New Mexico, Utah.

           9        Q.   They won't let me out of Rhode Island, so

          10   that's why I'm a little unfamiliar with these.

          11             MR. HEFFERON:  Are you angry there is no

          12   category for RI?

          13             MR. LEFEBVRE:  There wouldn't be very

          14   many of them.

11:53:39  15        Q.   So, for example, just looking at the first

          16   line we were talking about under Midwest MW 37, then I

          17   see a 3.03 percent.  What is that, please?

          18        A.   That would mean -- that's the percentage of

          19   errors of missing right of rescission notices in that

          20   region.  So the denominator is -- well, it is not

          21   exact here, but there is a denominator somewhere

          22   around 37.

          23        Q.   Okay.

          24        A.   And the number of files missing, dividing

          25   that out, you get to a 3.03 percent error rate.
```

Charles Covington    -    February 11, 2005

11:54:12  1      Q.  Of files that didn't have a right to

2  rescission?

3      A.  Yes.

4      Q.  And that same analysis would comply for the

5  other categories?  For example, I see on the second

6  line, rescission period not observed.  Pretty much

7  that was not an issue according to this report over

8  all of the regions?

9      A.  That's true.

10      Q.  And then notice of right to cancel not

11  completed correctly.  Under the Northeast one, there

12  was a problem in 10 percent of the sample that you

13  used?

14      A.  New England 1.

11:54:46  15      Q.  Well, it is E1, which I believe you told me

16  was New England one.

17      A.  Yeah, it is New England 1.  That was 10

18  percent, yes.

19      Q.  And the bottom -- the last expiration date is

20  inaccurate.  There was no problem in any of the

21  regions based on this statistical sampling during the

22  time frame contained in this report?

23      A.  That's correct.

24      Q.  Now, I was looking at document 988.  It

25  appears that -- are these done monthly?  Is this

11:55:20  1   report a monthly report?

2        A.  Yes.

3        Q.  It is.  And you generate these reports

4   every -- you were generating them monthly during the

5   period prior to the lawsuit?

6        A.  Yes.  Well, this QC testing procedures didn't

7   start until I will say mid '02.

8        Q.  Okay.  And then I gather that the rest of

9   these reports, these regions are still consistently

10   the same and the explanation relative to percentages

11   that you just testified are all similar based on the

12   particular inquiry contained in the report?

13        A.  The percentages and how we calculate it are

14   still the same.  The regions have all changed.  We

11:56:12  15   have a lot more regions now, and most of them aren't

16   even called this anymore.  There is no New England 1,

17   New England 2 anymore, for example.

18        Q.  Okay.

19            MR. LEFEBVRE:  Tom, if I take five

20   minutes just to review a few notes, I don't really

21   have much else and we can wrap this up.

22            MR. HEFFERON:  Okay.

23            (Recess 11:56 to 11:58.)

24            MR. LEFEBVRE:  Tom, just so -- I want to

25   put this on the record.  The individual that

Charles Covington    -    February 11, 2005

72

11:58:18  1   Mr. Covington identified that may have copies of some

2   of the variations, either from the TMO software or

3   front end or Guardian, I assume that you can look into

4   that and if there are such forms available, that you

5   would produce those?

6           MR. HEFFERON:  Yes, I can do that.

7      Q.  And then just one other question,

8   Mr. Covington.  Was TMO the predominant software used

9   during the time frame referenced in this complaint?

10      A.  It was the predominant one, I would say, yes.

11      Q.  When I say, predominant, used 70 percent of

12   the time?  I mean, because everyone could have a

13   different definition of predominant.  Let me ask you

14   what is your definition of predominant?

11:59:08  15      A.  I would say it was -- let me think about that

16   for a second.

17      Q.  Sure.

18      A.  I would say if all of our regions were using

19   different systems, TMO was being used -- I wouldn't

20   say half of them were using it.  I would say something

21   less than half were using it, would be my guess.

22      Q.  During the time frame of this lawsuit?

23      A.  Yes.

24           MR. HEFFERON:  State the time frame for

25   the witness, Chris, so that he has it in his mind when

Charles Covington    -    February 11, 2005

11:59:36    1    he answers the question.

2                     MR. LEFEBVRE:  Oh, do you want me to

3        restate it?

4                     MR. HEFFERON:  Yeah.  Would you do it

5        again?

6                     MR. LEFEBVRE:  Oh, sure.

7                     MR. HEFFERON:  And would you use dates?

8        Q.  I'm talking about February of 2001 to

9        February of 2004 for all states but Massachusetts,

