EXHIBIT A

00001

1     Exhibits 1 - 7    Vol. 1, Pgs. 1 - 87

2       UNITED STATES DISTRICT COURT

3       DISTRICT OF MASSACHUSETTS

4     ----------------------------------

5 RALPH G. McKENNA, GLENROY A. DEANE,

6 ILENE WILGOREN-DEANE, CHRISTOPHER J. LILLIE

7 and LAURA A. LILLIE

8       Plaintiffs

9 vs.       Docket No. 04-10370 (RCL)

10

11 FIRST HORIZON HOME LOAN CORPORATION

12       Defendant

13     ----------------------------------

14

15       DEPOSITION of RALPH G. McKENNA

16     Friday, January 14, 2005, 12:53 p.m.

17       Goodwin Procter LLP

18       Exchange Place

19       53 State Street

20       Boston, Massachusetts

21     ----------------------------------

22     Reporter: David A. Arsenault, RPR

23     Farmer Arsenault Brock LLC, Boston, MA

24       (617) 728-4404

00028

1    Q.  Do you understand that also as a right to

2  cancel?

3    A.  Yes.

4    Q.  Do you understand the right to rescind

5  and the right to cancel to be the same thing?

6    A.  No.  Because the right to cancel, when

7  you do the mortgage, I believe you have a three-day

8  limit from the day of the transaction that you can

9  cancel it for any reason.  The right to rescind is,

10  I think, a little bit different from that.  With

11  the right to rescind, I think in Massachusetts you

12  have four years and in other states you have three

13  years.

14    Q.  What about a time period for right to

15  cancel?

16    A.  I think that's three days.

17    Q.  Now, do you understand for the right to

18  cancel that you can cancel for any reason?

19    A.  That's my understanding.

20    Q.  So whether or not there are

21  irregularities in the documents, your understanding

22  is that you still have a right to cancel?

23    A.  That's my understanding.

24    Q.  And that's a three-day period that you

**McKenna, Ralph G. - 01/14/2005**                    **Page 28**

00029

1  described; is that right?

2   A.  That's what I think, yes.

3   Q.  I'm going to list some of the

4  transactions that you have described to me,

5  starting with the line of credit on the Braintree

6  house, the increase in the line of credit which

7  resulted in a mortgage, the refinance on that

8  house, the purchase of the Berse Avenue house, the

9  purchase of the East Avenue house and the

10  refinances of the East Avenue house.  Is it your

11  understanding that you had a right to cancel in all

12  of those cases?

13   A.  No, I believe only the Braintree home

14  because I believe it has only to do with the

15  personal residence.

16   Q.  The same question for the right of

17  rescission that we were talking about, is it also

18  your understanding that --

19   A.  The right of rescission is definitely for

20  your primary residence.

21   Q.  Now, for the Braintree residence in all

22  the transactions you described for that residence,

23  the line of credit, the increase of credit with the

24  mortgage, and refinance, is it your understanding

00030

1 that you would have the right to cancel in all of

2 those?

3         MR. LEFEBVRE: I think my client

4 already answered that.

5     A. I think that's the spirit of the right to

6 cancel form.

7     Q. But is that your understanding for the

8 Braintree residence transactions?

9     A. Yes.

10     Q. And for each of those transactions, for

11 how long did you think you had a right to cancel?

12     A. Three days.

13     Q. Other than the transaction that's at

14 issue in this case, did you ever try to cancel any

15 other loan?

16     A. No.

17     Q. Does that apply to loans that you've had

18 on all three of the residences that we've been

19 talking about?

20     A. Yes, it applies.

21         (Pause.)

22     Q. Mr. McKenna, for the equity line of

23 credit you first took out on the Braintree

24 residence, did you receive a notice of a right to

00039

1    Q.  Any other reason?

2    A.  No.

3    Q.  Before you refinanced, to whom did you

4  make your payments?

5    A.  I think it was Chase Mortgage.

6    Q.  And since the refinance, who do you make

7  your payments to?

8    A.  First Horizon.

9    Q.  When you refinanced, did you get a better

10  rate?

11    A.  Yes.

12    Q.  How much better was the rate, do you

13  remember?

