# APPENDIX B

Charles Covington    –    February 11, 2005

1

10:09:06  1         IN THE UNITED STATES DISTRICT COURT

        2          FOR THE DISTRICT OF MASSACHUSETTS

        3  RALPH G. MCKENNA, GLENROY    )
           A. DEANE, ILENE             )
        4  WILGOREN-DEANE, CHRISTOPHER )
           J. LILLIE, and LAURA A.     )
        5  LILLIE,                     )
                                       )
        6       Plaintiffs,            )
                                       )
        7  VS.                         )    NO. 04-10370-RCL
                                       )
        8  FIRST HORIZON HOME LOAN     )
           CORPORATION,                )
        9                              )
                Defendant.             )
       10

       11         TELEPHONIC DEPOSITION OF

       12          CHARLES COVINGTON

       13          FEBRUARY 11, 2005

       14              COPY

10:09:06  15

       16      TELEPHONIC DEPOSITION of CHARLES

       17  COVINGTON, produced as a witness at the instance of

       18  the Plaintiffs, and duly sworn, was taken in the

       19  above-styled and numbered cause on the 11th of

       20  February, 2005, from 10:09 a.m. to 12:09 p.m., before

       21  Audra B. Paty, CSR in and for the State of Texas,

       22  reported by machine shorthand, at the offices of First

       23  Horizon Home Loans, 4000 Horizon Way, in the City of

       24  Irving, County of Dallas, State of Texas, pursuant to

       25  Notice and the Federal Rules of Civil Procedure.

2

10:09:06

```
 1              A P P E A R A N C E S

 2      FOR THE PLAINTIFFS:
 3          Mr. Christopher M. Lefebvre (Via Phone)
            LAW OFFICES OF CLAUDE LEFEBVRE & SONS
            P.O. Box 479
 4          Pawtucket, RI 02862

 5

 6      FOR THE DEFENDANT:
 7          Mr. Thomas M. Hefferon
            GOODWIN PROCTER, L.L.P.
            901 New York Avenue, N.W.
 8          Washington, D.C. 20001

 9

10

11

12      ALSO PRESENT:
            Ms. Barbara Brown Eddy
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

10:09:06

1                          I N D E X

2   WITNESS                                    PAGE

3   CHARLES COVINGTON

4   EXAMINATION BY MR. LEFEBVRE                     4

5

6

7   EXHIBITS                            IDENTIFIED

8   1 - Notice of Depositions                    5

9   2 - Tabares Notice of Right to Cancel       33

10  3 - Notice of Right to Cancel FH 001047   35

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

10:09:06

1            P R O C E E D I N G S

2                CHARLES COVINGTON,

3    having been first duly sworn, testified as follows:

4                    EXAMINATION

5    BY MR. LEFEBVRE:

6        Q.  Good morning.

7        A.  Hello.

8        Q.  Hi.  I'm Chris Lefebvre, and I'm here in

9    Rhode Island conducting a deposition on behalf of

10   Ralph McKenna, Glenroy Deane, Ilene Deane, and

11   Christopher and Laura Lillie regarding a federal

12   lawsuit that is pending in the United States District

13   Court for the District of Massachusetts.

14            And what is your name, sir?

10:09:29   15        A.  Charles Stephen Covington.

16       Q.  Now, I'm going to be asking you a series of

17   questions, and I just want to briefly go over the

18   ground rules.  I'm going to assume that if you answer

19   my question, two things, number one, that you

20   understood the question, and, number two, that you

21   answered the question truthfully and honestly to the

22   best of your ability.  Okay?

23       A.  Okay.

24       Q.  Now, have you ever been deposed before?

25       A.  No.

5

10:10:00    1        Q.   This is the first time?

2        A.   Yes.

3             MR. LEFEBVRE:   Okay.  Madam Court

4   Reporter, could we have the notice of deposition --

5   that I believe Mr. Hefferon should have a copy --

6   marked as an exhibit for this deposition?

7             MR. HEFFERON:   I'm pulling it out, Chris.

8             MR. LEFEBVRE:   Thanks, Tom.

9             MR. HEFFERON:   Okay.  Chris, I have the

10   notice of deposition.  Like I said, it is my copy and

11   it has some highlighting on it, but we'll have the

12   court reporter mark it, and when we copy it, it will

13   just copy clean, I believe.

14             MR. LEFEBVRE:   Beautiful.

10:11:08   15             MR. HEFFERON:   All set.  She is just

16   going to mark it now.

17             (Exhibit No. 1 marked.)

18        Q.   Now, Mr. Covington, you have in front of you

19   what I believe has been marked as Plaintiff's Exhibit

20   1.  I'm going to ask you if you have seen this

21   document before.

22        A.   I have not seen this document before.

23        Q.   Okay.  I want you to take a moment.  It is

