Charles Covington    -    February 11, 2005

21

10:30:02    1        A.    Some potentially different version.

2        Q.    Okay.    I assume that the various versions

3    that may have been used of the right to cancel would

4    have been approved by First Horizon?

5        A.    Yes.

6        Q.    Okay.    And I assume that First Horizon would

7    have copies of the various right to cancel forms that

8    may have been used by those entities or divisions

9    within the retail division of First Horizon?

10                MR. HEFFERON:    During this period, you

11    mean?

12                MR. LEFEBVRE:    Yes.    I'm talking about

13    after May of '03.

14        A.    I'm assuming so.    I mean, do we have a handy

10:30:42    15    record of how it may have changed over time, I'm not

16    sure.    For sure, those disclosures would be in any

17    given loan file, and we do have a record of that.    So

18    from that standpoint, yes.

19        Q.    Okay.    Now, do you know why -- well, strike

20    that.

21                I assume before April of '03 that First

22    Horizon used a different notice of right to cancel

23    form for residential consumer mortgages.    Is that a

24    fair statement?

25        A.    That's true.

February 11, 2005

22

10:31:16    1        Q.   Okay.  Can you -- are you familiar with the

2    form that was used prior to April of '03?

3              MR. HEFFERON:  You mean the predecessor

4    to the form 1047?

5              MR. LEFEBVRE:  Absolutely, yes.

6        A.   Yes, I am.

7        Q.   Okay.  Can you tell me about that form in a

8    general sense, how it may be different from 1047?

9        A.   The previous form had a selection check box

10    type of presentation where depending on the rescission

11    right, there was a requirement for an affirmative

12    checking of a box.

13        Q.   So just so I'm clear, looking at paragraph

14    number 1 of document 1047, would it be fair to say

10:32:06   15    that there would be some type of marking either to

16    reflect that either the first two paragraphs apply of

17    paragraph one or the second paragraph applied

18    depending on the nature of the refinancing?

19        A.   I don't have that document in front of me.

20    Are we going to look at that document?

21              MR. LEFEBVRE:  It was not produced.  We

22    never had it.  We had asked for some form documents,

23    Tom.

24        Q.   Otherwise, if I had the document, I would

25    gladly have referred you to it, sir.

23

10:32:46    1                MR. HEFFERON:  Why don't you actually ask

2    him his recollection of how -- the format of the check

3    boxes --

4                MR. LEFEBVRE:  Sure.

5                MR. HEFFERON:  -- as to that difference.

6                MR. LEFEBVRE:  Sure.

7         Q.  You can answer Tom's question and pretend

8    it's mine.

9         A.  Okay.  Yeah, I mean, the way that form was

10   designed, is was a check box -- there was a check box

11   that would be checked depending on the rescission

12   rights that the customer had.  So it was -- if you

13   have these rights, you would check this box.  If you

14   have those rights, you would check that box to denote

10:33:17   15   the rights that were available to the customer.

16        Q.  Okay.  Now, do you know why there was -- why

17   the form changed?

18        A.  Yes.

19        Q.  Okay.  Can you tell me why?

20        A.  We became aware -- actually, it was brought

21   to my attention from our legal department that there

22   was some concern about the form and the checking of

23   the boxes.  And in looking at the form -- and whether

24   the boxes are being checked.  And from an operational

25   perspective, after looking at the form, we felt like

Charles Covington    -    February 11, 2005

24

10:33:56    1    would it not be better operationally if we had a form

2    which removed the boxes, which in our viewpoint was

3    just removing one less opportunity for a branch to

4    make a mistake.  They could check a wrong box.  They

5    could not check a box at all.  We are always trying to

6    simplify the process so we get it right.  So our

7    thought was, if we eliminate the boxes, maybe we would

8    eliminate an opportunity to make a mistake.

9        Q.   Okay.  And from your recollection, the prior

10    form, the content of the prior form was the same in

11    relation to paragraph 1?  That is, looking at 1047,

12    paragraph -- well, what is identified as number one on

13    the document says, your right to cancel, and

14    underneath that there are four separate paragraphs.

10:34:48    15    Do you see what I'm talking about?

