11:52:16   1        A.   That's correct.

           2        Q.   And then what is the E1 region?

           3        A.   That is New England 1 -- at the time -- the

           4   regions have all changed now, but at the time, that

           5   was New England 1 and New England 2.

           6        Q.   E1 and E2?

           7        A.   Yes.

           8        Q.   And that would comprise all of the New

           9   England states?  You actually did business in all of

          10   them?

          11        A.   I don't know.  I mean, principally.  I can't

          12   recall.  I would have to go and look and see what

          13   exactly states that was all in, but, yeah, it was the

          14   New England states.

11:52:48  15        Q.   And then I see Mass?

          16        A.   No, that is Mid-Atlantic.

          17        Q.   Oh, all right.  Mid-Atlantic.  Midwest?

          18        A.   Midwest.

          19        Q.   Nebraska?

          20        A.   Northeast, which is lower down that New

          21   England.

          22        Q.   Okay.

          23        A.   Northeast is more like Pennsylvania, New

          24   Jersey, Baltimore, Maryland, that area.

          25        Q.   Northwest?

11:53:13    1    A.  Northwest.

2    Q.  SA?

3    A.  South Atlantic.

4    Q.  Southeast?

5    A.  Southeast.

6    Q.  Southern?

7    A.  Which is Texas.  And then Southwest, which is

8    like Arizona, New Mexico, Utah.

9    Q.  They won't let me out of Rhode Island, so

10   that's why I'm a little unfamiliar with these.

11          MR. HEFFERON:  Are you angry there is no

12   category for RI?

13          MR. LEFEBVRE:  There wouldn't be very

14   many of them.

11:53:39    15   Q.  So, for example, just looking at the first

16   line we were talking about under Midwest MW 37, then I

17   see a 3.03 percent.  What is that, please?

18   A.  That would mean -- that's the percentage of

19   errors of missing right of rescission notices in that

20   region.  So the denominator is -- well, it is not

21   exact here, but there is a denominator somewhere

22   around 37.

23   Q.  Okay.

24   A.  And the number of files missing, dividing

25   that out, you get to a 3.03 percent error rate.

Charles Covington    -    February 11, 2005

11:54:12  1      Q.  Of files that didn't have a right to

2    rescission?

3      A.  Yes.

4      Q.  And that same analysis would comply for the

5    other categories?  For example, I see on the second

6    line, rescission period not observed.  Pretty much

7    that was not an issue according to this report over

8    all of the regions?

9      A.  That's true.

10      Q.  And then notice of right to cancel not

11    completed correctly.  Under the Northeast one, there

12    was a problem in 10 percent of the sample that you

13    used?

14      A.  New England 1.

11:54:46  15      Q.  Well, it is E1, which I believe you told me

16    was New England one.

17      A.  Yeah, it is New England 1.  That was 10

18    percent, yes.

19      Q.  And the bottom -- the last expiration date is

20    inaccurate.  There was no problem in any of the

21    regions based on this statistical sampling during the

22    time frame contained in this report?

23      A.  That's correct.

24      Q.  Now, I was looking at document 988.  It

25    appears that -- are these done monthly?  Is this

Charles Covington    -    February 11, 2005

71

11:55:20   1   report a monthly report?

2      A.  Yes.

3      Q.  It is.  And you generate these reports

4   every -- you were generating them monthly during the

5   period prior to the lawsuit?

6      A.  Yes.  Well, this QC testing procedures didn't

7   start until I will say mid '02.

8      Q.  Okay.  And then I gather that the rest of

9   these reports, these regions are still consistently

10  the same and the explanation relative to percentages

11  that you just testified are all similar based on the

12  particular inquiry contained in the report?

13     A.  The percentages and how we calculate it are

14  still the same.  The regions have all changed.  We

11:56:12  15  have a lot more regions now, and most of them aren't

16  even called this anymore.  There is no New England 1,

17  New England 2 anymore, for example.

18     Q.  Okay.

19        MR. LEFEBVRE:  Tom, if I take five

20  minutes just to review a few notes, I don't really

21  have much else and we can wrap this up.

