# EXHIBIT 9

00001
1          Volume I, Pages 1-96
2          Exhibits: 1-5
3      UNITED STATES DISTRICT COURT
4      FOR THE DISTRICT OF MASSACHUSETTS
5  RALPH G. McKENNA, GLENROY A.
6  DEANE, ILENE WILGOREN-DEANE,
7  CHRISTOPHER J. LILLIE, and LAURA
8  A. LILLIE,
9          Plaintiffs
10  v.          Docket No. 04-10370 (RCL)
11  FIRST HORIZON HOME LOAN
12  CORPORATION,
13          Defendant
14      DEPOSITION OF LAURA A. LILLIE
15    Thursday, December 16, 2004, 9:32 p.m.
16          Goodwin Procter LLP
17          Exchange Place
18          Boston, Massachusetts
19  ----Reporter: Kathleen Mullen Silva, RPR, CRR----
20  ksilva@fabreporters.com  www.fabreporters.com
21      Farmer Arsenault Brock LLC
22      50 Congress Street, Suite 415
23      Boston, Massachusetts 02109
24      617.728.4404  fax 617.728.4403

Lillie, Laura A. - 12/16/2004          Page 1

---

00002
1  APPEARANCES:
2    Family and Consumer Law Center
3    Christopher M. Lefebvre, Esq.
4    Two Dexter Street, P.O. Box 479
5    Pawtucket, Rhode Island 02862
6    401.728.6060  Fax: 401.728.6534
7    for Plaintiffs
8
9    Goodwin Procter LLP
10    Daniel J. Pasquarello, Esq.
11    Exchange Place
12    53 State Street
13    Boston, Massachusetts 02109
14    617.570.1000  Fax: 617.523.1231
15    dpasquarello@goodwinprocter.com
16    for Defendant
17
18
19
20
21
22
23
24

Lillie, Laura A. - 12/16/2004          Page 2

---

00003
1      P R O C E E D I N G S
2      LAURA A. LILLIE, sworn
3      EXAMINATION
4  BY MR. PASQUARELLO:
5    Q. Good morning, Mrs. Lillie. My name is Dan
6  Pasquarello, and I'm an attorney who represents
7  First Horizon in the litigation that you've brought
8  against First Horizon. Do you understand why we're
9  here today?
10    A. Yes, I do.
11      MR. PASQUARELLO: Why don't we mark this
12  as Exhibit 1.
13      (Marked, Exhibit 1, notice of taking
14  deposition.)
15    Q. Mrs. Lillie, I'm handing you a notice of
16  the deposition today. Have you seen that document
17  before?
18    A. Yes, I have.
19    Q. And you understand that's why we're here
20  today?
21    A. Yes.
22      MR. PASQUARELLO: Chris, before we get
23  any further, usual stipulations?
24      MR. LEFEBVRE: That's fine.

Lillie, Laura A. - 12/16/2004          Page 3

---

00004
1      MR. PASQUARELLO: Okay. All objections,
2  except as to form, are reserved until trial, as well
3  as motions to strike.
4      MR. LEFEBVRE: Fine.
5      MR. PASQUARELLO: Okay.
6    Q. Mrs. Lillie, before we get into the
7  questioning today, I want to give you some
8  preliminary instructions. First, have you ever been
9  deposed before?
10    A. No, I have not.
11    Q. It's important for you to answer all the
12  questions today audibly so the court reporter can
13  hear you and take down your answer. It's also
14  important for you to wait until I finish my
15  questions before you start your answers, because
16  it's sometimes difficult if two people are talking
17  at the same time.
18    A. I understand.
19    Q. Okay. If you need to take a break for any
20  reason this morning, just say so, and we can do
21  that. I only ask if there is a question pending at
22  the time, that you answer the question first, and
23  then we'll take the break.
24    A. Okay.

Lillie, Laura A. - 12/16/2004          Page 4

00005
1    Q.  If you don't understand any questions,
2  please tell me. I'll do the best I can to clarify
3  the question. If you don't tell me that, I'm going
4  to assume you do understand the question.
5    A.  Right.
6    Q.  Now, is there any reason why you can't
7  testify truthfully today?
8    A.  No, there is not.
9    Q.  Have you taken any medications or consumed
10  anything that might affect your ability to
11  understand or answer questions today?
12    A.  No, I have not.
13    Q.  Mrs. Lillie, could you please state your
14  full name.
15    A.  Laurie Ann Lillie.
16    Q.  Have you ever been known by any other
17  names?
18    A.  Yes, a previous marriage. Laurie Ann
19  Neahr, N-e-a-h-r, and my maiden name was Wemple,
20  W-e-m-p-l-e.
21    Q.  What was the date of your previous
22  marriage?
23    A.  Oh, my gosh, I have to think. 1983 to
24  1984. It was short.

Lillie, Laura A. - 12/16/2004          Page 5

00006
1    Q.  What's your date of birth?
2    A.  October 2, 1964.
3    Q.  And your Social Security number?
4    A.  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.
5    Q.  I'm sorry. What were the last four
6  numbers?
7    A.  1374.
8    Q.  And you are currently married, is that
9  right?
10    A.  Yes.
11    Q.  How long have you been in your current
12  marriage?
13    A.  Almost fifteen years.
14    Q.  What is your husband's name?
15    A.  Christopher Lillie.
16    Q.  Do you have any children?
17    A.  Yes, we do.
18    Q.  What are your children's names?
19    A.  Cassandra and Ethan.
20    Q.  How old are they?
21    A.  Fifteen and 10.
22    Q.  Do you have any children from your previous
23  marriage?
24    A.  No.

Lillie, Laura A. - 12/16/2004          Page 6

00007
1    Q.  Those are the only children you have?
2    A.  Only children I have.
3    Q.  I'd like to turn to your educational
4  background. What's the highest educational degree
5  you've received?
6    A.  High school diploma. I've taken other
7  courses where I've gotten certifications, but no
8  college education.
9    Q.  Where did you go to high school?
10    A.  Fonda-Fultonville Central School, New York.
11    Q.  When did you graduate?
12    A.  1982.
13    Q.  You said you've taken some certification
14  courses since high school?
15    A.  Yes.
16    Q.  What courses are those?
17    A.  I took a course at a local business school
18  for medical transcription, and I received a
19  certificate, and I recently took a course with the
20  Red Cross for the certified nursing assistant
21  program, and graduated and became certified as a
22  certified nursing aide, home health aide.
23    Q.  When did you take that program?
24    A.  Two months ago. I'm trying to think

Lillie, Laura A. - 12/16/2004          Page 7

00008
1  exactly now. October to November. It was a four-
2  week course.
3    Q.  Have you ever worked in the real estate
4  industry?
5    A.  No.
6    Q.  Have you ever worked in the mortgage
7  lending area?
8    A.  No.
9    Q.  Have any of your jobs ever involved
10  residential mortgages?
11    A.  No.
12    Q.  Have you ever had any training with regard
13  to residential mortgages?
14    A.  No.
15    Q.  Have you ever taken any courses, including
16  self-help courses, about selling or buying real
17  estate?
18    A.  No.
19    Q.  Are you currently employed?
20    A.  Yes.
21    Q.  What do you do?
22    A.  I am a private duty CNA. I take care of a
23  couple elderly folks, and I work full-time in a
24  group home, and I'm a night staff at the group home.

Lillie, Laura A. - 12/16/2004          Page 8

00009
1  I've been there for almost fifteen years.
2   Q.  Now, is all of that at the same place?
3   A.  No.
4   Q.  Now, CNA, does that mean certified nursing
5  assistant?
6   A.  Yes.
7   Q.  Is that what you just recently were
8  certified in?
9   A.  Yes.
10   Q.  How long have you had that position?
11   A.  I've been doing that since June of this
12  year, I believe.
13   Q.  And that's with a few elderly patients?
14   A.  Yes.
15   Q.  Now, what is your full-time job?
16   A.  My full-time job is in a group home with
17  mentally retarded individuals.  I'm a night staff.
18   Q.  What do you do?
19   A.  I'm a night staff in their group home.  I
20  go in at night and do laundry, bathing, if they need
21  it, get them coffee, and I administer medications in
22  the morning.
23   Q.  What is the name of your employer?
24   A.  Berkshire County ARC, which stands for

Lillie, Laura A. - 12/16/2004          Page 9

---

00010
1  Association for Retarded Citizens.
2   Q.  Did you say you've been with them for
3  fifteen years?
4   A.  Yes.  July will be fifteen years, next
5  July.
6   Q.  Was there one other job that you listed?
7   A.  That I'm doing right now you mean?
8   Q.  Right.
9   A.  No.  I'm just doing some private duty and
10  my full-time job.
11   Q.  Other than night staff, do you have a job
12  title?
13      MR. PASQUARELLO:  There's a cell phone
14  ringing.  Do you need to answer it?
15      THE WITNESS:  No, I don't.
16      MR. PASQUARELLO:  Whenever you're ready.
17   Q.  Mrs. Lillie, from all of your present
18  employment, what is your annual income?
19   A.  Since it's just a partial year this year,
20  with doing the private duty, this year I'd have to
21  say it's probably around $30,000 or $35,000.
22   Q.  Do you know what it was for last year?
23   A.  Around $20,000.
24   Q.  Other than your employment, do you have any

Lillie, Laura A. - 12/16/2004          Page 10

---

00011
1  other sources of income?
2   A.  No.
3   Q.  Is your spouse employed?
4   A.  Yes.
5   Q.  What does Mr. Lillie do?
6   A.  He's a painting contractor.
7   Q.  Does he own his own business?
8   A.  Yes, he does.
9   Q.  What's the name of his business?
10   A.  Christopher Lillie Painting Company.
11   Q.  How long has he had that business?
12   A.  I guess almost ten years.
13   Q.  Do you know if he has any business credit
14  cards for his business?
15   A.  He has a Mobil gas card that he uses for
16  business, gas.
17   Q.  Does he use any personal credit cards for
18  anything related to the business?
19   A.  I'm not aware of that.
20   Q.  Do you know if he has an accountant for his
21  business?
22   A.  Yes, he does.
23   Q.  Do you know the accountant's name?
24   A.  I can't think of it.

