# EXHIBIT 10

00001
1           Volume I, Pages 1-79
2           Exhibits: (1)
3       UNITED STATES DISTRICT COURT
4       FOR THE DISTRICT OF MASSACHUSETTS
5 RALPH G. McKENNA, GLENROY A.
6 DEANE, ILENE WILGOREN-DEANE,
7 CHRISTOPHER J. LILLIE, and LAURA
8 A. LILLIE,
9          Plaintiffs
10 v.          Docket No. 04-10370 (RCL)
11 FIRST HORIZON HOME LOAN
12 CORPORATION,
13          Defendant
14      DEPOSITION OF CHRISTOPHER J. LILLIE
15    Thursday, December 16, 2004, 12:32 p.m.
16        Goodwin Procter LLP
17        Exchange Place
18        Boston, Massachusetts
19 ----Reporter: Kathleen Mullen Silva, RPR, CRR----
20   ksilva@fabreporters.com   www.fabreporters.com
21      Farmer Arsenault Brock LLC
22      50 Congress Street, Suite 415
23      Boston, Massachusetts 02109
24      617.728.4404  fax 617.728.4403

Lillie, Christopher J. - 12/16/2004          Page 1

00002
1 APPEARANCES:
2    Family and Consumer Law Center
3    Christopher M. Lefebvre, Esq.
4    Two Dexter Street, P.O. Box 479
5    Pawtucket, Rhode Island  02862
6    401.728.6060  Fax: 401.728.6534
7    for Plaintiffs
8
9    Goodwin Procter LLP
10    Daniel J. Pasquarello, Esq.
11    Exchange Place
12    53 State Street
13    Boston, Massachusetts 02109
14    617.570.1000  Fax: 617.523.1231
15    dpasquarello@goodwinprocter.com
16    for Defendant
17
18
19
20
21
22
23
24

Lillie, Christopher J. - 12/16/2004          Page 2

00003
1        P R O C E E D I N G S
2       (Marked, Exhibit 1, notice of deposition
3 of Christopher J. Lillie.)
4       CHRISTOPHER J. LILLIE, sworn
5          EXAMINATION
6 BY MR. PASQUARELLO:
7    Q. Good afternoon, Mr. Lillie. My name is Dan
8 Pasquarello. I'm an attorney who represents First
9 Horizon in the litigation that you and your wife
10 have brought against First Horizon. Do you
11 understand why we're here today?
12    A. Yes.
13    Q. Let me show you a document that's already
14 been marked as Exhibit 1. Have you seen that
15 document before?
16    A. Yes, I have.
17    Q. Do you recognize that as the notice for
18 this deposition today?
19    A. Yes, I do.
20    Q. Mr. Lillie, have you ever had your
21 deposition taken before?
22    A. No.
23    Q. Let me give you a few instructions as to
24 how we will proceed today. It's important that you

Lillie, Christopher J. - 12/16/2004          Page 3

00004
1 answer my questions audibly so that the court
2 reporter can take down your answers. Try not to
3 shake your head or say things like mm-hmm or uh-huh.
4 Also, try to wait until I finish my question before
5 you start your answer so we're not both talking at
6 the same time, because it's difficult for the court
7 reporter to take down those answers. If you need to
8 take a break at any point this afternoon, please say
9 so. We can go ahead and take a break. I would ask
10 if there's a question pending at that time, that you
11 answer the question first, and then we'll go ahead
12 and take the break.
13       Do you understand all of those
14 instruction today?
15    A. Yes.
16    Q. If you don't understand a question, tell
17 me, and I'll try to clarify what that question is.
18 Unless you tell me, I'm going to assume that you do
19 understand the question. Okay. Do you understand
20 that?
21    A. Yes.
22    Q. Now, is there any reason why you can't
23 testify truthfully and completely today?
24    A. No.

Lillie, Christopher J. - 12/16/2004          Page 4

00005
1   Q. Have you taken any medications or consumed
2   anything that might affect your ability to
3   understand and answer questions today?
4   A. No.
5   Q. Could you please state your full name.
6   A. Christopher James Lillie.
7   Q. Have you ever been known by any other
8   names?
9   A. No.
10  Q. What's your date of birth?
11  A. 10/10/63.
12  Q. And your Social Security number?
13  A. 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.
14  Q. And you are married, is that right?
15  A. Yes.
16  Q. What's your wife's name?
17  A. Laurie.
18  Q. And you're aware your wife was deposed
19  earlier today, is that right?
20  A. Yes.
21  Q. How long have you been married?
22  A. Fourteen years, I think.
23      THE WITNESS: Right?
24      MRS. LILLIE: Mm-hmm.

Lillie, Christopher J. - 12/16/2004        Page 5

00006
1       MR. LEFEBVRE: That's one thing you
2   can't do. It's really important, and I'll tell
3   Laurie. Please don't interrupt the deposition at
4   all.
5       MR. PASQUARELLO: I was just about to
6   note for the record that Mrs. Lillie is also in the
7   deposition room, and as Mr. Lefebvre just noted, she
8   can't help with any answers during this deposition.
9   Q. Is that your only marriage?
10  A. Yes.
11  Q. Do you have any children?
12  A. Yes.
13  Q. How many?
14  A. Two.
15  Q. What are their names?
16  A. Cassandra and Ethan.
17  Q. How old are they?
18  A. Fifteen and ten.
19  Q. Now, are those your only children?
20  A. Yes.
21  Q. What is the highest level of education that
22  you've -- the highest degree level you've obtained?
23  A. High school diploma.
24  Q. Where did you go to high school?

Lillie, Christopher J. - 12/16/2004        Page 6

00007
1   A. Lenox Memorial High School, Lenox,
2   Massachusetts.
3   Q. What year did you graduate?
4   A. 1981.
5   Q. Did you attend college?
6   A. Yes.
7   Q. Where did you attend college?
8   A. Berkshire Community College, Pittsfield,
9   Massachusetts and New England Institute of
10  Technology in Warwick, Rhode Island.
11  Q. Did you graduate from either of those
12  colleges?
13  A. No.
14  Q. What years did you attend Berkshire
15  Community?
16  A. 1982.
17  Q. What did you study there?
18  A. Liberal arts.
19  Q. How long did you attend?
20  A. One semester.
21  Q. When did you attend New England Institute
22  of Technology?
23  A. 1983.
24  Q. For how long did you attend there?

Lillie, Christopher J. - 12/16/2004        Page 7

00008
1   A. One semester also.
2   Q. What did you study at the Institute of
3   Technology?
4   A. Mechanical drafting.
5   Q. Did you attend any sort of certificate
6   program since high school?
7   A. No.
8   Q. Do you have any certificates in any fields
9   since high school?
10  A. No.
11  Q. Are you currently employed?
12  A. Yes.
13  Q. What do you do?
14  A. I'm a painting contractor.
15  Q. Do you own your own business?
16  A. Yes.
17  Q. What's the name of your business?
18  A. Christopher Lillie Painting Company.
19  Q. How long have you owned your own business?
20  A. Eight years.
21  Q. Since 1996?
22  A. Yes.
23  Q. Is your business your only employment right
24  now?

Lillie, Christopher J. - 12/16/2004        Page 8

00009
1   A. Yes.
2   Q. Do you have any employees?
3   A. Yes.
4   Q. How many employees do you have?
5   A. Four.
6   Q. Am I correct that you're the owner and
7   proprietor of the business?
8   A. That's right.
9   Q. What sort of painting do you do for the
10  business?
11  A. Residential house painting, interior and
12  exterior.
13  Q. What would you say your average annual
14  income is for the painting business?
15  A. $40,000 to $60,000. Personal?
16  Q. That's net. Let me start with that. Your
17  personal average annual income.
18  A. $40,000 to $60,000, somewhere in there,
19  that range.
20  Q. Other than your business, do you have any
21  other sources of income?
22  A. No.
23  Q. Mr. Lillie, do you have any sort of credit
24  card that you use for the business?

00010
1   A. No.
2   Q. Do you have a business expense account
3   anywhere?
4   A. No.
5   Q. Do you have a business checking account?
6   A. Yes.
7   Q. Where do you have that checking account?
8   A. Legacy Banks.
9   Q. Where is Legacy Banks?
10  A. Pittsfield, Massachusetts.
11  Q. Do you have any other accounts at Legacy
12  Banks?
13  A. Yes.
14  Q. What are those accounts?
15  A. Personal checking and savings.
16  Q. Are those joint accounts?
17  A. Yes.
18  Q. Are those with your wife?
19  A. Yes.
20  Q. Do you and your wife have personal credit
21  cards?
22  A. Yes.
23  Q. Do you ever use your personal credit cards
24  for business expenses?

00011
1   A. No.
2   Q. Have you in the past?
3   A. I don't remember.
4   Q. Do you try to keep your business expenses
5   and accounts separate from your personal accounts?
6   A. Yes.
7   Q. Do you have an accountant for your
8   business?
9   A. I have a tax preparer.
10  Q. Who is that?
11  A. Douglas Webb.
12  Q. Now, does Mr. Webb only work seasonally
13  during tax season for you?
14  A. That's right.
15  Q. What does he do, does he just prepare your
16  annual tax statements?
17  A. That's right, and quarterly, how much I
18  should pay in quarterly, things like that, estimated
19  quarterly taxes.
20  Q. Now, working backwards from your current
21  job, what did you do before that, before your
22  position now as owner of a painting company?
23  A. I worked for a builder.
24  Q. What did you do?