10       which, obviously, is one year prior, which is February

11       of 2000 to February of 2004.

12                    MR. HEFFERON:  And the question is:  Was

13       TMO the predominant software program used during that

14       period?

12:00:04  15       A.  Well, to answer that question correctly, the

16       way it was, is that in the earlier part of that time

17       frame, we had multiple front-end systems and then we

18       migrated the entire company onto TMO in the later part

19       of that time frame.  So if you weigh all of that out,

20       I would say, yeah, it was probably -- was predominant

21       from a chronological standpoint.

22       Q.  Okay.  That gives me some idea.  Just a

23       couple of final questions.

24                    Do you know -- and I'm talking about

25       nationally -- how many nonpurchase money mortgages

Charles Covington    -    February 11, 2005

74

12:00:41   1   were originated by First Horizon during the calendar

2   year that ended December 31st, 2001?  Do you have a

3   good guesstimate?

4        A.  Do I know how many loans we originated for

5   the calendar year 2001?

6        Q.  Nonpurchase loans.

7        A.  Yeah.  I don't know.  I would have to go back

8   and pull out some reports.  I really don't know.  I

9   mean, our production back in that day is materially

10   less than it is today for sure.

11        Q.  Same question, but instead of the calendar

12   year 2001, how about the calendar year 2003.  Is that

13   information more readily available?

14        A.  Yeah.  I would be making up a number.  I

12:01:35   15   could cobble together a number for you, but I don't

16   know what that is.

17        Q.  I don't want you to guess.  Let me ask you

18   this:  For the calendar year 2001, do you believe that

19   First Horizon originated more than 5,000 loans?

20              MR. HEFFERON:  Of that type?

21              MR. LEFEBVRE:   Of nonpurchase money

22   mortgages.

23        A.  Yes.

24        Q.  And for 2002, more than 5,000?

25        A.  Yes.

Charles Covington    -    February 11, 2005

75

12:01:59    1        Q.   And in 2003 more than 5,000?

          2        A.   Yes.

          3        Q.   For 2003 more than 10,000?

          4              MR. HEFFERON:  Objection.  The witness

          5    says he doesn't know, Chris.  I don't want to play

          6    this game.

          7              MR. LEFEBVRE:  Okay.  That's fine.

          8        Q.   Couple of final questions.  Mr. Covington, we

          9    were talking about the compliance, and I had asked you

          10   a question about, you know, the time frame.  And I was

          11   looking at Exhibit 949 -- what has been marked -- not

          12   exhibit -- 949 you were talking to me about the review

          13   cycle.  Do you have that document in front of you?

          14             MR. HEFFERON:  He does, yes.

12:02:36   15        Q.   Okay.  After this review of the TIL

          16   disclosure is done, is there any other type of review,

          17   any other type of compliance for right to rescind?

          18             MR. HEFFERON:  Objection, vague.

          19        A.   I guess I would -- do you mean is there any

          20   other type of QC work done?

          21        Q.   Yes.

          22        A.   Within our QC process or separate from our QC

          23   process?

          24        Q.   How about both?  Within and separate.

          25        A.   Well, if this helps, within our QC process,

Charles Covington    -    February 11, 2005

12:03:12    1    we have an auditor review the files, and every

2    exception that is cited gets a second review.

3        Q.    Okay.

4        A.    And then it is sent to the branch to have the

5    branch have an opportunity to dispute the finding.

6    They are given a due process there.  So arguably you

7    could say each one of these findings is reviewed three

8    times from that perspective.  That's within our QC

9    cycle.  Outside of our QC cycle, I'm not exactly sure

10    what is done in postclosing reviews.  They may or may

11    not do something.  I'm not sure, but I don't think it

12    probably involves -- if they do something, my

13    impression would be it is to see if the document is

14    there.  It is probably more of a completeness review

12:03:55   15    than anything else.

16        Q.    Is it fair to say that most of the quality

17    control review is done within six months -- a six

18    month window from the time that the loan is actually

19    closed?

20        A.    That's true.  It is done within a 60-day time

21    frame of when the loan is closed.

22        Q.    Right.  And assume there is those situations

23    where there is some multiple review.  Six months would

24    be on the high side, correct?

25        A.    Well, all the QC process steps I mentioned,

Charles Covington    -    February 11, 2005

12:04:28    1    that's all done within that 60-day time frame.

2        Q.  Oh, it is?