14    A.  It might have been from 5.75 to 5.37.  I

15  believe it was under 6 with Chase.

16    Q.  Was it fixed or adjustable?

17    A.  Fixed.

18    Q.  When you refinanced did you take any cash

19  out?

20    A.  Yes, I did.

21    Q.  Do you know about how much?

22    A.  I think it was 35 or 40,000.

23    Q.  Do you recall the principal balance of

24  the loan when you refinanced?

00048

1    Q.  Did it seem that Mr. Rull had some sort

2  of routine for working through the transactions?

3    A.  Actually, all of the closings seemed

4  pretty much the same to me, no matter where you go

5  for them.

6    Q.  But based on the previous transactions

7  that you had attended with Mr. Rull and this

8  transaction, did it seem to you like the

9  explanations about the documents were similar?

10       MR. LEFEBVRE:  I would object as to

11  form.  I would suggest it asks for speculation on

12  the part of the witness.

13       You can answer.

14    A.  To be honest, I didn't take any notice.

15  I think it is always the same.  That's what I'm

16  saying.

17    Q.  Did you receive any of the documents that

18  you signed at that closing prior to the closing?

19    A.  I don't think, no.

20    Q.  Did you bring any documents with you to

21  the closing?

22    A.  No.

23    Q.  At the closing did you review any of the

24  documents before you signed them?

**McKenna, Ralph G. - 01/14/2005**                    **Page 48**

00049

1    A.  I just accepted his explanation of the

2  documents.

3    Q.  Did you read any of the documents before

4  you signed them?

5    A.  No, not really.

6    Q.  Do you recall how the closing began?

7    A.  In what respect.

8    Q.  How did Mr. Rull commence the closing?

9    A.  He said hello to me.

10    Q.  Did he give you any sort of preliminary

11  instructions or anything of that nature?

12    A.  No.

13    Q.  Hello is always a good start.

14        Did you ask any questions during the

15  closing?

16    A.  No.

17    Q.  What documents, if any, do you remember

18  receiving during the closing?

19    A.  You mean when we finished the closing,

20  during the actual closing.

21    Q.  During the closing process, I mean?

22    A.  Nothing really stands out in my mind.  I

23  received a photocopy of everything that I signed.

24    Q.  Any particular documents that you

00050

1 remember signing at the closing?

2    A.  Not particularly.

3    Q.  How about a note, do you remember that?

4 Do you remember signing a note at the closing?

5    A.  I guess the only thing that stands out in

6 my mind is that they make you sign your name all

7 different ways.  That's about it.

8    Q.  Let me just list a few other documents.

9 A mortgage, do you remember signing a mortgage?

10    A.  Well, like I say, you go through the

11 closing.  I've been to so many closings now that

12 it's just like, to remember one particular document

13 a year and a half later, you know...

14    Q.  Would you describe the closing overall as

15 a fairly quick process where you sign the

16 documents?

17    A.  Yes.

18    Q.  I'll just ask these.  The truth in

19 lending disclosure statement or the notice of your

20 right to cancel, do you remember receiving either

21 of those?

22    A.  I don't remember receiving them, but they

23 are part of it.  It's a standard procedure.

24    Q.  I understand.  Were there any documents

**McKenna, Ralph G. - 01/14/2005**　　　　　　　　**Page 50**

00051

1  at the closing that you read before signing?

2     A.  Not that I recall.

3     Q.  After the closing, did you sit down and

4  read through the copy of the documents you

5  received?

6     A.  No, I didn't.

7     Q.  Did you understand at the closing that

8  there would be some delay between the closing

9  itself and when you received the money?

10    A.  It didn't really occur to me.

11    Q.  Did you receive any money on the day of

12  the closing?

13    A.  I believe they had a check ready for me

14  the day of the closing for the amount that I took,

15  the cash amount that I increased it by.

16    Q.  What did you do with the check after the

17  closing?

18    A.  I deposited it in the bank.

19    Q.  Do you have any record of the deposit?

20    A.  I might have a bank statement.

21    Q.  Mr. McKenna, do you know when the first

22  payment was due on the new loan?