24   not a very lengthy document.  It should be really only

25   two substantive pages.  Take a moment to look at it,

10:11:36    1    and when you are done, let me know because I would

2    like to just ask you a few questions about it.

3                    MR. HEFFERON:  It is really the listing

4    here, the various topics that I have highlighted.  And

5    he wants you to read them over quickly once to

6    yourself, and then he may ask you a question or two

7    about it.

8        A.   Okay.

9        Q.   Do you understand that this is what is

10   known -- what I'm doing today is conducting a 30(b)(6)

11   deposition of First Horizon Home Loans?  You

12   understand that?

13       A.   Yes, I understand it is a deposition.  I

14   don't know about those citations, but, yes, I do

10:12:21  15   understand this is a deposition.

16       Q.   Okay.  Well, I want to make clear that

17   pursuant to this notice, I'm going to be asking First

18   Horizon --

19                   MR. LEFEBVRE:  Can we for the record

20   abbreviate when I say First Horizon that I'm referring

21   to the defendant in this case?  Is that an acceptable

22   stipulation, Tom?

23                   MR. HEFFERON:  Sure.

24       Q.   Mr. Covington, I want to make sure that you

25   understand that I'm conducting a deposition of First

7

10:12:48    1    Horizon today.

2         A.  Yes.

3         Q.  Not of you.  Do you understand that?

4         A.  I understand that.

5         Q.  Okay.  And that it is my understanding you

6    have been designated by First Horizon to answer

7    various questions -- what we call areas of inquiry --

8    as outlined in the two-page notice of deposition,

9    which I believe you have just reviewed.  Do you

10    understand that?

11         A.  Yes.

12         Q.  And you believe that you are competent and

13    knowledgeable to answer questions regarding the

14    various areas of inquiry contained in this notice of

10:13:26    15    deposition?

16         A.  I believe so.

17         Q.  Okay.  Now, you are presently employed by

18    First Horizon, correct?

19         A.  Yes.

20         Q.  Can you tell me your capacity, what type of

21    work you do for First Horizon?

22         A.  I am the director of quality control and

23    compliance for the company.

24         Q.  Okay.  Can you tell me, what does a director

25    of quality control and compliance do in a general

8

10:13:50    1   sense?

2       A.   Okay.   I manage our quality control testing

3   review function.   I manage our compliance function,

4   which is an advisory risk management type role.   I

5   manage a fraud investigation group for the company.   I

6   manage our HMDA data review and preparation and filing

7   function.   And I also manage our broker approval

8   function for the company.

9       Q.   Now, you are -- you actually work in Texas, I

10  assume?

11      A.   Yes.

12      Q.   At the corporate headquarters?

13      A.   Yes.

14      Q.   And how long have you held this title or had

10:14:32   15  this job?

16      A.   Since August of 2001.

17      Q.   Now, I'm going to call it in a general sense

18  the compliance quality control department.   Is that a

19  separate area or a separate department of First

20  Horizon?

21      A.   Well, collectively it is one department under

22  my management, which has those various operational

23  units.

24      Q.   And how many people actually work under your

25  supervision?

9

10:15:02

1      MR. HEFFERON:  You mean directly or

2  indirectly?

3      Q.  Let's start directly first.

4      A.  Directly I have five managers and an

5  administrative assistant that report to me.

6      Q.  And how about indirectly that work under you?

7      A.  35 people.

8      Q.  Did you say 35?

9      A.  35.

10      MR. LEFEBVRE:  Now, Tom, what I wanted to

11  do at this point --

12      Q.  Because I believe in simplifying things, Mr.

13  Covington.

14      MR. LEFEBVRE:  I don't want to make this

10:15:35  15  deposition three hours long when we can probably get

16  it done in an hour.  What I would like to do is have a

17  stipulation, Tom, relative to the right to cancel that

18  when I ask questions about the right to cancel form,

19  that I'm referring to the form which was attached as

20  Exhibit D, H, and L of the amended complaint that has

21  been filed in this case.  Is that an acceptable

22  stipulation, Tom?

23      MR. HEFFERON:  Yes.  I also point out

24  that we have produced those documents as well as part

25  of the loan files and also 1047, if you have it there,

10

10:16:17   1    Chris, is the actual form.

           2              MR. LEFEBVRE:  1...

           3              MR. HEFFERON:  1047.  Probably the last