16        A.   Yes.

17        Q.   Okay.  The prior form, prior to April of '03,

18    still had four paragraphs in this area identified as

19    your right to cancel; is that correct?

20            MR. HEFFERON:  If you recall.

21        A.   I believe so.  I don't have that form in

22    front of me.  But if you say so, I will concede that,

23    I guess.

24        Q.   Well, and I'm not trying to trick you.  I

25    recall seeing it in a few other cases that I had

Charles Covington    —    February 11, 2005

25

10:35:18  1  brought against First Horizon.  And my recollection

2  was that it was the same paragraph just with a box.

3  Either the first two paragraphs apply to the

4  transaction or the last two paragraphs.

5      A.  Okay.

6      Q.  Is that your recollection?

7      A.  Yes.

8      Q.  Okay.  So who made the final decision to

9  change the form?  Was that your decision or did

10  someone with you make that decision?

11      A.  The final decision -- the ultimate decision

12  was made by our, at that time, head of production

13  operations.

14      Q.  And what was his or her name?

10:35:55  15      A.  Annalee Myers.

16      Q.  Did you say Annmarie?

17      A.  Annalee.

18      Q.  Annalee.  And her position is what -- or was

19  what when this form was changed?

20      A.  At the time, she was executive vice president

21  over origination risk management.

22      Q.  And is she still employed with the company

23  now?

24      A.  Yes.

25      Q.  And what is her capacity now?

Charles Covington    -    February 11, 2005

26

10:36:16  1         A.  She is now in branch -- I guess it would be

2    considered kind of branch support.  She has dropped

3    off the risk management role and really just branch

4    support now.

5         Q.  Okay.  Now, you were talking about the prior

6    form.  Would you agree with me that but for the area

7    to check off in the first paragraph or this first

8    portion of the right to cancel, was the prior form

9    similar to 1047 that you have in front of you?

10              MR. HEFFERON:  Objection, vague.

11              Chris, he doesn't have the form in front

12    of him, and I think it is unfair to ask him how they

13    compared them.  Besides, you have the form because you

14    have written letters to my client in the past and sued

10:37:07  15    my client about the form.  So it seems --

16              MR. LEFEBVRE:  Well, I know that, Tom,

17    and I'm not trying to be difficult, but we had asked

18    for sample forms in discovery, and they were objected

19    to.  And I'm just, you know, trying to probe this

20    individual's recollection.  If it becomes an issue, we

21    can deal with it then.

22              MR. HEFFERON:  Yeah.  You know, I think

23    at this point if he doesn't have the form in front of

24    him and all he is giving you is his personal -- not

25    the company's testimony, his personal recollection, it

27

10:37:36  1  is just -- I mean, one can take out the form and take

2  out this form and just compare them, but go ahead.

3                MR. LEFEBVRE:  Well, Tom, just to follow

4  up, so if, in fact, there -- you mentioned that I had

5  brought some other lawsuits.  Would it be fair for me

6  to assume that the forms that were attached to the

7  other two complaints that I have filed, I believe in

8  the Rhode Island Federal District Court, would have

9  been indicative of the form that was used in

10  residential consumer mortgage closings prior to April

11  of '03?

12                MR. HEFFERON:  I think the answer to that

13  is that those forms -- are you referring to the Morin

14  case and Tabares case?

10:38:19  15                MR. LEFEBVRE:  Exactly, yes.

16                MR. HEFFERON:  I'll have to write you a

17  letter after this deposition, but I believe the answer

18  is, yes, that that form is indicative of the

19  predecessor to form recognizing the witness' prior

20  testimony already that there may well be and were, in

21  fact, other forms out there, but in terms of --

22                MR. LEFEBVRE:  Right.  That's fair.  Now,

23  do you have access -- is there a printer or a scanner

24  there if I actually -- I mean, I have the Tabares file

25  literally right at the corner of my desk.  I could fax

10:38:47    1    a copy of that and maybe that may assist Mr. Covington

2    in answering my questions.  Is that a problem if I

3    were to do that?

4                 MR. HEFFERON:  No, you can do that.

5                 MR. LEFEBVRE:  Can you tell me where I'm

6    going to send it to?  Do you want me to scan it,

7    e-mail it?  I don't know what facilities you have

8    right available to you.