22        MR. HEFFERON:  Okay.

23        (Recess 11:56 to 11:58.)

24        MR. LEFEBVRE:  Tom, just so -- I want to

25  put this on the record.  The individual that

Charles Covington    -    February 11, 2005

72

11:58:18   1   Mr. Covington identified that may have copies of some

2   of the variations, either from the TMO software or

3   front end or Guardian, I assume that you can look into

4   that and if there are such forms available, that you

5   would produce those?

6           MR. HEFFERON:  Yes, I can do that.

7       Q.  And then just one other question,

8   Mr. Covington.  Was TMO the predominant software used

9   during the time frame referenced in this complaint?

10      A.  It was the predominant one, I would say, yes.

11      Q.  When I say, predominant, used 70 percent of

12  the time?  I mean, because everyone could have a

13  different definition of predominant.  Let me ask you

14  what is your definition of predominant?

11:59:08  15      A.  I would say it was -- let me think about that

16  for a second.

17      Q.  Sure.

18      A.  I would say if all of our regions were using

19  different systems, TMO was being used -- I wouldn't

20  say half of them were using it.  I would say something

21  less than half were using it, would be my guess.

22      Q.  During the time frame of this lawsuit?

23      A.  Yes.

24          MR. HEFFERON:  State the time frame for

25  the witness, Chris, so that he has it in his mind when

Charles Covington    -    February 11, 2005

11:59:36   1   he answers the question.

2              MR. LEFEBVRE:  Oh, do you want me to

3   restate it?

4              MR. HEFFERON:  Yeah.  Would you do it

5   again?

6              MR. LEFEBVRE:  Oh, sure.

7              MR. HEFFERON:  And would you use dates?

8        Q.  I'm talking about February of 2001 to

9   February of 2004 for all states but Massachusetts,

10  which, obviously, is one year prior, which is February

11  of 2000 to February of 2004.

12             MR. HEFFERON:  And the question is:  Was

13  TMO the predominant software program used during that

14  period?

12:00:04  15        A.  Well, to answer that question correctly, the

16  way it was, is that in the earlier part of that time

17  frame, we had multiple front-end systems and then we

18  migrated the entire company onto TMO in the later part

19  of that time frame.  So if you weigh all of that out,

20  I would say, yeah, it was probably -- was predominant

21  from a chronological standpoint.

22        Q.  Okay.  That gives me some idea.  Just a

23  couple of final questions.

24             Do you know -- and I'm talking about

25  nationally -- how many nonpurchase money mortgages

Charles Covington        -      February 11, 2005

74

12:00:41   1    were originated by First Horizon during the calendar

2    year that ended December 31st, 2001?  Do you have a

3    good guesstimate?

4         A.   Do I know how many loans we originated for

5    the calendar year 2001?

6         Q.   Nonpurchase loans.

7         A.   Yeah.  I don't know.  I would have to go back

8    and pull out some reports.  I really don't know.  I

9    mean, our production back in that day is materially

10   less than it is today for sure.

11        Q.   Same question, but instead of the calendar

12   year 2001, how about the calendar year 2003.  Is that

13   information more readily available?

14        A.   Yeah.  I would be making up a number.  I

12:01:35  15   could cobble together a number for you, but I don't

16   know what that is.

17        Q.   I don't want you to guess.  Let me ask you

18   this:  For the calendar year 2001, do you believe that

19   First Horizon originated more than 5,000 loans?

20                  MR. HEFFERON:   Of that type?

21                  MR. LEFEBVRE:   Of nonpurchase money

22   mortgages.

23        A.   Yes.

24        Q.   And for 2002, more than 5,000?

25        A.   Yes.

Charles Covington    -    February 11, 2005

75

12:01:59    1    Q.  And in 2003 more than 5,000?

2    A.  Yes.

3    Q.  For 2003 more than 10,000?

4         MR. HEFFERON:  Objection.  The witness

5    says he doesn't know, Chris.  I don't want to play

6    this game.