Lillie, Laura A. - 12/16/2004          Page 11

---

00012
1   Q.  Do you know if he keeps separate accounts
2  for his business?
3   A.  Than personal?
4   Q.  Yes.
5   A.  Yes, he has a separate account for
6  business, and actually, the guy -- I don't think
7  he's an accountant.  He's a tax man.  He does the
8  taxes for the business and any other thing that
9  might come up that he needs.
10   Q.  Okay.  With regard to your employment,
11  before your current employment, which takes us back
12  about fifteen years, were you employed?
13   A.  Yes.
14   Q.  What did you do before that?
15   A.  I did the same type of work in New York
16  State, before I moved to Massachusetts.
17   Q.  Are you from the Fultonville area?
18   A.  Fonda, yes.
19   Q.  What part of New York is that?
20   A.  It's about an hour northwest of Albany.
21   Q.  One other question about your husband.
22  Before his painting business, was he employed?
23   A.  He had been employed doing carpentry work,
24  and also painting with other people.  He had a

Lillie, Laura A. - 12/16/2004          Page 12

00013
1  partnership with a guy for a very short amount of
2  time before he went and started his own business.
3    Q.  Now, with regard to today's deposition, did
4  you do anything to prepare for the deposition today?
5    A.  I just spoke with my lawyer.  That's all.
6    Q.  Did you have any meetings with your lawyer?
7    A.  No meetings in person.  We had a phone
8  conversation.
9    Q.  Just one phone conversation?
10   A.  Two, actually.
11   Q.  Can you tell me when those were?
12   A.  We spoke on Monday night, I believe it was,
13  and the prior week -- I'm not sure what evening it
14  was, one night we spoke briefly.
15   Q.  So Monday was this week?
16   A.  Yes.
17   Q.  Did you review any documents to prepare for
18  the deposition today?
19   A.  I went over the interrogatories and just
20  read through those again.
21   Q.  When you say "interrogatories," do you mean
22  your interrogatory responses?
23   A.  Yes.
24   Q.  Did you review anything other than the

Lillie, Laura A. - 12/16/2004          Page 13

00014
1  interrogatories?
2    A.  I just sort of went back through all the
3  documentation that I have collected since the
4  refinance, and just refreshed my memory on some of
5  the issues.
6    Q.  Do you keep these documents in a particular
7  file at home?
8    A.  Yes.
9    Q.  Where do you keep that file?
10   A.  It's in my bedroom in a filing cabinet.
11   Q.  Have all of those documents been produced
12  so your attorneys in this matter?
13   A.  Yes, everything.
14      MR. PASQUARELLO:  Chris, I'll ask you,
15  have all those documents been produced, if they're
16  not privileged?
17      MR. LEFEBVRE:  Yes.  To the best of my
18  knowledge, Heather Piccirilli, co-counsel, was
19  actually in charge of the coordination, but I know,
20  speaking with Mrs. Lillie, that's pretty much -- I
21  don't think there were any confidentiality issues
22  relative to the documents that you're referring to.
23   Q.  Mrs. Lillie, did you review any documents
24  that you believe to be First Horizon documents?

Lillie, Laura A. - 12/16/2004          Page 14

00015
1    A.  "First Horizon" meaning...?
2    Q.  Documents from First Horizon.
3    A.  Just one that I can think of that was a
4  communication we received from them in October of
5  this year about the home equity line of credit
6  portion of our refinance.
7    Q.  Other than your counsel, did you discuss
8  your anticipated testimony today with anybody else?
9    A.  Just my husband.  My mother-in-law knew we
10  were coming down to Boston.  My children know.
11   Q.  Now, did you discuss the substance of the
12  lawsuit with your mother-in-law or children?
13   A.  No.
14   Q.  They just know that you're coming here for
15  a deposition?
16   A.  Right.
17   Q.  Does anybody else know that you're being
18  deposed in this case today?
19   A.  Yes.
20   Q.  Can you tell me who that is?
21   A.  It's an elderly gentleman that I work for.
22   Q.  Mrs. Lillie, are you familiar with the firm
23  of Edelman, Combs, Lattumer & Goodwin?
24   A.  Yes.

Lillie, Laura A. - 12/16/2004          Page 15

00016
1    Q.  Do they also represent you in this lawsuit?
2    A.  Yes, they do.
3    Q.  Did you speak with anyone from Edelman
4  about today's deposition?
5    A.  I've been in contact with Heather
6  Piccirilli.  She's the only person I've ever spoken
7  with there, and I didn't speak to her about today's
8  deposition.  I talked to her about when it was
9  upcoming, that it was going to happen.
10   Q.  When did you first meet Mr. Lefebvre?
11   A.  I met him today for the first time in
12  person.
13   Q.  Did you first contact Mr. Lefebvre, or the
14  Edelman firm?
15   A.  Mr. Lefebvre.
16   Q.  How did that contact come about?
17   A.  I called him.
18   Q.  How did you become aware of his legal
19  services?
20   A.  We received a letter in the mail.
21   Q.  Do you know when that was?
22   A.  It was in March of this year.
23      MR. PASQUARELLO:  May I mark that as
24  Exhibit 2.

Lillie, Laura A. - 12/16/2004          Page 16

00017
1       (Marked, Exhibit 2, legal
2   advertisement.)
3   Q.  Mrs. Lillie, is that the letter you
4   received from Mr. Lefebvre?
5   A.  It looks like the same letter.
6   Q.  And you think you received this in March of
7   this year?
8   A.  Yes.
9   Q.  If you take a look at the letter, there are
10  a few things circled.  It looks like Mr. Lefebvre's
11  e-mail address and his name.
12  A.  Mm-hmm.
13  Q.  Did you circle those?
14  A.  I don't know.
15  Q.  Do you know if your husband circled those?
16  A.  I have no idea.
17  Q.  Mrs. Lillie, what's your current address?
18  A.  20 Endicott Street.
19  Q.  Where's Endicott Street?
20  A.  Pittsfield, Massachusetts.
21  Q.  How long have you lived there?
22  A.  Four years.
23  Q.  And who lives there with you?
24  A.  My husband and my two children and three

Lillie, Laura A. - 12/16/2004                    Page 17

00018
1   dogs.
2   Q.  Three dogs?
3   A.  Yes.
4   Q.  Where did you live before that?
5   A.  Before that we lived at 69 Cole, C-o-l-e,
6   Avenue in Pittsfield.
7   Q.  How long did you live there?
8   A.  Four years.
9   Q.  Did you own that property?
10  A.  Yes, we did.
11  Q.  Did you have a mortgage on that property?
12  A.  Yes, we did.
13  Q.  Before Cole Avenue, where did you live?
14  A.  We lived in Lenox, Massachusetts.  98
15  Church Street.
16  Q.  How long were you there?
17  A.  I think it was about seven years.
18  Q.  Did you own that house?
19  A.  No, we didn't.  We rented.
20  Q.  What year did you get married to
21  Mr. Lillie?
22  A.  1990.
23  Q.  1990?
24  A.  Yes.

Lillie, Laura A. - 12/16/2004                    Page 18

00019
1   Q.  Do you remember where you lived before
2   Lenox, Mass.?
3   A.  Before Lenox, we lived down in Lee,
4   Massachusetts.
5   Q.  Was this with Mr. Lillie?
6   A.  Yes.
7   Q.  Did you own that house?
8   A.  No.
9   Q.  Before you purchased the house on Cole Ave.
10  in Pittsfield, did you own any other real property?
11  A.  No.  We had -- when my grandmother passed
12  away, we got her house, and we fixed it up, and we
13  had renters living there.  That was over in New York
14  State where I grew up.  My grandmother lived next
15  door, and we ended up selling that house.
16  Q.  Who is "we"?
17  A.  My husband and I.
18  Q.  Okay.  So you inherited your grandmother's
19  house?
20  A.  That's correct.
21  Q.  And then you and your current husband fixed
22  it up and sold it?
23  A.  That's correct.
24  Q.  And that was in New York?

Lillie, Laura A. - 12/16/2004                    Page 19

00020
1   A.  Yes.
2   Q.  Did you have a mortgage on that house?
3   A.  No, I don't believe so.  I can't really
4   remember, to be sure.
5   Q.  Did you ever refinance a mortgage on that
6   house?
7   A.  No.
8   Q.  What's the first common residence you had
9   with your husband?
10  A.  My gosh.  That would have been my first
11  apartment that I lived in when I moved to Lenox at
12  Morgan Manor in Lenox.
13  Q.  Is that before the house in Lee?
14  A.  Yes.
15  Q.  Do you know about what year that was?
16  A.  1988.
17  Q.  So is it correct that the first real
18  property that you ever owned was your grandmother's
19  house that you inherited?
20  A.  Yes.
21  Q.  Then after that, the first property that
22  you owned was the Cole Street residence in
23  Pittsfield?
24  A.  That's correct.

Lillie, Laura A. - 12/16/2004                    Page 20

00021
1   Q. Before that you either rented or lived with
2 family, I'm assuming?
3   A. We rented.
4   Q. You said you've been living in your current
5 house for about four years. Do you remember when
6 you bought the house?
7   A. It was four years last month. It was
8 November -- I think it was November 4.
9   Q. Of 2000?
10   A. Yes. That's correct.
11   Q. How much did you pay for the house when you
12 bought it?
13   A. $102,000.
14   Q. Did you have a mortgage on the house?
15   A. Yes.
16   Q. Who did you have the mortgage with?
17   A. Greylock Federal Credit Union.
18   Q. Do you remember what kind of mortgage it
19 was?
20   A. No, I don't. A home mortgage.
21   Q. Do you know what the term was; how long the
22 mortgage was for?
23   A. I believe it was 30 years.
24   Q. Do you know if it was a fixed or adjustable
    .

00022
1 mortgage?
2   A. I believe it was fixed and them adjustable.
3 I believe it was five years fixed, and then
4 adjustable after that.
5   Q. Do you know what the rate was on your --
6 your interest rate?
7   A. I don't remember what it was.
8   Q. Were you represented by an attorney in that
9 transaction?
10   A. Yes.
11   Q. Do you know who the attorney was?
12   A. I believe it was Jeffrey Lee.
13   Q. Did he represent anybody else at the
14 closing?
15   A. I'm not sure.
16   Q. Did you have to pay Mr. Lee?
17   A. I think the attorney's fees come out of the
18 mortgage. I'm not sure how that works.
19   Q. Did you go to the closing when you bought
20 your home?
21   A. Yes.
22   Q. How long did that closing take?
23   A. I don't remember.
24   Q. Do you remember generally what happened at

00023
1 the closing?
2   A. I just remember signing papers and sitting
3 at a table and closing out the loan.
4   Q. Did you ask any questions during the
5 closing?
6   A. I don't remember.
7   Q. Did your spouse ask any questions?
8   A. I don't remember.
9   Q. Before you signed the documents at the
10 closing, did you read those documents?
11   A. You mean read through everything? No, we
12 didn't.
13   Q. Did you read them partially?
14   A. Skim.
15   Q. Do you remember any of the particular
16 documents from that mortgage?
17   A. No.
18   Q. Do you remember if you received any of the
19 documents that you had to sign before you went to
20 the closing?
21   A. No.
22   Q. Mrs. Lillie, did you have a right to cancel
23 that loan?
24   A. I believe so.

00024
1   Q. How did you know that you had a right to
2 cancel?
3   A. I think you always do. You have three days
4 or something to cancel after you've signed. That's
5 my understanding. I don't know for sure if it's
6 true.
7   Q. And is there some basis for that
8 understanding that you have, or what is the basis
9 for that understanding?
10   A. Just that if you've signed for something
11 and you're not sure afterwards, you have a limited
12 amount of time to undo what you've done.
13   Q. And you think that that period is a
14 standard three-day period?
15   A. For some reason three days sticks out in my
16 mind.
17   Q. And we're talking about that original
18 transaction to purchase your home in Pittsfield?
19   A. With Greylock.
20   Q. The one you currently live in?
21   A. Right.
22   Q. Did you want to cancel that transaction?
23   A. No.
24   Q. Did you ever try to cancel it?