00012
1   A. I was a carpenter.
2   Q. How long did you do that?
3   A. From 1984 until roughly 1994 or '95, before
4   I started getting into the painting business.
5   Q. So starting with a couple of years out of
6   high school, was that your principal employment?
7   A. Yes. It was a couple years out of high
8   school. It was some odd jobs. Then for the
9   builder, then to the painting business.
10  Q. Did you have any other jobs while you
11  worked as a carpenter?
12  A. No.
13  Q. Where were you working when you were
14  working as a carpenter?
15  A. For David E. Lanoue Incorporated Building
16  and Design. L-a-n-o-u-e.
17  Q. Is that out in the Pittsfield area?
18  A. Yes.
19  Q. Now, is your --
20  A. It isn't in Pittsfield. It's in
21  Stockbridge.
22  Q. Is your current painting business located
23  in the Pittsfield area?
24  A. Yes.

00013
1    Q. Is that where you do most of your business?
2    A. Yes. Berkshire County.
3        MR. LEFEBVRE: Excuse me. Can we take a
4    two-minute break? I'm getting kind of an emergency
5    call.
6        MR. PASQUARELLO: Sure. We can go off
7    the record for a few minutes.
8        (A recess was taken.)
9    Q. Mr. Lillie, we're back on the record. I
10   just want to remind you you're still under oath.
11   A. Okay.
12   Q. Mr. Lillie, have you ever worked in the
13   real estate industry?
14   A. No.
15   Q. Have you ever worked in the mortgage
16   lending area?
17   A. No.
18   Q. Have any of your jobs involved residential
19   mortgages?
20   A. No.
21   Q. Have you had any training with regard to
22   residential mortgages, including self-help courses?
23   A. No.
24   Q. Have you taken any courses, including self-

Lillie, Christopher J. - 12/16/2004    Page 13

00014
1    help courses, about selling or buying real estate?
2    A. No.
3    Q. Is your wife currently employed?
4    A. Yes.
5    Q. Can you tell me what she does?
6    A. She is night staff at a group home for
7    mentally handicapped persons, and I believe she also
8    is doing private care nurse work.
9    Q. Last year do you know what her annual
10   income was?
11   A. I'm guessing it was around $20,000,
12   $25,000. I'm not sure.
13   Q. How about for this year, do you know what
14   it will be?
15   A. Roughly the same.
16   Q. Other than your employment and your wife's
17   employment, do you have any other sources of income?
18   A. No.
19   Q. With regard to today's deposition,
20   Mr. Lillie, what did you do to prepare for today's
21   deposition?
22   A. I guess I just looked over some documents,
23   a few cover letter type things that you showed me,
24   and that's roughly it.

Lillie, Christopher J. - 12/16/2004    Page 14

00015
1    Q. Now, the only document you've seen so far
2    has been the notice, is that right?
3    A. The notice, yes.
4    Q. You looked at some other correspondence?
5    A. I think I looked at the interrogatories.
6    Q. Anything else?
7    A. No. Those are the items.
8    Q. When you say "interrogatories," do you mean
9    your interrogatory responses?
10   A. Yes. I think so, yes.
11   Q. Did you participate in preparing the
12   responses to those interrogatories?
13   A. No.
14   Q. Do you know who did?
15   A. I believe my wife did.
16   Q. Other than those two documents you've
17   listed, did you look at any other documents to
18   prepare for the deposition?
19   A. I looked through, I think, my old -- my
20   mortgage documents.
21   Q. Which mortgage documents, sir, are you
22   referring to?
23   A. The refinancing mortgage documents from
24   First Horizon.

Lillie, Christopher J. - 12/16/2004    Page 15

00016
1    Q. Did you look through any other mortgage
2    documents?
3    A. Not that I know of.
4    Q. Do you remember any of the mortgage
5    documents in particular that you looked through?
6    A. Can you be more specific?
7    Q. When you say "mortgage documents," do you
8    mean more than one document?
9    A. Yes. Like the stack that they give you.
10   Q. Do you remember the titles of any of these
11   documents?
12   A. No.
13   Q. Do you know if you looked at the mortgage
14   itself?
15   A. Yeah. I was looking at the interest rates
16   and the finance and how much went to, you know,
17   title fee, things like that. I was looking down the
18   itemization list there, the lines there, kind of
19   curious about the numbers and...
20   Q. Any other documents you remember looking
21   at?
22   A. Not particularly. Nothing sticks out.
23   Q. Did you look at the note for your mortgage?
24   A. I might have. I'm not sure.

Lillie, Christopher J. - 12/16/2004    Page 16

00017
1   Q. Do you remember looking at a document
2   called a truth-in-lending disclosure?
3   A. Yes.
4   Q. Do you remember looking at a document
5   called a notice of right to cancel?
6   A. Yes.
7   Q. Did you look at a document entitled a
8   settlement statement?
9   A. Not that I can remember.
10   Q. Any others that you remember?
11   A. I think that's about it.
12   Q. When did you look at these documents?
13   A. Over the course of the last couple of
14   evenings.
15   Q. Any other times?
16   A. A little bit on our ride in this morning.
17   Q. Which documents did you look at on the ride
18   in?
19   A. The interrogatories, and I don't think I
20   looked -- I don't think I looked at any mortgage
21   documents this morning.
22   Q. Now, when you said you looked at the
23   documents, did you glance at them or did you read
24   them completely?  What did you do?

Lillie, Christopher J. - 12/16/2004          Page 17

00018
1   A. I kind of just glanced over them.
2   Q. Did you meet with anyone to prepare for the
3   deposition?
4   A. Just my wife and I discussed this.
5   Q. Did you meet with Mr. Lefebvre to prepare
6   for the deposition?
7   A. Well, we had a speaker phone conversation.
8   Q. When was that?
9   A. Monday evening, I believe.
10   Q. Who was on the speaker phone conversation?
11   A. Mr. Lefebvre.
12   Q. Anybody else?
13   A. No. My wife and I and Mr. Lefebvre.
14   Q. Anybody else at your house?
15   A. No.
16   Q. Did you meet with Mr. Lefebvre today to
17   discuss your testimony?
18   A. We just met downstairs.
19   Q. This morning?
20   A. We met in this building down in the lobby.
21   Q. Before your wife's deposition?
22   A. Yes.
23   Q. Did you discuss your testimony with
24   Mr. Lefebvre during the lunch break?

Lillie, Christopher J. - 12/16/2004          Page 18

00019
1   A. We just talked about the general way a
2   deposition goes.
3   Q. Did you review any documents during the
4   lunch break?
5   A. No.
6   Q. Have you met with anyone from Edelman,
7   Combs, Latturner & Goodwin?
8   A. No.
9   Q. Any phone conversations with anyone from
10   that firm to prepare?
11   A. No.
12   Q. Other than your counsel and your wife, did
13   you discuss your expected testimony today with
14   anybody else?
15   A. No.
16   Q. Does anybody else know that you're being
17   deposed in this case today?
18   A. I don't believe so.
19   Q. When's the first time you met Mr. Lefebvre?
20   A. In person?
21   Q. Yes.
22   A. Today.
23   Q. When is the first time you learned who he
24   was?

Lillie, Christopher J. - 12/16/2004          Page 19

00020
1   A. I'm guessing four or five months ago, six
2   months ago.  I'm really not sure on the timeline.
3   Q. How did you come to know Mr. Lefebvre?
4   A. Through my wife.
5   Q. Do you know how she came to know
6   Mr. Lefebvre?
7   A. I think through an advertisement or a
8   letter that we received in the mail.
9   Q. Did you ever see that advertisement?
10   A. I saw the letter, yes.
11   Q. Let me show you what was marked during your
12   wife's deposition as Exhibit 2.  Is that the letter
13   you're referring to?
14   A. Yes, it is.
15   Q. Is there a -- I don't think there's a date
16   on that letter, is there?
17   MR. LEFEBVRE: No, there's not.
18   MR. PASQUARELLO: At least not on my
19   copy.
20   Q. The question is, does looking at that
21   letter help you to remember when it is that you saw
22   it?
23   A. I wish I could say yes, but I don't know
24   when it was.  I know it was months ago.

Lillie, Christopher J. - 12/16/2004          Page 20

00021
1   Q.  Does March of 2004 sound accurate?
2   A.  Yeah, somewhere around there, I guess.
3   March, April, May.
4        MR. LEFEBVRE:  I don't mean to
5   interrupt.  But if you don't know, it's okay to say
6   you don't know.
7        THE WITNESS:  Okay.
8        MR. LEFEBVRE:  You don't have to create
9   an answer.  If you're not sure, just tell him, you
10  know, whatever the answer may be.
11  Q.  Mr. Lillie, what's your current address?
12  A.  20 Endicott Street, Pittsfield,
13  Massachusetts.
14  Q.  How long have you lived there?
15  A.  Four years.
16  Q.  Who do you live there with?
17  A.  My wife, Laurie, and our two children.
18  Q.  Where did you live before that?
19  A.  89 Cole Avenue, I think it was, in
20  Pittsfield, Massachusetts.
21  Q.  Did you own that house?
22  A.  Yes.
23  Q.  What kind of house was that?
24  A.  It was a two-family.