3        A.  Yes.

4        Q.  So pretty much 60 days is the window?

5        A.  Yes.

6        Q.  As outlined in subparagraph I?

7        A.  Yes.

8        Q.  Okay.  I'm just trying to understand.  I

9    would like you to look at document 916, which was a

10    document produced involving one of the named

11    plaintiffs' loans, not the loan subject of this

12    lawsuit, but another loan that was -- involved First

13    Horizon.  Do you have those two documents in front of

14    you?

12:05:06    15                MR. HEFFERON:  916?

16                MR. LEFEBVRE:  Yeah, 000916.

17                MR. HEFFERON:  No, because you didn't

18    tell me to go to it.

19                MR. LEFEBVRE:  I'm sorry.

20                MR. HEFFERON:  What is it?

21                MR. LEFEBVRE:  That's the letter dated

22    October 20th, 2004 regarding the Lillie home equity

23    line which starts out -- and I'll read the first two

24    sentences, Tom.  First Horizon routinely reviews and

25    audits loans for accuracy, completeness, and

Charles Covington    -    February 11, 2005

78

| | | |
|---|---|---|
| 12:05:33 | 1 | compliance with applicable law.  An error was made in |
| | 2 | the information that was provided to you regarding |
| | 3 | your home equity line of credit mortgage loan.  We |
| | 4 | recently discovered that the federal Truth in Lending |
| | 5 | disclosures provided to you were not in technical |
| | 6 | compliance with federal disclosure statutes and |
| | 7 | recollections.  Are you familiar with that form, Tom? |
| | 8 | MR. HEFFERON:  Well, you should ask the |
| | 9 | witness if he is. |
| | 10 | Q.  Well, do you know what letter I'm talking |
| | 11 | about? |
| | 12 | A.  I believe I do. |
| | 13 | Q.  Okay.  Do you know what document I'm |
| | 14 | referring to, Mr. Covington? |
| 12:06:07 | 15 | MR. HEFFERON:  I think he just said he |
| | 16 | believes he does. |
| | 17 | A.  I believe I do, yes. |
| | 18 | Q.  Now, it is my understanding that the Lillie |
| | 19 | home equity loan, which I believe is the subject of |
| | 20 | this correspondence, was closed well over a year prior |
| | 21 | to the mailing of this notice.  And I'm just |
| | 22 | wondering -- I'm just trying to understand.  I thought |
| | 23 | you told me quality control was done within 60 days. |
| | 24 | I'm just wondering why the Lillies would have received |
| | 25 | this notice almost 14 months after the loan was |

Charles Covington    -    February 11, 2005

79

| | | |
|---|---|---|
| 12:06:47 | 1 | closed. |
| | 2 | A.  That review was not conducted by my quality |
| | 3 | function, which we have been discussing, but rather it |
| | 4 | was done by an operational review at our parent bank |
| | 5 | in Memphis. |
| | 6 | Q.  And is that operational review standard |
| | 7 | practice, or is it -- well, answer that question.  Was |
| | 8 | it part of standard practice? |
| | 9 | A.  Let me think about that.  They have a |
| | 10 | standard practice of reviewing rights of rescissions |
| | 11 | for the HELOC loans. |
| | 12 | Q.  The HELOC? |
| | 13 | A.  Yeah, home equity line of credit.  We call |
| | 14 | them HELOCs.  Home equity line of credit. |
| 12:07:35 | 15 | Q.  Okay.  I have to confess.  I had no idea what |
| | 16 | you were talking about.  Okay.  But you would agree |
| | 17 | that when you review the home equity loans, isn't that |
| | 18 | usually done shortly after the closing of the loan? |
| | 19 | MR. HEFFERON:  You mean when First |
| | 20 | Horizon does? |
| | 21 | Q.  First Horizon, yes. |
| | 22 | A.  Yes. |
| | 23 | Q.  Okay.  So I guess I'm trying to understand. |
| | 24 | I guess what I'm saying is, I see the materials would |
| | 25 | seem to suggest 60 days, and I understand this was |

Charles Covington    -    February 11, 2005

80

12:08:04    1    done by a different -- did you say a different

2    department of First Horizon?

3        A.   Different department of our -- that resides

4    at our parent bank in Memphis.

5        Q.   Okay.  Let me ask you this:  Was the Lillies'

6    file, the HELOC file, reviewed because a lawsuit was

7    filed, or was it part of just standard review, if you

8    know?

9                MR. HEFFERON:  You mean, the review that

10    resulted in this letter you described?

11                MR. LEFEBVRE:  Absolutely.

12                MR. HEFFERON:  The question is:  The

13    review that resulted in this letter, was this as a

14    result of this lawsuit or something else?

12:08:39   15        A.   No, this was in relation to something else.

16        Q.   Okay.  And not because the Lillies had been

17    named plaintiffs in the lawsuit?

18        A.   That's correct.

19        Q.   And you said the result of something else.

20    Can you tell me what the something else was, if you

21    know?

22        A.   We had discovered some other issues related

23    to Truth in Lending compliance, not right of

24    rescission related, but TIL disclosure related, which

25    is the subject of that letter.

Charles Covington    -    February 11, 2005

81