23    A.  I think it was due August 1st.

24    Q.  Did you make the first payment?

00052

1    A.  Oh, yes.

2    Q.  Who do you make the payment to?

3    A.  First Horizon.

4    Q.  How did you make the payment?

5    A.  By check.

6    Q.  By check.  Have you always paid by check?

7    A.  Yes.

8    Q.  Have you ever missed any payments?

9    A.  No.

10    Q.  Have you ever fallen behind on any of

11  your mortgage payments with First Horizon?

12    A.  No.

13    Q.  Were you happy with the servicing on the

14  loan?

15    A.  Yes.

16    Q.  Mr. McKenna, when was it that you first

17  decided you wanted to cancel your loan?

18    A.  After I spoke to my attorney, Chris

19  Lefebvre.

20    Q.  Before that time, you had no desire to

21  cancel?

22    A.  I didn't know there was any problem with

23  it.

24    Q.  Did you instruct Mr. Lefebvre to contact

**McKenna, Ralph G. - 01/14/2005**                **Page 52**

00039

1    Q.  Any other reason?

2    A.  No.

3    Q.  Before you refinanced, to whom did you

4  make your payments?

5    A.  I think it was Chase Mortgage.

6    Q.  And since the refinance, who do you make

7  your payments to?

8    A.  First Horizon.

9    Q.  When you refinanced, did you get a better

10  rate?

11    A.  Yes.

12    Q.  How much better was the rate, do you

13  remember?

14    A.  It might have been from 5.75 to 5.37.  I

15  believe it was under 6 with Chase.

16    Q.  Was it fixed or adjustable?

17    A.  Fixed.

18    Q.  When you refinanced did you take any cash

19  out?

20    A.  Yes, I did.

21    Q.  Do you know about how much?

22    A.  I think it was 35 or 40,000.

23    Q.  Do you recall the principal balance of

24  the loan when you refinanced?

**McKenna, Ralph G. - 01/14/2005**                    **Page 39**

00065

1    A.  About a year now.

2    Q.  Since you retained your attorney?

3    A.  Yes.

4    Q.  Does your decision on whether or not to

5  rescind depend in any way on what sort of

6  refinancing rate that you can get?

7    A.  No, not really.

8    Q.  If you can only get a refinancing loan

9  and an interest rate of 10 percent, would you still

10  want to refinance your loan?

11    A.  No, I wouldn't refinance it.

12    Q.  I meant to say would you still want to

13  rescind your loan?

14    A.  Yes.

15    Q.  You would still want to rescind if the

16  only rate you could get would be 10 percent?

17    A.  Yes.

18    Q.  Would you still want to rescind if the

19  only rate you could get would be 15 percent?

20    A.  Yes.

21    Q.  How about 20 percent?

22    A.  Yes.

23    Q.  Is there some cutoff?

24    A.  No, there's no cutoff.

EXHIBIT B

00001

1          Volume 1, Pages 1-96

2          Exhibits: 1-5

3      UNITED STATES DISTRICT COURT

4      FOR THE DISTRICT OF MASSACHUSETTS

5  RALPH G. McKENNA, GLENROY A.

6  DEANE, ILENE WILGOREN-DEANE,

7  CHRISTOPHER J. LILLIE, and LAURA

8  A. LILLIE,

9          Plaintiffs

10  v.          Docket No. 04-10370 (RCL)

11  FIRST HORIZON HOME LOAN

12  CORPORATION,

13          Defendant

14      DEPOSITION OF LAURA A. LILLIE

15  Thursday, December 16, 2004, 9:32 p.m.

16          Goodwin Procter LLP

17          Exchange Place

18          Boston, Massachusetts

19  ----Reporter:  Kathleen Mullen Silva, RPR, CRR----

20  ksilva@fabreporters.com  www.fabreporters.com

21      Farmer Arsenault Brock LLC

22      50 Congress Street, Suite 415

23      Boston, Massachusetts 02109

24      617.728.4404  fax 617.728.4403

**Lillie, Laura A. - 12/16/2004**          **Page 1**

00024

1    Q.  How did you know that you had a right to

2  cancel?

3    A.  I think you always do.  You have three days

4  or something to cancel after you've signed.  That's

5  my understanding.  I don't know for sure if it's

6  true.