           4    document that we produced to you.

           5              MR. LEFEBVRE:  Oh, 1047, yes.  I saw

           6    that.  That's basically the same as Exhibit, D, H, and

           7    L, but it doesn't have the identifying information.

           8              MR. HEFFERON:  That's correct.  It does

           9    actually have an address here of Pittsburgh,

          10    Pennsylvania as a place.

          11              MR. LEFEBVRE:  You are right.  I saw

          12    that.

          13              MR. HEFFERON:  Yeah, but, anyway, if you

          14    wanted to mark 1047, you could do that.  I don't care

10:16:49  15    what you do.

          16              MR. LEFEBVRE:  I think we can have an

          17    agreement that 1047 speaks for itself if we need it

          18    somehow in some pleading before Judge Lindsey.  We can

          19    attach it.  I don't think we need to mark it.

          20              MR. HEFFERON:  Okay.  But I'm putting it

          21    before the witness so that when you are talking about

          22    the right to cancel form that you described and I

          23    agree is D, H, and L, I'm putting 1047 before the

          24    witness in case he has to refer to it.

          25              MR. LEFEBVRE:  Certainly.  That's fine.

Charles Covington    -    February 11, 2005

11

| 10:17:13 | 1 | MR. HEFFERON: Okay. Go ahead. |

1      MR. HEFFERON: Okay. Go ahead.

2   Q. Okay. Now, Mr. Covington --

3      MR. HEFFERON: So just to make sure

4  Mr. Covington understands, so when he talks about the

5  right to cancel form, he is talking about this

6  document here that is before you, 1047, unless he

7  makes it clear otherwise. And you should feel free --

8  and I'm sure Chris agrees with this -- if you are not

9  sure which form he is talking about, to ask him to

10  clarify.

11      THE WITNESS: Okay.

12   Q. Can you tell me a little bit about the

13  residential foreclosure portfolio of First Horizon?

14  I'm mainly interested in getting a general sense about

15  the various depositions. I understand through the

16  documents there is a retail and wholesale. Can you

17  tell me the different divisions?

18   A. I don't understand. Residential foreclosure

19  division?

20      MR. HEFFERON: You said, foreclosure,

21  Chris.

22   Q. I'm sorry. I meant -- not foreclosure. I

23  met consumer mortgages, refinances.

24      MR. HEFFERON: Lending?

25   Q. Lending.

10:17:50 (line 15)

Charles Covington    -    February 11, 2005

12

10:18:14

1    A.   You are talking about the channels that we

2  originate loans?

3    Q.   Absolutely.

4    A.   Well, we have a retail origination channel.

5  We have a wholesale broker origination channel.  We

6  have a correspondent origination channel.  We have a

7  nonprime business, which is lending center that can be

8  an origination channel.  Consider that separately.

9  And then within that, we have telemarketing-type

10  origination channels, direct marketing, and things

11  like that, both inbound and outbound.

12    Q.   Okay.  Can you tell me in a general sense

13  about the retail channel?  And I'm talking about -- I

14  want to stay focused.  I'm talking about consumer

10:19:02  15  mortgage loans.  That's what I'm talking about.

16  Either refinance or purchase loans.

17          MR. HEFFERON:  You mean how it is

18  organized?

19          MR. LEFEBVRE:  Yes.

20    A.   Okay.  How it is organized?  It is organized

21  on a regional level.  We have 11 or 12 regions, and

22  within those regions, there are various branches.  And

23  within those branches, there is a branch manager to

24  whom the -- what we call relationship managers, loan

25  officers report to.  Is that what you had in mind?

Charles Covington    -    February 11, 2005

13

10:19:35

1        Q.   Yes.   Thank you.

2             And how about the wholesale?   That, I

3    assume, is different than the retail?

4        A.   It is fairly similar.   We don't have our --

5    from an organizational standpoint, retail and

6    wholesale report into the same senior executive.   So

7    within these regions, you'll have both retail branches

8    and wholesale branches.   And in a wholesale branch, it

9    is very similar.   We have a branch manager.   You don't

10   have relationship managers.   You have what we call

11   account executives who actually are the ones that sign

12   up new brokers, but a fairly similar structure

13   otherwise.

14       Q.   Just so I'm clear, why would a consumer --

10:20:25   15   let me withdraw the question.   So in the retail area,

16   you actually have what might be considered storefront

17   where, you know, people know it is a First Horizon