9                 MR. HEFFERON:  Hold on a second.  Fax it.

10                (Recess 10:38 to 10:42.)

11                 MR. LEFEBVRE:  Madam Court Reporter,

12    could you please read the last question back before

13    the discussion about the fax?

14                (Record read.)

10:41:39    15                 MR. LEFEBVRE:  Okay.  Thank you.

16    Q.  Mr. Covington, the form -- the right to

17    cancel form used prior to April of '03, had New

18    Century ever received any complaints from either

19    mortgage brokers or consumers about the content of the

20    right to cancel form used at that time?

21                 MR. HEFFERON:  You mean First Horizon?

22    Q.  First Horizon.  I'm sorry.

23    A.  Okay.  Have we ever received any complaints

24    about that form prior to the issue being brought to my

25    attention that we talked about earlier?

Charles Covington    -    February 11, 2005

10:42:07  1      Q.  No, I guess what I'm -- let Me withdraw the

2   question.  You told me that in April the form was

3   changed.  I guess during the time frame when the other

4   form was in existence, had you received any complaints

5   from either brokers or consumers about the content of

6   the right to cancel form that was used?

7      A.  Not that I'm aware of.

8      Q.  Not that you are aware of?

9      A.  No.

10      Q.  And you said that you had received some

11   correspondence from your legal department about the

12   form, correct?

13           MR. HEFFERON:  Objection.  I don't think

14   that's what he said.

10:42:43  15      Q.  All right.  Can you tell me how the legal

16   department got involved with the new form 1047, if at

17   all?

18           MR. HEFFERON:  You mean in terms of

19   initiation of the change?

20           MR. LEFEBVRE:  Exactly.

21      A.  Yes.  I think what I said is it was brought

22   to my attention by the legal department that we had an

23   issue with the form.  And, apparently, it was -- I

24   believe it was -- I have learned today that it was you

25   that had complained about the design of the form

Charles Covington    -    February 11, 2005

30

10:43:14    1    and --

2                    MR. HEFFERON:  And don't talk about what

3    your lawyer told you about the form.

4                    THE WITNESS:  Right.

5        A.  And then stemming from that, then, as I said

6    earlier, we thought we would re-evaluate the form and

7    if the check boxes were problematic, could we design a

8    form that would be easier and better for our branches

9    to execute and fulfill the rescission requirements,

10    and that was how we came to design this form.

11        Q.  Okay.  Now, who at First Horizon actually

12    reviewed the 1047 right to cancel form before it was

13    decided to implement it in its residential mortgage

14    foreclosing packet?

10:44:11    15                    MR. HEFFERON:  Objection.

16                    You mean reviewed after it was drafted

17    and before it was implemented?

18                    MR. LEFEBVRE:  Right.

19                    MR. HEFFERON:  Go ahead, if you know.

20        A.  That would have been Annalee Myers.  If you

21    want to separate the drafters and designers from the

22    approvers and reviewers.

23        Q.  And that's what I'm getting at.  I'm really

24    asking for who the approvers of this form are.

25        A.  The ultimate approvers of the form would have

Charles Covington    -    February 11, 2005

10:44:36    1    been Annalee Myers.  She was head of -- this is a

2    branch operations issue, and she was head of branch

3    operations at that time.

4        Q.  Now, was the form -- and I'm talking about

5    1047.  Was the form reviewed by any state or federal

6    regulatory agency prior to its implementation, if you

7    know?

8        A.  In other words, are you asking did we submit

9    it to them for their review?

10        Q.  Yes.

11        A.  We did not submit it to any of those type of

12    individuals for review.

13        Q.  Did the board of directors of First Horizon

14    have to review this form?

10:45:23    15        A.  No.

16        Q.  Were they aware that the form had changed?

17    When I say, they, I'm referring to the board of

18    directors.

19        A.  I don't know if they were aware of this issue

20    or not.

21            MR. LEFEBVRE:  Okay.  Now, Tom, I want to

22    just briefly talk about -- prior to this deposition we

23    discussed the stipulation and the discovery.  To make

24    it simple, I'm assuming that numerosity for purposes

25    of the class definition as outlined in the amended

Charles Covington    -    February 11, 2005

32

10:45:57  1  complaint is not being contested by First Horizon at

2  this time?