7         MR. LEFEBVRE:  Okay.  That's fine.

8    Q.  Couple of final questions.  Mr. Covington, we

9    were talking about the compliance, and I had asked you

10   a question about, you know, the time frame.  And I was

11   looking at Exhibit 949 -- what has been marked -- not

12   exhibit -- 949 you were talking to me about the review

13   cycle.  Do you have that document in front of you?

14        MR. HEFFERON:  He does, yes.

12:02:36   15   Q.  Okay.  After this review of the TIL

16   disclosure is done, is there any other type of review,

17   any other type of compliance for right to rescind?

18        MR. HEFFERON:  Objection, vague.

19   A.  I guess I would -- do you mean is there any

20   other type of QC work done?

21   Q.  Yes.

22   A.  Within our QC process or separate from our QC

23   process?

24   Q.  How about both?  Within and separate.

25   A.  Well, if this helps, within our QC process,

12:03:12    1    we have an auditor review the files, and every

2    exception that is cited gets a second review.

3        Q.  Okay.

4        A.  And then it is sent to the branch to have the

5    branch have an opportunity to dispute the finding.

6    They are given a due process there.  So arguably you

7    could say each one of these findings is reviewed three

8    times from that perspective.  That's within our QC

9    cycle.  Outside of our QC cycle, I'm not exactly sure

10    what is done in postclosing reviews.  They may or may

11    not do something.  I'm not sure, but I don't think it

12    probably involves -- if they do something, my

13    impression would be it is to see if the document is

14    there.  It is probably more of a completeness review

12:03:55    15    than anything else.

16        Q.  Is it fair to say that most of the quality

17    control review is done within six months -- a six

18    month window from the time that the loan is actually

19    closed?

20        A.  That's true.  It is done within a 60-day time

21    frame of when the loan is closed.

22        Q.  Right.  And assume there is those situations

23    where there is some multiple review.  Six months would

24    be on the high side, correct?

25        A.  Well, all the QC process steps I mentioned,

Charles Covington    -    February 11, 2005

77

12:04:28   1   that's all done within that 60-day time frame.

2        Q.   Oh, it is?

3        A.   Yes.

4        Q.   So pretty much 60 days is the window?

5        A.   Yes.

6        Q.   As outlined in subparagraph I?

7        A.   Yes.

8        Q.   Okay.  I'm just trying to understand.  I

9   would like you to look at document 916, which was a

10  document produced involving one of the named

11  plaintiffs' loans, not the loan subject of this

12  lawsuit, but another loan that was -- involved First

13  Horizon.  Do you have those two documents in front of

14  you?

12:05:06   15            MR. HEFFERON:   916?

16            MR. LEFEBVRE:   Yeah, 000916.

17            MR. HEFFERON:   No, because you didn't

18  tell me to go to it.

19            MR. LEFEBVRE:   I'm sorry.

20            MR. HEFFERON:   What is it?

21            MR. LEFEBVRE:   That's the letter dated

22  October 20th, 2004 regarding the Lillie home equity

23  line which starts out -- and I'll read the first two

24  sentences, Tom.  First Horizon routinely reviews and

25  audits loans for accuracy, completeness, and

Charles Covington    -    February 11, 2005

78

| | |
|---|---|
| 12:05:33 | 1 |

1    compliance with applicable law.  An error was made in

2    the information that was provided to you regarding

3    your home equity line of credit mortgage loan.  We

4    recently discovered that the federal Truth in Lending

5    disclosures provided to you were not in technical

6    compliance with federal disclosure statutes and

7    recollections.  Are you familiar with that form, Tom?

8              MR. HEFFERON:  Well, you should ask the

9    witness if he is.

10        Q.  Well, do you know what letter I'm talking

11   about?

12        A.  I believe I do.

13        Q.  Okay.  Do you know what document I'm

14   referring to, Mr. Covington?

15             MR. HEFFERON:  I think he just said he

16   believes he does.

17        A.  I believe I do, yes.

18        Q.  Now, it is my understanding that the Lillie

19   home equity loan, which I believe is the subject of

20   this correspondence, was closed well over a year prior

21   to the mailing of this notice.  And I'm just

22   wondering -- I'm just trying to understand.  I thought

23   you told me quality control was done within 60 days.