00025
1   A. No.
2   Q. Do you remember if you received a notice of
3 a right to cancel that transaction?
4   A. With the mortgage papers you mean?
5   Q. Yes.
6   A. I don't remember, but I'm sure it was in
7 there.
8   Q. Do you still have all the mortgage papers
9 from your original mortgage transaction with
10 Greylock?
11   A. I think I do.
12   Q. Have you provided those documents to your
13 attorneys in this case?
14   A. I'm not sure. I don't remember if I -- I
15 don't think so.
16       MR. LEFEBVRE: If you want them, we'll
17 get them copied. No problem.
18   Q. Now, other than the refinance transaction
19 that is the subject of this case, did you ever try
20 to refinance that mortgage?
21   A. No.
22   Q. So was this the first time that you
23 refinanced?
24   A. Yes.

Lillie, Laura A. - 12/16/2004          Page 25

00026
1   Q. I want to go back to the house you owned
2 before that, which is Cole Street.
3   A. Cole Avenue.
4   Q. Cole Avenue. Okay. When did you buy that
5 house?
6   A. Well, it would have been, I guess, 1996.
7   Q. And you bought that with your husband, is
8 that right?
9   A. Yes. And also with my mother-in-law,
10 actually. It was a duplex property that we shared
11 with my mother-in-law.
12   Q. A two-family?
13   A. Yes.
14   Q. Do you remember what you paid for that
15 house?
16   A. I think $99,500.
17   Q. Again, did you take a mortgage?
18   A. Yes.
19   Q. With whom?
20   A. I believe that one was also with Greylock.
21 Actually, no, it wasn't. It was with another bank
22 down in Lee, I believe.
23   Q. Do you remember the name of the bank?
24   A. I think it might have been Lee Bank, but

Lillie, Laura A. - 12/16/2004          Page 26

00027
1 I'm not sure.
2   Q. Did you go to the closing --
3   A. Yes.
4   Q. -- for that transaction?
5   A. Yes, I did.
6   Q. Were you represented by an attorney?
7   A. I'm sure we must have been. I think you
8 have to have an attorney at those closings, and you
9 have to pay an attorney for a closing on a house. I
10 don't remember, though.
11   Q. Do you know if that attorney represented
12 anybody else in the transaction?
13   A. I don't remember.
14   Q. And you don't know who that attorney was?
15   A. No, I don't.
16   Q. Now, did you have to sign documents at the
17 closing?
18   A. Yes.
19   Q. Did you read any of the documents before
20 you signed?
21   A. No.
22   Q. Did you ask any questions at that closing?
23   A. No.
24   Q. Do you remember if anybody else asked

Lillie, Laura A. - 12/16/2004          Page 27

00028
1 questions at the closing?
2   A. I don't remember. It's a long time ago.
3   Q. Do you believe that you had a right to
4 cancel that loan?
5   A. I must have. I didn't think about it at
6 the time.
7   Q. Is it for the same reason that you gave me
8 before?
9   A. What reason?
10   Q. Why did you think you had a right?
11   A. I just thought it was -- you always have a
12 right to cancel. That's just my assumption. I
13 don't know if that's true or not. I didn't have any
14 reason to want to cancel, so it wasn't something
15 that I worried about.
16   Q. Now, for that mortgage, did you ever
17 refinance that mortgage?
18   A. No.
19   Q. So you held that mortgage until you sold
20 the property?
21   A. That's correct.
22   Q. Other than your current house, do you own
23 any other real property today?
24   A. No.

Lillie, Laura A. - 12/16/2004          Page 28

00029
```
 1   Q. Other than your current house, the house on
 2  Cole Avenue and the house you inherited from your
 3  grandmother, have you ever owned any other real
 4  property?
 5   A. No.
 6   Q. How about your husband, do you know if he's
 7  ever owned any other real property?
 8   A. Only what he's owned with me, together with
 9  me.
10   Q. Before you refinanced on your present
11  house, who was the servicer on the loan?
12   A. The servicer?
13   Q. Let me rephrase that. Who did you send
14  your payments to?
15   A. I believe it's Greylock Federal Credit
16  Union. My husband wrote the check, so I'm not sure.
17  I imagine it went right to them.
18   Q. And for your first home on Cole Avenue, was
19  that to the bank in Lee, were payments made to the
20  bank in Lee?
21   A. It may have been to them, or maybe it went
22  to somebody else out of state. I don't know.
23   Q. Can you tell me generally what your
24  understanding is about what happens at a refinance
```

Lillie, Laura A. - 12/16/2004            Page 29

00030
```
 1  transaction?
 2   A. What my understanding is? Somebody comes.
 3  You close out the loan. You have to sign a bunch of
 4  papers, and you refinance your loan for a better
 5  rate or for whatever reason.
 6   Q. Other than for a better rate, are there any
 7  other reasons that you're aware of?
 8   A. Sure. We did it for a better rate and to
 9  consolidate debt.
10   Q. Leaving aside your current mortgage and the
11  home equity line of credit that you took out at the
12  same time, have you ever tried to cancel any loan?
13   A. No.
14   Q. A couple of questions for you about
15  household management issues.
16   A. Okay.
17   Q. Who opens the mail at home?
18   A. I open my mail. My husband opens his mail.
19   Q. Who manages the finances?
20   A. My husband pays all the household bills,
21  car payments. I pay my own personal bills.
22   Q. What would you consider to be your own
23  personal bills?
24   A. Credit cards. I pay my children's piano
```

Lillie, Laura A. - 12/16/2004            Page 30

00031
```
 1  payment, those kinds of things, skiing lessons,
 2  things like that that come up, I usually take care
 3  of the extras.
 4   Q. So your husband is the one who takes care
 5  of the mortgage payments?
 6   A. Exactly.
 7   Q. Does he typically write checks to pay the
 8  mortgage?
 9   A. Yes.
10   Q. Who would you say handles communications
11  with creditors?
12   A. It would depend on what it was in reference
13  to. If it's something for my husband, he would
14  handle it. If it's something for me, I would handle
15  it.
16   Q. So the same situation you just described to
17  me?
18   A. Yes.
19   Q. Now, with regard to your current mortgage,
20  do you know what your monthly payment is?
21   A. $700 and something, $750 something. I'm
22  not sure exactly.
23   Q. Do you know what your payment was before
24  you refinanced?
```

Lillie, Laura A. - 12/16/2004            Page 31

00032
```
 1   A. I think it was $600 something.
 2   Q. Did your husband also write checks to make
 3  payments?
 4   A. Yes.
 5   Q. Have you ever fallen behind on your current
 6  mortgage payments?
 7   A. Never.
 8   Q. What about your previous mortgage payments
 9  before you refinanced?
10   A. Never.
11   Q. Now, before you refinanced in 2003, had you
12  ever taken out a home equity loan or a home equity
13  line of credit?
14   A. I don't believe we ever have.
15   Q. So then the home equity line of credit that
16  you took with the current loan was the first home
17  equity line of credit you've taken?
18   A. I believe so. I don't recall ever doing it
19  before.
20   Q. Now, with regard to your current loan, do
21  you know what the term of the loan is, meaning the
22  length?
23   A. I believe it was 30 years also.
24   Q. Do you know what the interest rate was?
```

Lillie, Laura A. - 12/16/2004            Page 32

00033
1    A.  It was, I think, four and a quarter on the
2    main mortgage and five something on the home equity
3    line of credit portion.
4    Q.  At the refinancing, were you represented by
5    an attorney?
6    A.  For this?
7    Q.  Yes.
8    A.  You mean was one there present?
9    Q.  Yes.
10   A.  No.
11   Q.  I just wanted to check.  You said Mr. Lee
12   was at the purchase of the house, is that right?
13   A.  Yes.
14   Q.  Mrs. Lillie, have you or your husband ever
15   filed for bankruptcy?
16   A.  No.
17   Q.  Now, with regard to the refinance
18   transaction, am I right that this is the only
19   refinancing transaction that you've ever
20   participated in?
21   A.  Yes, I believe so.
22   Q.  Who made the decision to refinance?
23   A.  We made the decision together.
24   Q.  And what was the reason for deciding to

00034
1    refinance?
2    A.  The rates were low, interest rates had
3    come down a lot.  That was a major incentive, and we
4    thought we would just clear up little bits of debt
5    at the same time while doing it.
6    Q.  Do you remember what sort of debt you were
7    consolidating?
8    A.  Oh, it was credit card.  My husband had a
9    motorcycle payment that he wanted to pay off, that
10   kind of thing.  One was actually a school loan I had
11   taken out when I took the course at Mildred Elley.
12   Q.  Do you know who the school loan was with?
13   A.  Nelnet.
14   Q.  How about the motorcycle, do you know who
15   that was with?
16   A.  I'm not sure.  It was one of our local
17   banks.
18   Q.  Was there more than one credit card you
19   were paying off?
20   A.  There were a few small ones.
21   Q.  Do you have a checking account or a
22   checking and savings account?
23   A.  Yes.
24   Q.  What bank do you use?

00035
1    A.  Greylock Federal Credit Union, I use.
2    Q.  What about your husband?
3    A.  He uses Lenox Savings Bank.
4    Q.  Does he use that for both personal and
5    business?
6    A.  Yes.
7    Q.  Do you know if the accounts are separate?
8    A.  The personal and business?  Yes.  He has a
9    business account there, and we also have a joint
10   personal account at Lenox Savings Bank.  I have a
11   personal account at Greylock, because I have direct
12   deposit with my job.
13   Q.  You might have already told me this before,
14   but what was the rate on your previous loan with
15   Greylock?
16   A.  I don't remember what it was.  It must have
17   been somewhere in the neighborhood of 7, maybe 8,
18   8 1/4, something like that.
19   Q.  So was your refinance at a substantially
20   better rate?
21   A.  It was.
22   Q.  When you refinanced, do you remember what
23   the principal amount you owed on the house was?
24   A.  It was $90,000.