                Lillie, Christopher J. - 12/16/2004        Page 21

00022
1   Q.  Did you buy that house with your wife?
2   A.  Yes.
3   Q.  Anybody else?
4   A.  Yes.  My mother.
5   Q.  Did your mother live in the other part of
6   the house?
7   A.  She lived upstairs, yes.
8   Q.  Were all three of you on the mortgage
9   documents?  I'm sorry.  Was there a mortgage on the
10  house?
11  A.  Yes.
12  Q.  Were all three of you on the mortgage
13  documents?
14  A.  Yes.
15  Q.  I know I started going backwards, but let
16  me start going forward now.
17  A.  Okay.
18  Q.  Where did you first meet your wife?
19  A.  1988.
20  Q.  When is the first time you had a common
21  residence?
22  A.  I think 1989.
23  Q.  Where was that?
24  A.  In Lenox.

                Lillie, Christopher J. - 12/16/2004        Page 22

00023
1   Q.  Can you work forward for me from that Lenox
2   address through the Cole Avenue address with your
3   residential history.
4   A.  I'll try.
5   Q.  If you could, just provide the dates as to
6   when you were at each location.
7   A.  Okay.  I'll try.
8   Q.  Go ahead.  Start with Lenox in 1989.
9   A.  Lenox, we lived in Lenox in 1989 in Morgan
10  Manor Apartments.  We lived there for six months
11  maybe.  Then we moved to Lee, Massachusetts.  We
12  rented an apartment on Main Street in Lee,
13  Massachusetts from -- I guess it must have been 1990
14  until '92 or 93, and then in 1992 or 93, we moved
15  back to Lenox, Massachusetts, and lived on Church
16  Street and rented a house on Church Street from 1992
17  or 93 until 1996, and that's when we moved into our
18  home on Cole Avenue, and we lived on Cole Avenue
19  from 1996 until the year 2000.  Then now we're
20  living -- from 2000 until present, we're on 20
21  Endicott.
22  Q.  Okay.  Now, of all of those properties,
23  which are the ones you owned?
24  A.  Endicott, where we live now, and Cole

                Lillie, Christopher J. - 12/16/2004        Page 23

00024
1   Avenue.
2   Q.  Have you owned any other real property?
3   A.  Yes.  We owned a house in New York State.
4   Q.  Where in New York?
5   A.  Fonda, New York, I believe.
6   Q.  How did you come to own that house in New
7   York?
8   A.  It was my wife's grandmother's house, and
9   she was living with her mom and dad, and we were
10  offered an opportunity to purchase it.
11  Q.  Did you purchase it?
12  A.  Yes, we did.
13  Q.  Did you have a mortgage on that house?
14  A.  I don't know if we did or not.  I don't
15  know.  I don't remember.  It was a long time ago.
16  Q.  Do you remember the address?
17  A.  Yellowville Road in Fonda, New York.
18  Q.  Did your wife's grandmother own the house
19  before you owned it, immediately before you owned
20  it?
21  A.  I believe so.
22  Q.  What was her name, your wife's grandmother?
23  A.  I don't know.  I don't know her name.
24       MRS. LILLIE:  Grandma.

                Lillie, Christopher J. - 12/16/2004        Page 24

00025
```
 1        THE WITNESS:  Grandma.
 2    Q.  Do you know whether or not your wife
 3  inherited that house?
 4    A.  I think it was something like that.  Her
 5  dad offered us an opportunity, I think, for $5,000
 6  to buy the house, I think, some figure like that.
 7    Q.  But you don't remember any mortgage
 8  payments on the house?
 9    A.  No.  There was no mortgage payments on the
10  house.
11    Q.  Did you ever refinance a loan on that
12  house?
13    A.  No.  I think we borrowed money from
14  Household Finance, or something like that.  I don't
15  really remember, and we borrowed extra money to fix
16  it up and rent it, I believe.
17    Q.  What kind of a loan was that?
18    A.  I'm not really sure.  I guess a home
19  improvement loan possibly.  I'm not sure.
20    Q.  It was a home equity loan?
21    A.  I don't know.
22    Q.  Do you remember anything about that loan?
23    A.  That it was -- I think it was a Household
24  Finance loan.  That's really about all I know about
```

00026
```
 1  it.
 2    Q.  Do you still own that house?
 3    A.  No.
 4    Q.  What happened with that house?  Did you
 5  sell it?
 6    A.  Yes.
 7    Q.  Did you sell it back into the family or to
 8  a different buyer?
 9    A.  To a different buyer.
10    Q.  Jumping forward to the next house you owned
11  on Cole Avenue.
12    A.  Mm-hmm.
13    Q.  Did you have a mortgage on that house?
14    A.  Yes.
15    Q.  Who did you have the mortgage with?  Before
16  you answer that, do you remember the dates that you
17  owned your wife's grandmother's house in New York,
18  the years?
19    A.  It was the early '90s.
20    Q.  But you never lived there?
21    A.  No.
22    Q.  Okay.  Now, I'm sorry.  Jumping back to the
23  Cole Avenue house.  Do you remember who you had the
24  mortgage with?
```

00027
```
 1    A.  I want to say City Savings Bank.
 2    Q.  Did you make payments to City Savings Bank?
 3    A.  Yes.
 4    Q.  Did you ever make payments to anybody else
 5  on that loan?
 6    A.  No.
 7    Q.  Did you ever refinance that loan?
 8    A.  No.
 9    Q.  So is it correct that you held that loan
10  from the time you bought the house until the time
11  you sold the house?
12    A.  Yes.
13    Q.  Now, on that mortgage that you had, do you
14  remember what the term was?
15    A.  30 years fixed.
16    Q.  30 years fixed?
17    A.  I think, yes.
18    Q.  Do you remember what the interest rate was?
19    A.  Somewhere in the 5 percent range, 6 percent
20  possibly.
21    Q.  Did you go to the closing transaction for
22  that house?
23    A.  Yes.
24    Q.  Were you represented by an attorney?
```

00028
```
 1    A.  Yes.
 2    Q.  Do you remember who the attorney was?
 3    A.  No.
 4    Q.  Do you remember paying attorney fees?
 5    A.  No, I don't remember, but I'm sure I did.
 6    Q.  Do you know if that attorney represented
 7  anybody else in the transaction?
 8    A.  No, I don't remember.
 9    Q.  Do you know if you had a right to cancel
10  that loan?
11    A.  I don't know, but I'm sure I did.
12    Q.  Why do you say that you're sure you did?
13    A.  Well, I'm guessing that that's standard
14  procedure in all mortgages.
15        THE WITNESS:  Can I get a glass of
16  water?
17        MR. PASQUARELLO:  Absolutely.  Sure.
18    Q.  When you say you're guessing, do you mean
19  you are assuming?
20    A.  I'm assuming.
21    Q.  Did you ever try to cancel that loan you
22  had with City Savings Bank?
23    A.  No.
24    Q.  Now, tell me what your assumption is with
```

00029
1  regard to the standard procedure for cancellation.

2   A.  Can you repeat that?

3   Q.  Yes.  Let me rephrase that.  That was a bad

4  question.

5       With regard to the right to cancel loans

6  that you just described to me, is there some sort of

7  time period you're aware of for canceling?

8   A.  Yes.

9   Q.  What is that?

10   A.  I think it's three business days, or three

11  days or -- yeah.

12   Q.  Is it correct that you associate that

13  three-day period generally with the right to

14  rescind?

15   A.  I suppose, although I'm not familiar with

16  the term -- I'm not familiar with the term "rescind"

17  in conj...

18   Q.  Let me rephrase that.

19       MR. PASQUARELLO:  Can you read that back

20  to me.

21       (Question read by Court Reporter.)

22   Q.  Same question, but instead of "rescind"

23  I'll plug in "cancel."  With the right to cancel.

24  Do you associate that three-day period with the

Lillie, Christopher J. - 12/16/2004          Page 29

---

00030
1  right to cancel?

2   A.  Yes.

3   Q.  Yes, you do?

4   A.  Yes.

5   Q.  Do you remember what you paid for the Cole

6  Avenue home?

7   A.  I think it was $99,000.

8   Q.  And you sold that house at the time that

9  you moved into Endicott Street, is that right?

10   A.  That's right.

11   Q.  What did you pay for your house on Endicott

12  Street?

13   A.  I believe it was $102,000.

14   Q.  Did you take a mortgage?

15   A.  Yes.

16   Q.  With whom?

17   A.  Greylock Federal Credit Union.

18   Q.  Had you done business with Greylock before?

19   A.  No.

20   Q.  Is Greylock a local Federal Credit Union in

21  Western Mass.?

22   A.  Yes.

23   Q.  Do you have any accounts at Greylock?

24   A.  No, not that I know of.

Lillie, Christopher J. - 12/16/2004          Page 30

---

00031
1   Q.  What about your wife?  Do you know if she

2  does?