```
12:09:26   1        Q.   Okay.  And I assume that -- well, strike

           2   that.

           3               Were there many other individuals other

           4   than the Lillies that received this similar letter?

           5               MR. HEFFERON:  I'm going to object and

           6   instruct him not to answer, Chris.  That has nothing

           7   to do with this lawsuit.  I think you have established

           8   that this letter Lillie got had nothing to do with

           9   this lawsuit.  So other aspects, are not -- I'm not

          10   going to let him get into.

          11               MR. LEFEBVRE:  Mr. Covington, I

          12   appreciate your patience, and I am done.

          13               I assume he is going to read and sign,

          14   Tom?

12:09:48  15               MR. HEFFERON:  Yes, he will.  He will

          16   read and sign in the ordinary course.  And I have no

          17   questions for you, Mr. Covington.

          18               (Deposition adjourned at 12:09 p.m.)

          19

          20

          21

          22

          23

          24

          25
```

Charles Covington    —    February 11, 2005

82

```
 1              CHANGES AND SIGNATURE

 2   WITNESS NAME:  CHARLES COVINGTON  FEBRUARY 11, 2005

 3   PAGE   LINE   CHANGE              REASON

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

Charles Covington    —    February 11, 2005

83

1           I, CHARLES COVINGTON, have read the

2    foregoing deposition and hereby affix my signature

3    that same is true and correct, except as noted above.

4

5                         _____

                          CHARLES COVINGTON
6

7

8

9

10   THE STATE OF _____)

11   COUNTY OF _____)

12           Before me, _____, on this

13   day personally appeared CHARLES COVINGTON, known to me

14   (or proved to me under oath or through

15   _____) (description of identity card or

16   other document) to be the person whose name is

17   subscribed to the foregoing instrument and

18   acknowledged to me that they executed the same for the

19   purposes and consideration therein expressed.

20           Given under my hand and seal of office this

21   _____ day of _____, 2005.