7    Q.  And is there some basis for that

8  understanding that you have, or what is the basis

9  for that understanding?

10    A.  Just that if you've signed for something

11  and you're not sure afterwards, you have a limited

12  amount of time to undo what you've done.

13    Q.  And you think that that period is a

14  standard three-day period?

15    A.  For some reason three days sticks out in my

16  mind.

17    Q.  And we're talking about that original

18  transaction to purchase your home in Pittsfield?

19    A.  With Greylock.

20    Q.  The one you currently live in?

21    A.  Right.

22    Q.  Did you want to cancel that transaction?

23    A.  No.

24    Q.  Did you ever try to cancel it?

00025

1    A. No.

2    Q. Do you remember if you received a notice of

3 a right to cancel that transaction?

4    A. With the mortgage papers you mean?

5    Q. Yes.

6    A. I don't remember, but I'm sure it was in

7 there.

8    Q. Do you still have all the mortgage papers

9 from your original mortgage transaction with

10 Greylock?

11    A. I think I do.

12    Q. Have you provided those documents to your

13 attorneys in this case?

14    A. I'm not sure.  I don't remember if I -- I

15 don't think so.

16       MR. LEFEBVRE:  If you want them, we'll

17 get them copied.  No problem.

18    Q. Now, other than the refinance transaction

19 that is the subject of this case, did you ever try

20 to refinance that mortgage?

21    A. No.

22    Q. So was this the first time that you

23 refinanced?

24    A. Yes.

00026

1    Q. I want to go back to the house you owned

2  before that, which is Cole Street.

3    A. Cole Avenue.

4    Q. Cole Avenue. Okay. When did you buy that

5  house?

6    A. Well, it would have been, I guess, 1996.

7    Q. And you bought that with your husband, is

8  that right?

9    A. Yes. And also with my mother-in-law,

10  actually. It was a duplex property that we shared

11  with my mother-in-law.

12    Q. A two-family?

13    A. Yes.

14    Q. Do you remember what you paid for that

15  house?

16    A. I think $99,500.

17    Q. Again, did you take a mortgage?

18    A. Yes.

19    Q. With whom?

20    A. I believe that one was also with Greylock.

21  Actually, no, it wasn't. It was with another bank

22  down in Lee, I believe.

23    Q. Do you remember the name of the bank?

24    A. I think it might have been Lee Bank, but

00027

1  I'm not sure.

2    Q. Did you go to the closing --

3    A. Yes.

4    Q. -- for that transaction?

5    A. Yes, I did.

6    Q. Were you represented by an attorney?

7    A. I'm sure we must have been.  I think you

8  have to have an attorney at those closings, and you

9  have to pay an attorney for a closing on a house.  I

10  don't remember, though.

11    Q. Do you know if that attorney represented

12  anybody else in the transaction?

13    A. I don't remember.

14    Q. And you don't know who that attorney was?

15    A. No, I don't.

16    Q. Now, did you have to sign documents at the

17  closing?

18    A. Yes.

19    Q. Did you read any of the documents before

20  you signed?

21    A. No.

22    Q. Did you ask any questions at that closing?

23    A. No.

24    Q. Do you remember if anybody else asked

**Lillie, Laura A. - 12/16/2004**                    **Page 27**

00028

1 questions at the closing?

2    A. I don't remember. It's a long time ago.

3    Q. Do you believe that you had a right to

4 cancel that loan?

5    A. I must have. I didn't think about it at

6 the time.

7    Q. Is it for the same reason that you gave me

8 before?

9    A. What reason?

10    Q. Why did you think you had a right?

11    A. I just thought it was -- you always have a

12 right to cancel. That's just my assumption. I

13 don't know if that's true or not. I didn't have any

14 reason to want to cancel, so it wasn't something

15 that I worried about.

16    Q. Now, for that mortgage, did you ever

17 refinance that mortgage?

18    A. No.

19    Q. So you held that mortgage until you sold

20 the property?

21    A. That's correct.

22    Q. Other than your current house, do you own

23 any other real property today?

24    A. No.

00050

1  documents to review?