18   building and if you want a mortgage, you can go.

19   That's a retail division, correct?

20       A.   Well, in our retail -- we do have retail

21   offices that would accept, you know, walk-up customer

22   business.

23       Q.   Okay.

24       A.   Which would not be the case in wholesale, if

25   that's what you mean.

Charles Covington    -    February 11, 2005

14

10:20:52    1        Q.   Right.  Now, wholesale, I assume they must

2    deal with various independent mortgage brokers in the

3    particular region, correct?

4        A.   That's true.  Yes.

5        Q.   Okay.

6             MR. LEFEBVRE:  Tom, I'm having a hard

7    time hearing.  Hold on a second.  I'm just going to

8    make an adjustment.

9             MR. HEFFERON:  Okay.

10             MR. LEFEBVRE:  Okay.  Can you hear me

11    okay now?

12             MR. HEFFERON:  Yeah.

13             MR. LEFEBVRE:  You don't have a problem

14    on my end?

10:21:26    15             MR. HEFFERON:  No.

16             MR. LEFEBVRE:  I'm just having a little

17    bit of a problem.  I can hear you, Tom, very, very

18    well, but I'm having a hard time hearing

19    Mr. Covington.  I don't know if it is his location to

20    the speaker or not or maybe, Mr. Covington, if you

21    could just speak up a little bit for me, that might be

22    helpful and might expedite the process for me.

23             THE WITNESS:  Okay.

24             MR. HEFFERON:  Go ahead, Chris.

25        Q.   What state is First Horizon licensed to do

charles covington    –    february 11, 2005

15

| | |
|---|---|
| 10:21:53 | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |

10:21:53   1   business in the residential mortgage arena?

2                   MR. HEFFERON:  Chris, let me just suggest

3   that because of the various rules about licensing, I

4   assume that you really just want to know where they

5   make loans.

6                   MR. LEFEBVRE:  Absolutely.

7                   MR. HEFFERON:  So why don't you just

8   answer that question, Steve.  Residential mortgage

9   loans.

10                   MR. LEFEBVRE:  Absolutely.

11        Q.  That's what we are talking about for this

12   deposition, residential mortgage loans.  I want to

13   know where you pretty much do business.

14        A.  Well, we do business in most states.  We

10:22:18   15   don't have offices in every state, but in most states

16   in the U.S. we have offices.

17        Q.  Okay.  And how long has First Horizon

18   actually been doing residential mortgages?  How many

19   years now?

20        A.  Well, I mean, that's a complex question.

21   First Horizon is an aggregation of a lot of different

22   businesses that have been acquired over time and

23   really branded under the name First Horizon just

24   within the last few years.

25        Q.  When you say, few years, how many is it?

16

10:22:56    1    A.    I think the name change occurred in -- let me

2    think for a second.    Well, 2000 I think is when we

3    went to the overall First Horizon branding.    Prior to

4    that these various companies were owned by First

5    Horizon, but they operated under their previous names.

6    Q.    Now, getting back to the retail and wholesale

7    segments, I assume that the documentation involving a

8    First Horizon residential mortgage is the same other

9    than, obviously, the interest rate and the consumer

10    and the property.    I'm talking about the form

11    documentation is the same in both divisions?

12    MR. HEFFERON:    You mean currently?

13    MR. LEFEBVRE:    Yes.

14    MR. HEFFERON:    Objection, compound

10:23:55    15    question.

16    Go ahead.    You can answer it.

17    A.    Well, I guess you mean -- what documents are

18    you talking about?    I don't -- disclosures or forms or

19    what do you mean?

20    Q.    Well, I guess what I'm asking is if there is

21    a residential mortgage closing that is generated from

22    the retail division, there is a set of documentation

23    that generally has to be signed by the homeowner when

24    they want to take out a mortgage with First Horizon,

25    correct?

17

10:24:30

1   A.   True, yes.

2       Q.   And assume that another scenario, a mortgage

3   that ultimately is going to be generated, still a

4   consumer residential with First Horizon that comes

5   from the wholesale division, I assume there is also a

6   set of documentation that the consumer has to sign at

7   the time of the closing, correct?

8       A.   Yes, some documents would be principally the

9   same.  For example, we would use a standard conforming

10  Fannie Mae note.  Other documents coming from

11  wholesale may be different because some of the