3           MR. HEFFERON:  That's correct.

4           MR. LEFEBVRE:  Okay.

5       Q.  Now, Mr. Covington, do you know how many

6  loans subsequent to April of '03 -- and I'm referring

7  to nonpurchase money refinance transactions that were

8  secured by a consumer's residence -- had this loan

9  form executed at the time of closing?

10      A.  I do not know specifically how many have this

11  form.

12      Q.  Okay.  You are aware that this lawsuit was

13  filed in February of 2004?

14      A.  I was not aware of that.  I guess I'm aware

10:46:47 15  of that now.

16      Q.  Okay.  Would you agree that there were more

17  than 100 nonpurchase money loans that were secured by

18  residence -- principal residences that had a form 1047

19  executed at the time of closing?

20      A.  Yes, I would believe that would be true.

21      Q.  Okay.  Same question, but instead of 100,

22  250?

23      A.  I would believe that to be true.

24      Q.  And not to belabor it, but just one final

25  number, 500.  Do you think there were 500 people,

Charles Covington    -    February 11, 2005

33

10:47:24    1    residential nonpurchase money loans secured by their

2    principal residence that had form 1047 in their packet

3    subsequent to '03?

4        A.   Yes.

5        Q.   Okay.

6             MR. HEFFERON:  Chris, we have the other

7    form now.

8             MR. LEFEBVRE:  Oh, you do?  Oh, great.

9        Q.   Now, Mr. Covington --

10            MR. LEFEBVRE:  Why don't we mark that,

11   Tom?

12            MR. HEFFERON:  Which one?

13            MR. LEFEBVRE:  I guess that would be 2.

14            MR. HEFFERON:  The Tabares one?

10:48:03   15            MR. LEFEBVRE:  Yeah.  You know what, Tom,

16   it probably makes sense since we have been referring

17   to it, why don't we also have the court reporter

18   mark --

19            MR. HEFFERON:  1047?

20            MR. LEFEBVRE:  Yeah.

21            MR. HEFFERON:  Okay.  She'll mark that as

22   3.

23            (Exhibit Nos. 2 and 3 marked.)

24            MR. HEFFERON:  Okay.  Now, of course,

25   Chris, what we have done here is we have marked as

Charles Covington      -      February 11, 2005

34

10:48:23

1   Exhibit 2 what you faxed in from the Tabares file, and

2   on the assumption that I'm operating under certainly

3   that although Tabares is an existing lawsuit, that you

4   are not trying to take discovery of Tabares through

5   this case, but you are just using this form because

6   you want to ask him things about Exhibit 3 and how it

7   is different and...

8               MR. LEFEBVRE:  Absolutely that's a fair

9   statement.  That is not my intention.  I think

10  having -- you raised the issue I had used the form,

11  and I think it makes sense -- or I had seen the form,

12  rather, and it makes sense to have Mr. Covington have

13  both so we are not speculating how -- the April of '03

14  changes to the form versus what the form was before.

10:49:07

15      Q.  Mr. Covington, you have both forms in front

16  of you, correct?

17      A.  Yes.

18      Q.  Okay.  Looking at Exhibit 2, which I believe

19  is a notice of right to cancel in a transaction --

20  consumer transaction that is totally unrelated to this

21  case, does that form appear to be the -- indicative of

22  the right to cancel form that was utilized by First

23  Horizon prior to the changes that were implemented in

24  April or May of '03?

25      A.  Yes.

Charles Covington    -    February 11, 2005

35

10:49:43

1      Q.  Okay.  Now, you also have -- we have just

2  marked Exhibit 3, which is the First Horizon form 1047

3  which is the form that is part of this lawsuit, the --

4  of this lawsuit.  Having looked at both forms, other

5  than the little line contained in Exhibit 2, is there

6  any difference between the content of paragraph one,

7  which states, your right to cancel, the paragraphs

8  below that?  Are they both the same in Exhibit 2 and

9  Exhibit 3?

10            MR. HEFFERON:  He is going to have to --

11  he is going through it right now so...