24   I'm just wondering why the Lillies would have received

25   this notice almost 14 months after the loan was

Charles Covington    –    February 11, 2005

79

12:06:47   1    closed.

2        A.   That review was not conducted by my quality

3    function, which we have been discussing, but rather it

4    was done by an operational review at our parent bank

5    in Memphis.

6        Q.   And is that operational review standard

7    practice, or is it -- well, answer that question.  Was

8    it part of standard practice?

9        A.   Let me think about that.  They have a

10   standard practice of reviewing rights of rescissions

11   for the HELOC loans..

12       Q.   The HELOC?

13       A.   Yeah, home equity line of credit.  We call

14   them HELOCs.  Home equity line of credit.

12:07:35  15       Q.   Okay.  I have to confess.  I had no idea what

16   you were talking about.  Okay.  But you would agree

17   that when you review the home equity loans, isn't that

18   usually done shortly after the closing of the loan?

19            MR. HEFFERON:  You mean when First

20   Horizon does?

21       Q.   First Horizon, yes.

22       A.   Yes.

23       Q.   Okay.  So I guess I'm trying to understand.

24   I guess what I'm saying is, I see the materials would

25   seem to suggest 60 days, and I understand this was

Charles Covington    -    February 11, 2005

80

12:08:04    1    done by a different -- did you say a different

2    department of First Horizon?

3        A.   Different department of our -- that resides

4    at our parent bank in Memphis.

5        Q.   Okay.  Let me ask you this:  Was the Lillies'

6    file, the HELOC file, reviewed because a lawsuit was

7    filed, or was it part of just standard review, if you

8    know?

9            MR. HEFFERON:  You mean, the review that

10    resulted in this letter you described?

11            MR. LEFEBVRE:  Absolutely.

12            MR. HEFFERON:  The question is:  The

13    review that resulted in this letter, was this as a

14    result of this lawsuit or something else?

12:08:39    15        A.   No, this was in relation to something else.

16        Q.   Okay.  And not because the Lillies had been

17    named plaintiffs in the lawsuit?

18        A.   That's correct.

19        Q.   And you said the result of something else.

20    Can you tell me what the something else was, if you

21    know?

22        A.   We had discovered some other issues related

23    to Truth in Lending compliance, not right of

24    rescission related, but TIL disclosure related, which

25    is the subject of that letter.

Charles Covington    -    February 11, 2005

81

```
12:09:26   1        Q.   Okay.   And I assume that -- well, strike

           2   that.

           3                Were there many other individuals other

           4   than the Lillies that received this similar letter?

           5                MR. HEFFERON:   I'm going to object and

           6   instruct him not to answer, Chris.   That has nothing

           7   to do with this lawsuit.   I think you have established

           8   that this letter Lillie got had nothing to do with

           9   this lawsuit.   So other aspects, are not -- I'm not

          10   going to let him get into.

          11                MR. LEFEBVRE:   Mr. Covington, I

          12   appreciate your patience, and I am done.

          13                I assume he is going to read and sign,

          14   Tom?

12:09:48  15                MR. HEFFERON:   Yes, he will.   He will

          16   read and sign in the ordinary course.   And I have no

          17   questions for you, Mr. Covington.

          18                (Deposition adjourned at 12:09 p.m.)

          19

          20

          21

          22

          23

          24

          25
```

Charles Covington    -    February 11, 2005

82

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:   CHARLES COVINGTON   FEBRUARY 11, 2005

3    PAGE   LINE   CHANGE                    REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Charles Covington    -    February 11, 2005

1      I, CHARLES COVINGTON, have read the

2  foregoing deposition and hereby affix my signature

3  that same is true and correct, except as noted above.

4

5                          _____

6                          CHARLES COVINGTON

7

8

9

10  THE STATE OF _____)

11  COUNTY OF _____)

12      Before me, _____, on this

13  day personally appeared CHARLES COVINGTON, known to me

14  (or proved to me under oath or through

15  _____) (description of identity card or

16  other document) to be the person whose name is

17  subscribed to the foregoing instrument and

18  acknowledged to me that they executed the same for the

19  purposes and consideration therein expressed.