00036
1    Q.  Is that approximate?
2    A.  Yes, and change.  $90,000 and change.
3    Q.  Is it correct that you had the loan for
4    about three years or so at that time?
5    A.  That's correct.
6    Q.  How is it that you chose First Horizon to
7    refinance?
8    A.  We had been looking into -- because the
9    interest rates had gone down, we had been looking at
10   a lot of different possibilities, and I believe we
11   received a mailing from them and called them up, and
12   then I started dealing with them.  Actually, it was
13   Empire Mortgage we received the mailing from.  It
14   ended up being through First Horizon, but that was
15   the initial contact.
16   Q.  Empire Mortgage was the initial contact?
17   A.  Yes.
18   Q.  Before you got that mailing, have you ever
19   done business with Empire Mortgage?
20   A.  No.
21   Q.  What about First Horizon, had you ever done
22   business with First Horizon before that?
23   A.  No.
24   Q.  So you received a mailing, and then you

00037
1  called Empire?
2   A.  Correct.
3   Q.  Do you know where Empire was located?
4   A.  I don't remember.  I think it was maybe
5  Connecticut or New Jersey.
6   Q.  So they weren't local?
7   A.  No.
8   Q.  Did you ever meet with anyone from Empire?
9   A.  No.
10   Q.  Did you ever meet with anyone from First
11  Horizon?
12   A.  No.
13   Q.  Do you remember when you applied to
14  refinance?
15   A.  It may have been in July.  I know we closed
16  out at the end of August.  So it may have been in
17  July.  It probably was towards the end of July.
18   Q.  And how much did you apply to borrow?
19   A.  I don't remember what the application was
20  for, how much.
21   Q.  Do you remember how much the loan was for
22  when it was disbursed?
23   A.  I think it was -- well, it was confusing,
24  because we thought it was going to be one mortgage,

00038
1  and it turned out being two separate loans.  The
2  mortgage ended up being for $112,000, I believe, and
3  the equity line of credit being for $9,600.
4   Q.  Do you know why it was two separate loans?
5   A.  I don't understand why it was.
6   Q.  So all told, we're talking about $120,000
7  or so?
8   A.  Around there.
9   Q.  Can you explain to me how the application
10  and approval process worked?
11   A.  We filled out an application and sent it to
12  them, I imagine, and we were approved, and we worked
13  with them from there.
14   Q.  You sent it to Empire?
15   A.  Yes, we must have.  We were dealing with
16  Empire, I believe, at the time.
17   Q.  So was this by mail?
18   A.  Yes.
19   Q.  Did you have any meetings with anyone
20  before the closing?
21   A.  No.  All communication was only by phone.
22   Q.  Were you approved fairly quickly for the
23  loan?
24   A.  Yes.  I'm sure we were.

00039
1   Q.  So you think the whole application process,
2  approval to closing, was about a month or so?
3   A.  Probably right around there.
4   Q.  Do you remember if there was an appraisal
5  on your house?
6   A.  Yes, there was.
7   Q.  Do you know what the appraised value of
8  your house was?
9   A.  I'm going to say it was either $141,000 or
10  $144,000.  I'm not sure.
11   Q.  Did anybody explain to you the reason for
12  the two separate loans?
13   A.  I think he tried to explain it to me on the
14  phone one day when I questioned it, and I don't even
15  remember how he explained it.  It was kind of a
16  surprise when it happened.  I wasn't expecting it.
17  We were expecting we were getting one loan.  And I
18  think it was the week prior to when we signed that
19  information seemed to unfold.
20   Q.  When you applied, were you looking to
21  refinance or to borrow a certain amount of money?
22   A.  Yes.  We were looking to refinance and
23  borrow a certain amount of money.
24   Q.  And how much was that?

00040
1   A.  Around $20,000, I think.
2   Q.  So on top of what you owed on the house?
3   A.  Right.
4   Q.  You were looking to consolidate somewhere
5  in the neighborhood of $20,000 of debt?
6   A.  Exactly.  Some debt, and we wanted to put
7  in an oil furnace.
8   Q.  Mrs. Lillie, do you know what a loan-to-
9  value ratio is?
10   A.  No.
11   Q.  Have you ever heard that term before?
12   A.  It sounds familiar, but I don't know what
13  it means.
14   Q.  Did anybody bring that up in explaining why
15  there was more than one loan?
16   A.  Possible.  They could have.
17   Q.  Now, you've mentioned a few times that you
18  were taking cash out, in addition to paying off your
19  previous mortgage, is that right?
20   A.  That's correct.
21   Q.  And you wanted to consolidate certain debts
22  that you had?
23   A.  That's right.
24   Q.  Do you remember if you consolidated debt

00041
1  from the First U.S.A. Bank?

2   A.  Yes.

3   Q.  And what sort of debt did you have with

4  First U.S.A.?

5   A.  I believe that was a credit card.

6   Q.  How about Discover Financial?

7   A.  That was a credit card.

8   Q.  Is that a Discover card?

9   A.  Yes.

10  Q.  Berkshire Bank?

11  A.  Yes.  That I believe was my husband's

12  motorcycle payment.

13  Q.  So you just paid off the balance of the

14  motorcycle?

15  A.  Right.  He paid the loan off.

16  Q.  You mentioned Nelnet.  That was your

17  student loan?

18  A.  Right.

19  Q.  Did you have a credit card with Chase?

20  A.  Probably.

21  Q.  Do you know, was that paid off?

22  A.  I don't remember.  There was some

23  discrepancy at the end as to one of my husband's

24  credit cards being paid off and one of mine.  They

---

00042
1  were both for about the same amount of money, and

2  for some reason they had to do my husband's instead

3  of mine.  So I don't remember which...

4   Q.  What credit card was yours?

5   A.  I don't remember now.

6   Q.  Do you have an account -- either you or

7  your husband -- with -- it looks like Household

8  Bank, HHLD?

9   A.  Household?

10  Q.  It might not be Household.

11  A.  I don't remember what that was.  I don't.

12  Q.  Were there any credit card balances you had

13  that you didn't pay off?

14  A.  There was one that didn't get paid off.

15  Q.  What was that?

16  A.  I'm not sure what it was at the time.  It's

17  been refinanced since then.

18  Q.  I'm just going to give you some amounts,

19  and I just want you to tell me if you think that

20  sounds accurate in terms of what the payoff amounts

21  were.

22  A.  Okay.

23  Q.  About $6,450 for First U.S.A.

24  A.  It could be.  I don't remember.

---

00043
1     MR. PASQUARELLO:  You know, why don't we

2  just mark this as Exhibit 3.

3     MR. LEFEBVRE:  I was going to suggest

4  that.

5     MR. PASQUARELLO:  This is the settlement

6  statement.

7   A.  I remember my husband's motorcycle loan was

8  around $6,000.

9     (Marked, Exhibit 3, settlement

10  statement.)

11  Q.  I'm looking at what's been marked as

12  Exhibit 3, which is a settlement statement from your

13  mortgage refinance transaction.  It has a Bates

14  label of FH 650 to 651.  First, can you take a look

15  at the second page and tell me if that's your

16  signature and your husband's signature?

17  A.  Yes, it is.

18  Q.  Now, turning to the first page, about a

19  quarter of the way down in the left-hand columns,

20  line 109 says payoff to First U.S.A. Bank for

21  $6,449?

22  A.  Yes.

23  Q.  You say that's a credit card.  Do you

24  remember what sort of charges were on the card?

---

00044
1   A.  Just miscellaneous, I think.

2   Q.  Do you know if there were any charges from

3  your husband's business on the card?

4   A.  I don't believe so.

5   Q.  For the Discover card, which is line 110,

6  it's $5,931.  Again, do you know what sort of

7  charges are on that credit card?

8   A.  I think that was mostly my braces.

9   Q.  Do you know if there were any business

10  charges on the card?

11  A.  No.

12  Q.  The next line is a payoff to Berkshire Bank

13  for $3,034.

14  A.  Yes.

15  Q.  Did you say that is to pay off your

16  husband's motorcycle loan?

17  A.  I believe that was the motorcycle loan,

18  yes, because that was a local bank.

19  Q.  If you turn to the second page down towards

20  the bottom, line 1304, it says payoff to HHLD Bank

21  for about $2,000, $1,966.

22  A.  Yes.

23  Q.  Is this a credit card or is that a loan, do

24  you know, or something else?

00045
1    A.  I don't remember.  I'm sure I have it in my
2  paperwork, because I still have all the check stubs
3  from the original refinance.  So I'll have the stub
4  for that actual check.
5    Q.  Okay.
6    A.  But I don't remember off the top of my head
7  what that stood for.
8    Q.  All right.  Moving down to the next line is
9  Chase NA for $1,553.
10    A.  That was probably a credit card.
11    Q.  Do you know what sort of charges were on
12  that card?
13    A.  Just miscellaneous items.
14    Q.  Do you know if there were any charges from
15  your husband's business on that card?
16    A.  No.  My husband had a separate business
17  line of credit, if he needed it, at Lenox Savings
18  Bank.  So if he had any business expenses, he would
19  have used his business line of credit.  This was
20  personal stuff.
21    Q.  And the Nelnet again is your student loan?
22    A.  Right.
23    MR. PASQUARELLO:  Why don't we take a
24  five-minute break.  We've been going for about an

00046
1  hour.
2    (A recess was taken.)
3    MR. PASQUARELLO:  Back on the record.
4    Q.  Mrs. Lillie, we're back on the record.  I
5  just want to remind you that you are still under
6  oath.
7    A.  Yes.
8    Q.  Before we took a break, we were talking
9  about your 2003 refinance transaction.
10    A.  Correct.
11    Q.  Now, for that transaction, did you believe
12  that you had a right to cancel that loan?
13    A.  For the refinance?
14    Q.  Yes.
15    A.  Yes.
16    Q.  Again, for how long a period did you think
17  you had a right to cancel?
18    A.  Three days.
19    Q.  During that three-day period, did you try
20  to cancel the loan?
21    A.  No, we did not.
22    Q.  Again, is there any different reason for
23  you thinking you had a right to cancel the loan than
24  what you told me before?

00047
1    A.  No.  I remember seeing it, you know, that
2  there was three days, a three-day period, you know,
3  that you had a chance to cancel it, if you wanted
4  to.  But by the time that three days was up, we
5  still hadn't received our proceeds from the loan.
6  So we didn't even know at that point whether we
7  wanted to cancel it or not.  We were still waiting
8  for the proceeds.
9    Q.  You said you saw the three-day period
10  written somewhere, is that right?
11    A.  Yes.
12    Q.  Do you remember where you saw that?
13    A.  In the paperwork, the loan paperwork.
14    Q.  I think you told me before that you did not
15  have an attorney present at the closing transaction,
16  is that right?
17    A.  There was no attorney present.
18    Q.  Where did you go for the closing?
19    A.  It was at our home.
20    Q.  Who was there?
21    A.  My husband, myself and the gentleman who
22  came, who brought us the papers to sign.
23    Q.  Do you know who that was?
24    A.  I don't remember his name.

00048
1    Q.  Had you ever met him before?
2    A.  No.
3    Q.  Do you know if he was an Empire mortgage
4  employee?
5    A.  I believe he was associated with them.
6    Q.  Do you know if he was a First Horizon
7  employee?
8    A.  I don't know.
9    Q.  Was your -- I'm sorry.  What time of day
10  was the closing?
11    A.  10:30 at night.
12    Q.  How long did it take?
13    A.  Maybe 15, 20 minutes.
14    Q.  Did you have to take work off?
15    A.  No.  I actually was late for work that
16  night, because he showed up so late at our home.
17    Q.  And you don't remember this person's name?
18    A.  I don't remember.
19    Q.  Man or a woman?
20    A.  Man.
21    Q.  Had you ever spoken to him before?
22    A.  I spoke with him on the phone that night,
23  when he called to tell us he was running late.
24    Q.  How was the closing scheduled?