3   A.  Yes, she does.  I think she has a checking

4  account there.

5   Q.  The mortgage from Greylock, do you remember

6  what the term was?

7   A.  It was 30 years.

8   Q.  Was it fixed or adjustable?

9   A.  It was an adjustable.

10   Q.  Do you remember the interest rate?

11   A.  I'm not exactly sure.  I think probably in

12  the 5s or low 6 percent.

13   Q.  Do you know what your monthly payment was

14  under that mortgage?

15   A.  With everything escrowed in, principal,

16  insurance and taxes, I think it was around in the

17  mid 600s, 650.  I don't really remember.

18   Q.  Did you attend the closing for the

19  transaction on the Endicott Street house?

20   A.  Yes.

21   Q.  Did you have an attorney?

22   A.  Yes.

23   Q.  What was your attorney's name, if you

24  remember?

Lillie, Christopher J. - 12/16/2004          Page 31

---

00032
1   A.  I just -- I know his name, but I can't

2  think of it off the top of my head.  I just saw him

3  yesterday.

4   Q.  If you think of it during the course of the

5  deposition, let me know what it is when it comes to

6  you.

7   A.  Okay.

8   Q.  Did you review any of the documents at that

9  closing before you signed them?

10   A.  No.

11   Q.  Did you read any of the documents before

12  you signed them?

13   A.  No.

14   Q.  How long did the closing take, if you

15  remember?

16   A.  Probably 45 minutes to an hour.

17   Q.  Did you have a right to cancel that loan?

18   A.  I don't remember.

19   Q.  Do you think that you had a right to

20  cancel?

21   A.  Yes.

22   Q.  What do you think the cancellation period

23  was for that loan?

24   A.  Well, I think it would be three days.

Lillie, Christopher J. - 12/16/2004          Page 32

00033
1    Q. Did you ever try to cancel that loan?
2    A. No.
3    Q. Did you ever want to cancel that loan?
4    A. No.
5    Q. Did you ask any questions during the
6    closing?
7    A. Not that I remember.
8    Q. Again, we're talking about the closing when
9    you bought the Endicott Street house in 2000.
10   A. That's right.
11   Q. Did your wife ask any questions at the
12   closing?
13   A. Not that I can remember.
14   Q. Do you remember about how long the closing
15   took?
16   A. For Endicott?
17   Q. Yes.
18   A. I think I said about 45 minutes to an hour.
19   Q. Do you remember if you received a notice of
20   a right to cancel that loan?
21   A. I can't remember.
22   Q. Do you know if the documents associated
23   with that transaction have been produced in this
24   lawsuit?

00034
1    A. I don't know. I don't know.
2    Q. Did you participate in any way in
3    assembling documents to be produced through your
4    attorneys in this suit?
5    A. No, not that I know of.
6    Q. Was it your wife who principally gathered
7    whatever documents had to be produced?
8    A. Yes.
9    Q. Did anybody else participate in getting
10   documents that you know of?
11   A. No.
12   Q. Other than your attorneys?
13   A. No, not that I know of, no.
14   Q. Do you keep a file with your mortgage
15   documents in it?
16   A. Yes.
17   Q. Does that file include your mortgage
18   documents from Greylock?
19   A. I'm guessing it does, yes.
20   Q. Where do you keep that file?
21   A. In a filing cabinet.
22   Q. Where's the filing cabinet?
23   A. I think it's in our bedroom.
24   Q. Do you maintain it or does your wife

00035
1    maintain the file?
2    A. My wife.
3    Q. Okay. Other than the refinance that is at
4    issue in this case, did you ever try to refinance
5    that mortgage on the Endicott Street home?
6    A. No.
7    Q. How many times have you refinanced a
8    mortgage?
9    A. I think this is the first time.
10   Q. When did that take place?
11   A. Let's see. Roughly a year ago. Maybe a
12   little -- around a year ago -- a year October or
13   August, somewhere around there sometime.
14   Q. August 2003?
15   A. Yes.
16   Q. So is it correct that the refinance at
17   issue in this case is the only refinance transaction
18   that you have participated in?
19   A. Yes. This is the only one, yes, on
20   Endicott.
21   Q. So you've had this one refinance on
22   Endicott, and none on Cole Avenue?
23   A. That's right.
24   Q. I may have asked you this already, but just

00036
1    to make sure I get it. Other than your current
2    house, do you own any other real property now?
3    A. No.
4    Q. Other than the Endicott Street house, the
5    Cole Avenue house and your wife's grandmother's
6    house in New York, have you ever owned any other
7    real property?
8    A. No.
9    Q. Mr. Lillie, can you tell me what your
10   general understanding is about what happens in a
11   refinancing transaction?
12   A. Yeah. A general understanding is that we
13   approach a bank to borrow money at a lower interest
14   rate.
15   Q. Other than a lower interest rate, any other
16   reason?
17   A. Sometimes you borrow a little more to
18   consolidate debt.
19   Q. Now, leaving aside your current mortgage
20   with First Horizon and the home equity loan of
21   credit, have you ever tried to cancel a mortgage or
22   an equity loan?
23   A. No.
24   Q. Some questions for you about your

00037
1  household.
2     A.  Okay.
3     Q.  Who opens the mail?
4     A.  We both do.  Well, my wife and I open the
5  mail.
6     Q.  Who would you say manages the household
7  finances?
8     A.  I do.
9     Q.  Are you the one who pays the bills?
10    A.  Yes.
11    Q.  Do you pay the mortgage?
12    A.  Yes.
13    Q.  Have you always paid the mortgage?
14    A.  Yes.
15    Q.  Do you write checks to pay the mortgage?
16    A.  Yes.
17    Q.  Have you ever paid the mortgage by
18  automatic withdrawal?
19    A.  No.
20    Q.  Are you the one who handles communications
21  with creditors?
22    A.  Well, that depends on -- creditors for me
23  or for her?  I mean, it's different.  I mean, she
24  would communicate with her own creditors, and I'd

00038
1  communicate with mine.
2     Q.  Who would handle communications with First
3  Horizon?
4     A.  I haven't had any communications with First
5  Horizon, other than to pay them.
6     Q.  What is your monthly payment now on your
7  mortgage?
8     A.  It's $769.55, something like that.
9     Q.  Do you make your payments by check?
10    A.  Yes.
11    Q.  Have you ever fallen behind in your
12  payments?
13    A.  No.
14    Q.  On any of your previous mortgages, have you
15  ever fallen behind on those payments?
16    A.  No.
17    Q.  Before you refinanced in 2003, had you ever
18  taken out a home equity loan?
19    A.  Not that I can recollect, no.
20    Q.  Had you ever taken out a home equity line
21  of credit prior to the refinancing in 2003?
22    A.  No.
23    Q.  For the home equity line of credit that
24  you -- I'm sorry -- that was part of the 2003

00039
1  refinancing, did you have to go to a separate
2  closing transaction for that loan?
3     A.  I don't remember, but I don't think so.  I
4  think it was all kind of wrapped up into one, you
5  know, meeting.
6     Q.  So for the refinance transaction, was there
7  just one closing meeting?
8     A.  Yes.  I believe so, yes.
9     Q.  Mr. Lillie, have you ever filed for
10  bankruptcy?
11    A.  No.
12    Q.  Who decided to refinance your mortgage in
13  2003?
14    A.  I think it was a joint decision between my
15  wife and I.
16    Q.  I asked you a few minutes ago about what
17  the monthly payment is.  Do you know what the
18  interest rate is on your loan?
19    A.  It's right around 5 percent, a little
20  lower, maybe 4.9.  I'm not really sure.  Somewhere
21  around there.
22    Q.  By "loan" I mean your mortgage for which
23  you have the $769 payment.
24    A.  Right.

00040
1     Q.  So somewhere in the neighborhood of...
2     A.  Five percent.
3     Q.  Five?
4     A.  Maybe a little less.
5     Q.  Now, when did you and your wife decide that
6  you wanted to refinance?
7     A.  Spring of 2003, early summer possibly.
8     Q.  Why did you want to refinance?
9     A.  To get a lower interest rate and
10  consolidate some debt, credit cards.
11    Q.  Would you characterize the differential
12  between the rate you refinanced at and the rate that
13  you had on your Greylock mortgage as significant?
14    A.  Yes.
15    Q.  Do you know what the difference was?
16    A.  In percentage or monthly payment?
17    Q.  How about both.
18    A.  I guess we must have been saving almost --
19  probably a percent, and lowering our mortgage
20  payment by a couple hundred dollars, I would guess.
21    Q.  Do you know what the principal balance was
22  on your mortgage when you refinanced?
23    A.  I think it was $80,000.
24    Q.  How long had you had that loan at the time

00041
1  that you refinanced?
2   A.  Three years, roughly three years, three and
3  a half.
4   Q.  Had you ever done business with First
5  Horizon before you refinanced?
6   A.  No.
7   Q.  How did you come into -- how did you
8  contact First Horizon?
9   A.  My wife did, I believe.  I believe my wife
10  contacted First Horizon.
11   Q.  Do you know how she did that?
12   A.  Maybe on line.
13   Q.  Have you ever met with anyone from First
14  Horizon?
15   A.  Not that I know of, outside of the closing.
16  Maybe there was a First Horizon -- the guy at the
17  closing might have been a First Horizon
18  representative.  I'm guessing he was.
19   Q.  Do you know one way or another if he was
20  employed by First Horizon?
21   A.  I don't know.
22   Q.  Do you know what that person's name was at
23  the closing?
24   A.  No.