22

23

24                       _____

                         NOTARY PUBLIC IN AND FOR
25                       THE STATE OF _____

     My commission expires: _____

Charles Covington    -    February 11, 2005

84

```
 1   STATE   OF   TEXAS )

 2   COUNTY OF DALLAS )

 3              I, Audra B. Paty, Certified Shorthand

 4   Reporter, in and for the State of Texas, certify that

 5   the foregoing deposition of CHARLES COVINGTON was

 6   reported stenographically by me at the time and place

 7   indicated, said witness having been placed under oath

 8   by me, and that the deposition is a true record of the

 9   testimony given by the witness.

10              I further certify that I am neither counsel

11   for nor related to any party in this cause and am not

12   financially interested in its outcome.

13              Given under my hand on this the ____ day of

14   _____, 2005.

15

16                    _Audra B. Paty_____

17                    Audra B. Paty, Certified
                      Shorthand Reporter No. 5987
18                    Dickman Davenport, Inc.
                      Firm Registration #312
19                    1010 Two Turtle Creek Village
                      3838 Oak Lawn Avenue
20                    Dallas, Texas 75219
                      (214) 855-5100   (800) 445-9548
21                    e-mail:  abp@dickmandavenport.com
                      My commission expires 12-31-05
22   Time used by each party:
     Mr. Lefebvre - 1:36
23   Mr. Hefferon - 0:00

24

25
```

DEC-08-2004  16:30    ECLG LLC                         3124190379    P.03/06

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RALPH G. MCKENNA, | ) | |
| GLENROY A. DEANE, | ) | |
| ILENE WILGOREN-DEANE, | ) | |
| CHRISTOPHER J. LILLIE; and | ) | |
| LAURIE A. LILLIE; | ) | |
| | ) | |
| Plaintiffs, | ) | 04-10370-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST HORIZON HOME LOAN | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF DEPOSITIONS

To:    U. Gwyn Williams
       Daniel J. Pasquarello
       Goodwin & Procter LLP
       Exchange Place
       Boston, MA 02109
       617-227-8591 (Facsimile)

     **PLEASE TAKE NOTICE** that, pursuant to Fed. R. Civ. P. 30(b)(6), First Horizon Home Loan is to produce the individuals below for taking their depositions. The depositions will be taken at the offices of Goodwin Procter, LLP, Exchange Place, Boston, MA 02109, on the dates and at the times listed below. The depositions will be taken before a person authorized to administer oaths and will continue until completed.

| Deponent | Date | Time |
|---|---|---|
| Person(s) most knowledgeable regarding plaintiffs' loans | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable in the preparing of documents for residential mortgages and refinancing | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable regarding the allegations in plaintiffs' amended complaint | December 20, 2004 | 10:00 a.m. |

1



DEPOSITION
EXHIBIT
1
COVINGTON

DEC-08-2004  10:30        ECLC LLC                                    3124190375    P.04/06

Person(s) most knowledgeable regarding compliance       December 20, 2004    10:00 a.m.
with the rescission notice provisions of TILA

Person(s) most knowledgeable regarding quality control   December 20, 2004    10:00 a.m.
with respect to TILA compliance

Person(s) most knowledgeable regarding the areas of       December 20, 2004    10:00 a.m.
inquiry as outlined and requested in plaintiffs' first
discovery requests (requests for admissions,
interrogatories and requests for production of
documents)

Person(s) most knowledgeable regarding the accuracy of    December 20, 2004    10:00 a.m.
information provided to plaintiffs in response to
plaintiffs' first discovery requests (requests for
admissions, interrogatories and requests
for production of documents)

Person(s) most knowledgeable to any changes or            December 20, 2004    10:00 a.m.
revisions to the right to cancel form for residential
mortgage refinances from February 24, 2000
to the present.