2     A.  I don't recall.

3     Q.  Do you remember if you reviewed any

4  documents before the closing?

5     A.  I don't recall.

6     Q.  Did the person who performed the closing

7  provide any instructions to you at the closing?

8     A.  Not really.  He really basically just

9  whipped papers at us, "Sign here.  Sign here.  Sign

10  here."  He had to be at another closing up in Adams

11  after us.  This was 10:30 at night.

12     Q.  Did you ask any questions during the

13  closing?

14     A.  No.

15     Q.  How about your husband?

16     A.  No.  I don't believe either one of us did.

17     Q.  What documents do you remember receiving at

18  the closing?

19     A.  All the loan papers, all the mortgage

20  documents.  At the time I didn't know what -- I

21  didn't have a chance to even look at anything to see

22  what it was.  I mean, he was literally whipping

23  papers at us, very fast, very rushed.

24     Q.  Do you remember signing a note at the

**Lillie, Laura A. - 12/16/2004**          **Page 50**

00051

1  closing?

2    A.  No.

3    Q.  Do you remember signing a mortgage at the

4  closing?

5    A.  I just remember signing a bunch of

6  documents, a pile of documents that we thought were

7  our loan documents.

8    Q.  You don't remember any specific documents?

9    A.  Nothing specific.

10    Q.  Do you remember receiving a truth-in-

11  lending disclosure statement?

12    A.  I believe it was within the paperwork that

13  we had, the loan paperwork.

14    Q.  Do you remember receiving a notice of your

15  right to cancel with the papers?

16    A.  That was in with the loan documents also.

17    Q.  Am I correct that you just signed all the

18  documents that were provided to you?

19    A.  That's correct.

20    Q.  So you didn't read any of the documents at

21  the closing?

22    A.  Basically, no, "This is this, sign here.

23  This is this, sign here.  This is that, sign here."

24    Q.  So when you say, "this is whichever

**Lillie, Laura A. - 12/16/2004**                    **Page 51**

00052

1 document," was he explaining to you what the

2 documents were?

3    A. No.

4    Q. But he was identifying what the documents

5 were?

6    A. He would identify the document, "Sign

7 here."

8    Q. Other than the documents I just walked

9 through with you, the note, the mortgage, the truth-

10 in-lending disclosure statement, the notice of the

11 right to cancel, do you remember any other documents

12 that you received at closing?

13    A. No.

14    Q. You mentioned to me a few minutes ago that

15 the loan proceeds weren't released to you for a few

16 days, is that right?

17    A. That's correct.

18    Q. Did you understand that there was a waiting

19 period between the closing and when you would

20 receive the money?

21    A. I knew there would be a little bit of time

22 that would pass, but I didn't realize it would go

23 beyond our opportunity to rescind the loan. We had

24 trouble when the checks came too. I have checks

**Lillie, Laura A. - 12/16/2004**        **Page 52**

00056

1     MR. LEFEBVRE:  And L is the right to

2  cancel.  That's correct, Dan.

3     Q.  Mrs. Lillie, do you remember when your

4  first payment was due?

5     A.  I believe it must have been the beginning

6  of October.

7     Q.  Do you know how that payment was made?

8     A.  By check.

9     Q.  Do you recall who the payment was made to?

10    A.  First Horizon, I believe.

11    Q.  I think you told me before that you have

12  not fallen behind on any of your loan payments, is

13  that right?

14    A.  No, never.

15    Q.  Now, since the refinancing, have you been

16  happy with the servicing on the loan?

17    A.  Since the refinancing?

18    Q.  Yes.

19    A.  We've had no problems, I mean, other than

20  the whole process of getting the loan and what we

21  went through at the closing and things like that.

22  Paying the loan each month is not a problem.  We do

23  that.  That's the only really servicing that happens

24  is we pay them.

00060

1  marked as Exhibit 4.  It has a Bates number of

2  FH 676.  Do you remember this document as the notice

3  that you received in your loan package?

4      A.  Yes.

5      Q.  And at the bottom, is that your signature

6  and your husband's signature?

7      A.  Yes, it is.

8      Q.  And it's dated August 27, 2003?

9      A.  That's correct.

10     Q.  Now, is this a document you were telling me

11  about a few minutes ago that told you you had a

12  three-day period to cancel?