12  documents may have been generated by the wholesale

13  broker.

14      Q.   Oh, okay.  But in the retail division, is it

10:25:15
15  fair to say that all of the documentation is generated

16  by First Horizon or is that not a correct assumption?

17      A.   Well, that depends on what you mean.  We have

18  various origination systems that create documents and

19  there is flexibility given to our branches for what

20  system is selected, and there are some differences

21  among those systems.

22      Q.   And can you explain to me what some of those

23  differences might be in a general sense?

24      A.   Well, in a general sense we have our own

25  in-house origination system, which would generate a

10:25:52    1  doc set that would look one way whereas we have some

2  doc prep vendors that would prepare documents for us

3  which may appear differently.  In some states, I think

4  we have to have even attorneys prepare the documents

5  because of certain state laws and things like that.

6      Q.  Okay.  Now, I want to ask you a few questions

7  about the right to cancel form that we were talking

8  about earlier.  It is my understanding reviewing

9  responses of First Horizon that the right to cancel

10  form, which is the subject of this litigation was --

11  began to be used by First Horizon in April of '03; is

12  that correct?

13      A.  Yeah, the form was created in April of '03.

14  I think it was actually implemented in May of '03.

10:26:48   15      Q.  And if you just take a look at the document

16  that you should in have in front of you -- and I'm

17  referring to the document that Tom referenced, the

18  number 1047 that was provided to me.  Do you have that

19  in front of you?

20      A.  Yes, I do.

21      Q.  I noticed in the left-hand corner there is

22  some type of -- left-hand bottom corner.

23      A.  Yes.

24      Q.  There is some type of letter and numerical

25  combination which appears to me to be some type of

Charles Covington    -    February 11, 2005

19

| | |
|---|---|
| 10:27:17 | 1 | identifying feature, CV6D016.  Do you see what I'm |
| | 2 | referring to? |
| | 3 |     A.  Yes. |
| | 4 |     Q.  Okay.  Does that have any type of |
| | 5 | significance, that code or combination of letters in |
| | 6 | the 4/03 date thereafter? |
| | 7 |     A.  I don't really know what that is.  That is |
| | 8 | probably a reference number for this doc residing on |
| | 9 | our TMO system. |
| | 10 |     Q.  Now, you said that this document was created |
| | 11 | or -- in April of '03? |
| | 12 |     A.  Created in April of '03, yes. |
| | 13 |     Q.  Okay.  And did you personally or anyone under |
| | 14 | your supervision or control participate in the |
| 10:28:01 | 15 | creation of this document? |
| | 16 |     A.  Yes. |
| | 17 |     Q.  Okay.  And First Horizon started to use this |
| | 18 | document in May of '03, correct? |
| | 19 |     A.  I believe so, yes. |
| | 20 |     Q.  Okay.  Now, earlier we were talking about the |
| | 21 | retail division.  Is it fair for me to assume that |
| | 22 | this document, the number 1047, the right to cancel |
| | 23 | that we have been talking about, would have been |
| | 24 | utilized by all of the retail component of First |
| | 25 | Horizon after May of '03? |

Charles Covington    -    February 11, 2005

20

10:28:38  1              MR. HEFFERON:  Objection, vague.

         2              You can answer if you understand it.

         3      A.  Well, let me think about that.

         4      Q.  Do you understand what I'm asking?

         5      A.  Maybe repeat the question.

         6      Q.  Okay.  We were talking about the retail

         7  division.  I just want to understand if there is

         8  uniformity of documents throughout the retail consumer

         9  residential mortgage division of First Horizon.  So my

        10  question is:  Is it fair to say that after May of '03

        11  that this right to cancel, which you have in front of

        12  you, is the form that was utilized by all of the

        13  retail branches or outfits of First Horizon?

        14              MR. HEFFERON:  Objection, asked and

10:29:28 15  answered.

        16              Go ahead.

        17      A.  I would say that -- well, I think I would

        18  have to answer no because we have various doc prep

        19  vendors and other types of avenues in which closing

        20  documents are prepared.  So it wouldn't be -- I

        21  couldn't say that this is the form that has been used

        22  every single time, no.

        23      Q.  Oh, so some of the vendors that you were

        24  talking about a little bit earlier, they may have used

        25  a different version of the right to cancel?