12            MR. LEFEBVRE:  All right.  Take a minute.

13            THE WITNESS:  Does he want me to read it

14  word for word and answer that?

10:50:38  15            MR. HEFFERON:  Yeah, if there is any

16  differences.  And when you find any differences, you

17  should probably then recite them at that point rather

18  than trying to remember them.

19      A.  I don't see any differences in that

20  paragraph, the first paragraph.

21            MR. HEFFERON:  The first paragraph of

22  section 1.

23      Q.  Okay.  So basically both forms, Exhibit 2 and

24  3, have the four separate paragraphs underneath?

25      A.  Yes.

Charles Covington    -    February 11, 2005

36

10:51:12  1     Q.  And the Exhibit 2 just has a line to either

2   apply the first two paragraphs or the second two

3   paragraphs contained in the big paragraph number one?

4            MR. HEFFERON:  No, Chris.  Because you

5   are not here, you didn't see what he did.  He actually

6   just testified there is no difference between the

7   first of the four paragraphs.

8            MR. LEFEBVRE:  Oh, I'm sorry.  Okay.

9            MR. HEFFERON:  If you were here, you

10   would have seen that.  If you want him to compare all

11   of the four paragraphs --

12            MR. LEFEBVRE:  Yeah, I would like him to

13   compare all of the four paragraphs under the generic

14   paragraph number 1 called your right to cancel.

10:51:51  15            MR. HEFFERON:  He is looking at the

16   second one.

17            MR. LEFEBVRE:  Okay.  Sorry.

18            THE WITNESS:  Okay.  We want to talk

19   about the second paragraph?

20            MR. HEFFERON:  Sure.

21     A.  I don't see any difference in the wording

22   absent on Exhibit 3, there is not a place to mark or

23   check that paragraph.

24            MR. HEFFERON:  Okay.  Why don't you go on

25   to the third paragraph.

Charles Covington    –    February 11, 2005

37

10:52:30    1        A.  Well, we are going to have to parse through

2    this.  This paragraph is going to have some

3    differences.  The first sentence is different between

4    the two.  The second sentence -- the second sentence

5    seems to be the same.  The third sentence appears to

6    be the same.  The fourth sentence is the same, and the

7    last sentence of that paragraph, the fifth sentence,

8    is the same.

9        Q.  Okay.

10            MR. HEFFERON:  Do you want him to look at

11    the last?

12            MR. LEFEBVRE:  Yeah, please.

13            MR. HEFFERON:  Look at the fourth

14    paragraph.

10:53:41    15        A.  Okay.  I believe the fourth paragraph is the

16    same between the two notices.

17        Q.  So other than you -- you mentioned there was

18    a slight change in one of the sentences, the four

19    paragraphs contained in the big paragraph number one,

20    pretty close between the two forms, correct?

21            MR. HEFFERON:  Objection to the

22    characterization.  He testified that there was

23    differences.  You added the slight and pretty close

24    characterizations.

25            MR. LEFEBVRE:  Okay.  All right.

38

10:54:07   1           MR. HEFFERON:  As well as the lines.  He

         2   pointed out the lines are not there.

         3           MR. LEFEBVRE:  Right.  Okay.

         4       Q.  Now, Mr. Covington, looking at Exhibit 2, the

         5   Tabares right to cancel, is it fair to say -- or I

         6   want to make sure I understand your testimony -- that

         7   it was brought to your attention that there was some

         8   problems about checking off the line, which line

         9   applies?

        10       A.  Yes.

        11       Q.  Okay.  Can you be more specific when you say

        12   problem?  What was the problem that you became aware

        13   of?

        14       A.  These boxes or lines not being checked.

10:54:43  15       Q.  Okay.  And are you familiar with what is

        16   known as the H-8 right to cancel model form under

        17   Truth in Lending?

        18       A.  Yes.

        19       Q.  And are you familiar with what is known as

        20   the H-9 form.

        21       A.  Yes.

        22       Q.  And what is your understanding of the H-9

        23   form?  What type of transaction is the H-9 form

        24   utilized in?