20      Given under my hand and seal of office this

21  _____ day of _____, 2005.

22

23

24                          _____

25                          NOTARY PUBLIC IN AND FOR
                            THE STATE OF _____
    My commission expires: _____

Charles Covington    -    February 11, 2005

84

1  STATE  OF  TEXAS )

2  COUNTY OF DALLAS )

3          I, Audra B. Paty, Certified Shorthand

4  Reporter, in and for the State of Texas, certify that

5  the foregoing deposition of CHARLES COVINGTON was

6  reported stenographically by me at the time and place

7  indicated, said witness having been placed under oath

8  by me, and that the deposition is a true record of the

9  testimony given by the witness.

10          I further certify that I am neither counsel

11  for nor related to any party in this cause and am not

12  financially interested in its outcome.

13          Given under my hand on this the _____ day of

14  _____, 2005.

15

16          *Audra B. Paty*

17          Audra B. Paty, Certified
           Shorthand Reporter No. 5987

18          Dickman Davenport, Inc.
           Firm Registration #312

19          1010 Two Turtle Creek Village
           3838 Oak Lawn Avenue

20          Dallas, Texas 75219
           (214) 855-5100   (800) 445-9548

21          e-mail:  abp@dickmandavenport.com
           My commission expires 12-31-05

22  Time used by each party:
    Mr. Lefebvre - 1:36

23  Mr. Hefferon - 0:00

24

25

DEC-08-2004  16:30    ECLG LLC    3124190379    P.03/06

## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RALPH G. MCKENNA, | ) | |
| GLENROY A. DEANE, | ) | |
| ILENE WILGOREN-DEANE, | ) | |
| CHRISTOPHER J. LILLIE; and | ) | |
| LAURIE A. LILLIE; | ) | |
|  | ) | |
| Plaintiffs, | ) | 04-10370-RCL |
|  | ) | |
| v. | ) | |
|  | ) | |
| FIRST HORIZON HOME LOAN | ) | |
| CORPORATION, | ) | |
|  | ) | |
| Defendant. | ) | |

### NOTICE OF DEPOSITIONS

To:    U. Gwyn Williams
       Daniel J. Pasquarello
       Goodwin & Procter LLP
       Exchange Place
       Boston, MA 02109
       617-227-8591 (Facsimile)

**PLEASE TAKE NOTICE** that, pursuant to Fed. R. Civ. P. 30(b)(6), First Horizon Home Loan is to produce the individuals below for taking their depositions. The depositions will be taken at the offices of Goodwin Procter, LLP, Exchange Place, Boston, MA 02109, on the dates and at the times listed below. The depositions will be taken before a person authorized to administer oaths and will continue until completed.

| Deponent | Date | Time |
|---|---|---|
| Person(s) most knowledgeable regarding plaintiffs' loans | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable in the preparing of documents for residential mortgages and refinancing | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable regarding the allegations in plaintiffs' amended complaint | December 20, 2004 | 10:00 a.m. |

1



DEPOSITION
EXHIBIT
1
COVINGTON

DEC-08-2004  16:30       ECLG LLC                              3124190379    P.04/06

| | | |
|---|---|---|
| Person(s) most knowledgeable regarding compliance with the rescission notice provisions of TILA | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable regarding quality control with respect to TILA compliance | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable regarding the areas of inquiry as outlined and requested in plaintiffs' first discovery requests (requests for admissions, interrogatories and requests for production of documents) | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable regarding the accuracy of information provided to plaintiffs in response to plaintiffs' first discovery requests (requests for admissions, interrogatories and requests for production of documents) | December 20, 2004 | 10:00 a.m. |
| Person(s) most knowledgeable to any changes or revisions to the right to cancel form for residential mortgage refinances from February 24, 2000 to the present. | December 20, 2004 | 10:00 a.m. |