00049
1    A.  I believe he was supposed to be at our home
2  by 7:00 or 8:00 that evening.
3    Q.  Was it scheduled by a mailing to you?
4    A.  No.  I believe the folks at Empire set it
5  up with this person.  He must be somebody that they
6  use to go around in our area to do this kind of
7  thing.  He was coming from Springfield, I remember
8  that, the Springfield area.
9    Q.  Do you know about how old he was -- how old
10  was he, approximately?
11   A.  He was probably late 40s.
12   Q.  What did he look like?
13   A.  Scary.
14   Q.  Scary-looking?
15   A.  Yes.
16   Q.  How was he scary-looking?
17   A.  He looked like a Mafia hit man.
18   Q.  Can you give me some details?
19   A.  He had a shirt that was silky and
20  unbuttoned, low, and jewelry, and he didn't look
21  professional.
22   Q.  What color hair did he have?
23   A.  Dark.
24   Q.  Before the closing, did you receive any

00050
1  documents to review?
2    A.  i don't recall.
3    Q.  Do you remember if you reviewed any
4  documents before the closing?
5    A.  I don't recall.
6    Q.  Did the person who performed the closing
7  provide any instructions to you at the closing?
8    A.  Not really.  He really basically just
9  whipped papers at us, "Sign here.  Sign here.  Sign
10  here."  He had to be at another closing up in Adams
11  after us.  This was 10:30 at night.
12   Q.  Did you ask any questions during the
13  closing?
14   A.  No.
15   Q.  How about your husband?
16   A.  No.  I don't believe either one of us did.
17   Q.  What documents do you remember receiving at
18  the closing?
19   A.  All the loan papers, all the mortgage
20  documents.  At the time I didn't know what -- I
21  didn't have a chance to even look at anything to see
22  what it was.  I mean, he was literally whipping
23  papers at us, very fast, very rushed.
24   Q.  Do you remember signing a note at the

00051
1  closing?
2    A.  No.
3    Q.  Do you remember signing a mortgage at the
4  closing?
5    A.  I just remember signing a bunch of
6  documents, a pile of documents that we thought were
7  our loan documents.
8    Q.  You don't remember any specific documents?
9    A.  Nothing specific.
10   Q.  Do you remember receiving a truth-in-
11  lending disclosure statement?
12   A.  I believe it was within the paperwork that
13  we had, the loan paperwork.
14   Q.  Do you remember receiving a notice of your
15  right to cancel with the papers?
16   A.  That was in with the loan documents also.
17   Q.  Am I correct that you just signed all the
18  documents that were provided to you?
19   A.  That's correct.
20   Q.  So you didn't read any of the documents at
21  the closing?
22   A.  Basically, no, "This is this, sign here.
23  This is this, sign here.  This is that, sign here."
24   Q.  So when you say, "this is whichever

00052
1  document," was he explaining to you what the
2  documents were?
3    A.  No.
4    Q.  But he was identifying what the documents
5  were?
6    A.  He would identify the document, "Sign
7  here."
8    Q.  Other than the documents I just walked
9  through with you, the note, the mortgage, the truth-
10  in-lending disclosure statement, the notice of the
11  right to cancel, do you remember any other documents
12  that you received at closing?
13   A.  No.
14   Q.  You mentioned to me a few minutes ago that
15  the loan proceeds weren't released to you for a few
16  days, is that right?
17   A.  That's correct.
18   Q.  Did you understand that there was a waiting
19  period between the closing and when you would
20  receive the money?
21   A.  I knew there would be a little bit of time
22  that would pass, but I didn't realize it would go
23  beyond our opportunity to rescind the loan.  We had
24  trouble when the checks came too.  I have checks

00053
1  dated September 9 and checks dated September 15.
2  You're going halfway through September now.
3      Q.  Okay.  Now, you said you received checks.
4  When did you receive the money?
5      A.  Well, the first checks that I received were
6  dated September 5.  So if they were one or two days
7  in the mail to me, I got them maybe on the 6th or
8  7th of September.  There was a problem with a couple
9  of the checks.  They weren't correct.  I had to
10  contact them, send them back, get them to issue
11  correct checks.  That didn't -- those one or two
12  checks were dated September 15.  So I maybe received
13  them the 16th or 17th of September.
14      Q.  When you say they were incorrect, how were
15  they incorrect?
16      A.  I think one was -- there might have been a
17  wrong amount.  It was made out to the wrong
18  creditor.  There was just something wrong with them.
19  They weren't what we needed or what we had agreed
20  upon.
21      Q.  Who was making out the checks that were
22  being sent to you?
23      A.  I believe it was Resource Title LLC that
24  was on the checks.

00054
1      Q.  They were the ones writing the checks to
2  you?
3      A.  That was on the check.  I don't know who
4  wrote them.  It was the proceeds from the loan.  I
5  still have the stubs from the checks.
6      Q.  Have you produced those check stubs to your
7  attorneys in the case?
8      A.  I don't remember.  I don't think I ever
9  sent those.
10          MR. LEFEBVRE:  If you want them, Dan,
11  we'll --
12          MR. PASQUARELLO:  We may just make a
13  supplemental discovery request.
14          MR. LEFEBVRE:  Sure.  If you do it by
15  letter.  The same thing with the other documents I
16  think Mrs. Lillie referenced earlier that she would
17  gladly provide.
18          THE WITNESS:  If I still have that loan.
19  I'm not sure I do.
20      Q.  Okay.  And if we need to get a release for
21  you to sign for any Greylock documents, do you have
22  any problem --
23      A.  No problem.
24      Q.  -- signing that?

00055
1      A.  No problem at all.
2      Q.  Does the same go for your previous mortgage
3  with whatever bank that was?
4      A.  Yes.
5      Q.  Okay.  I'm not going to mark this as an
6  exhibit, but this is a copy of the amended
7  complaint, and I attached to the back Exhibits I, J,
8  K and L.  I just want you to flip through the
9  exhibits and tell me if those are the documents we
10  were talking about a few minutes ago that you
11  received.
12      A.  Yes.
13      Q.  And Exhibit I should be the note, J should
14  be the mortgage, K should be the disclosure
15  statement for truth-in-lending, and I think L is the
16  notice.
17          MR. LEFEBVRE:  We're just getting to K
18  now.  We've looked at the note and mortgage.
19          THE WITNESS:  Right.  They were terrible
20  copies, too, and I got a lot of them in that kind of
21  condition.
22          MR. LEFEBVRE:  K is the truth-in-
23  lending.
24          THE WITNESS:  Yes.

00056
1          MR. LEFEBVRE:  And L is the right to
2  cancel.  That's correct, Dan.
3      Q.  Mrs. Lillie, do you remember when your
4  first payment was due?
5      A.  I believe it must have been the beginning
6  of October.
7      Q.  Do you know how that payment was made?
8      A.  By check.
9      Q.  Do you recall who the payment was made to?
10      A.  First Horizon, I believe.
11      Q.  I think you told me before that you have
12  not fallen behind on any of your loan payments, is
13  that right?
14      A.  No, never.
15      Q.  Now, since the refinancing, have you been
16  happy with the servicing on the loan?
17      A.  Since the refinancing?
18      Q.  Yes.
19      A.  We've had no problems, I mean, other than
20  the whole process of getting the loan and what we
21  went through at the closing and things like that.
22  Paying the loan each month is not a problem.  We do
23  that.  That's the only really servicing that happens
24  is we pay them.

00057
1   Q. Okay. So since you've been paying on your
2   loan, you haven't had any problem with First
3   Horizon, is that correct?
4   A. No.
5   Q. No, you haven't had any problem, or --
6   A. No problem. I really don't have any
7   dealings with them. We send them a check. That's
8   it.
9   Q. Now, after the closing that night -- first,
10  do you know what the date was of the closing?
11  A. I believe it was August 27.
12  Q. So after the closing on August 27, did you
13  go back and read any of the loan documents?
14  A. Yeah, we looked through them.
15  Q. When did you do that?
16  A. Probably the following day, when we had
17  time to sit down and look through them.
18  Q. Now, after you looked through the documents
19  on the following day, or whenever it was, did you
20  went to cancel the loan?
21  A. We were a little concerned at that time.
22  Q. Why were you concerned?
23  A. Just because of the way everything
24  happened. We kind of felt like maybe we shouldn't

Lillie, Laura A. - 12/16/2004          Page 57

00058
1   have signed. I don't know. We probably should have
2   turned that guy away at the door. It just seemed
3   really shady and unprofessional, and it was a little
4   scary because we didn't have our money, yet we could
5   see by the paperwork we only had a limited amount of
6   time to cancel it. We didn't know what to do.
7   Q. Are there any documents in particular that
8   you remember reviewing?
9   A. I remember seeing that there was a
10  three-day window to rescind the loan.
11  Q. Did your husband also read the documents
12  that you're describing?
13  A. We looked through them together.
14  Q. So after you looked through the documents
15  on the following day --
16  A. Yes.
17  Q. -- you understood that you had a three-day
18  window to cancel the loan?
19  A. Yes. I remember seeing that in the
20  paperwork, that there was a three-day window.
21  Q. And what was your understanding of what
22  would happen if you canceled the loan?
23  A. My understanding was that within that time
24  period, if we wanted to cancel it, we would be able

Lillie, Laura A. - 12/16/2004          Page 58

00059
1   to.
2   Q. And that comes from reading the documents?
3   A. Just -- yeah, from what I could get out of
4   it, from what I could understand of it, yes.
5   Q. Now, ultimately you decided not to do that,
6   is that right, in the three-day period?
7   A. Within the three-day period, yeah. We
8   decided -- we hadn't decided to do it within the
9   three-day period.
10  Q. I want to show you -- first, before I do
11  that, you had the mortgage loan, and you had the
12  home equity line of credit?
13  A. Yes.
14  Q. Did you have more than one closing?
15  A. For this refinance?
16  Q. Yes.
17  A. No.
18  Q. So this was the only closing transaction?
19  A. This was it.
20      MR. PASQUARELLO: Could you mark that as
21  the next exhibit.
22      (Marked, Exhibit 4, notice of right to
23  cancel.)
24  Q. Mrs. Lillie, I'm handing you what's been

Lillie, Laura A. - 12/16/2004          Page 59

00060
1   marked as Exhibit 4. It has a Bates number of
2   FH 676. Do you remember this document as the notice
3   that you received in your loan package?
4   A. Yes.
5   Q. And at the bottom, is that your signature
6   and your husband's signature?
7   A. Yes, it is.
8   Q. And it's dated August 27, 2003?
9   A. That's correct.
10  Q. Now, is this a document you were telling me
11  about a few minutes ago that told you you had a
12  three-day period to cancel?
13  A. Yes.
14  Q. So when was it then that you first decided
15  that you wanted to cancel your loan?
16  A. I hadn't made a decision to want to cancel
17  the loan at all until I actually spoke with
18  Mr. Lefebvre. We had been very unhappy with the
19  whole process, and once the checks -- the proceeds
20  from the loan finally came, and then there was a
21  problem with that. All along things were happening
22  that were like, "What is going on here? We
23  shouldn't have done this." We should have -- at the
24  time not done it, not signed.