                    Lillie, Christopher J. - 12/16/2004        Page 41

00042
1   Q.  Had you ever met him before?
2   A.  No.
3   Q.  Had you ever talked to him before?
4   A.  No.
5   Q.  Have you ever heard of Empire Mortgage
6  Services?
7   A.  Yes.
8   Q.  How have you heard of them?
9   A.  I believe they were the broker.
10   Q.  Do you know if your wife contacted Empire
11  or First Horizon?
12   A.  I'm not sure if she was in communication
13  with both or just one.  I don't know.
14   Q.  When was it that you applied for the
15  refinancing loan?
16   A.  Like I said, I think it was in the spring
17  or early summer of 2003.
18   Q.  Do you remember how much you applied to
19  borrow?
20   A.  I think we wanted somewhere around $20,000,
21  $25,000.
22   Q.  When you say $20,000 or $25,000, is that on
23  top of what your mortgage balance was?
24   A.  Yes.

                    Lillie, Christopher J. - 12/16/2004        Page 42

00043
1   Q.  So whatever your principal balance was,
2  plus $20,000 or $25,000 extra?
3   A.  Something like that, yeah.  It was -- the
4  principal mortgage is $112,000 right now.  So it
5  was -- I forget what was on the mortgage before we
6  refinanced.  I said $80,000.  It might have been
7  $90,000.  I don't remember.
8   Q.  Did it take long for you to get approved
9  for the loan?
10   A.  I don't think so.  I'm not sure, though.  I
11  don't remember.
12   Q.  What did you understand the terms of the
13  new loan to be?
14   A.  It would be a 30-year adjustable rate.
15   Q.  Okay.  I think you already told me what the
16  payment is.
17   A.  Yes.
18   Q.  It's about $760 or so?
19   A.  $769 or something like that right now,
20  yeah.
21   Q.  Now, for the $20,000 to $25,000 on top of
22  your mortgage balance, what did you plan to do with
23  that money?
24   A.  It was used to pay credit card debt off and

                    Lillie, Christopher J. - 12/16/2004        Page 43

00044
1  consolidate it into the new mortgage.
2   Q.  Do you know which credit cards you used the
3  proceeds to pay off?
4   A.  I don't.  I don't.
5   Q.  In addition to credit cards, or other than
6  credit cards, was there anything else you used the
7  proceeds for?
8   A.  Yes.  We put a new oil burning furnace in
9  the house.
10   Q.  Anything else?
11   A.  I believe I paid off a motorcycle.
12   Q.  Anything other than that?
13   A.  No, not that I can remember.
14   Q.  I want to direct your attention to what was
15  marked as Exhibit 3 in your wife's deposition.
16   A.  Okay.
17   Q.  Which is a settlement statement from your
18  mortgage.
19   A.  Mm-hmm.
20   Q.  If you'd take a look at the first page.
21  Before we do that, on the second page, is that your
22  signature at the bottom of the page?
23   A.  Yes.
24   Q.  Just for the record, this document is Bates

                    Lillie, Christopher J. - 12/16/2004        Page 44

00045
1  labeled FH650 and 651. On the first page, about a
2  quarter of the way down, line 109, it says payoff to
3  First U.S.A. Bank for $6,449.
4     A. Mm-hmm.
5     Q. Was that a credit card?
6     A. It must have been.
7     Q. Do you know one way or the other? I don't
8  want you to guess, if you don't know.
9     A. I don't know.
10    Q. Do you know what made up that amount of
11 $6,449 in terms of what sort of charges were on that
12 card, if it was a card?
13    A. I'm guessing that it must have been one of
14 my wife's credit cards.
15    Q. How about for the next line, Discover
16 Financial, $5,939?
17    A. Again, I believe that was one of my wife's
18 credit cards.
19    Q. And Berkshire Bank?
20    A. That was the motorcycle.
21    Q. Now, looking at the second page on the
22 bottom of that page, line 1304, it says there is a
23 payoff to HHLD Bank for $1,966.
24    A. Mm-hmm.

                Lillie, Christopher J. - 12/16/2004          Page 45

00046
1     Q. Do you see that line?
2     A. Yes.
3     Q. Do you know what that was for?
4     A. I don't. HHLD. $1,966.
5     Q. Do you know if HHLD stands for Household
6  Bank?
7     A. I don't. It may be. I don't know.
8     Q. You mentioned earlier in your testimony
9  when you were talking about your wife's
10 grandmother's house --
11    A. Uh-huh.
12    Q. -- something that sounded like Household
13 Bank? Could this have anything to do with that?
14    A. No. No. That was way long ago.
15    Q. The next line is a payoff to Chase NA for
16 $1,553. Do you know what that is?
17    A. That, again, is either my -- one of my
18 wife's credit cards or one of mine. It could have
19 been mine.
20    Q. And the next line, the Nelnet LNS for $716.
21    A. I don't know what that is. I think --
22 that's not mine. That's not my credit card, if it
23 is a credit card
24    Q. Do you and your wife keep your credit card

                Lillie, Christopher J. - 12/16/2004          Page 46

00047
1  statements?
2     A. No, I don't.
3     Q. Do you know whether there were any charges
4  from your business on any of these credit cards that
5  were paid off?
6     A. Do I -- yes, I know that there wasn't.
7     Q. How do you know that?
8     A. Because I always use -- I always pay my
9  bills through my business checking account.
10    Q. Do you also have a business credit line?
11    A. No. I have a personal credit card. No
12 business credit card or credit line.
13    Q. So is it correct that you don't use any
14 credit cards for business purposes?
15    A. That's right.
16    Q. And that business account is at Lenox or
17 Legacy Bank?
18    A. Yes.
19    Q. Legacy Bank?
20    A. Yes.
21       MR. PASQUARELLO: Why don't we take a
22 five-minute break. We've been going for about an
23 hour.
24       MR. LEFEBVRE: Sure. Okay.

                Lillie, Christopher J. - 12/16/2004          Page 47

00048
1       (A recess was taken.)
2       MR. PASQUARELLO: We are back on the
3  record.
4     Q. Mr. Lillie, you're still under oath. Do
5  you understand that?
6     A. Yes.
7     Q. Have you ever been involved in any other
8  litigation?
9     A. No.
10    Q. And this includes being a party or a
11 witness in another lawsuit?
12    A. No.
13    Q. Have you ever been a defendant in a
14 criminal case?
15    A. Yes.
16    Q. When was that?
17    A. 1988.
18    Q. What was that case about?
19    A. I was arrested for driving under the
20 influence.
21    Q. Did you have to testify in that case?
22    A. No.
23    Q. Did that case go to a hearing?
24    A. Like trial?

                Lillie, Christopher J. - 12/16/2004          Page 48

00049
1    Q. Yes.
2    A. No.
3    Q. Were you convicted?
4    A. Yes.
5    Q. Is that your only criminal offense?
6    A. Yes.
7    Q. Do you remember what your sentence was?
8    A. Yes. Loss of license for one year and
9 limited license for the second year, dawn to dusk.
10    Q. Anything else?
11    A. Driving -- I don't know the name of it. I
12 don't remember the name of it. But like a weekly
13 class that I had to attend.
14    Q. For driving?
15    A. For driving. You know, educational
16 concerns about DUI.
17    Q. Did you have to serve any jail time?
18    A. No.
19    Q. Have you ever been arrested for any other
20 criminal offense?
21    A. No.
22    Q. I want to go back to the refinancing
23 transaction in 2003. Were you represented by
24 counsel for the refinancing?

Lillie, Christopher J. - 12/16/2004          Page 49

00050
1    A. Was I represented by an attorney?
2    Q. Yes.
3    A. For the refinancing. Not that I recollect.
4 I don't know. I mean, we closed at our dining room
5 table, if that's what you mean. At the closing
6 there was my wife --
7    Q. I'll get to that in a second.
8    A. Okay.
9    Q. Before I go on, during the break that we
10 just had, did you discuss any of your testimony with
11 your wife?
12    A. No.
13    Q. Can you tell me the time and place of the
14 closing for the refinance?
15    A. The time was late at night, 10:30,
16 possibly, 10:00, 10:30 at night my house at my
17 dining room table.
18    Q. Did you have to take off any time from
19 work?
20    A. No.
21    Q. How long did the closing take?
22    A. I want to say a half an hour to 45 minutes.
23    Q. Other than you, your wife and the person
24 who performed the closing, was anybody else present?