                                    Christopher Lefebvre (CMA).
                                    Christopher M. Lefebvre (CMA).
                                    LAW OFFICES OF CLAUDE
                                         LEFEBVRE & SONS
                                    P.O. Box 479
                                    Pawtucket, RI 02862
                                    (401) 728-6060
                                    (401) 728-6534 (FAX)
                                    B.B.O. # 629056

                                    Daniel A. Edelman
                                    Cathleen M. Combs
                                    Heather Piccirilli
                                    EDELMAN COMBS, LATTURNER,
                                         & GOODWIN, LLC
                                    120 South LaSalle Street, 18th Floor
                                    Chicago, Illinois 6603

                                            2

(312) 739-4200
(312) 419-0379 (FAX)

3

## CERTIFICATE OF SERVICE

I, Heather A. Piccirilli, certify that on December 8, 2004, a copy of the attached document was served by United States Mail and Facsimile upon the party listed above.

Heather A. Piccirilli

4

From:PAWTUCKET LEGAL CLINIC          4017286534          02/11/2005 12:57 #525 P.002/002

# NOTICE OF RIGHT TO CANCEL

LOAN #:     0030905186

ERTY ADDRESS:     54-56 FIRST STREET
                  PAWTUCKET, RI 02861

1.  YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/deed of trust on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occur last: (1) the date of the transaction, which is   November 13, 2002   ; or (2) the date you received your Truth-in-Lending disclosures; or (3) the date which you received this notice of your right to cancel.

_____ If you cancel the transaction, the mortgage/deed of trust is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/deed of trust on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

_____ If you cancel the new transaction, your cancellation will apply only to the increase in the amount of credit. It will not affect the amount that you presently owe or the mortgage, lien, or security interest we already have on your home. If you cancel the mortgage, lien, or security interest as it applies to the increased amount is also cancelled. Within 20 calendar days after we receive your notice of cancellation of the new transaction, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home no longer applies to the increase of credit. We must also return any money you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

2.  HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing at:
    FIRST HORIZON HOME LOAN CORPORATION
    309 METRO CENTER BLVD., STE. 205
    WARWICK, RI 02886

You may use any written statement that is signed and dated by you and your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice letter not later than midnight of   11/16/2002   (or midnight of the third business day following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

_____ _____   _____ _____
Signature                 Date       Signature                 Date


_____ _____   _____ _____
Signature                 Date       Signature                 Date

JOINT OWNERS HAVE THE RIGHT TO RESCIND, AND A RESCISSION BY ONE IS EFFECTIVE FOR ALL.
RECEIPT
Each of the undersigned acknowledges receipt of 2 copies of this Notice of Right to Cancel.


_____ _____   _____ _____
RLEY TABARES             Date        MARIA H TABARES           Date


_____ _____   _____ _____
                          Date                                  Date

DEPOSITION
EXHIBIT
2
COVINGTON

CB6D016 (7/01)

# NOTICE OF RIGHT TO CANCEL



**LOAN #:**

**PROPERTY ADDRESS:**

## 1. YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/deed of trust on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occur last: (1) the date of the transaction, which is                              ; or (2) the date you received your Truth-in-Lending disclosures; or (3) the date which you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/deed of trust is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/deed of trust on your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

For new transactions involving us, if you cancel the new transaction, your cancellation will apply only to the increase in the amount of credit. It will not affect the amount that you presently owe or the mortgage lien, or security interest we already have on your home. If you cancel the mortgage, lien, or security interest as it applies to the increased amount is also canceled. Within 20 calendar days after we receive your notice of cancellation of the new transaction, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home no longer applies to the increase of credit. We must also return any money you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

## 2. HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing at:

FIRST HORIZON HOME LOAN CORPORATION
681 ANDERSEN DRIVE, SUITE 420
PITTSBURGH, PA 15220

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice letter not later than midnight of _____ (or midnight of the third business day following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Signature | Date | Signature | Date |

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Signature | Date | Signature | Date |

JOINT OWNERS HAVE THE RIGHT TO RESCIND, AND A RESCISSION BY ONE IS EFFECTIVE FOR ALL.
RECEIPT
Each of the undersigned acknowledges receipt of 2 copies of this Notice of Right to Cancel.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Signature | Date | Signature | Date |

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Signature | Date | Signature | Date |