13     A.  Yes.

14     Q.  So when was it then that you first decided

15  that you wanted to cancel your loan?

16     A.  I hadn't made a decision to want to cancel

17  the loan at all until I actually spoke with

18  Mr. Lefebvre.  We had been very unhappy with the

19  whole process, and once the checks -- the proceeds

20  from the loan finally came, and then there was a

21  problem with that.  All along things were happening

22  that were like, "What is going on here?  We

23  shouldn't have done this."  We should have -- at the

24  time not done it, not signed.

00076

1    A.  I don't know.  We hadn't discussed it any

2   further than that.

3    Q.  It's your husband who had these

4   discussions?

5    A.  Someone had contacted him recently and

6   talked to him on the phone.

7    Q.  Does the interest rate that is available

8   have any effect on your decision as to whether or

9   not to rescind?

10   A.  No.

11   Q.  If you couldn't get a better interest rate

12  than what you have now on your current loan, would

13  you still want to rescind?

14   A.  Yes.

15   Q.  Why is that?

16   A.  I would want to have my loan be done

17  locally, as it always was before, and not have to

18  deal with the out-of-town company.

19       MR. LEFEBVRE:  Excuse me, Dan.  May I

20  see the complaint that you had shown her earlier,

21  just for myself.

22       MR. PASQUARELLO:  Sure.

23       MR. LEFEBVRE:  Thank you.

24   Q.  So does your decision to rescind, if you

**Lillie, Laura A. - 12/16/2004**                    **Page 76**

EXHIBIT C



FAMILY AND CONSUMER LAW CENTER
WWW.RICONSUMERLAW.COM     401-719 5759
CLAUDE P. LEFEBVRE
CHRISTOPHER M. LEFEBVRE, P.C.
ATTORNEYS & COUNSELORS AT LAW



# LEGAL ADVERTISEMENT

Dear Homeowner:

    If you recently refinanced a mortgage with a loan from First Horizon, then you may have received inaccurate disclosures in violation of the Federal Truth in Lending Laws. You could be entitled to monetary damages of $2,000.00 and or rescission of the entire loan. A recent client of mine rescinded his mortgage loan and saved $50,000.00!!

    I would love to conduct a free telephonic consultation to discuss your First Horizon loan. Please have a copy of your closing documents readily available before you call. I can be reached daily at 401-728-6060 and or toll free at 1-800-851-1829. You may also contact me via email at Lefeblaw@aol.com. ( Please include "First Horizon" in the subject line of your email.)

*Christopher M. lefebvre Esquire*

TWO DEXTER STREET, P.O. BOX 479   PAWTUCKET, RI 02862     PHONE: (401) 728-6060   FAX (401) 728-6534

EXHIBIT D

10:09:06

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

RALPH G. MCKENNA, GLENROY )
A. DEANE, ILENE )
WILGOREN-DEANE, CHRISTOPHER )
J. LILLIE, and LAURA A. )
LILLIE, )
                             )
        Plaintiffs,          )
                             )
VS.                          )      NO. 04-10370-RCL
                             )
FIRST HORIZON HOME LOAN      )
CORPORATION,                 )
                             )
        Defendant.           )

TELEPHONIC DEPOSITION OF

CHARLES COVINGTON

FEBRUARY 11, 2005

COPY

10:09:06

TELEPHONIC DEPOSITION of CHARLES

COVINGTON, produced as a witness at the instance of

the Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 11th of

February, 2005, from 10:09 a.m. to 12:09 p.m., before

Audra B. Paty, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of First

Horizon Home Loans, 4000 Horizon Way, in the City of

Irving, County of Dallas, State of Texas, pursuant to

Notice and the Federal Rules of Civil Procedure.

10:42:07   1   Q.  No, I guess what I'm -- let Me withdraw the

       2   question.  You told me that in April the form was

       3   changed.  I guess during the time frame when the other

       4   form was in existence, had you received any complaints

       5   from either brokers or consumers about the content of

       6   the right to cancel form that was used?