        25       A.  If I can look at this.  The H -- the H-9 form

Charles Covington    -    February 11, 2005

39

| | |
|---|---|
| 10:55:20 | 1  is used when you are refinancing a loan already |
| | 2  secured by the creditor and there is an increase of |
| | 3  that credit amount. |
| | 4      Q.  Okay.  And how about the H-8 form? |
| | 5      A.  H-8 is where you have no existing lien on the |
| | 6  property and the refinancings occur, you use this |
| | 7  right of rescission form meaning that the customer has |
| | 8  the right to rescind the entire amount of the money |
| | 9  versus just the new amount under H-9. |
| | 10      Q.  Okay.  Now, looking at Exhibit 2, the Tabares |
| | 11  form, is it fair to say that when this form was |
| | 12  utilized by First Horizon at the time of the actual |
| | 13  closing, it was standard practice and procedure to |
| | 14  have the closing individual to check off one of the |
| 10:56:16 | 15  two lines, either the line that begins if you cancel |
| | 16  the transaction, the second subparagraph of -- big |
| | 17  paragraph one or the third subparagraph which begins |
| | 18  if you cancel the new transaction? |
| | 19      A.  Well, I'm not exactly sure I know what you |
| | 20  mean by the closing individual.  That could be -- are |
| | 21  you talking about the closer in our branch who |
| | 22  prepares these documents or the title agent or the |
| | 23  closing attorney that executes them with the customer? |
| | 24      Q.  You told me there was a problem with these |
| | 25  boxes. |

Charles Covington    -    February 11, 2005

40

10:56:50    1                     MR. HEFFERON:  Objection.  He testified

2    that you had claimed there was a problem with these

3    boxes.

4                     MR. LEFEBVRE:  Okay.  That's a fair

5    question.

6         Q.  Well, were you aware that there were any

7    problems with these boxes but for me?

8         A.  No.

9         Q.  Okay.  So I was the only person who ever

10    lodged a complaint -- when I say, myself, myself on

11    behalf of my client -- that there was a problem with

12    boxes not being checked?

13         A.  To my knowledge, yes.

14         Q.  Oh, okay.  Other than this lawsuit that is

10:57:32    15    pending in Massachusetts, has anyone filed any type of

16    complaint relative to the content of Exhibit 3?

17                     MR. HEFFERON:  Define what you mean by

18    filed a complaint.

19         Q.  Well, has it been brought to the attention of

20    New Century that there were any type of problems with

21    the right to cancel the contents of the right to

22    cancel form, which is referenced in Exhibit 3, the

23    form they are using now?

24                     MR. HEFFERON:  You referred to New

25    Century again.

Charles Covington    -    February 11, 2005

41

10:58:04   1             MR. LEFEBVRE:  I'm sorry.  You know who I

2      have got on my mind, right?

3             MR. HEFFERON:  Apparently.  Maybe you

4      should spend your time suing them and not First

5      Horizon.

6             MR. LEFEBVRE:  I'll comment after the

7      testimony about that.

8        Q.  I meant First Horizon.  I'm sorry.

9             MR. HEFFERON:  So the question is:  Other

10     than this lawsuit, is Mr. Covington aware of other

11     complaints being made concerning Exhibit 3?

12       A.  I am not aware of any other complaints

13     concerning Exhibit 3.

14       Q.  Okay.  Now, where are the -- after a loan is

10:58:36  15    closed -- and, once again, I'm staying focused on

16     residential consumer either purchase loans or

17     refinancing -- where are the loan files actually kept?

18            MR. HEFFERON:  Objection, compound.

19            I think it might be helpful to the

20     witness if you say when in time, Chris.  Where did

21     they eventually go or where are they kept in the

22     process.

23            MR. LEFEBVRE:  I want to focus -- I mean,

24     obviously, in this lawsuit, there has been an issue

25     about document retrieval.

Charles Covington    -    February 11, 2005

42

10:59:08    1        Q.   And I want to know where do they ultimately

2    go, Mr. Covington.

3              MR. HEFFERON:  Go ahead.

4        A.   Ultimately, they -- we maintain all of our

5    loan records on an imaging system.  So there -- our

6    permanent record is maintained on imaging, so they are

7    on electronic media.

8        Q.   Okay.  And can you tell me what -- let's back

9    up a minute.  So is there any paper, actual hard paper

10   file, kept anywhere?