Christopher M. Lefebvre  (JAD)
Christopher M. Lefebvre
LAW OFFICES OF CLAUDE
   LEFEBVRE & SONS
P.O. Box 479
Pawtucket, RI 02862
(401) 728-6060
(401) 728-6534 (FAX)
B.B.O. # 629056

Daniel A. Edelman
Cathleen M. Combs
Heather Piccirilli
EDELMAN COMBS, LATTURNER,
   & GOODWIN, LLC
120 South LaSalle Street, 18th Floor
Chicago, Illinois 6603

2

(312) 739-4200
(312) 419-0379 (FAX)

3

DEC-08-2004  16:30        ECLG LLC                          3124190379    P.06/06

## CERTIFICATE OF SERVICE

I, Heather A. Piccirilli, certify that on December 8, 2004, a copy of the attached document was served by United States Mail and Facsimile upon the party listed above.

Heather A. Piccirilli

4

From:PAWTUCKET LEGAL CLINIC          4017286534          02/11/2005 12:57 #525 P.002/002

# NOTICE OF RIGHT TO CANCEL

LOAN #:  0030905186

ERTY ADDRESS:  54-56 FIRST STREET
PAWTUCKET, RI 02861

**1.  YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage/deed of trust on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occur last: (1) the date of the transaction, which is  November 13, 2002  ; or (2) the date you received your Truth-in-Lending disclosures; or (3) the date which you received this notice of your right to cancel.

_____ If you cancel the transaction, the mortgage/deed of trust is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/deed of trust on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

_____ If you cancel the new transaction, your cancellation will apply only to the increase in the amount of credit. It will not affect the amount that you presently owe or the mortgage, lien, or security interest we already have on your home. If you cancel the mortgage, lien, or security interest as it applies to the increased amount is also cancelled. Within 20 calendar days after we receive your notice of cancellation of the new transaction, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home no longer applies to the increase of credit. We must also return any money you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**2.  HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:
FIRST HORIZON HOME LOAN CORPORATION
300 METRO CENTER BLVD., STE. 205
ARWICK, RI 02886

You may use any written statement that is signed and dated by you and your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice letter not later than midnight of ____11/16/2002____ (or midnight of the third business day following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

**JOINT OWNERS HAVE THE RIGHT TO RESCIND, AND A RESCISSION BY ONE IS EFFECTIVE FOR ALL.**
RECEIPT
Each of the undersigned acknowledges receipt of 2 copies of this Notice of Right to Cancel.

| | | | |
|---|---|---|---|
| _Nely Tabares_  11-13-02 | | _Maria H Tabares_  11-13-02 | |
| RLEY TABARES | Date | MARIA H TABARES | Date |

| | | | |
|---|---|---|---|
| | Date | | Date |

DEPOSITION EXHIBIT
2
COVINGTON

PENGAD 800-631-6989

CB6D016 (7/01)

## NOTICE OF RIGHT TO CANCEL



LOAN #:

PROPERTY ADDRESS:

### 1.  YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/deed of trust on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occur last: (1) the date of the transaction, which is _____ ; or (2) the date you received your Truth-in-Lending disclosures; or (3) the date which you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/deed of trust is also canceled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/deed of trust on your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

For new transactions involving us, if you cancel the new transaction, your cancellation will apply only to the increase in the amount of credit. It will not affect the amount that you presently owe or the mortgage lien, or security interest we already have on your home. If you cancel the mortgage, lien, or security interest as it applies to the increased amount is also canceled. Within 20 calendar days after we receive your notice of cancellation of the new transaction, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home no longer applies to the increase of credit. We must also return any money you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must then offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

### 2.  HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing at:

FIRST HORIZON HOME LOAN CORPORATION
681 ANDERSEN DRIVE, SUITE 420
PITTSBURGH, PA 15220

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice letter not later than midnight of _____ (or midnight of the third business day following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

I WISH TO CANCEL

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

JOINT OWNERS HAVE THE RIGHT TO RESCIND, AND A RESCISSION BY ONE IS EFFECTIVE FOR ALL. RECEIPT
Each of the undersigned acknowledges receipt of 2 copies of this Notice of Right to Cancel.

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

CB6D016 (4/03)

FH 001047