Lillie, Laura A. - 12/16/2004          Page 60

00061
1   Q. Let me go back to the check questions.
2   A. Okay.
3   Q. Did you eventually get the correct check
4 amounts --
5   A. Eventually.
6   Q. -- and the correct payees?
7   A. Eventually, by the middle, towards the end
8 of September, yes.
9   Q. After that happened, did you have any
10 problems with anything with the loan?
11   A. No. After all that was done, I felt like
12 it was finally behind us, the nightmare.
13   Q. Now, you still have Exhibit 4 in front of
14 you.
15   A. Yes.
16   Q. After you reviewed that document, you still
17 understood that you had the right to cancel your
18 loan, is that right?
19   A. I thought I had the right to cancel it, but
20 apparently the language in it isn't pertaining to
21 the type of loan that we had, because it says, for
22 the new transactions, cancellation will only apply
23 to the increased amount of credit. So we didn't
24 have the right to rescind the entire transaction,

Lillie, Laura A. - 12/16/2004          Page 61

00062
1 which I assumed, just by reading, you have three
2 days to cancel, you know, that you would be able to
3 cancel the entire transaction.
4       MR. PASQUARELLO: I'm going to move to
5 strike whatever portions are nonresponsive.
6   Q. At the time, back in August of 2003, was it
7 your understanding, after you looked at this
8 document, that you had the right to cancel the loan?
9   A. I assumed we had the right to cancel the
10 entire loan.
11   Q. In August of 2003?
12   A. Yes.
13   Q. Is it correct that you've come to a
14 different conclusion since you have retained
15 Mr. Lefebvre?
16   A. Now I understand that the document was
17 incorrect that we received for the type of loan that
18 we did get.
19   Q. But you didn't hold that opinion until you
20 had retained Mr. Lefebvre, is that right?
21   A. Until I had spoken with him on the phone.
22 I hadn't retained him yet.
23   Q. I'm sorry. But the first time you had
24 spoken to Mr. Lefebvre was in March of 2004?

Lillie, Laura A. - 12/16/2004          Page 62

00063
1   A. That's correct.
2   Q. Mrs. Lillie, when was it that you concluded
3 that you wanted to cancel your loan?
4   A. Well, certainly after we got the proceeds
5 from the loan, we were unhappy with the whole
6 process of everything, and when we sat down and went
7 over the numbers, I found out that we were
8 overcharged somewhere in the neighborhood of $4,500
9 more than what we were quoted. I was very unhappy
10 about that at that point, and so was my husband, but
11 at this point, it's middle to the end of September.
12 To my understanding, we only had three days if we
13 wanted to cancel it. We couldn't do anything about
14 it, so decided to just suck it up and put it behind
15 us, learn and move on.
16       MR. PASQUARELLO: Again, I'm going to
17 move to strike whatever portions are nonresponsive.
18   Q. So I don't think you actually told me when
19 it was that you decided to cancel?
20   A. We decided to cancel after speaking with
21 Mr. Lefebvre. Before that, we didn't think -- by
22 the time we had decided we would like to cancel, if
23 we could, we thought we no longer could.
24   Q. So is it correct that you had some qualms

Lillie, Laura A. - 12/16/2004          Page 63

00064
1 about the process at the beginning?
2   A. Yes.
3   Q. But then you didn't want to cancel until
4 you had spoken to Mr. Lefebvre?
5   A. If we could have canceled in the middle of
6 September, we probably would have.
7   Q. Fair enough. You didn't decide to cancel
8 until after you had spoken to Mr. Lefebvre?
9   A. Right.
10   Q. Now, when you came to this decision, who
11 did you notify?
12   A. Who did I notify?
13   Q. Yes.
14   A. What decision? The right -- that we wanted
15 to cancel the loan?
16   Q. Yes.
17   A. We spoke with Mr. Lefebvre, talked to my
18 husband, we decided yes, let's try to cancel this if
19 we can.
20       MR. PASQUARELLO: Could you mark that as
21 Exhibit 5.
22       (Marked, Exhibit 5, letter, 3/15/2004.)
23   Q. Mrs. Lillie, have you seen this document
24 before?

Lillie, Laura A. - 12/16/2004          Page 64

00065
```
 1    A.  Yes, I have.
 2    Q.  And it's a letter from Mr. Lefebvre to
 3  First Horizon, dated March 15, the Bates label is
 4  ECL&G 223.  Can you tell me what this letter is?
 5        Strike that question.
 6        Do you know what this letter is?
 7    A.  This is a letter from Chris Lefebvre
 8  notifying somebody that he's representing us.
 9    Q.  Did you review the letter before
10  Mr. Lefebvre sent it out?
11    A.  Yes, I did, and I believe I had to sign and
12  authorize him to send it.  I think I have a copy of
13  it.
14    Q.  So he sent you the letter before he sent it
15  out?
16    A.  I believe it was faxed to me.
17    Q.  Okay.  Now, at the time that the letter was
18  sent, had you already decided to file a lawsuit?
19    A.  At the time of this letter?
20    Q.  Yes.
21    A.  We had decided, yes, to get involved in
22  this class action lawsuit.
23    Q.  Did you think there was already a lawsuit
24  that had been filed?
```

Lillie, Laura A. - 12/16/2004        Page 65

00066
```
 1    A.  I knew there was at least the beginnings of
 2  one, yes, that it had been filed, and we were coming
 3  on board after the initial having been filed, the
 4  original complaint.
 5    Q.  Do you know when that lawsuit was filed?
 6    A.  I don't know when it was filed originally.
 7    Q.  Do you know when the amended complaint was
 8  filed?
 9    A.  I'm not sure exactly.  Sometime this year.
10    Q.  So after reviewing the letter that we
11  marked as Exhibit 5, did you understand that
12  Mr. Lefebvre had indicated there was a 20-day period
13  for First Horizon to respond to the letter?
14    A.  I'm not sure.  I don't remember.
15    Q.  Did the response from First Horizon matter
16  to you in any way as to whether or not you were
17  going to join the lawsuit?
18    A.  Not really.
19    Q.  Mrs. Lillie, can you tell me what it is
20  that you think that First Horizon did wrong?
21    A.  I think First Horizon gave us the wrong
22  right-to-cancel paperwork in our loan documents.
23  The language in it was contradictory and confusing.
24    Q.  Now, is that everything that you think that
```

Lillie, Laura A. - 12/16/2004        Page 66

00067
```
 1  First Horizon did wrong?
 2    A.  Yes.
 3    Q.  Now, is that the only claim that you're
 4  making in this lawsuit against First Horizon?
 5    A.  Yes, it is.
 6    Q.  Can you tell me what you mean when you say
 7  that they provided the wrong right-to-cancel?
 8    A.  For the type of loan that we had, the
 9  language in the right-to-cancel that was included
10  with our loan was confusing and seemed contradictory
11  for the type of loan we had.
12    Q.  What type of loan did you have?
13    A.  We had a loan that was refinanced from
14  another bank, a separate, different bank, to First
15  Horizon, the whole amount.  It wasn't just a partial
16  or a home equity line of credit on top of another
17  old mortgage.
18    Q.  Now, you've also alleged in your amended
19  complaint that you think that right to cancel was
20  somehow limited.  Can you tell me what you mean by
21  that?
22    A.  What I mean is that what it says in the
23  right to rescission is that only the new part of the
24  loan is eligible to be rescinded, meaning that the
```

Lillie, Laura A. - 12/16/2004        Page 67

00068
```
 1  first original amount we had our mortgage with
 2  Greylock would not be eligible for rescission.  Only
 3  the amount over and above that amount that was
 4  borrowed.
 5    Q.  Now, could you take a look at Exhibit 4.
 6    A.  Yes.
 7    Q.  Now that is, again, the notice with your
 8  signature on it.  Which part of this notice are you
 9  now alleging is the confusing part?
10    A.  Is it okay if I reread it again?
11    Q.  Sure.
12    A.  Review it.
13        MR. LEFEBVRE:  Sure.  Take your time
14  before you answer his question.  Take as much as
15  time as you need.
16    A.  (Witness reviewing document.)
17        All right.  What was the question again?
18        MR. PASQUARELLO:  Could you read back
19  the question.
20        (Question read by Court Reporter.)
21    A.  Okay.  The part where it says, "For new
22  transactions involving us, if you cancel the new
23  transaction, your cancellation will only apply to
24  the increase in the amount of credit."
```

Lillie, Laura A. - 12/16/2004        Page 68

00069
1    Q.  Can you tell me what paragraph on the
2  notice that appears in?
3    A.  In the third paragraph where I'm reading
4  from right now.
5    Q.  Okay.  So there are two paragraphs that
6  appear before that?
7    A.  Yeah, under number 1, yes.
8    Q.  Did you read those first two paragraphs a
9  moment ago?
10   A.  Yes.
11   Q.  Now, looking at those first two paragraphs,
12  would you say that the first two paragraphs also
13  describe a right to cancel the loan?
14   A.  Yes.
15   Q.  How do you know what that right is, or what
16  is your understanding of that?
17   A.  My understanding is that you have three
18  business days, as of this date, or the date you
19  received your truth-in-lending disclosures or the
20  date you received this notice of the right to
21  cancel.
22   Q.  Three business days to do what?
23   A.  To cancel the loan.
24   Q.  Mrs. Lillie, what law is it that you

Lillie, Laura A. - 12/16/2004          Page 69

00070
1  believe First Horizon violated?
2    A.  The truth-in-lending.
3    Q.  Have you read the truth-in-lending act as
4  it relates to this case?
5    A.  Yes, I've read it.
6    Q.  What parts of the truth-in-lending act have
7  you read?
8    A.  I'm sure I've read through the whole thing.
9  A lot of it doesn't make sense to me.  I don't
10  understand it.
11       MR. LEFEBVRE:  It doesn't make sense to
12  a lot of lawyers either.
13       THE WITNESS:  But you understand it
14  better than I do.
15   Q.  You described earlier that you received a
16  wrong right of cancellation, is that correct?
17   A.  Yes, the form that was in it was incorrect.
18   Q.  Do you think you should have received a
19  different form?
20   A.  Apparently, according to the law, we should
21  have.
22   Q.  What is your basis for saying that?
23   A.  I spoke with my attorney --
24       MR. LEFEBVRE:  You never want to tell