Lillie, Christopher J. - 12/16/2004          Page 50

00051
1    A. No.
2    Q. Am I right that you don't know the person's
3 name who came to do the closing?
4    A. Yes.
5    Q. Did that person give you any instructions
6 about the closing?
7    A. I don't remember.
8    Q. Did you review any documents before you
9 signed them?
10    A. No.
11    Q. Did you read any documents before you
12 signed them?
13    A. No.
14    Q. Before the closing took place, did you
15 receive any of the documents that you later signed
16 at the closing?
17    A. I don't remember.
18    Q. Do you know if your spouse reviewed any of
19 the documents at the closing?
20    A. I don't know.
21    Q. Do you know if she reviewed any of them
22 before the closing?
23    A. No. I don't know.
24    Q. Can you tell me how the closing began?

Lillie, Christopher J. - 12/16/2004          Page 51

00052
1    A. Well, he came to the house later in the
2 evening, around 10:00, 10:30. He came in. He had
3 the file of documents for us to sign and initial,
4 and I'm guessing that that's how it went, how the
5 closing went. And then off he went.
6    Q. Did you ask any questions during the
7 closing?
8    A. No.
9    Q. Did you have any questions during the
10 closing?
11    A. No.
12    Q. Did your wife ask any questions during the
13 closing?
14    A. I don't know. I don't remember.
15    Q. What documents do you remember receiving at
16 the closing?
17    A. I can't give you a specific document that I
18 remember receiving. I just remember that there was
19 a pile of mortgage documents or refinance documents
20 that we both had to sign and initial.
21    Q. Do you remember signing the note?
22    A. No, I don't remember, but I'm guessing I
23 signed it.
24    Q. Are there any documents in particular that

Lillie, Christopher J. - 12/16/2004          Page 52

00053
1  you remember signing?

2   A.  Nothing jumps out and sticks in my mind.

3   Q.  Let me show you a copy of the amended

4  complaint with a few exhibits attached to it from 1

5  through L.  Can you just take a quick look at those

6  exhibits and tell me if those are documents that you

7  received at the closing?

8   A.  (Witness reviewing documents.)

9       Okay.  I'm sure they were there, and we

10  signed them, but I don't remember them.  I'm

11  guessing yes, I signed them, but I don't remember

12  reading them.

13   Q.  Did the documents you just looked at that

14  were attached as exhibits look familiar to you?

15   A.  No.  I'm sure that they were there and, you

16  know, I'm certain I signed them, whatever was there.

17   Q.  Did the person who was conducting the

18  closing explain to you what the documents were?

19   A.  I don't know.  I don't remember.  I'm sure

20  he said a little something.  You know, "This is for

21  this.  This means this," brief stuff, brief

22  explanations of the document, and then, "Sign and

23  initial," or, "Initial and sign."

24   Q.  Now, did you understand that there was a

00054
1  waiting period between the closing and when you

2  would actually receive the money?

3   A.  Did I understand that there was a waiting

4  period?  I never even really thought of it, or

5  thought about it.  I assumed that monies would be

6  coming at some point, sure.

7   Q.  When did you receive the money?

8   A.  The money -- the cashout money?  The extra

9  money?

10   Q.  Any of it.

11   A.  I don't know.  I'm guessing, you know, they

12  took care of all of the exchanging of monies to pay

13  off creditors and stuff, you know.  I don't know if

14  I saw any of that.  I know we did get checks for

15  certain things, but I don't really remember how long

16  it took, if that's what you're asking.

17   Q.  Well, let me ask it this way:  Did you

18  understand that you wouldn't immediately get the

19  money on the night of the closing?

20   A.  Yes.  I'm sure I didn't expect to see any

21  money the night -- that night at 11:00, the night of

22  the closing.

23   Q.  So you knew that disbursement would take

24  place a few days after the closing?

00055
1   A.  Yes.

2   Q.  So for your payments on the new loan, do

3  you know when your first payment was due?

4   A.  Well, let's see, the closing was in August,

5  and the first payment was in October.

6   Q.  Did you pay by check?

7   A.  I'm certain I did.

8   Q.  To whom did you make the payment?

9   A.  First Horizon Home Loans.

10   Q.  Have you ever missed any payments on this

11  loan?

12   A.  No.

13   Q.  Have you ever fallen behind on your loan

14  payments on this loan?

15   A.  No.

16   Q.  Since the refinancing transaction and the

17  time that you received the cashout money, have you

18  been happy with the servicing of the loan?

19   A.  Since...?

20   Q.  Yes.

21   A.  I suppose.  I haven't had any complaints

22  about it.  I'm just paying a mortgage payment, if

23  that's what you mean.  I mean, nobody is calling me

24  up and asking me how I like, you know, the loan or

00056
1  anything like that, you know.

2   Q.  Have you had any problems with the loan?

3   A.  We had initial problems with monies that we

4  thought we were going to receive that somehow fell

5  short of what we thought we were going to receive.

6  Now, I'm not exactly sure how much or what, or the

7  specifics of how much money we thought we were going

8  to receive as opposed to how much we actually got,

9  but I know that there was a difference there that we

10  were unhappy with, yes, and I believe my wife

11  probably has the amounts in question written down

12  and documented somewhere.

13   Q.  So did you receive money or checks from the

14  cashout that you then went and paid off?  I'm sorry.

15  That you then used to go pay off like credit cards

16  or something like that?

17   A.  Yes.  I believe we must have, yeah.

18   Q.  Do you know which ones, which credit cards

19  you paid off yourself?

20   A.  I don't remember, no.

21   Q.  So once we leave these initial problems,

22  have there been any other problems?

23   A.  No.

24   Q.  The initial problems that you described,

00057
1  were they fixed fairly quickly?
2  A.  What initial problems?  The discrepancy of
3  monies?  I don't know what you're talking about.
4  Q.  Okay.  Why don't you tell me again what the
5  initial problems are that you were talking about.
6  A.  Well, the closing wasn't -- the closing was
7  late.  That was an aggravation.  After the closing,
8  when we were supposed to receive X amount of
9  dollars, we didn't receive the proper amounts, and I
10  wasn't aware of it -- my wife brought it to my
11  attention.  So we were unhappy with that.
12  Q.  So you said you didn't get the proper
13  amounts first.  Does that mean it was corrected and
14  you eventually got the proper amounts?
15  A.  No.  I don't believe we ever did get the
16  proper amounts.
17  Q.  Can you tell me what those amounts were
18  for?
19  A.  I can tell you that we borrowed X amount of
20  dollars, and we were supposed to receive X amount of
21  dollars, and we didn't receive X amount of dollars.
22  We received less than X amount of dollars.
23  Q.  So you didn't receive as much as --
24  A.  So I was unhappy with that.

Lillie, Christopher J. - 12/16/2004          Page 57

00058
1  Q.  So you didn't receive as much as you
2  thought you were going to receive?
3  A.  That's right.
4  Q.  Mr. Lillie, is it correct that you did not
5  read any of the documents before you signed them at
6  the closing?
7  A.  Yes.
8  Q.  After the closing, did you then read any of
9  the documents?
10  A.  Yes.
11  Q.  When did you do that?
12  A.  Probably weeks later.
13  Q.  Do you remember which documents you read?
14  A.  I remember reading -- I remember realizing
15  that when there was this discrepancy in monies, that
16  I was dissatisfied, so I reviewed the documents to
17  see where there might have been an error, and it was
18  quite confusing to me.  So I didn't read on any
19  further.
20  Q.  Do you remember seeing a notice of right to
21  cancel in the loan documents?
22  A.  Mm-hmm.
23  Q.  At the closing, do you remember seeing it?
24  A.  I'm sure I saw it, but I can't say for sure

Lillie, Christopher J. - 12/16/2004          Page 58

00059
1  that I remember seeing it.  I'm sure I signed and
2  initialed it.
3  Q.  Do you know if you read it before you
4  signed and initialed it?
5  A.  I don't know.  I'm guessing I didn't read
6  it thoroughly.
7  Q.  Let me show you what was marked as Exhibit
8  4 at your wife's deposition this morning.  Is that
9  the notice that you remember from the closing
10  documents?
11  A.  I suppose it is.
12  Q.  Now, on the bottom, is that your signature?
13  A.  Yes.
14  Q.  Is it dated August 27, 2003?
15  A.  Yes.
16  Q.  Now, at the closing did you understand that
17  you had a right to cancel the loan?
18  A.  Yes.
19  Q.  What was your understanding at the closing?
20  A.  I suppose that I had three days to cancel,
21  if I needed to, but I'm not sure that I recognized
22  that fact at the closing.
23  Q.  Now, several weeks later, when you went
24  back to review the documents, did you understand at

Lillie, Christopher J. - 12/16/2004          Page 59

00060
1  that time that there was a time window for you to
2  cancel the loan?
3  A.  Yes.
4  Q.  What did you understand about your right to
5  cancel at that time?
6  A.  Well, by the time that I looked at the
7  documents then, I assumed that my right to cancel
8  had expired, because it was several weeks since I
9  had reviewed the documents, or since the closing and
10  the time I reviewed the documents.
11  Q.  Now, at the closing, what was your
12  understanding of what the right to cancel was?
13  A.  Like previous closings, I guess my
14  understanding was that I had three business days.
15  Q.  To do what?
16  A.  To rescind or cancel the -- the right to
17  rescind the mortgage.
18  Q.  Now, does rescind mean cancel to you?
19  A.  I guess those are the -- it's the same kind
20  of language.
21  Q.  So is it correct that you understood that
22  within that three-day period, you could nullify the
23  transaction?
24  A.  Yes.  That would be my understanding.