       7   A.  Not that I'm aware of.

       8   Q.  Not that you are aware of?

       9   A.  No.

      10   Q.  And you said that you had received some

      11   correspondence from your legal department about the

      12   form, correct?

      13           MR. HEFFERON:  Objection.  I don't think

      14   that's what he said.

10:42:43  15   Q.  All right.  Can you tell me how the legal

      16   department got involved with the new form 1047, if at

      17   all?

      18           MR. HEFFERON:  You mean in terms of

      19   initiation of the change?

      20           MR. LEFEBVRE:  Exactly.

      21   A.  Yes.  I think what I said is it was brought

      22   to my attention by the legal department that we had an

      23   issue with the form.  And, apparently, it was -- I

      24   believe it was -- I have learned today that it was you

      25   that had complained about the design of the form

10:43:14   1   and --

2                    MR. HEFFERON:  And don't talk about what

3   your lawyer told you about the form.

4                    THE WITNESS:  Right.

5        A.  And then stemming from that, then, as I said

6   earlier, we thought we would re-evaluate the form and

7   if the check boxes were problematic, could we design a

8   form that would be easier and better for our branches

9   to execute and fulfill the rescission requirements,

10  and that was how we came to design this form.

11       Q.  Okay.  Now, who at First Horizon actually

12  reviewed the 1047 right to cancel form before it was

13  decided to implement it in its residential mortgage

14  foreclosing packet?

10:44:11  15                   MR. HEFFERON:  Objection.

16                   You mean reviewed after it was drafted

17  and before it was implemented?

18                   MR. LEFEBVRE:  Right.

19                   MR. HEFFERON:  Go ahead, if you know.

20       A.  That would have been Annalee Myers.  If you

21  want to separate the drafters and designers from the

22  approvers and reviewers.

23       Q.  And that's what I'm getting at.  I'm really

24  asking for who the approvers of this form are.

25       A.  The ultimate approvers of the form would have

Charles Covington    -    February 11, 2005

40

10:56:50

1          MR. HEFFERON:  Objection.  He testified

2     that you had claimed there was a problem with these

3     boxes.

4          MR. LEFEBVRE:  Okay.  That's a fair

5     question.

6     Q.  Well, were you aware that there were any

7     problems with these boxes but for me?

8     A.  No.

9     Q.  Okay.  So I was the only person who ever

10    lodged a complaint -- when I say, myself, myself on

11    behalf of my client -- that there was a problem with

12    boxes not being checked?

13    A.  To my knowledge, yes.

14    Q.  Oh, okay.  Other than this lawsuit that is

10:57:32    15    pending in Massachusetts, has anyone filed any type of

16    complaint relative to the content of Exhibit 3?

17         MR. HEFFERON:  Define what you mean by

18    filed a complaint.

19    Q.  Well, has it been brought to the attention of

20    New Century that there were any type of problems with

21    the right to cancel the contents of the right to

22    cancel form, which is referenced in Exhibit 3, the

23    form they are using now?

24         MR. HEFFERON:  You referred to New

25    Century again.

Charles Covington   -   February 11, 2005

41

10:58:04

1        MR. LEFEBVRE:  I'm sorry.  You know who I

2    have got on my mind, right?

3        MR. HEFFERON:  Apparently.  Maybe you

4    should spend your time suing them and not First

5    Horizon.

6        MR. LEFEBVRE:  I'll comment after the

7    testimony about that.

8        Q.  I meant First Horizon.  I'm sorry.

9        MR. HEFFERON:  So the question is:  Other

10    than this lawsuit, is Mr. Covington aware of other

11    complaints being made concerning Exhibit 3?

12        A.  I am not aware of any other complaints

13    concerning Exhibit 3.

14        Q.  Okay.  Now, where are the -- after a loan is

10:58:36  15    closed -- and, once again, I'm staying focused on

16    residential consumer either purchase loans or

17    refinancing -- where are the loan files actually kept?

18        MR. HEFFERON:  Objection, compound.

19        I think it might be helpful to the

20    witness if you say when in time, Chris.  Where did

21    they eventually go or where are they kept in the

22    process.

23        MR. LEFEBVRE:  I want to focus -- I mean,

24    obviously, in this lawsuit, there has been an issue

25    about document retrieval.