11       A.   There may be some kept for a period of time.

12   The branches sometimes keep a backup copy.  There may

13   be a paper copy in our post-closing area here or

14   there, but officially our record retention is through

10:59:58   15   this electronic media storage mechanism.

16       Q.   Okay.  Tell me a little bit about the

17   electronic storage.  What actually is electronically

18   stored, the entire closing file or certain portions of

19   the closing file?

20       A.   The entire loan file.

21       Q.   Okay.  And what documents would -- in a

22   general sense would be included in the entire closing

23   file?

24       A.   All documents related to the loan.

25       Q.   So would it be fair to say that the note,

Charles Covington    -    February 11, 2005

43

11:00:28  1    mortgage, HUD 1 statement, right to cancel form, would

2    be included in the file that is ultimately imaged?

3        A.  Yes.

4        Q.  Now, is there some type of computer system

5    that allows access to retrieve the files?

6        A.  Yes.

7        Q.  Can you tell me what that -- tell me about

8    that computer system.  Does it have a particular name?

9        A.  We call it Workflow.  It is a web-based

10   browser.

11       Q.  And does that computer system allow you to

12   retrieve individual documents that can be identified?

13   For example, let me give you a hypothetical.  If you

14   wanted a right to cancel form -- to look at a right to

11:01:21  15   cancel form in a loan -- three-year-old loan that was

16   originated and closed in the state of Nebraska, could

17   you punch a code in and have that document be

18   retrieved, or would you have to pull up the whole

19   closing file?

20       A.  You have to access the entire file.

21       Q.  Okay.  So someone would have to -- and I just

22   want to understand.  It is not a trick question.

23   Someone would actually have to pull up the whole file

24   on a screen and manually move the mouse or whatever to

25   the particular document you were looking for?

Charles Covington    -    February 11, 2005

44

11:01:57    1         A.   That's correct.

2         Q.   Okay.  And where is the imaging actually

3    done?  Is it done in a central location or done by the

4    individual branches or --

5         A.   You mean now or historically because that

6    procedure has changed over time.

7         Q.   All right.  Let's talk about what the

8    procedure was two years ago.

9         A.   I don't know for sure.  Back in that time, it

10   was a mix of some branches did their scanning at the

11   branch; others sent their documents in to our

12   post-closing area here in Dallas.  So it was a

13   mishmash of some branches were on -- we call that

14   distributive capture.  I mean, they have scanning

11:02:41   15   material -- scanning machines in their branches.  They

16   do the scanning themselves.  Others didn't.  So it is

17   just a mishmash.  We have now gone to primarily a

18   totally a decentralized scanning process where now all

19   of the branches scan their own documents by and large.

20   It is not exactly perfect because every once in a

21   while a file may get missed.  They can still send it

22   into our back office for scanning and trailing

23   documents are scanned here.  So, I mean, that's not

24   exact, but that's principally how it works.

25         Q.   And when did that change?  When was that

Charles Covington    -    February 11, 2005

45

11:03:13  1    change?

2        A.  We probably completed the rollout of

3    distributing capture concept, I would say -- I would

4    say in '03.  I don't know the dates exactly.  It was a

5    phased rollout over time.  We do a few branches a

6    month kind of thing, but I would say throughout '03,

7    if I recall.

8        Q.  Okay.  But regardless of -- right now the

9    goal is that every file is ultimately scanned,

10   correct?

11       A.  Yes, every -- the question is, do we scan

12   every file?  Yes, we do.

13       Q.  Okay.  Now, I want to --

14           MR. LEFEBVRE:  Tom, do you have that

11:04:01  15   packet of the -- I'm sorry.  I'm having a mental

16   block.  The documents you produced about quality

17   control that we talked about prior to the deposition?

18           MR. HEFFERON:  Yes, we do.

19           MR. LEFEBVRE:  Okay.

20           MR. HEFFERON:  Can we take -- Chris,

21   before we move on, can we take a break?

22           MR. LEFEBVRE:  Okay.  Sure.

23           (Recess 11:04 to 11:23.)

24           MR. HEFFERON:  Mr. Covington does have

25   the documents numbered First Horizon 936 through First