Lillie, Laura A. - 12/16/2004          Page 70

00071
1  them what I may have said.
2        MR. PASQUARELLO:  Right.
3    Q.  Don't tell me the substance of what you
4  discussed with your attorney.
5    A.  I wouldn't have known on my own.  After I
6  discussed it with my lawyer, I realized.
7    Q.  Is there a form that you think you should
8  have received?
9    A.  I'm sure there is, but I don't know what it
10  is.
11   Q.  Mrs. Lillie, are you making the same claims
12  that you've described to me on behalf of a class?
13   A.  Yes.
14   Q.  Can you tell me what the claims are that
15  you're making on behalf of the class?
16   A.  Other folks just like myself and my husband
17  received this wrong, incorrect form in their loan
18  documents.
19   Q.  Is that limited to the same situation that
20  you described to me a few moments ago, namely that
21  you think that the right is somehow limited?
22   A.  Yes.
23   Q.  Okay.  Now, do you believe that other
24  people had the same experience with their loans that

Lillie, Laura A. - 12/16/2004          Page 71

00072
1  you did with your loan?
2    A.  Yes, I do.
3    Q.  Why is that?
4    A.  Why do I believe it?
5    Q.  Yes.
6    A.  Because I know there's other people that
7  are involved with this and have the same situation.
8    Q.  What other people do you know of?
9    A.  I only know of the Deans and Mr. McKenna
10  are the only folks I have names.  I know there are
11  others, but I don't know their names.
12   Q.  Do you know what time period the
13  allegations apply to?
14   A.  What time period?
15   Q.  Yes.
16   A.  My specific allegations?
17   Q.  On behalf of the class.  I'm sorry.
18   A.  I believe it goes back four years in
19  Massachusetts.
20   Q.  Mrs. Lillie, have you personally suffered
21  any damages as a result of First Horizon's conduct?
22   A.  Financial, yes.
23   Q.  What damages are those?
24   A.  About $4,500 that we ended up paying that

Lillie, Laura A. - 12/16/2004          Page 72

00073
1  we weren't -- we were misquoted, excessive costs of
2  the loan.
3    Q.  Have you ever communicated this concern
4  about excessive costs to First Horizon?
5    A.  No.
6    Q.  Now, are you alleging those costs as
7  damages in this lawsuit?
8    A.  No.
9    Q.  So other than those costs that you just
10  described then, are there any other damages that
11  you're alleging that you've suffered in this
12  lawsuit?
13    A.  No.
14    Q.  Can you tell me what damages you are
15  seeking in this lawsuit for yourself personally?
16    A.  Just to have the right to cancel the loan.
17    Q.  Now, have you told me all of the damages
18  that you think you are seeking in the case?
19    A.  Yes.
20    Q.  What damages are you seeking on behalf of
21  the class?
22    A.  For anyone in the class to have the same
23  right to cancel their loan if they so choose.
24    Q.  Anything else?

**Lillie, Laura A. - 12/16/2004          Page 73**

00074
1    A.  No.
2    Q.  Mrs. Lillie, can you tell me what your
3  understanding of rescission is?
4    A.  Rescission?  To me it means to undo
5  something that was done.
6    Q.  Now, as it relates to your loan, what is
7  your understanding of the rescission process?
8    A.  I don't know what you mean.
9    Q.  If you are allowed to rescind your loan, do
10  you know how that process would work?
11    A.  Yes.  It tells you right on the form how
12  you can go about doing it.
13    Q.  Do you understand that you would have an
14  obligation to return to First Horizon the amount
15  that they financed in the loan?
16    A.  Yes.
17    Q.  Are you prepared to do that?
18    A.  Yes.
19    Q.  Do you realize that you'd have to tender
20  that amount within a certain period of time?
21    A.  Yes.
22    Q.  Have you looked into alternative financing
23  or arranged for alternative financing to do that?
24    A.  No.

**Lillie, Laura A. - 12/16/2004          Page 74**

00075
1    Q.  Have you talked to any mortgage brokers
2  about alternative financing?
3    A.  No.
4    Q.  Have you discussed current interest rates
5  with anybody about alternative financing?
6    A.  No.
7    Q.  Do you have any idea what interest rate you
8  could get on a new loan?
9    A.  Right now?
10    Q.  Right now.
11    A.  I have an idea.
12    Q.  Can you tell me what that is?
13    A.  I think we could probably get something at
14  around 5 percent.
15    Q.  Do you know what kind of loan that would
16  be?
17    A.  No, I don't.
18    Q.  Do you know if that would include points or
19  closing costs?
20    A.  I believe my husband had been talking with
21  somebody recently, and it was -- he had quoted him
22  no points, no costs.
23    Q.  Do you know if that is a fixed loan rate or
24  an adjustable loan rate?

**Lillie, Laura A. - 12/16/2004          Page 75**

00076
1    A.  I don't know.  We hadn't discussed it any
2  further than that.
3    Q.  It's your husband who had these
4  discussions?
5    A.  Someone had contacted him recently and
6  talked to him on the phone.
7    Q.  Does the interest rate that is available
8  have any effect on your decision as to whether or
9  not to rescind?
10    A.  No.
11    Q.  If you couldn't get a better interest rate
12  than what you have now on your current loan, would
13  you still want to rescind?
14    A.  Yes.
15    Q.  Why is that?
16    A.  I would want to have my loan be done
17  locally, as it always was before, and not have to
18  deal with the out-of-town company.
19    MR. LEFEBVRE:  Excuse me, Dan.  May I
20  see the complaint that you had shown her earlier,
21  just for myself.
22    MR. PASQUARELLO:  Sure.
23    MR. LEFEBVRE:  Thank you.
24    Q.  So does your decision to rescind, if you

**Lillie, Laura A. - 12/16/2004          Page 76**

00077
1  can, depend in any way on what the deal is on the
2  interest rate that you can get at the time?
3  A.  No.
4  Q.  If you are not entitled to recover any sort
5  of damages in this case, would you still want to
6  proceed?
7  A.  Yes.
8  Q.  If you're not entitled to receive any sort
9  of damages, would you still want to rescind?
10  A.  Yes.
11  Q.  Have you ever been a party in a lawsuit
12  before?
13  A.  No.
14  Q.  Have you ever been a witness in a lawsuit
15  before?
16  A.  No, I have never been a witness.
17  Q.  You told me earlier that you have not been
18  deposed before, is that correct?
19  A.  That's correct.
20  Q.  Have you ever been a defendant in a
21  criminal case?
22  A.  No.
23  Q.  Were you involved in a personal injury
24  lawsuit?

Lillie, Laura A. - 12/16/2004          Page 77

00078
1  A.  Yes, I was.
2  Q.  When was that?
3  A.  That was approximately nine years ago.  I
4  don't remember exactly.
5  Q.  Were you a plaintiff or a defendant?
6  A.  I was a plaintiff.
7  Q.  Did that case go to trial?
8  A.  No, it did not.
9  Q.  Did it settle?
10  A.  Yes, it did.
11  Q.  Do you remember what it settled for?
12  A.  How much money you mean?
13  Q.  Yes.
14  A.  I think it was around $11,000.
15  Q.  What was the nature of claim?
16  A.  I was hit by a car.
17  Q.  Mrs. Lillie, do you understand that you are
18  a plaintiff in this case against First Horizon?
19  A.  Yes.
20  Q.  Do you also understand that this is a class
21  action?
22  A.  Yes, I do.
23  Q.  Can you tell me what a class action is?
24  A.  A class action is when one, two, three,

Lillie, Laura A. - 12/16/2004          Page 78

00079
1  four or however many that have like interests in a
2  case come together as a unit.
3  Q.  Do you know what the purpose of the class
4  action is?
5  A.  The purpose of a class action?
6  Q.  Yes.
7  A.  It's to -- I can't describe exactly what it
8  is.
9  Q.  Do you understand that you're listed as a
10  class representative for the alleged class?
11  A.  Yes, I do.
12  Q.  Do you also understand that your husband is
13  not listed as a class representative?
14  A.  Yes, I do.
15  Q.  Do you know why your husband is not listed
16  as a class representative?
17  A.  Didn't feel it was necessary for him to.
18  Q.  Who didn't feel it was necessary?
19  A.  I didn't feel it was necessary.  He didn't
20  feel it was necessary.
21  Q.  By "he," do you mean your husband?
22  A.  Yes, my husband.
23  Q.  Have you ever served as a class
24  representative before?

Lillie, Laura A. - 12/16/2004          Page 79

00080
1  A.  No.
2  Q.  Have you ever been asked to serve as a
3  class representative before?
4  A.  No.
5  Q.  Do you know anyone who has served as a
6  class rep before?
7  A.  No.
8  Q.  Do you know anyone who has been asked to
9  serve as a class representative before?
10  A.  No.
11  Q.  Have you ever been a party to a class
12  action before?
13  A.  No.
14  Q.  Do you know anyone who has been a party to
15  a class action?
16  A.  No.
17  Q.  Does Mr. Lefebvre represent you in the
18  class action?
19  A.  Yes, he does.
20  Q.  Whose idea was it to retain him?
21  A.  Mine and my husband.
22  Q.  Did you and your husband retain
23  Mr. Lefebvre to represent you?
24  .  Yes.

Lillie, Laura A. - 12/16/2004          Page 80

00081
```
 1   Q.  When was that?
 2   A.  I believe it was in March of this year.
 3   Q.  Did you also first speak to Mr. Lefebvre in
 4   March of 2004?
 5   A.  Yes.
 6   Q.  Was that after you had seen his legal
 7   advertisement?
 8   A.  Yes.
 9   Q.  Is there any written agreement between you
10   and Mr. Lefebvre?
11   A.  Yes.  We have a retainer agreement.
12   Q.  Who signed the agreement?
13   A.  Myself and my husband.
14   Q.  Do you know what the terms are?
15   A.  That he's working for us on a contingency
16   basis.
17   Q.  Is there any other -- I'm sorry.  Strike
18   that.
19        Is there an oral agreement between you
20   and Mr. Lefebvre, in addition to the retainer
21   agreement?
22   A.  No.
23   Q.  Does Edelman, Combs, Latturner & Goodwin
24   also represent you in the class action?
```

00082
```
 1   A.  Yes.
 2   Q.  Whose idea was it to retain the Edelman
 3   firm?
 4   A.  My attorney.
 5   Q.  Mr. Lefebvre?
 6   A.  Yes.
 7   Q.  Did Mr. Lefebvre retain the Edelman firm to
 8   represent you?
 9   A.  I believe so.
10   Q.  Do you know when that happened?
11   A.  No, I don't.
12   Q.  You told me earlier you have spoken to
13   Ms. Piccirilli from the Edelman firm?
14   A.  That's correct.
15   Q.  When was the first time you spoke to her?
16   A.  I don't remember.
17   Q.  How did you get in touch with
18   Ms. Piccirilli?
19   A.  I would have telephoned her.
20   Q.  Is there any agreement between you and the
21   Edelman firm?
22   A.  I'm not aware, as I haven't signed anything
23   with them.
24   Q.  Do you have any sort of oral agreement with
```