Lillie, Christopher J. - 12/16/2004          Page 60

00061
```
 1    Q. Now, several weeks later, when you were
 2  reviewing the document, was that still your
 3  understanding at that time, about what the right to
 4  rescind was?
 5    A. Yes.
 6    Q. During the three-day period after you
 7  closed the loan, did you want to cancel the loan?
 8    A. No.
 9    Q. During the three-day period after you
10  closed the loan, did you try to cancel the loan?
11    A. No.
12    Q. In the several weeks before you reviewed
13  the documents, did you want to cancel the loan?
14    A. I wanted to -- I was wanting to find out
15  what I could do about this situation, because of the
16  monies that I felt we were shorted, but I didn't
17  realize that until the monies came in.
18    Q. Can you tell me when was the first time
19  that you decided to cancel the loan?
20    A. It must have been when I -- I was upset
21  with the process -- with First Horizon. I was upset
22  with them when I realized that we weren't getting
23  the monies that we thought we were. I was upset
24  then and I was frustrated, but I had decided at that
```

00062
```
 1  point there wasn't anything that we could do about
 2  it, and so I just decided that, well, live and
 3  learn.
 4    Q. Did you talk to an attorney at that point?
 5    A. No.
 6    Q. Did you consider bringing any kind of
 7  lawsuit at that time?
 8    A. Not at that time.
 9    Q. Can you tell me why it is you want to
10  cancel your loan now?
11    A. Because I want to be able to rescind or
12  cancel my mortgage so that I can refinance with
13  someone else.
14    Q. Do you think that you have to rescind or
15  cancel in order to refinance with somebody else?
16    A. No. I can go ahead and refinance with
17  someone else now, if I want to.
18    Q. So is there any other reason why you want
19  to cancel the loan now, other than your desire to
20  refinance?
21    A. I'm not sure I understand the question
22  exactly. Can you repeat it?
23      MR. PASQUARELLO: Can you read that
24  back.
```

00063
```
 1      (Question read by Court Reporter.)
 2    A. Well, yeah. I feel that, you know, there
 3  was an injustice done, and I would like it to be
 4  righted.
 5    Q. Can you tell me what the injustice was?
 6    A. The injustice was my right to cancel wasn't
 7  properly -- I suppose properly acknowledged to me
 8  or...
 9    Q. What do you mean by that?
10    A. I'm kind of losing my train of thought
11  here. I'm trying to back up and break it down in a
12  way that will make sense, and if I can get a minute
13  to gather my thoughts, I'll be able to do so.
14    Q. Okay. Take your time. That's fine.
15    (Pause.)
16    A. I guess what I'm trying to say is that
17  because we thought that we were shorted monies
18  through this whole transaction, I was upset, but by
19  the time I realized that we could cancel the loan
20  and rescind it, time had expired, and so I felt like
21  there wasn't anything that I could really do about
22  it, and then fortunately I was -- this legal
23  advertisement was presented to me, and that kind of
24  breathed a little life into my frustration.
```

00064
```
 1    Q. I understand all that, but can you tell me
 2  why it is you think that your right to cancel wasn't
 3  properly acknowledged to you? I'm paraphrasing your
 4  previous answer.
 5    A. Can I explain to you? No, I can't. I
 6  can't explain to you why I think my right to cancel
 7  wasn't acknowledged to me properly. I can't explain
 8  it.
 9    Q. But it is correct that at the time of the
10  closing and several weeks later, you understood that
11  there was a right to cancel or nullify the loan, is
12  that right?
13    A. I understood that, yeah, but within three
14  days.
15    Q. Just the period had passed you by already?
16    A. That's right.
17    Q. And is it also correct that you understood
18  that if you went ahead and canceled, the loan would
19  have been nullified?
20    A. That's right.
21    Q. So to speak.
22    A. That's my understanding.
23    Q. As if it didn't happen?
24    A. Yeah. Although I didn't -- I don't know
```

00065
1 that the language – I'm not an expert in the field
2 of writing mortgages. I'm a house painter.
3    Q. Did you ever try to cancel the loan before
4 you received the legal advertisement from
5 Mr. Lefebvre?
6    A. No.
7    Q. Do you understand that Mr. Lefebvre has
8 attempted to cancel your loan for you?
9    A. Do I understand that he has attempted to
10 cancel?
11    Q. Yes.
12    A. No. I don't understand that.
13    Q. Okay. Do you understand that Mr. Lefebvre
14 has notified First Horizon that you want to cancel
15 your loan?
16    A. Yes. I guess it's my understanding he's
17 done that.
18    Q. Do you know how he's --
19    A. I'm not too involved with Mr. Lefebvre. My
20 wife has been handling most of the communication
21 between Mr. Lefebvre's group and herself and us in
22 this whole issue.
23    Q. Do you know how Mr. Lefebvre sent that
24 notice?

Lillie, Christopher J. - 12/16/2004        Page 65

00066
1    A. No.
2    Q. Have you seen any letter from Mr. Lefebvre
3 to First Horizon saying that you want to cancel your
4 loan?
5    A. I don't know. I might have, but, like I
6 said...
7    Q. Let me show you this. This is Exhibit 5
8 from your wife's deposition. Have you seen that
9 letter before?
10    A. I can't say that I have. I might have
11 looked at it, but I can't say for sure that I have.
12 Again, my wife handles most of the communication.
13    Q. Who made the decision to join this lawsuit
14 as plaintiffs?
15    A. I guess I was part of the decision.
16    Q. Did you and your wife decide together to
17 join as plaintiffs in this lawsuit?
18    A. Yeah, I'm sure we did. I'm sure we thought
19 it would make sense to see if our -- you know, we
20 could do something about this, yes.
21    Q. Do you understand that you're a plaintiff
22 in this lawsuit?
23    A. Yes.
24    Q. Do you know whether or not you're a class

Lillie, Christopher J. - 12/16/2004        Page 66

00067
1 representative in this lawsuit?
2    A. I am not.
3    Q. Do you know whether or not your wife is a
4 class representative?
5    A. I believe she is.
6    Q. Is there any reason why you are not, but
7 your wife is a class representative?
8    A. I believe that she was more able and
9 capable to devote the time required, and I wasn't.
10    Q. Do you understand that your wife cannot
11 settle her claim individually if she is a class
12 representative?
13    A. Yes.
14    Q. Do you understand that that might delay the
15 resolution of your claim?
16    A. Yes.
17    Q. Are you willing to delay the resolution of
18 your claim?
19    A. I'm not sure I understand the question.
20    Q. If you could settle your claim or resolve
21 your claim sooner than possible if you were a class
22 representative, would you want to do that?
23        MR. LEFEBVRE: I'm going to object.
24        MR. PASQUARELLO: Strike that question.

Lillie, Christopher J. - 12/16/2004        Page 67

00068
1 I'm just going to move on.
2    Q. Mr. Lillie, what is it that you believe
3 that First Horizon did wrong in this case?
4    A. Well, I guess it's my understanding that
5 First Horizon didn't give us the proper right to
6 rescind our mortgage, give us the proper documents.
7 That's my understanding.
8    Q. By "documents," do you mean documents about
9 your right to rescind?
10    A. Yes.
11    Q. Tell me why the document you received about
12 your right to rescind was not proper?
13    A. I guess the -- from my understanding, the
14 language in the document is confusing.
15    Q. Were you confused by that language?
16    A. I didn't actually read the document
17 thoroughly, but any document like that is confusing
18 to me.
19    Q. Do you know if your wife was confused by
20 the document?
21    A. I don't know.
22    Q. Can you tell me how it was confusing?
23    A. No, I can't.
24    Q. Have you told me everything that you

Lillie, Christopher J. - 12/16/2004        Page 68

00069
1 believe that First Horizon did wrong?

2   A.  I guess I have, yeah.  I'm guessing I did.

3   Q.  So just the documents about the right to

4 rescind?

5   A.  I believe so.

6   Q.  Can you tell me what your claim is against

7 First Horizon?

8   A.  My claim against First Horizon is to

9 my right to rescind a matter of public record, and

10 be able to get back all fees and closing costs,

11 points, et cetera, and interest back, I suppose.

12 That would be my claim.

13   Q.  Is that the only claim that you're aware

14 of?

15   A.  Yeah.  Like I said, I'm not privy to all of

16 the specifics of the case.

17   Q.  Mr. Lillie, there is an allegation in your

18 amended complaint that says the right to rescind that

19 you were provided was limited.  Can you tell me what

20 you mean by that?

21   A.  I can't tell you exactly what I mean by

22 that.  Again, you know, that's all details that I'm

23 not, you know -- I'm not knowledgeable of.

24   Q.  When did you come to the conclusion that

Lillie, Christopher J. - 12/16/2004          Page 69

---

00070
1 First Horizon had allegedly violated the law?