00083
```
 1   the Edelman firm?
 2   A.  No.
 3   Q.  Are you aware of any agreement between
 4   Mr. Lefebvre and the Edelman firm?
 5   A.  No.
 6   Q.  Can you tell me what your role is as a
 7   class representative?
 8   A.  My role is to represent the members of the
 9   class, to come to a deposition and testify
10   truthfully, to notify them of anything that they
11   need to know about, any communications that they
12   need.
13   Q.  Do you know if you have an obligation to
14   testify at trial?
15   A.  I'm sure I would have to if it went to
16   trial, yes.
17   Q.  Do you have an obligation to supervise your
18   attorneys?
19   A.  Yes.
20   Q.  Can you tell me how you are supervising
21   your attorneys?
22   A.  No, I haven't really needed to do anything
23   to supervise them at this point.  I've been very
24   happy with the work that they've been doing.
```

00084
```
 1   Q.  Do you have an obligation to monitor the
 2   litigation?
 3   A.  Yes.
 4   Q.  Can you tell me how you are monitoring the
 5   litigation?
 6   A.  Just by everything that's sent to me in the
 7   mail that I review that's happening with the case.
 8   Q.  Do you understand it to be your role to
 9   control the litigation?
10   A.  No.
11   Q.  Can you tell me what decisions you've made
12   so far with regard to the litigation?
13   A.  No.  Just to become part of the class
14   action and agreement to be a class representative.
15   Q.  Did you have any role in preparing and
16   filing the amended complaint?
17   A.  No.
18   Q.  Do you understand what the differences are
19   between the amended complaint and the original
20   complaint?
21   A.  I believe, to my knowledge, I was added to
22   it, and my husband was added to it.  Other than
23   that, I don't know.
24   Q.  What role have you had in responding to
```

00085
1  First Horizon's discovery requests?
2     A.  I've answered any questions that they might
3  have had, to the best of my ability.
4     Q.  Did you do that with your husband?
5     A.  No.
6     Q.  So you alone provided the answers for the
7  discovery requests, is that correct?
8     A.  I believe so.
9     Q.  Is it correct you were working with your
10 attorneys to do that?
11    A.  Yes.
12    Q.  Can you tell me what court this case is
13 pending in?
14    A.  Federal District Court here in Boston.
15    Q.  Do you know who the judge is?
16    A.  His name is Reginald Lindsay.
17    Q.  Can you tell me how often you speak with
18 your counsel about the case?
19    A.  How often?  Gosh.  Maybe once a month,
20 sometimes more.  It depends on what's happening.
21    Q.  Do you understand there's a difference
22 between serving as a class representative and
23 serving as a plaintiff?
24    A.  Yes.

00086
1     Q.  Can you tell me why you are acting as a
2  class representative?
3     A.  I was asked to, and I agreed to.
4     Q.  Any other reason?
5     A.  No.
6     Q.  Do you know why you were asked to?
7     A.  No, I don't.
8     Q.  Do you have time to serve as a class
9  representative?
10    A.  Yes.
11    Q.  What is your work schedule?
12    A.  I work nights, 11:00 to 7:00, and I do some
13 private duty care, it's part-time.
14    Q.  Do you have a set schedule for your
15 part-time employment?
16    A.  No, I don't.
17    Q.  Is your part-time employment the nursing
18 assistant role you described earlier?
19    A.  Yes.
20    Q.  Mrs. Lillie, are you willing to make
21 decisions on behalf of the class?
22    A.  Yes.
23    Q.  Have you been promised anything in exchange
24 for your service as a class representative?

00087
1     A.  No.
2     Q.  Do you understand that you cannot settle
3  your claim individually if you are a class
4  representative?
5     A.  Yes, I do.
6     Q.  Are you willing to delay the resolution of
7  your individual claim in order to be a class
8  representative?
9     A.  Yes.
10    Q.  Do you know if your husband is also willing
11 to delay the resolution of his claim, whether or not
12 he's a class representative?
13    A.  Yes, I believe so.
14    Q.  Do you know if your husband wants to be a
15 class representative?
16    A.  I don't think he wants to be.  If he was
17 asked, he would, I'm sure.
18    Q.  Have you read through the amended
19 complaint?
20    A.  Yes.
21    Q.  Did you read it before it was filed?
22    A.  I believe so, yes.  It was sent to me to
23 look over before it was filed.
24    Q.  Did you comment on it?

00088
1     A.  Other than to say it looks fine to me, no.
2     Q.  Do you know who drafted the amended
3  complaint?
4     A.  No, I don't, off the top of my head.
5     Q.  Are you familiar with the original
6  complaint?
7     A.  I've seen it.
8     Q.  Have you read it?
9     A.  I've glanced through it.
10    Q.  Did you read it before the amended
11 complaint was filed?
12    A.  I don't recall.
13    Q.  Again, do you know who drafted that?
14    A.  I don't.
15    Q.  Now, you told me earlier that you were
16 involved in responding to the interrogatory requests
17 from First Horizon, is that right?
18    A.  Yes.
19    Q.  Did you draft the responses to those
20 requests?
21    A.  I worked with my attorney on understanding
22 what they meant, and she helped me to understand
23 what the question was, and then I could provide the
24 answer.

00089

Q. How about the document requests, did you participate in responding to those?

A. Yes.

Q. And what did you do?

A. I produced any documents that were asked for, and made copies of them, and mailed them out.

Q. What did you do to collect the responsive documents?

A. Went to my file, pulled things out, looked for what was needed.

Q. Other than your file, are you aware of any other location where you might have documents that are responsive?

A. No.

Q. Did you say earlier that you produced everything that is in the file to your attorneys already?

A. All the loan documents, yes.

Q. By "loan documents," which loan documents do you mean?

A. The refinance with First Horizon loan documents.

MR. LEFEBVRE: She did indicate, I think, she had some check stubs that we didn't

00090

produce.

MR. PASQUARELLO: That's right.

MR. LEFEBVRE: Other than those.

THE WITNESS: Copies of canceled checks, yeah.

MR. PASQUARELLO: Why don't we take a break for a few minutes.

MR. LEFEBVRE: Sure.

(A recess was taken.)

Q. Mrs. Lillie, we are back on the record and you are still under oath. Do you understand that?

A. Yes, I do.

Q. A few questions for you regarding your discovery responses. Did you search for any documents from your previous mortgages?

A. I don't remember.

Q. Did you still have any documents from your mortgage on the Cole Avenue property?

A. No.

Q. Have those documents been destroyed?

A. Yes.

Q. Do you still have all of your original mortgage documents from Greylock?

A. I'm not sure. I'd have to look.

00091

Q. Other than the Deans and Mr. McKenna, are you aware of any other potential class members?

A. No.

Q. Have you talked to anybody who might be a potential class member that you know of?

A. No.

Q. Are you aware of any witness statements from any potential member of the class?

A. No.

Q. Can you tell me why it is you think your claim is typical of the rest of the class?

A. Apparently the same thing happened with them that happened with us. I don't know if they typically do business that way, or if it was just a mistake.

Q. And that relates to the form of the notice that you received, is that right?

A. That's right.

Q. With regard to the fee agreement that you have with your attorney, is there anything that you have to pay for?

A. Not upfront, no. He's forwarding costs, any costs for the case.

Q. Do you know what your attorneys would

00092

receive in this case?

A. No, I don't.

Q. Now, you told me earlier what you thought your claims were in the case. I just want to paraphrase from the complaint and have you tell me if this is accurate.

MR. PASQUARELLO: In paragraph 38 of the amended complaint, Chris.

Q. It states that, "Whether First Horizon had a practice of issuing a form of notice exemplified by" -- it says Exhibit D here, but we understand that's a different notice -- "in connection with refinancing loans made by someone else." Is that what you understand of your claim is?

A. Yes.

Q. Do you understand your claim to be anything else?

A. No.

MR. PASQUARELLO: That's all I have for now. Chris, do you have questions?

MR. LEFEBVRE: I just have one or two.

EXAMINATION

BY MR. LEFEBVRE:

Q. Mrs. Lillie, you were asked earlier what

00093

1  you're actually looking for on behalf of the class,
2  and I believe you said the right for class members
3  to rescind if they want to, correct?
4     A.   That's correct.
5     Q.   Are you also looking for your lawyer's
6  legal fees to be paid?
7        MR. PASQUARELLO:  Object to the form.
8     A.   Yes.
9     Q.   Do you know what statutory damages are?
10    A.   I do.
11    Q.   Are you asking that statutory damages be
12  awarded to the potential class members?
13    A.   Yes.
14       MR. PASQUARELLO:  Object to form.
15       MR. LEFEBVRE:  That's all I have.
16       MR. PASQUARELLO:  Before we conclude, I
17  just want to note if you would like to review before
18  you sign.  Chris, do you want to put that on the
19  record?
20       MR. LEFEBVRE:  Absolutely.  Mrs. Lillie
21  wants to read and sign.
22       MR. PASQUARELLO:  Why don't we break for
23  lunch, and then we'll continue with Mr. Lillie.
24       (11:58, proceedings adjourned.)

---

00094

1        CERTIFICATE OF COURT REPORTER
2        I, Kathleen Mullen Silva, Registered
3  Professional Reporter and Certified Realtime
4  Reporter, do certify that the deposition of LAURA A.
5  LILLIE, in the matter of Ralph G. McKenna, et al. V.
6  First Horizon Home Loan Corporation, on December 16,
7  2004, was stenographically recorded by me; that the
8  witness provided satisfactory evidence of
9  identification, as prescribed by Executive Order 455
10  (03-13) issued by the Governor of the Commonwealth
11  of Massachusetts, before being sworn by me, a Notary
12  Public in and for the Commonwealth of Massachusetts;
13  that the transcript produced by me is a true and
14  accurate record of the proceedings to the best of my
15  ability; that I am neither counsel for, related to,
16  nor employed by any of the parties to the above
17  action; and further that I am not a relative or
18  employee of any attorney or counsel employed by the
19  parties thereto, nor financially or otherwise
20  interested in the outcome of the action.
21
22  December 28, 2004  _____
21       Kathleen Mullen Silva, RPR, CRR
24

---

00095

1        I N D E X
2
3        EXAMINATIONS
4  LAURA A. LILLIE
5     BY MR. PASQUARELLO          3
6     BY MR. LEFEBVRE            92
7
8        EXHIBITS MARKED
9  1, notice of taking deposition      3
10  2, legal advertisement            17
11  3, settlement statement           43
12  4, notice of right to cancel      59
13  5, letter, 3/15/2004             64
14
15
16
17
18
19
20
21
22
23
24

---

00096

1        LAURA A. LILLIE
         SIGNATURE PAGE/ERRATA SHEET
2     PAGE  LINE   CHANGE OR CORRECTION AND REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  I have read the transcript of my deposition taken on December 16, 2004.
    Except for any corrections or changes noted above I hereby subscribe to
14  the
    transcript as an accurate record of the statements made by me.
15  _____DATE_____
    Deponent, LAURA A. LILLIE
16
    On this _____ day of _____, 200___, before me, the
17  undersigned
18  notary public, personally appeared LAURA A. LILLIE, who presented
19  satisfactory evidence of identification, to wit,
20  _____, and signed this document in my presence.
21
22  _____
23  NOTARY PUBLIC
24  My commission expires_____