2   A.  After speaking with my wife through -- and

3 Mr. Lefebvre.

4   Q.  Is that how you came to that conclusion?

5   A.  That's right.

6   Q.  Can you tell me what law it is that you

7 think First Horizon violated?

8   A.  I can't tell you exactly what it is, but I

9 think it's, you know, one of them truth-in-lending

10 laws or something.  You know, I'm not sure.  I'm not

11 certain.

12   Q.  Have you suffered any damages as a result

13 of First Horizon's conduct relating to the violation

14 you described to me?

15   A.  Monetary?

16   Q.  Yes.

17   A.  Yeah.  I suppose I have, yeah, sure.

18   Q.  Can you tell me what they are?

19   A.  Actually, no.  I guess I can't tell you

20 whether or not I have suffered any damages, so I'll

21 have to take that back.

22   Q.  Now, does that mean monetary or otherwise?

23   A.  Yes.  I can't, again, answer that clearly.

24   Q.  Okay.  Do you know what damages you're

Lillie, Christopher J. - 12/16/2004          Page 70

---

00071
1 seeking in this case for yourself personally?

2   A.  Personally, I think we're seeking to -- I'm

3 seeking to rescind the mortgage and get back all

4 closing costs and points and fees and things of that

5 nature, according to the -- you know, in accordance

6 with the mortgage.  Anything associated with the

7 mortgage and the right to rescind.  That's

8 personally.

9   Q.  Now, do you understand the damages that are

10 sought on behalf of the class to be the same or

11 different?

12   A.  I think they're different.  I'm not real

13 sure.  I think they're -- I think for the class,

14 they just -- they're looking for the right to be

15 able to rescind their mortgage.

16   Q.  What's your understanding of what

17 rescission is?

18   A.  My understanding is rescission is for First

19 Horizon or for the company to take back their

20 mortgage, cancel the mortgage, cancel it out, and if

21 the individual has an opportunity to refinance

22 through someone else, then that's fine, but I'm

23 real clear on it.  We're getting into some real

24 foggy territory for me.

Lillie, Christopher J. - 12/16/2004          Page 71

---

00072
1   Q.  Do you realize if you rescind a loan, that

2 you have to return to First Horizon the amount that

3 they provided to you?

4   A.  Yes.

5   Q.  Do you realize you'd have to tender

6 whatever that amount is in a certain amount of time?

7   A.  Yes.

8   Q.  Have you arranged for alternative

9 financing?

10   A.  I haven't arranged for it, but I know I can

11 get it, yes.

12   Q.  How do you know that?

13   A.  Because I think that with our credit and --

14 we'd have no problem.

15   Q.  Have you talked to any mortgage brokers

16 about financing recently?

17   A.  Not specifically for this, you know, within

18 the past couple of weeks, no.

19   Q.  Have you discussed with any mortgage

20 brokers what the current interest rates are on loans

21 for alternative financing?

22   A.  No, I haven't.

23   Q.  Do you have any idea what sort of an

24 interest rate you could get at this time?

Lillie, Christopher J. - 12/16/2004          Page 72

00073
1    A.  Probably, you know, 5 percent, 4.9, you
2  know, adjustable, something like that.  You know,
3  something in the low -- high 4.9 to 5 percent or in
4  that area, maybe 5 1/2 percent.
5    Q.  Is that higher than the rate you have now?
6    A.  I'm not sure what our rate is right now.  I
7  know it's a three-year adjustable, I think, or five
8  years adjustable.  I'm not sure.
9    Q.  Do you know if your rate now is 4 1/4
10 percent?
11   A.  It might be.
12   Q.  But you don't know?  You're not sure?
13   A.  I'm not sure.
14   Q.  If your rate now is 4 1/4 percent and you
15 could only get a loan to refinance at 5 percent or
16 higher, would you still want to rescind?
17   A.  Yes.
18   Q.  Can you tell me why?
19   A.  Yes.  Because I feel that there was
20 injustice done here.  There was an injustice done.
21   Q.  Does that injustice relate to the amounts
22 that you were talking about being disbursed with the
23 loan?
24   A.  Not just that.  The right to cancel, the

Lillie, Christopher J. - 12/16/2004          Page 73

00074
1  rescission language I guess is wrong too, but I
2  didn't know that at the time.  I know it now through
3  my attorney.
4    Q.  Does Mr. Lefebvre represent you in the
5  class action?
6    A.  Yes, I think he does.
7    Q.  Does anybody else?
8    A.  Edelman, Combs & Latturner.
9    MR. PASQUARELLO:  Why don't we take one
10 last short break and wrap this up.
11   MR. LEFEBVRE:  Great.
12   (A recess was taken.)
13   Q.  Mr. Lillie, you're still under oath.  I
14 want to show you Exhibit 4 again, which is the
15 notice of right to cancel.
16   A.  Okay.
17   Q.  Now, you've testified earlier that since
18 you've retained your attorney, you've concluded that
19 the language in this notice is allegedly confusing.
20   A.  Mm-hmm.
21   Q.  Can you take a look at that document now
22 and tell me what you are referring to?
23   A.  No, I can't.
24   Q.  Well, if you can't, you can send it back.

Lillie, Christopher J. - 12/16/2004          Page 74

00075
1    In paragraph 38 of your amended
2  complaint, it says that -- one of the allegations is
3  whether or not First Horizon had a practice of
4  issuing the form of notice in connection with
5  refinancing loans made by someone else.  Do you
6  understand that to be your allegation in this case?
7    A.  No.  I don't -- I mean, I'm sure it is,
8  but, again, I don't know too much about that amended
9  complaint.  I know my name is on there, but, again,
10 my wife pretty much does all the correspondence with
11 Mr. Lefebvre.
12   Q.  Are you done?  I just want to make sure you
13 finished your answer.
14   A.  Yeah.
15   Q.  Mr. Lillie, if we need to get releases from
16 you to obtain documents from any of your former
17 mortgages, do you have a problem with signing those
18 releases?
19   A.  No.
20   Q.  Do you know any other potential class
21 members?
22   A.  Mr. McKenna, I believe is one, and the
23 Deans are another, I believe.
24   Q.  Have you ever met either of them?

Lillie, Christopher J. - 12/16/2004          Page 75

00076
1    A.  No.
2    Q.  Do you only know them through this lawsuit?
3    A.  Mm-hmm.
4    MR. LEFEBVRE:  You have to state your
5  answer.
6    A.  Yes.  I know of their names.
7    Q.  Mr. Lillie, thank you for your time today.
8  That's all I have.
9    THE WITNESS:  Okay.
10   MR. LEFEBVRE:  Read and sign on this one
11 also.  He'd like to read and sign it.
12   MR. PASQUARELLO:  No questions?
13   MR. LEFEBVRE:  No questions.
14   (2:44 p.m., proceedings adjourned.)
15
16
17
18
19
20
21
22
23
24

Lillie, Christopher J. - 12/16/2004          Page 76

00077
```
 1          CERTIFICATE OF COURT REPORTER
 2          I, Kathleen Mullen Silva, Registered
 3   Professional Reporter and Certified Realtime
 4   Reporter, do certify that the deposition of
 5   CHRISTOPHER J. LILLIE, in the matter of Ralph G.
 6   McKenna, et al. V. First Horizon Home Loan
 7   Corporation, on December 16, 2004, was
 8   stenographically recorded by me; that the witness
 9   provided satisfactory evidence of identification, as
10   prescribed by Executive Order 455 (03-13) issued by
11   the Governor of the Commonwealth of Massachusetts,
12   before being sworn by me, a Notary Public in and for
13   the Commonwealth of Massachusetts; that the
14   transcript produced by me is a true and accurate
15   record of the proceedings to the best of my ability;
16   that I am neither counsel for, related to, nor
17   employed by any of the parties to the above action;
18   and further that I am not a relative or employee of
19   any attorney or counsel employed by the parties
20   thereto, nor financially or otherwise interested in
21   the outcome of the action.
22
23   December 28, 2004 _____
24          Kathleen Mullen Silva, RPR, CRR
```

00078
```
 1          I N D E X
 2
 3          EXAMINATIONS
 4   CHRISTOPHER J. LILLIE
 5      BY MR. PASQUARELLO         3
 6
 7          EXHIBITS MARKED
 8   1, notice of deposition of        3
 9   Christopher J. Lillie
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



00079
```
 1                CHRISTOPHER J. LILLIE
                SIGNATURE PAGE/ERRATA SHEET
 2     PAGE   LINE    CHANGE OR CORRECTION AND REASON
 3
 4
 5
 6
 7
 8
 9
10
11
12
13     I have read the transcript of my deposition taken on December 16, 2004.
       Except for any corrections or changes noted above I hereby subscribe to
14  the
       transcript as an accurate record of the statements made by me.
15                                   DATE _____
       Deponent, CHRISTOPHER J. LILLIE
16
       On this _____ day of _____, 200__, before me, the
17  undersigned
18     notary public, personally appeared CHRISTOPHER J. LILLIE, who presented
19     satisfactory evidence of identification, to wit,
20     _____, and signed this document in my presence.
21
22     _____
23     NOTARY PUBLIC
24     My commission expires_____
```