# EXHIBIT 11

00001
```
 1   Exhibits 1 - 7    Vol. 1, Pgs. 1 - 87
 2        UNITED STATES DISTRICT COURT
 3          DISTRICT OF MASSACHUSETTS
 4     ----------------------------------
 5  RALPH G. McKENNA, GLENROY A. DEANE,
 6  ILENE WILGOREN-DEANE, CHRISTOPHER J. LILLIE
 7  and LAURA A. LILLIE
 8        Plaintiffs
 9  vs.           Docket No. 04-10370 (RCL)
10
11  FIRST HORIZON HOME LOAN CORPORATION
12        Defendant
13     ----------------------------------
14
15       DEPOSITION of RALPH G. McKENNA
16  Friday, January 14, 2005, 12:53 p.m.
17        Goodwin Procter LLP
18          Exchange Place
19          53 State Street
20        Boston, Massachusetts
21     ----------------------------------
22    Reporter:  David A. Arsenault, RPR
23  Farmer Arsenault Brock LLC, Boston, MA
24          (617) 728-4404
```

McKenna, Ralph G. - 01/14/2005          Page 1

00002
```
 1  PRESENT:
 2  Family and Consumer Law Center
 3    Marc D. Lefebvre, Esq.
 4    Two Dexter Street
 5    Pawtucket, Rhode Island  02860
 6    401-728-6060
 7    for Plaintiffs
 8
 9  Goodwin Procter LLP
10    Daniel J. Pasquarello, Esq.
11    Exchange Place
12    53 State Street
13    Boston, Massachusetts  02109
14    617-570-1000
15    for Defendant
16
17
18  Marked exhibits copied by court reporter; originals
19  returned to Daniel Pasquarello; cc's sent to Marc
20  D. Lefebvre.  Signature/errata page sent to Marc
21  Lefebvre.
22
23
24
```

McKenna, Ralph G. - 01/14/2005          Page 2

00003
```
 1        PROCEEDINGS - 12:53 p.m.
 2     ---------------
 3        RALPH GERARD McKENNA, sworn
 4     ---------------
 5        (Marked, Exhibit 1.)
 6        EXAMINATION
 7  BY MR. PASQUARELLO.
 8    Q.  Good afternoon, Mr. McKenna.  My name is
 9  Dan Pasquarello.  I'm an attorney representing
10  First Horizon in the litigation you've brought
11  against First Horizon.
12        We are here today to take your
13  deposition in the case.  Do you understand that?
14    A.  Yes.
15    Q.  I want to show you what's been marked
16  Exhibit 1.  Have you seen that document before?
17    A.  Yes.
18    Q.  Exhibit 1 is a revised notice of your
19  deposition to appear here today.
20        Have you ever had your deposition
21  taken before?
22    A.  Yes, I have.
23    Q.  How many times?
24    A.  Once.
```

McKenna, Ralph G. - 01/14/2005          Page 3

00004
```
 1    Q.  When was that?
 2    A.  A year ago.
 3    Q.  Was that in a lawsuit where you were a
 4  party?
 5    A.  Yes.
 6    Q.  Can you tell me what lawsuit that is?
 7    A.  It has to do with a lead paint complaint
 8  on a property that I own.
 9    Q.  Is that the only time that you've been
10  deposed?
11    A.  Yes.
12    Q.  Let me provide some preliminary
13  instructions.
14    A.  Okay.
15    Q.  It's important that you answer the
16  question audibly and not with shakes or nods of the
17  head so the court reporter can take down your
18  answers.  It's also important that you wait until I
19  finish my questions before you try to answer them
20  so that we are not both talking at the same time.
21        If you don't understand any of my
22  questions, please let me know and I'll try to
23  clarify at best that I can.  If you don't let
24  me know that, I'm going to assume that you do
```

McKenna, Ralph G. - 01/14/2005          Page 4

00005
1 understand my question. Okay?

2   A.   Okay.

3   Q.   You will notice that there are beverages

4 available. You are free to help herself. If you

5 need to take a break, let me know and I'll do that.

6 I only ask if there's a question pending that you

7 answer the question first and then we'll take the

8 break.

9   A.   Yes, thank you.

10   Q.   Is there any reason why you can't testify

11 truthfully and completely today?

12   A.   No reasons.

13   Q.   Have you taken any medications or

14 anything that might affect your ability to

15 understand and answer fully my questions?

16   A.   No.

17   Q.   Can you please state your full name.

18   A.   Ralph Gerard McKenna.

19   Q.   Have you ever gone by any other names?

20   A.   No.

21   Q.   What's your date of birth?

22   A.   October 22, 1957.

23   Q.   Your Social Security number?

24   A.   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.

---

00006
1   Q.   Are you married?

2   A.   Yes.

3   Q.   How long have you been married?

4   A.   Eight and a half years.

5   Q.   Is that your only marriage?

6   A.   Yes.

7   Q.   And your wife's name?

8   A.   Tatiana.

9   Q.   And does she share your last name?

10   A.   She uses her maiden name and hyphenates.

11   Q.   And what's her maiden name?

12   A.   Pozdnyakova, P O Z D N V A K O V A.

13   Q.   Do you have any children?

14   A.   No, we don't.

15   Q.   For the other deposition that you

16 mentioned a minute ago, do you have a copy of your

17 transcript from that?

18   A.   At home.

19   Q.   You do.

20   A.   Yes.

21   Q.   Were you represented by counsel in that

22 case?

23   A.   Yes.

24   Q.   Is that case still pending?

---

00007
1   A.   Yes.

2   Q.   What date?

3   A.   January 27.

4   Q.   Can you give me a description of the

5 issue in the case?

6   A.   I bought a three-family home. I bought

7 it as deleaded. In less than six months after I

8 bought it, two children tested positive for lead

9 paint poisoning. The City of Boston came after me

10 because the kids tested positive at school. They

11 put pressure on me. I presented the certificates

12 that were given to me and it was learned they were

13 not done correctly.

14   Q.   Were you deposed by the other party in

15 the lawsuit?

16   A.   I was deposed by the attorney for the

17 realty agency.

18   Q.   Who is your attorney in that case?

19   A.   Alan Margolies, I believe.

20   Q.   Mr. McKenna, where did you go to high

21 school?

22   A.   Don Bosco Technical High School in

23 Boston.

24   Q.   Did you graduate?

---

00008
1   A.   Yes.

2   Q.   When did you graduate?

3   A.   1976.

4   Q.   Is Don Bosco still around?

5   A.   No, unfortunately.

6   Q.   Did you go to college?

7   A.   No. I didn't.

8   Q.   Did you attend college?

9   A.   No.

10   Q.   Any education after high school?

11   A.   No.

12   Q.   Any sort of certificate programs?

13   A.   No.

14   Q.   Are you currently employed?

15   A.   Yes.

16   Q.   What do you do?

17   A.   I'm a printer.

18   Q.   Where do you work?

19   A.   George H. Dean & Company.

20   Q.   Where is George H. Dean?

21   A.   Braintree, Massachusetts.

22   Q.   Can you describe what your job

23 responsibilities are at George H. Dean?

24   A.   I'm an offset -- I operate an offset

00009
```
 1  printing press.
 2    Q.  How long have you had that position?
 3    A.  At George H. Dean & Company, almost 24
 4  years.  I did it previous to that for probably four
 5  or five years.
 6    Q.  Where did you do that?
 7    A.  Previous?
 8    Q.  Yes.
 9    A.  Champagne Offset in Newton is the most
10  previous job.  There's a list of them.  I could
11  give them all to you but there's 12 of them.
12    Q.  That's okay.  You've been doing this line
13  of work for 29 years?
14    A.  Yes.
15    Q.  Have you worked in any other fields?
16    A.  No.
17    Q.  Did you start working in this field
18  pretty much right after high school?
19    A.  During high school.
20    Q.  During high school.  What is your annual
21  income from that job now?
22    A.  There's overtime.  The range would be 50
23  to 60,000.  It's different every year because of
24  overtime.
```

McKenna, Ralph G. - 01/14/2005          Page 9

00010
```
 1    Q.  Do you know what your income was for last
 2  year?
 3    A.  Yes.  It was 47,000.
 4    Q.  Now, you mentioned that you own a
 5  three-family house.  Do you have rental income from
 6  that house?
 7    A.  I do, yes.
 8    Q.  How much would you say the rental income
 9  is?
10    A.  It varies because of whether you have
11  vacancies or not.
12    Q.  Well, for last year?
13    A.  In the past year I've had four months of
14  vacancy.  Say $1500 per apartment times three, and
15  times that by 12 and then you might subtract 4, so
16  6,000 for the total from the vacancies.
17    Q.  Do you have any other sources of income
18  besides your job and the rental property?
19    A.  No.
20    Q.  Does your spouse work?
21    A.  No.
22    Q.  Have you ever worked in the real estate
23  industry?
24    A.  No.
```

McKenna, Ralph G. - 01/14/2005          Page 10

00011
```
 1    Q.  Have you ever worked in the mortgage
 2  lending area?
 3    A.  No.
 4    Q.  Have any of your jobs involved
 5  residential mortgages?
 6    A.  No.
 7    Q.  Have you had any training with respect to
 8  residential mortgages?
 9    A.  No, I haven't.
10    Q.  Have you taken any courses including
11  self-help courses about buying or selling real
12  estate?
13    A.  No.
14    Q.  Other than the three-family home, have
15  you bought any other real estate for investment
16  purposes?
17    A.  My brother and I have another three-
18  family.
19    Q.  Where is that?
20    A.  Also in Dorchester.
21    Q.  So two investment properties?
22    A.  One investment property.  That one
23  doesn't turn in any money at all.  We lose money on
24  it.  There's no income coming out of that one.
```

McKenna, Ralph G. - 01/14/2005          Page 11

00012
```
 1    Q.  Do you rent it out?
 2    A.  Yes.
 3    Q.  Any other properties?
 4    A.  My brother and I own the house where my
 5  father lives.  He still considers it his home.
 6  It's a little two-family.  He keeps the rental
 7  income from the tenants.  We don't consider it our
 8  property.
 9    Q.  Who is he?
10    A.  My father.
11    Q.  Where is that located?
12    A.  In Dorchester also.
13    Q.  Is that a two-family house?
14    A.  Yes.
15    Q.  Does your father live there?
16    A.  Yes.
17    Q.  What's the address on that house?
18    A.  7 Puritan Avenue.
19    Q.  In Dorchester?
20    A.  Yes.
21    Q.  The three-family that does not turn a
22  profit, what's the address there?
23    A.  5-7 Berne Avenue.
24    Q.  In Dorchester?
```

McKenna, Ralph G. - 01/14/2005          Page 12

00013
1    A.  Yes.
2    Q.  Your other three-family house?
3    A.  Number 14 East Street.
4    Q.  Dorchester?
5    A.  Yes.
6    Q.  What's your current address?
7    A.  674 Granite Street in Braintree.
8    Q.  What's your brother's name?
9    A.  Thomas McKenna.
10   Q.  Does he reside at one of these
11   properties?
12   A.  No.
13   Q.  Where does he live?
14   A.  Six Lake View Road, in Foxborough.
15   Q.  With regard to today's deposition, what
16   did you do to prepare for the deposition today?
17   A.  I had a few discussions with my attorney,
18   Christopher Lefebvre.
19   Q.  Anything else?
20   A.  Looked over the interrogatories, looked
21   at the complaint.
22   Q.  Did you look at any other documents?
23   A.  Not that I can think of right now.
24   Q.  Did you look at the complaint or did you

00014
1    look at the amended complaint?
2    A.  The amended complaint.
3    Q.  Did you meet with anybody to prepare for
4    the deposition today?
5    A.  No.  My attorney's brother, who met me
6    here.
7    Q.  Marc Lefebvre?
8    A.  Yes.
9    Q.  How long did your meeting today with
10   Mr. Lefebvre last?
11   A.  Just a few minutes.
12   Q.  Is that the only meeting that you have
13   had to prepare for the deposition?
14   A.  Other than phone conversations with Chris
15   Lefebvre.
16   Q.  Did you review any documents that you
17   believed to be documents from First Horizon?
18   A.  We spoke about the right to cancel
19   document.
20   Q.  You don't have to tell me the substance
21   of your conversation with your counsel.  In terms
22   of documents that you looked at to prepare, do you
23   remember what any of those were besides what you
24   already identified for me?

00015
1    A.  No.
2    Q.  Other than your counsel, did you discuss
3    your anticipated testimony today with anybody else?
4    A.  No.
5    Q.  Who knows that you are being deposed
6    today in a lawsuit?
7    A.  Other than my counsel?
8    Q.  Yes.
9    A.  I mentioned to my wife that I had a
10   meeting today.  At work I just called in sick and
11   said I had some things to do.  I didn't elaborate
12   on it.
13   Q.  Did you discuss the lawsuit or today's
14   deposition with your wife?
15   A.  No, not really.  She doesn't understand.
16   Q.  Did you speak with anybody from Edelman,
17   Combs, Latturner about today's deposition?
18   A.  I have had a conversation with Heather
19   Piccirilli on the telephone.  I haven't talked to
20   her in a couple of weeks.
21   Q.  Did you bring anything with you today to
22   the deposition regarding the deposition itself?
23   A.  I brought the interrogatories with me in
24   case I had to refer to them.

00016
1    Q.  Anything else?
2    A.  No.
3    Q.  Did you bring any notes with you or have
4    you made any notes since you've been here?
5    A.  No, I haven't.
6    Q.  So the only document you brought with you
7    were the interrogatories?
8    A.  Yes.
9    Q.  When you say interrogatories, do you mean
10   your interrogatory responses or the interrogatory
11   questions?
12   A.  The questions and the responses.
13   Q.  Mr. McKenna, can you tell me how you
14   first met Christopher Lefebvre?
15   A.  I received an advertisement circular
16   through the mail.
17   Q.  Do you remember what the advertisement
18   said?
19   A.  It had to do with the possibility of some
20   inconsistencies with my mortgage with First
21   Horizon.
22   Q.  Do you know when you received that?
23   A.  Either December of 2003 or January of
24   2004.  It was around that area.

00017
1    Q.  Do you know if the advertisement
2  specifically referred to First Horizon?
3    A.  I don't remember.
4    Q.  I want to show you a document labeled
5  ECL&G 6.  Have you ever seen that before?
6    A.  Yes.
7    Q.  Can you tell me what that is?
8    A.  It looks like the letter that I received
9  originally.  That's why I wasn't sure if he
10  mentioned First Horizon or just said generally
11  there was a problem with the mortgage.  I don't see
12  First Horizon mentioned.
13    Q.  Do you know if you received anything else
14  from Mr. Lefebvre's office around this time?
15    A.  I think this was the original thing that
16  I received.  That's my writing there.  I wrote down
17  his phone number.
18        MR. PASQUARELLO:  Can we mark that as
19  Exhibit 2.
20        (Marked, Exhibit 2.)
21    Q.  Mr. McKenna, how long have you lived at
22  674 Granite Street in Braintree?
23    A.  Three years.
24    Q.  And who lives there with you?

00018
1    A.  My wife.
2    Q.  Anybody else?
3    A.  No.
4    Q.  How long has she been there?
5    A.  Three years.
6    Q.  Before Granite Street, where did you
7  live?
8    A.  In Dorchester, 7 Puritan Avenue.
9    Q.  How long were you there?
10    A.  44 years.
11    Q.  Is this at your father's house?
12    A.  Yeah.  My wife and I lived in the
13  second-floor apartment.
14    Q.  That's a two-family house?
15    A.  Yes.
16    Q.  Did your father live there at the time?
17    A.  Oh, yes.
18    Q.  How long have you and your brother owned
19  that house?
20    A.  We changed the title on it probably three
21  years ago, maybe four.  Time goes by so fast.
22    Q.  Well, do you remember if you were living
23  there at the time that the title changed or were
24  you in Braintree?

00019
1    A.  I was in Braintree.
2    Q.  Do you have any other residences during
3  the years you've already provided or is that pretty
4  much exclusively your residential history?
5    A.  Pretty much exclusively, yeah.
6    Q.  When did you buy the Braintree house?
7    A.  November 19, '96.
8    Q.  How much did you pay for it?
9    A.  120,000.
10    Q.  Is that a one-family house?
11    A.  Yes.
12    Q.  Did you take a mortgage at the time on
13  the house?
14    A.  No, I paid cash for it.
15    Q.  For the closing on the purchase of the
16  house, were you represented by an attorney?
17    A.  Originally when I purchased it?
18    Q.  Yes.
19    A.  Yes.
20    Q.  Do you know the attorney's name?
21    A.  Alan Margolies.
22    Q.  Did you go to the closing when you bought
23  the house?
24    A.  Yes.

00020
1    Q.  Do you know how long the closing took?
2    A.  Maybe an hour, an hour and a half, if
3  that, even.
4    Q.  Was anybody else at the closing with you?
5    A.  My wife.
6    Q.  What year did you get married?
7    A.  1996, July.
8    Q.  Since you purchased that house, have you
9  taken out a mortgage on it?
10    A.  Yes, I have.
11    Q.  When was the first time you took a
12  mortgage?
13    A.  I believe it was like an equity line of
14  credit.  It started with a line of credit to get
15  work done to the house, because the house needed a
16  lot of work.  And then I got a hundred thousand at
17  Citizens.  I think the mortgage, the first time it
18  actually had a mortgage was probably around 2000 or
19  2001 that I actually did a mortgage on it.  I think
20  the previous money I used were lines of credit.
21    Q.  When was the first time that you had a
22  line of credit, do you remember that?
23    A.  It probably would have been '96 or '97,
24  because it needed extensive work when I bought it.

00021
1     Q.   Right around the time that you purchased
2 the house?
3     A.   After, yes.
4     Q.   That first line of credit, was it for a
5 hundred thousand dollars?
6     A.   It was for about 35,000.
7     Q.   Does the hundred thousand refer to the
8 line of credit?
9     A.   I moved it up to a higher number.
10     Q.   So the first transaction was with
11 Citizens?
12     A.   The first two on the house were with
13 Citizens.
14     Q.   Did you go to a closing for the first
15 transaction on the line of credit?
16     A.   It was a closing, but it was only a
17 matter of signing papers with an officer at the
18 local Citizens branch, done at the branch at her
19 desk.
20     Q.   So there was no attorney present.
21     A.   No.
22     Q.   Did you review the papers before you
23 signed them?
24     A.   I didn't read them word for word.  As I

00022
1 signed them, she told me what they were.
2     Q.   Did you ask any questions, if you
3 remember?
4     A.   I don't remember.
5     Q.   For the documents that you signed at that
6 closing, had you received any of them beforehand?
7     A.   The best answer is that I don't remember.
8 Probably no, but I really don't know.
9     Q.   Is it correct that you don't remember
10 reviewing any documents that you might have
11 received before the closing?
12     A.   Yes.
13     Q.   After this initial credit line, did you
14 then go back to Citizens for an increase in the
15 credit?
16     A.   Yes.  But this time I needed to get a
17 mortgage, because there was a lot of work I did to
18 the house.  We were getting ready to live there.
19 We did a lot to it.
20     Q.   When did that happen?
21     A.   That would have been in 2001.
22     Q.   How much was the amount?
23     A.   I believe I was looking for 200 or two
24 and a quarter, total amount.  I ended up not taking

00023
1 the mortgage at Citizens.
2     Q.   Did you take a mortgage elsewhere?
3     A.   Yes.
4     Q.   Where was that?
5     A.   I want to say that I think it was First
6 Horizon, but I did it through a mortgage broker.
7     Q.   Since that transaction, did you refinance
8 that loan?
9     A.   Yes.
10     Q.   With whom?
11     A.   What we are doing today, First Horizon.
12 What happened is Chase took over that loan.  There
13 was no refinancing or anything.  They bought it.  I
14 made the payments to Chase.  Then the refinance
15 came with First Horizon.
16     Q.   Let me go back to the transaction where
17 you took out a mortgage for the first time.  Do you
18 have any memory of that transaction?
19     A.   Yes.
20     Q.   Did you review any documents related to
21 that transaction at the time of the closing?
22     A.   I didn't have my lawyer present.  Their
23 lawyer was present.  Again, it was the same thing.
24 Each time I signed something, he told me what it

00024
1 was and I just signed it.
2     Q.   Did you have a lawyer at the time?
3     A.   I didn't for that, no.
4     Q.   You did not?
5     A.   No.
6     Q.   I just want to make sure that I have the
7 timeline right for the other properties.  When did
8 you purchase the three-family house on Berse
9 Avenue?
10     A.   October of 2003.
11     Q.   How about 14 East Street?
12     A.   October of 2000.
13     Q.   For the transaction where you and your
14 brother took over ownership of your father's house,
15 was that simply some sort of a transfer?
16     A.   Yes.
17     Q.   Did you have a mortgage on or do you have
18 a mortgage on the Berse Avenue property?
19     A.   Yes.
20     Q.   Who do you have that mortgage with?
21     A.   Chase Manhattan.
22     Q.   Do you know what the principal amount is?
23     A.   I think it is somewheres around 400,000.
24     Q.   Do you remember what the loan amount is?

00025
1    A.  Like 404,000.
2    Q.  Have you ever refinanced that mortgage?
3    A.  No.
4    Q.  For the East Street property, did you
5  take a mortgage on that property?
6    A.  Yes.
7    Q.  With whom?
8    A.  Washington Mutual.
9    Q.  Have you refinanced that property?
10   A.  Yes.
11   Q.  How many times?
12   A.  Either two or three.
13   Q.  Do you remember dates for the refinances?
14   A.  Not really.
15   Q.  Who holds the mortgage now?
16   A.  First Horizon.
17   Q.  Do you know who held it before First
18 Horizon?
19   A.  I think Washington Mutual.
20   Q.  Did you ever refinance with Washington
21 Mutual?
22   A.  I want to say that I originally had North
23 American and then it became Washington Mutual and
24 then First Horizon.

00026
1    Q.  So North American might have been the
2  first mortgage on the property?
3    A.  Yeah.  And then I might have refinanced
4  with them.  When I refinanced it became Washington
5  Mutual.  And then I believe I refinanced with First
6  Horizon.  I think it's almost like every year in
7  the springtime.  I'm just talking off the top of my
8  head.  Datewise I'm not sure of the month and day.
9  That's roughly the time line.
10   Q.  At any of these closings or refinancing
11 transactions have you been represented by an
12 attorney?
13   A.  No, only the original when we took out a
14 mortgage did I have an attorney for East Street and
15 Berse.
16   Q.  What about when you first purchased the
17 Braintree residence?
18   A.  Yes.  The same attorney.  It was the same
19 attorney on the three properties.
20   Q.  Mr. Margolies?
21   A.  Yes.
22   Q.  Did Mr. Margolies explain to you what the
23 documents were at those transactions?
24   A.  They hand him the document.  He hands it

00027
1  to me, tells me what it is, and I sign it.  I don't
2  read them word for word.
3    Q.  At any point after the closings have you
4  sat down and read through the mortgage documents?
5    A.  No, I haven't.
6    Q.  Just so I'm clear, I'm referring to all
7  of the transactions we are talking about.
8    A.  No, I haven't.
9    Q.  So in none of those cases have you gone
10 back and read the documents.
11   A.  No.
12   Q.  Do you know what a right of rescission
13 is, Mr. McKenna?
14   A.  I think I do.
15   Q.  Can you tell me what your understanding
16 is?
17   A.  If there's an irregularity with the
18 documents, with the closing documents, such as
19 there is in my case with the right to cancel that
20 violates the Truth in Lending Act, all of an
21 opportunity to try to rescind the mortgage.
22   Q.  When you say rescind the mortgage, what
23 do you mean by that?
24   A.  To get out of the mortgage.

00028
1    Q.  Do you understand that also as a right to
2  cancel?
3    A.  Yes.
4    Q.  Do you understand the right to rescind
5  and the right to cancel to be the same thing?
6    A.  No.  Because the right to cancel, when
7  you do the mortgage, I believe you have a three-day
8  limit from the day of the transaction that you can
9  cancel it for any reason.  The right to rescind is,
10 I think, a little bit different from that.  With
11 the right to rescind, I think in Massachusetts you
12 have four years and in other states you have three
13 years.
14   Q.  What about a time period for right to
15 cancel?
16   A.  I think that's three days.
17   Q.  Now, do you understand for the right to
18 cancel that you can cancel for any reason?
19   A.  That's my understanding.
20   Q.  So whether or not there are
21 irregularities in the documents, your understanding
22 is that you still have a right to cancel?
23   A.  That's my understanding.
24   Q.  And that's a three-day period that you

00029
1  described; is that right?
2    A.  That's what I think, yes.
3    Q.  I'm going to list some of the
4  transactions that you have described to me,
5  starting with the line of credit on the Braintree
6  house, the increase in the line of credit which
7  resulted in a mortgage, the refinance on that
8  house, the purchase of the Berse Avenue house, the
9  purchase of the East Avenue house and the
10 refinances of the East Avenue house. Is it your
11 understanding that you had a right to cancel in all
12 of those cases?
13   A.  No, I believe only the Braintree home
14 because I believe it has only to do with the
15 personal residence.
16   Q.  The same question for the right of
17 rescission that we were talking about, is it also
18 your understanding that --
19   A.  The right of rescission is definitely for
20 your primary residence.
21   Q.  Now, for the Braintree residence in all
22 the transactions you described for that residence,
23 the line of credit, the increase of credit with the
24 mortgage, and refinance, is it your understanding

00030
1  that you would have the right to cancel in all of
2  those?
3        MR. LEFEBVRE:  I think my client
4  already answered that.
5    A.  I think that's the spirit of the right to
6  cancel form.
7    Q.  But is that your understanding for the
8  Braintree residence transactions?
9    A.  Yes.
10   Q.  And for each of those transactions, for
11 how long did you think you had a right to cancel?
12   A.  Three days.
13   Q.  Other than the transaction that's at
14 issue in this case, did you ever try to cancel any
15 other loan?
16   A.  No.
17   Q.  Does that apply to loans that you've had
18 on all three of the residences that we've been
19 talking about?
20   A.  Yes, it applies.
21     (Pause.)
22   Q.  Mr. McKenna, for the equity line of
23 credit you first took out on the Braintree
24 residence, did you receive a notice of a right to

00031
1  cancel that transaction?
2    A.  I don't remember.
3    Q.  For the increase in the credit line with
4  the mortgage that you described, do you remember if
5  you received a notice of a right to cancel that
6  transaction?
7    A.  I don't remember.
8    Q.  Do you know if you have ever received a
9  notice of right to cancel for any of the
10 transactions on the other properties we've been
11 talking about?
12   A.  I don't remember receiving them off the
13 top of my head. I have the documents for all of
14 those transactions.
15   Q.  You maintain documents from each of the
16 real estate transactions?
17   A.  Yes.
18   Q.  Where do you keep those documents?
19   A.  At home.
20   Q.  Where at home?
21   A.  In my desk.
22   Q.  Did you search through all of those
23 documents for this case?
24   A.  I only searched through the documents,

00032
1  the file for this transaction.
2    Q.  By this transaction, you mean the 2003
3  refinance with First Horizon?
4    A.  Yes, on the Braintree home, yes.
5    Q.  But you do still maintain files on all of
6  the other transactions?
7    A.  Most of them, yeah.
8    Q.  Did you provide documents from any of
9  those other transactions to your attorneys in this
10 case?
11   A.  No.
12   Q.  Other than the Berse Avenue property, the
13 East Street property, the Braintree property and
14 now the Puritan Ave. property, have you ever owned
15 any other real estate?
16   A.  No.
17   Q.  Do you own the Braintree property
18 individually or jointly?
19   A.  Individually.
20   Q.  You mentioned First Horizon with respect
21 to the East Street property; is that right?
22   A.  Yes.
23   Q.  Do they currently hold the mortgage on
24 that property?

00033
1   A.  Yes.
2   Q.  Have you had any problems with First
3 Horizon with respect to that loan on that property?
4   A.  No.
5   Q.  Does First Horizon hold the loans on any
6 of your other properties?
7   A.  No, just my primary home and East Street.
8   Q.  Have you had any servicing problems on
9 your loan on your Braintree property?
10   A.  No.
11   Q.  Other than what's at issue in this
12 lawsuit, have you had any problems with First
13 Horizon?
14   A.  No.
15   Q.  Have you ever rented out the Braintree
16 property?
17   A.  Yes, I have.
18   Q.  When did you do that?
19   A.  From 1997 until 2000.
20   Q.  Any time after 2000 did you rent it out?
21   A.  No.
22   Q.  At some point did you live with your
23 brother in Foxborough?
24   A.  Just for a few short months.

00034
1   Q.  When was that?
2   A.  Back in '89.
3   Q.  To whom did you rent the house out in
4 Braintree?
5   A.  I had three different parties there; from
6 probably February of '97 until June of 2000.  I
7 don't recall the names.  The middle party I had was
8 Shellman.  It was a brother and sister and couple
9 of their friends.  The first was a couple.  I don't
10 remember their names.  The last group was a family,
11 a single mom and I think four kids.
12   Q.  And do you remember what you charged for
13 rent?
14   A.  I think the first group was maybe a
15 thousand per month.  The second group was the same
16 amount and the third group was 1200 per month.
17   Q.  Now, did you rent the house out in
18 Braintree up until the time you moved in?
19   A.  Yes.  It was vacant one year prior to me
20 moving back in.
21   Q.  So would that be for 2001?
22   A.  From July of 2000 until October or
23 September of 2001, something like that.
24       (Marked, Exhibit 3.)

00035
1   Q.  Mr. McKenna, I'm handing you what's been
2 marked as McKenna Exhibit 3, Bates label FH 053.
3 Have you seen that document before?
4   A.  Yes.
5   Q.  Is that your signature on the document?
6   A.  Yes, it is.
7   Q.  It's a letter dated May 19, 2003?
8   A.  Yes.
9   Q.  From you to First Horizon Home Loans?
10   A.  Yes.
11   Q.  Have you had a chance to look at the
12 letter?
13   A.  Let me take a look at it.
14   Q.  Once you've had a chance, can you tell me
15 if that is accurate, the information?
16   A.  I think that I had it rented until the
17 end of 2000, until July.
18   Q.  Do you have any record of the rental
19 history on the property?
20   A.  I probably don't.
21   Q.  Do you have any bank statements from that
22 period, from the period of 2000 through 2002?
23   A.  Yeah, I think I do.
24       MR. PASQUARELLO:  Marc, we ask that

00036
1 those statements be produced.
2       MR. LEFEBVRE:  For what, again?
3       MR. PASQUARELLO:  Any time from the
4 period – anything from '96 through 2002.
5       MR. LEFEBVRE:  In his custody and
6 control.
7       MR. PASQUARELLO:  That he has.
8       MR. LEFEBVRE:  In his possession.
9       MR. PASQUARELLO:  He said he thinks
10 he has his bank statements.
11   Q.  Mr. McKenna, what I would ask you to do
12 is gather whatever documents you have and turn them
13 over to your attorneys.
14       MR. PASQUARELLO:  We can discuss
15 whatever production issues there are then.
16   Q.  In terms of household management, who
17 opens the mail at home?
18   A.  I do.
19   Q.  Do you manage the finances?
20   A.  Yes.
21   Q.  Does that include paying the bills?
22   A.  Yes.
23   Q.  Paying the mortgage?
24   A.  Yes.

00037
1    Q.  Do you write the checks for the bills?

2    A.  Yes.

3    Q.  Do you pay the mortgage by check?

4    A.  Yes.

5    Q.  Do you handle communications with

6 creditors?

7    A.  Yes.

8    Q.  Including First Horizon?

9    A.  Yes.

10   Q.  Have you ever fallen behind on any

11 mortgage payments?

12   A.  No.

13   Q.  Have you ever filed for bankruptcy?

14   A.  No.

15   Q.  Before you refinanced with First Horizon

16 in 2003, do you recall what your monthly payment on

17 the mortgage was?

18   A.  On my primary residence?

19   Q.  Yes.

20   A.  Probably the same thing, $50 either way,

21 probably $50 more.

22   Q.  Do you remember what the interest rate

23 was on your mortgage before you refinanced?

24   A.  No, I don't.

00038
1    Q.  What's your interest rate now?

2    A.  I think it's 5.37.

3    Q.  Is it somewhere south of 5 1/2?

4    A.  I think it is 5.37.

5    Q.  Do you remember the interest rates for

6 any of the previous loans that you have had on the

7 Braintree property?

8    A.  No, I don't.

9    Q.  Do you remember information about terms

10 of the loans that you had on the Braintree property

11 before this current loan?

12   A.  No, I don't.

13   Q.  At any refinance transaction, have you

14 been represented by counsel?

15   A.  No.

16   Q.  Did you make the decision, Mr. McKenna,

17 to refinance on your Braintree home?

18   A.  Yes, I did.

19   Q.  When did you make that decision?

20   A.  Probably two months prior to actually

21 doing it.

22   Q.  What was the reason for that decision?

23   A.  Just to get a better interest rate and

24 perhaps a lower payment.

00039
1    Q.  Any other reason?

2    A.  No.

3    Q.  Before you refinanced, to whom did you

4 make your payments?

5    A.  I think it was Chase Mortgage.

6    Q.  And since the refinance, who do you make

7 your payments to?

8    A.  First Horizon.

9    Q.  When you refinanced, did you get a better

10 rate?

11   A.  Yes.

12   Q.  How much better was the rate, do you

13 remember?

14   A.  It might have been from 5.75 to 5.37.  I

15 believe it was under 6 with Chase.

16   Q.  Was it fixed or adjustable?

17   A.  Fixed.

18   Q.  When you refinanced did you take any cash

19 out?

20   A.  Yes, I did.

21   Q.  Do you know about how much?

22   A.  I think it was 35 or 40,000.

23   Q.  Do you recall the principal balance of

24 the loan when you refinanced?

00040
1    A.  I don't.

2    Q.  Do you know what the loan amount is, the

3 overall loan amount is now, or was, sorry?

4    A.  I don't know what it was.  I know roughly

5 what it is now.

6    Q.  What is it now?

7    A.  237,000, I believe.

8    Q.  Is that close to what it was at the time

9 of the refinance?

10   A.  Yes.

11   Q.  How long had you had the loan at the time

12 that you refinanced in June 2003?

13   A.  Probably from September of 2001.

14   Q.  About two years?

15   A.  Yes.

16   Q.  How did you choose First Horizon?

17   A.  A loan officer from First Horizon called

18 me.

19   Q.  Do you remember who the loan officer was?

20   A.  Jack O'Reardon.

21   Q.  Do you know Mr. O'Reardon?

22   A.  Yes.

23   Q.  How did you know him?

24   A.  I had done a mortgage with him before.

00041
1    Q.   What mortgage was that?
2    A.   At 14 East Street.
3    Q.   Was that a First Horizon mortgage?
4    A.   No. North American.
5    Q.   Did Mr. O'Reardon work for North American
6    at the moment?
7    A.   Yes.
8    Q.   Do you know when that mortgage was with
9    North American?
10   A.   October of 2000.
11   Q.   Did you know Mr. O'Reardon before that
12   transaction?
13   A.   We went to the same grammar school
14   together.
15   Q.   So you've known him for quite some time?
16   A.   He was a little older than me. He was in
17   a different class. I knew who he was. I shouldn't
18   have said together. I knew who he was from the
19   same neighborhood.
20   Q.   Had you conducted any other business with
21   Mr. O'Reardon before the North American mortgage on
22   the East Street home?
23   A.   No.
24   Q.   So that was the first business

00042
1    transaction that you had with Mr. O'Reardon?
2    A.   Yes.
3    Q.   Since that transaction, did you do
4    subsequent business with Mr. O'Reardon?
5    A.   A couple of refinancings at East Street.
6    Q.   Did you also contact Mr. O'Reardon with
7    regard to the refinance in this case?
8    A.   He contacted me.
9    Q.   He contacted you?
10   A.   Yes.
11   Q.   He was involved in this refinance also?
12   A.   Yes.
13   Q.   How is your relationship with
14   Mr. O'Reardon?
15   A.   Okay.
16   Q.   Do you have a relationship other than
17   business with him?
18   A.   No.
19   Q.   Did Mr. O'Reardon contact you in some
20   kind of cold-call manner or did he know that you
21   were looking to refinance?
22   A.   He contacted me about East Street.
23   Q.   How did the subject of Braintree come up,
24   if it did?

00043
1    A.   It did come up. I forget if he raised it
2    or I raised it.
3    Q.   Did you meet with anybody else from First
4    Horizon?
5    A.   No.
6    Q.   During the application process for your
7    most recent loan with First Horizon in 2000, did
8    you receive any disclosures during that process?
9    A.   You mean prior to the closing?
10   Q.   Yes.
11   A.   They did send me some things.
12   Q.   Do you remember what you received?
13   A.   It was a folder full of paperwork. I
14   didn't really read it.
15   Q.   Do you still have that folder?
16   A.   I don't think that I do. I believe that
17   I just saved the closing documents.
18   Q.   With regard to your current loan, do you
19   know if it is fixed or adjustable?
20   A.   Fixed.
21   Q.   Do you know what the term is?
22   A.   I believe it is a 30-year fixed mortgage.
23   Q.   Do you know what the payment is on the
24   loan?

00044
1    A.   I think it is 1617 per month.
2    Q.   You said you received some cash back at
3    the refinancing; is that right?
4    A.   Yes.
5    Q.   Could you tell me what you used the
6    proceeds for?
7    A.   I used it for some work on the house. I
8    bought a tractor.
9    Q.   Did you use any of the proceeds for
10   business purposes?
11   A.   No.
12        (A recess was taken.)
13        (Marked, Exhibits 4 - 5.)
14   Q.   Mr. McKenna, we are back on the record.
15   I remind you that you are still under oath.
16   A.   Okay.
17   Q.   I want to show you what have been marked
18   as Exhibits 4 and 5. Exhibit 4 is ECL&G 114 to
19   115; Number 5 is ECL&G 118 to 119.
20        I'm handing you Exhibit 4 right now.
21   Do you recognize that document?
22   A.   No, I don't.
23   Q.   Do you recall receiving that document?
24   A.   I don't recall whether I received it or

00045
```
 1  not.
 2  Q.  All right.  Let me show you Exhibit 5.
 3  Have you seen that document before?
 4  A.  I would have to say yes.
 5  Q.  Now, Exhibit 5 is a document entitled
 6  First Horizon Home Loan Corporation Loan Approval
 7  Letter.  It is addressed to Mr. McKenna.
 8       Do you recall receiving this before
 9  you went to the closing for your loan?
10  A.  I don't recall receiving it.
11  Q.  But you have seen it?
12  A.  Just looking at it, I would say yes.
13       MR. PASQUARELLO:  Exhibit 4 was
14  entitled State of Massachusetts Disclosures.
15  Q.  For the refinancing that's at issue in
16  the litigation, do you remember when it took place?
17  A.  I want to say June of 2003 or '04.  No,
18  it is 2003.
19  Q.  Does June 25, 2003 sound correct?
20  A.  Yes, I knew it was in June.  The years...
21  Q.  Where did you go for the closing?
22  A.  Attorney Dan Rull's office in South
23  Boston.
24  Q.  Did you know Mr. Rull before this
```

McKenna, Ralph G. – 01/14/2005          Page 45

00046
```
 1  closing?
 2  A.  I had been to a closing before in his
 3  office.
 4  Q.  Just one or more?
 5  A.  More than one; two, maybe three.
 6  Q.  Had Mr. Rull ever served as your
 7  attorney?
 8  A.  No.
 9  Q.  Was Mr. Rull serving as the closing
10  attorney for the lender?
11  A.  Yes.
12  Q.  Had he been doing that in the previous
13  transactions in his office?
14  A.  Yes.
15  Q.  Who was present besides you and Mr. Rull?
16  A.  His secretary.
17  Q.  Was she in the room during the closing?
18  A.  She was in and out.  She was making
19  photocopies and doing different things.
20  Q.  Anybody else there?
21  A.  I think not.
22  Q.  How long did the closing take, start to
23  finish?
24  A.  Maybe an hour.
```

McKenna, Ralph G. – 01/14/2005          Page 46

00047
```
 1  Q.  Did you have to take off any time from
 2  work?
 3  A.  Yes.
 4  Q.  What time of day was the closing?
 5  A.  It was late afternoon.
 6  Q.  Did you understand that Mr. Rull
 7  represented the lender?
 8  A.  Yes.
 9  Q.  Did you think he was your attorney also?
10  A.  No.
11  Q.  Can you describe for me what happened at
12  the closing.
13  A.  It was a typical closing, signing many
14  documents.  Mr. Rull would tell me what the
15  document was.  I would sign it.
16  Q.  Would he explain what each document was
17  before you signed it?
18  A.  Just in the most general terms, just what
19  it was.  Not a word-for-word explanation of what it
20  said.
21  Q.  Was the closing transaction similar to
22  other closing transactions that you had been to
23  with Mr. Rull?
24  A.  Yes.
```

McKenna, Ralph G. – 01/14/2005          Page 47

00048
```
 1  Q.  Did it seems that Mr. Rull had some sort
 2  of routine for working through the transactions?
 3  A.  Actually, all of the closings seemed
 4  pretty much the same to me, no matter where you go
 5  for them.
 6  Q.  But based on the previous transactions
 7  that you had attended with Mr. Rull and this
 8  transaction, did it seem to you like the
 9  explanations about the documents were similar?
10       MR. LEFEBVRE:  I would object as to
11  form.  I would suggest it asks for speculation on
12  the part of the witness.
13       You can answer.
14  A.  To be honest, I didn't take any notice.
15  I think it is always the same.  That's what I'm
16  saying.
17  Q.  Did you receive any of the documents that
18  you signed at that closing prior to the closing?
19  A.  I don't think, no.
20  Q.  Did you bring any documents with you to
21  the closing?
22  A.  No.
23  Q.  At the closing did you review any of the
24  documents before you signed them?
```

McKenna, Ralph G. – 01/14/2005          Page 48

00049
1    A.  I just accepted his explanation of the
2  documents.
3    Q.  Did you read any of the documents before
4  you signed them?
5    A.  No, not really.
6    Q.  Do you recall how the closing began?
7    A.  In what respect.
8    Q.  How did Mr. Rull commence the closing?
9    A.  He said hello to me.
10   Q.  Did he give you any sort of preliminary
11 instructions or anything of that nature?
12   A.  No.
13   Q.  Hello is always a good start.
14       Did you ask any questions during the
15 closing?
16   A.  No.
17   Q.  What documents, if any, do you remember
18 receiving during the closing?
19   A.  You mean when we finished the closing,
20 during the actual closing.
21   Q.  During the closing process, I mean?
22   A.  Nothing really stands out in my mind.  I
23 received a photocopy of everything that I signed.
24   Q.  Any particular documents that you

McKenna, Ralph G. - 01/14/2005          Page 49

00050
1  remember signing at the closing?
2    A.  Not particularly.
3    Q.  How about a note, do you remember that?
4  Do you remember signing a note at the closing?
5    A.  I guess the only thing that stands out in
6  my mind is that they make you sign your name all
7  different ways.  That's about it.
8    Q.  Let me just list a few other documents.
9  A mortgage, do you remember signing a mortgage?
10   A.  Well, like I say, you go through the
11 closing.  I've been to so many closings now that
12 it's just like, to remember one particular document
13 a year and a half later, you know...
14   Q.  Would you describe the closing overall as
15 a fairly quick process where you sign the
16 documents?
17   A.  Yes.
18   Q.  I'll just ask these.  The truth in
19 lending disclosure statement or the notice of your
20 right to cancel, do you remember receiving either
21 of those?
22   A.  I don't remember receiving them, but they
23 are part of it.  It's a standard procedure.
24   Q.  I understand.  Were there any documents

McKenna, Ralph G. - 01/14/2005          Page 50

00051
1  at the closing that you read before signing?
2    A.  Not that I recall.
3    Q.  After the closing, did you sit down and
4  read through the copy of the documents you
5  received?
6    A.  No, I didn't.
7    Q.  Did you understand at the closing that
8  there would be some delay between the closing
9  itself and when you received the money?
10   A.  It didn't really occur to me.
11   Q.  Did you receive any money on the day of
12 the closing?
13   A.  I believe they had a check ready for me
14 the day of the closing for the amount that I took,
15 the cash amount that I increased it by.
16   Q.  What did you do with the check after the
17 closing?
18   A.  I deposited it in the bank.
19   Q.  Do you have any record of the deposit?
20   A.  I might have a bank statement.
21   Q.  Mr. McKenna, do you know when the first
22 payment was due on the new loan?
23   A.  I think it was due August 1st.
24   Q.  Did you make the first payment?

McKenna, Ralph G. - 01/14/2005          Page 51

00052
1    A.  Oh, yes.
2    Q.  Who do you make the payment to?
3    A.  First Horizon.
4    Q.  How did you make the payment?
5    A.  By check.
6    Q.  By check.  Have you always paid by check?
7    A.  Yes.
8    Q.  Have you ever missed any payments?
9    A.  No.
10   Q.  Have you ever fallen behind on any of
11 your mortgage payments with First Horizon?
12   A.  No.
13   Q.  Were you happy with the servicing on the
14 loan?
15   A.  Yes.
16   Q.  Mr. McKenna, when was it that you first
17 decided you wanted to cancel your loan?
18   A.  After I spoke to my attorney, Chris
19 Lefebvre.
20   Q.  Before that time, you had no desire to
21 cancel?
22   A.  I didn't know there was any problem with
23 it.
24   Q.  Did you instruct Mr. Lefebvre to contact

McKenna, Ralph G. - 01/14/2005          Page 52

00053
1  First Horizon and tell them that you wanted to
2  cancel your loan?
3     A.  Yes.
4     Q.  Do you know how he did that?
5     A.  I believe by letter.
6     Q.  Did you see the letter before it was
7  sent?
8     A.  He sent me a copy of it I believe after
9  it was sent.
10    Q.  When was it that you decided to file the
11 lawsuit?
12    A.  After meeting with Chris Lefebvre.
13    Q.  Did you decide to file the lawsuit before
14 the letter was sent?
15    A.  Yes.
16    Q.  Did the response from First Horizon to
17 the letter make any difference as to whether or not
18 you were going to proceed with the lawsuit?
19    A.  No.
20    Q.  So you planned to proceed with the
21 lawsuit regardless of the response?
22    A.  I'm not sure how to answer that, because
23 it's not something I gave any thought to.
24       MR. PASQUARELLO:  Can we mark that as

00054
1  the next exhibit.
2       (Marked, Exhibit 6.)
3     Q.  Mr. McKenna, this has been marked as
4  Exhibit 6.  It is numbered ECL&G 4.  Is that a copy
5  of the letter from your attorney to First Horizon?
6     A.  Yes.
7     Q.  It's dated February 5, 2004?
8     A.  Yes.
9     Q.  You received a copy of that after it was
10 sent; is that right?
11    A.  Yes.
12    Q.  Can you tell me what it is that you think
13 First Horizon did wrong in this case?
14    A.  The wording in the right to cancel is
15 confusing.
16    Q.  Can you tell me how it is confusing?
17    A.  Can I just take a look at the right to
18 cancel for a minute.  I don't have it with me.
19    Q.  We can do that in a minute.  I want to
20 see if you can answer the question without it.
21    A.  I might be able to.  Let me try.
22    Q.  Okay.
23    A.  According to the way I understand it, the
24 wording is that if you already have a preexisting

00055
1  mortgage on your primary residence and you decide
2  to refinance, and you refinance, say, bank A, the
3  bank that holds the mortgage, you refinance with
4  them and take out an additional amount of cash, you
5  have a right to cancel the transaction for the
6  additional amount of cash and you are only held
7  responsible for the original amount.  That's
8  dealing with the same bank, refinancing with the
9  same bank as your original bank that's the holder
10 of the lien.
11       The other situation is that you
12 refinance with a different bank than the original
13 lienholder.  Then you have the option to rescind
14 the whole amount of the loan.  On one paragraph on
15 the right to cancel I received it says one thing
16 pertaining to the original lienholder and the
17 refinance with them and the other one has to do
18 with refinancing with a different bank than the
19 original lienholder.  There's two different
20 paragraphs where the language is very confusing and
21 contradictory.
22    Q.  Now, am I correct that you only came to
23 this conclusion after you had spoken to
24 Mr. Lefebvre?

00056
1     A.  Yes.
2     Q.  So I want you to go back in time now to
3  the closing itself.  Did you have that
4  understanding of your right to cancel at the
5  closing?
6     A.  No.
7     Q.  Am I correct that at the closing you
8  understood that you had a right to cancel?
9     A.  You're correct in that at the closing I
10 was told that this is the right to cancel form and
11 I don't recall what was explained about it, and I
12 signed it.
13    Q.  Do you think that Mr. Rull made any sort
14 of explanation about your right to cancel?
15    A.  I'm sure that he told me what the form
16 was as he handed it to me.  I didn't read it and I
17 don't believe he made any explanation about what it
18 said.
19    Q.  Do you know if Mr. Rull explained the
20 cancellation process at all to you?
21    A.  He didn't.
22    Q.  Did Mr. Rull explain the cancellation
23 process to you in any of the previous transactions
24 you had closed with him?

00057
1    A.  No.
2    Q.  During the three-day period after you
3  closed the loan, did you want to cancel for any
4  reason?
5    A.  No.
6    Q.  Between the time you closed the loan up
7  until the time you received the letter from
8  Mr. Lefebvre, did you want to cancel your loan for
9  any reason?
10    A.  No.
11    Q.  Mr. McKenna, have you told me everything
12  it is that you think First Horizon did wrong?
13    A.  Yes.
14    Q.  Is that the only claim of which you are
15  aware?
16    A.  Of which I am aware, yes.
17    Q.  Do you think there might be other claims?
18    A.  I don't know.
19      MR. LEFEBVRE:  I would object on the
20  form.  The question seems to be a little bit
21  ambiguous.  Could you explain what you mean on the
22  record.
23    Q.  Other than the claim that you described
24  about the notice of right to cancel form, are you

McKenna, Ralph G. - 01/14/2005          Page 57

00058
1  aware of any other claims in the lawsuit that you
2  are alleging?
3    A.  No.
4    Q.  Now, I think what you told me earlier,
5  Mr. McKenna, is that you received a number of
6  documents from Mr. Rall at the closing and you
7  proceeded to sign them without really reading
8  through any of them; is that right?
9    A.  Without reading them word for word, yes.
10    Q.  Does that also apply to the notice of
11  right to cancel?
12    A.  Yes.
13    Q.  So you didn't read the notice of the
14  right to cancel word for word at the closing?
15    A.  No, I didn't.
16    Q.  Could you tell me what law it is that you
17  think First Horizon allegedly violated?
18    A.  The Truth in Lending Act.
19    Q.  Is the first time you believed that after
20  you talked to your attorney?
21    A.  Yes.
22    Q.  Is that how you came to believe that?
23    A.  Yes.
24    Q.  Have you ever read any parts of the Truth

McKenna, Ralph G. - 01/14/2005          Page 58

00059
1  in Lending Act?
2    A.  No, I haven't.
3    Q.  Mr. McKenna, are you making the same
4  claims that you described to me on behalf of a
5  class?
6    A.  Yes, I am.
7    Q.  Are you making any different claims on
8  behalf of a class?
9    A.  As far as?  I believe the only claim is
10  the issue of the right to cancel, the document.
11    Q.  Do you believe that other people had the
12  same experience with their loans as you did with
13  your loan?
14    A.  Yes.
15    Q.  Why do you believe that?
16    A.  My attorney informed me of that.
17      MR. LEFEBVRE:  For the record, I
18  would just object to the answer on the basis of
19  privilege.
20    Q.  Is that the only reason why you believe
21  that, Mr. McKenna?
22    A.  I wouldn't have any other way of knowing
23  it.
24    Q.  Can you tell me who you think is in the

McKenna, Ralph G. - 01/14/2005          Page 59

00060
1  class that is alleged?
2    A.  Well, the other representative is
3  Mrs. Lillie.  Her husband is a member of the class.
4  Then there's a Mr. and Mrs. Deane.  Then there are
5  some other members that I'm not familiar with.
6    Q.  Do you understand that the class
7  allegations are limited to issues about the right
8  to cancel?
9    A.  That's my understanding, yes.
10    Q.  Do you know what the time period is for
11  the alleged class?
12    A.  In Massachusetts it's four years.  In the
13  other states it's three years.
14      (Marked, Exhibit 7.)
15    Q.  Mr. McKenna, this is the notice of the
16  right to cancel that we were talking about a few
17  minutes ago.
18    A.  Okay.
19    Q.  Would you just take a look at the bottom
20  of that and tell me if that's your signature.
21    A.  It is.
22    Q.  Now, can you explain to me which part of
23  this form you think is confusing?
24      MR. LEFEBVRE:  Can I have a minute to

McKenna, Ralph G. - 01/14/2005          Page 60

00061
1  review it?

2      MR. PASQUARELLO:  Yes.

3      MR. LEFEBVRE:  Take your time.

4      (A recess was taken.)

5  A.  Well, the part here that says for new

6  transactions, then there's another part above it

7  that talks about just cancelling a mortgage that

8  you already have.  So it gets into that situation

9  of refinancing with the same bank or refinancing

10  with a different bank.

11  Q.  Now, am I correct that this wasn't an

12  issue for you at the closing?

13  A.  No, it wasn't.

14  Q.  Anything else about the form or is that

15  everything?

16  A.  That's the only problem in that form.

17  Q.  Mr. McKenna, have you suffered any

18  damages as a result of the allegedly confusing

19  form?

20  A.  No.

21  Q.  Can you tell me what sort of remedy that

22  you are seeking in the case for yourself?

23  A.  Rescission of the mortgage, and the right

24  to a rescission for the other members of the class,

McKenna, Ralph G. - 01/14/2005          Page 61

00062
1  if they choose, statutory damages and legal fees.

2  Q.  Now, are you seeking actual rescission

3  for yourself or just the right to rescind?

4  A.  Actual rescission.

5  Q.  Are there any other remedies you are

6  seeking on behalf of the class?

7  A.  The same remedies, statutory damages and

8  legal fees.

9  Q.  And are you seeking those same things for

10  yourself?

11  A.  Yes.

12  Q.  What's your understanding of how the

13  rescission process works?

14      MR. LEFEBVRE:  Objection.  I think

15  that question was asked and answered previously.

16      Answer it anyways.

17  A.  Well, if you refinance with one bank --

18  Q.  Let me just stop you for one second but

19  let me try to clarify what my question is.

20      Once you've made the decision to

21  rescind, what's your understanding of how the

22  rescission process works?

23  A.  I don't really understand besides what my

24  explanation is of having a rescission.

McKenna, Ralph G. - 01/14/2005          Page 62

00063
1  Q.  Do you understand that if you rescind

2  your loan you would have to return the principal

3  amount to the lender?

4  A.  Yes, I understand that.

5  Q.  Are you prepared to do that?

6  A.  Yes.

7  Q.  Do you realize that you would have to

8  return that amount of money within a certain amount

9  of time?

10  A.  Yes.

11  Q.  Have you arranged for alternative

12  financing?

13  A.  Not at this time.

14  Q.  Have you talked to any mortgage brokers

15  about alternative financing?

16  A.  Not at this time.

17  Q.  You discussed what interest rates are

18  now?

19  A.  No.

20  Q.  Have you done any research into interest

21  rates?

22  A.  No.

23  Q.  Do you know whether interest rates are

24  higher or lower than when you financed in June of

McKenna, Ralph G. - 01/14/2005          Page 63

00064
1  2003?

2  A.  I think they have been fluctuating in the

3  area.  It could be a little bit higher.

4  Q.  Do you know what rate you might be able

5  to get right now?

6  A.  No.

7  Q.  Does the interest rate that's available

8  on a refinance affect whether or not you want to

9  rescind?

10  A.  No.

11  Q.  If you could only get an interest rate

12  that is higher than the interest rate you currently

13  have, would you still want to rescind?

14  A.  Yes.

15  Q.  Can you tell me why?

16  A.  Because I think that I would be better

17  off out of this mortgage.  I'm unhappy with the

18  fact that the language in that is not as it should

19  be.

20  Q.  Any other reason?

21  A.  No.

22  Q.  You said you are unhappy with the

23  language on the form.  How long have you been

24  unhappy with the language?

McKenna, Ralph G. - 01/14/2005          Page 64

00065
1   A.  About a year now.

2   Q.  Since you retained your attorney?

3   A.  Yes.

4   Q.  Does your decision on whether or not to

5   rescind depend in any way on what sort of

6   refinancing rate that you can get?

7   A.  No, not really.

8   Q.  If you can only get a refinancing loan

9   and an interest rate of 10 percent, would you still

10  want to refinance your loan?

11  A.  No, I wouldn't refinance it.

12  Q.  I meant to say would you still want to

13  rescind your loan?

14  A.  Yes.

15  Q.  You would still want to rescind if the

16  only rate you could get would be 10 percent?

17  A.  Yes.

18  Q.  Would you still want to rescind if the

19  only rate you could get would be 15 percent?

20  A.  Yes.

21  Q.  How about 20 percent?

22  A.  Yes.

23  Q.  Is there some cutoff?

24  A.  No, there's no cutoff.

00066
1   Q.  Fair enough.  If you're not entitled to

2   receive any statutory damages, would you still want

3   to proceed with the case?

4   A.  Well, I would have to look at what the

5   damages are.  Possibly.

6   Q.  If rescinding your loan meant that you

7   would end up losing money, would you still want to

8   rescind the loan?

9   A.  No.

10  Q.  Mr. McKenna, have you ever been a party

11  in a lawsuit other than this one and the lead paint

12  lawsuit that you told me about earlier?

13  A.  No.

14  Q.  Have you ever been a witness in any other

15  lawsuits?

16  A.  No.

17  Q.  Have you ever been a defendant in a

18  criminal case?

19  A.  No.

20  Q.  Can you tell me what a class action is?

21  A.  It's when a group of people that have a

22  similar complaint get together and form a group to

23  bring a legal action against the defendant.

24  Q.  Do you understand that you listed as a

00067
1   representative of the class?

2   A.  Yes.

3   Q.  Have you ever served as a class

4   representative before?

5   A.  No, I haven't.

6   Q.  Have you ever been asked to serve as a

7   class representative before?

8   A.  No, I have not.

9   Q.  Do you know anyone who has served as a

10  class representative before?

11  A.  Not prior to this case.  I know

12  Mrs. Lillie is the other class representative.

13  Q.  You also mentioned some of the other

14  plaintiffs in the case.  Other than those

15  plaintiffs, do you know any other members of the

16  alleged class?

17  A.  I don't.

18  Q.  Have you ever been a member of another

19  class action?

20  A.  No.

21  Q.  Mr. McKenna, shortly after the lawsuit

22  was filed, did you have doubts about whether or not

23  you wanted to proceed with the case?

24  A.  Yes.

00068
1   Q.  Did you tell someone that you did not

2   plan to proceed with the case?

3   A.  Yes.

4        MR. LEFEBVRE:  I object.  I would not

5   answer the question if it's going to a response

6   relative to any conversation that he had with his

7   lawyer.

8        MR. PASQUARELLO:  Fine.

9        MR. LEFEBVRE:  In other words, do you

10  understand what I'm saying?

11       THE WITNESS:  Yes.

12  Q.  Does that change your answer?

13  A.  No, it doesn't change my answer.

14  Q.  Can you tell me what the reason for that

15  was, your doubts?

16  A.  Jack O'Reardon had called me up.  He was

17  curious about what was going on after Chris

18  Lefebvre had sent First Horizon a letter.  I had

19  known Jack O'Reardon for a number of years.  He's

20  definitely a good guy.  I didn't want to do

21  anything to hurt him.

22  Q.  Any other reason?

23  A.  No, no other reason.

24  Q.  You eventually decided to continue the

00069
1 lawsuit?

2    A.   I did.

3    Q.   Does Mr. Lefebvre represent you in the

4 class action?

5    A.   Yes.

6    Q.   Was it your idea for you to retain him?

7    A.   Yes.

8    Q.   When, if you remember, did you retain

9 him?

10        MR. LEFEBVRE:  I'm going to object as

11 to form.  I believe the question was asked and

12 answered by the party previously.

13   A.   It would have been in February.  It was

14 President's Day, either Martin Luther King in

15 January or President's Day in February.  I went to

16 his office that day.

17   Q.   Is it correct that you retain

18 Mr. Lefebvre personally and in the class action?

19   A.   Yes.

20   Q.   Is there any written agreement between

21 you and Mr. Lefebvre?

22   A.   Yes, there is.

23   Q.   Can you tell me who signed the agreement?

24   A.   I signed it and Mr. Lefebvre signed it.

00070
1    Q.   Do you know what the terms of the

2 agreement are?

3    A.   Basically, yes.

4    Q.   Can you tell me what they are?

5        MR. LEFEBVRE:  I'm going to object,

6 privilege.  I think this might be privileged

7 information.

8        You can answer it.

9    A.   That I'm responsible for the expenses in

10 this lawsuit.

11   Q.   Anything else?

12   A.   Just that he's, that Chris is

13 representing me in this.

14   Q.   Other than the written agreement, is

15 there any sort of oral agreement between you and

16 Mr. Lefebvre?

17   A.   No.

18   Q.   Are you also represented in the case by

19 Edelman, Combs, Latturner & Goodwin?

20   A.   Yes.

21   Q.   Do you know whose idea it was to retain

22 that firm?

23   A.   Chris Lefebvre.

24   Q.   Did Mr. Lefebvre retain the Edelman firm

00071
1 to represent you?

2    A.   Yes.

3    Q.   Do you know when they were retained?

4    A.   No, I don't.

5    Q.   Have you spoken to anybody besides

6 Ms. Piccirilli at the Edelman firm?

7    A.   No, just Heather Piccirilli.

8    Q.   Is there any written agreement between

9 you and the Edelman firm?

10   A.   No.

11   Q.   Is there any oral agreement between you

12 and the Edelman firm?

13   A.   No.

14   Q.   Are you aware of any agreement between

15 Mr. Lefebvre and the Edelman firm?

16   A.   I'm not aware of it.

17   Q.   Mr. McKenna, what is your role as a class

18 representative?

19   A.   I'm supposed to appear at a deposition,

20 if necessary.  I'm supposed to appear at trial.

21 I'm supposed to be in contact with the attorney and

22 somewhat controlling the attorney and making sure

23 he's acting on everybody's best behalf.  That's

24 pretty much it.

00072
1    Q.   Is it your understanding that you have an

2 obligation to testify?

3    A.   Yes.

4    Q.   Is it your understanding that you have an

5 obligation to supervise your attorneys?

6    A.   Yes.

7    Q.   Can you tell me how you are supervising

8 your attorneys?

9    A.   By keeping in contact with them.  I've

10 spoken to Chris several times on the telephone.

11 I've spoken to Heather out in Chicago at Edelman,

12 Combs, Latturner on several occasions.

13   Q.   Is it your understanding that you have an

14 obligation to monitor the litigation?

15   A.   Yes.

16   Q.   Can you tell me how you've been

17 monitoring the litigation?

18   A.   Just by keeping in contact with the

19 attorneys.

20   Q.   What is your role with regard to control

21 of the litigation?

22   A.   Basically just keeping in contact with

23 the attorneys.

24   Q.   Can you tell me what decisions, if any,

00073
1  that you have made so far in the litigation?
2    A.   Made the decision to go forward with it.
3    Q.   Anything else?
4    A.   Made the decision to accept being a
5  representative of the class.
6    Q.   Did you have any role in preparing or
7  filing the complaint?
8    A.   Just providing the information I was
9  asked for.
10   Q.   Did you have any role in preparing or
11  filing the amended complaint?
12   A.   No.
13   Q.   Did you have any role in responding to
14  First Horizon's discovery requests?
15   A.   Just in providing the information.
16   Q.   When you say providing information, does
17  that include both documents and --
18   A.   Answers to the interrogatories.
19   Q.   Do you know how the amended complaint
20  differs from the original complaint?
21   A.   I believe more people were added to it.
22   Q.   Any other differences that you're aware
23  of?
24   A.   Not that I can think of at this time.

McKenna, Ralph G. - 01/14/2005          Page 73

00074
1    Q.   Have you read the amended complaint?
2    A.   I looked it over.
3    Q.   Did you look it over before it was filed?
4    A.   I'm not sure.
5    Q.   How about the original complaint, did you
6  look that over before it was filed?
7    A.   I'm also not sure of that.
8    Q.   Do you know who drafted the amended
9  complaint?
10   A.   I believe Chris Lefebvre.
11   Q.   How about for the original complaint?
12   A.   I believe Chris Lefebvre.
13   Q.   How often do you speak to your counsel
14  about the case?
15   A.   Sometimes once a week. I'd say no more
16  than two weeks goes by without me speaking to
17  either Chris or Heather.
18   Q.   Do you know who the judge is in this
19  case?
20   A.   Judge Lindsey.
21   Q.   Do you know what court this case is in?
22   A.   A federal district court in Boston.
23   Q.   Can you tell me why you are serving as a
24  class representative in the case?

McKenna, Ralph G. - 01/14/2005          Page 74

00075
1    A.   Other than Chris asking me to serve, I
2  can't tell you a reason.
3    Q.   Do you have time to serve as a class
4  representative?
5    A.   Yes, I do.
6    Q.   Would you be willing to make decisions on
7  behalf of a class?
8    A.   Yes.
9    Q.   Have you been promised anything in
10  exchange for your services as a class
11  representative?
12   A.   No, I have not.
13   Q.   Do you understand that you can't settle
14  your claim individually if you are a class
15  representative?
16   A.   I understand that.
17   Q.   Are you willing to delay resolution of
18  your individual claim in order to be a class
19  representative?
20   A.   Yes.
21   Q.   Let me jump back to a background question
22  for one second. Is your spouse listed as having an
23  ownership interest in the Braintree residence?
24   A.   No.

McKenna, Ralph G. - 01/14/2005          Page 75

00076
1        (A recess was taken.)
2    Q.   Back on the record. You are still under
3  oath. I have a few more questions for you.
4    A.   Okay.
5    Q.   With regard to the discovery responses in
6  this case, were you shown a copy of your
7  interrogatory responses before they were sent to
8  First Horizon?
9    A.   I'm not sure I understand the question.
10   Q.   Did you participate in the compiling of
11  responses to the interrogatory answers?
12   A.   Yes, I did.
13   Q.   Did you also participate in responding to
14  the document requests?
15   A.   Yes.
16   Q.   Did you search through your documents at
17  home to find responsive documents?
18   A.   Yes.
19   Q.   Did you search anywhere else?
20   A.   No.
21   Q.   Other than the files that you described
22  to me at your desk at home, do you keep files
23  anywhere else?
24   A.   No.

McKenna, Ralph G. - 01/14/2005          Page 76

00077
1    Q.  Do you keep a file on this case?

2    A.  Yes.

3    Q.  Documents that you keep in the file about

4    this case, did you produce those to your attorneys

5    with respect to the document requests?

6    A.  I produced what they asked me to produce.

7    Q.  Did you keep a file about your mortgage

8    with First Horizon?

9    A.  Yes.

10   Q.  Did you produce all of those documents?

11   A.  Yes.

12   Q.  With regard to the loan transactions on

13   the Braintree residence, the original transaction

14   for the equity line of credit, did you believe at

15   the time that you had a right to cancel that

16   transaction?

17   A.  To be honest with you, I don't think it

18   occurred to me at the time.

19   Q.  The next transaction, which I think was

20   the transaction where you first had a mortgage and

21   increased your line of credit, did you believe that

22   you had a right to cancel that transaction?

23   A.  I don't think it occurred to me.

24   Q.  Am I correct that the next transaction on

---

00078
1    the Braintree house is the current transaction?

2    A.  No.  Because I had said to you earlier a

3    third time I went to Citizens Bank to take out a

4    formal mortgage.  I was also in contact with a

5    mortgage broker.  She ended up getting me better

6    terms, and I believe it was First Horizon.  And

7    then Chase Manhattan bought that loan.  So that's

8    one loan.  And then the one we are here today

9    about.

10   Q.  All right.  Work backwards for me.  I

11   will do the first few steps.  You tell me if I'm

12   correct.  The current transaction.

13   A.  Okay.

14   Q.  Chase was involved at some point.  Before

15   Chase you think it was a First Horizon loan?

16   A.  I believe it was, yes.

17   Q.  Can you tell me what were the

18   transactions before the First Horizon?

19   A.  The two lines of credit, equity-type

20   situations.  I don't believe either one were a

21   mortgage.  They were equity lines.

22   Q.  The first line, was that for

23   approximately 30 to $40,000?

24   A.  Yes.

---

00079
1    Q.  What was the second?

2    A.  A hundred thousand.

3    Q.  How long after the first line was the

4    second line?

5    A.  Maybe two years.

6    Q.  Do you recall who the lenders were for

7    both of those transactions?

8    A.  Citizens Bank.

9    Q.  For both?

10   A.  Yes.  The local branch.

11   Q.  Do you recall whether or not you had a

12   right to cancel either of those transactions?

13   A.  I don't recall.

14   Q.  I think you told me earlier that you

15   might still have the paperwork on those

16   transactions?

17   A.  I may still have that, yes.

18   Q.  For the refinancing on the East Street

19   property in Dorchester, I think you told me there

20   were two or three refinances?

21   A.  Yes.

22   Q.  You were not represented by counsel in

23   those?

24   A.  Only the very first when I took out the

---

00080
1    original mortgage.

2    Q.  For the purchase?

3    A.  Yes.

4    Q.  What was the reason for the refinances

5    for the East Street property?

6    A.  Just a better rate with the rates coming

7    down.

8    Q.  Mr. McKenna, if it turns out that you do

9    not have documents from some of these other

10   mortgages, do you have any problem with signing a

11   release to acquire the documents from some of the

12   other mortgage companies?

13   A.  No.

14   Q.  I want to refer you to the amended

15   complaint, Paragraph 38, which relates to the class

16   allegations.

17   A.  Yes.

18   Q.  If you could read Paragraph 38 to

19   yourself.

20   A.  (Witness complies.)  Okay.

21   Q.  With regard to the class allegations in

22   the case, are you alleging anything other than what

23   is specified in Paragraph 38 on behalf of the

24   class?

00081
```
 1    A.  No.
 2    Q.  There are also class allegations in
 3  Paragraph 51.  Could you take a look at that.
 4    A.  (Witness complies.)  Okay.
 5    Q.  The same question for Paragraph 51 as for
 6  38, are you aware of any other allegations on
 7  behalf of the class?
 8    A.  No, I am not.
 9    Q.  Can you tell me why you think your claim
10  is typical of the class?
11    A.  Only because I've been told that by my
12  attorney.
13        MR. LEFEBVRE:  I would just object;
14  privilege.  The question is answered.
15    Q.  Thank you for your time today.  I don't
16  have any other questions for you.
17        MR. LEFEBVRE:  I have a few.
18        EXAMINATION
19  BY MR. LEFEBVRE:
20    Q.  Mr. McKenna, I'm showing you Exhibit 7,
21  the notice of the right to cancel.  Who, if anyone,
22  at the closing reviewed this notice of the right to
23  cancel with you; who, if anyone?
24        MR. PASQUARELLO:  Objection to the
```

00082
```
 1  form.
 2    A.  No one.
 3    Q.  Your answer is no one?
 4    A.  No one.
 5        MR. PASQUARELLO:  Can you read the
 6  question back.
 7        (Questions and answers read by
 8  reporter.)
 9    Q.  Mr. McKenna, I'm showing you Exhibit
10  Number 5, which is the loan approval letter.  How
11  confident are you that you in fact received this
12  document from First Horizon Loan Corporation.  Do
13  you believe in fact you received this document?
14    A.  I honestly don't know.
15    Q.  On the bottom of the document it says
16  First Horizon Home Loan Corporation branch manager.
17  Would you in fact know who the branch manager was
18  based on your dealings with the person that you
19  were dealing with to obtain this loan through First
20  Horizon Home Loan Corporation?
21    A.  No.
22    Q.  I want you to read into the record, if
23  you would, what this says on Exhibit 5, beginning
24  here, "the attached."
```

00083
```
 1    A.  "The attached Exhibit A, specifically the
 2  paragraphs marked with an X, shall be construed as
 3  part of this commitment."
 4    Q.  I want to take you to the second page of
 5  Exhibit 5, Exhibit A.  Would you read into the
 6  record what A 1 reads where there's actually an X
 7  crossed off, right of rescission.  Could you read
 8  that into the record.
 9    A.  "A 1, right of rescission:  If the loan
10  is an owner-occupied primary residence and the loan
11  amount is greater than the existing balance."
12    Q.  Now, do you know whether or not there
13  was -- only answer this if you know the answer to
14  the question -- whether or not there was an
15  addendum in addition to Exhibit A that relates to
16  right of rescission?
17    A.  I don't know.
18    Q.  Now, when you went to closing, do you
19  remember whether or not you reviewed the loan
20  approval letter with Mr. Rull, Attorney Rull?  Did
21  you review the loan approval letter with Mr. Rull
22  prior to the closing?
23    A.  I honestly don't remember.
24    Q.  Did you have any prior conversations at
```

00084
```
 1  all with Mr. Rull prior to the closing?
 2    A.  I don't remember.
 3    Q.  Do you remember having any conversations
 4  with anyone from First Horizon Home Loan
 5  Corporation relative to the conditions and terms
 6  outlined in this loan approval letter prior to you
 7  going to the closing on the loan?
 8    A.  I don't remember, no.
 9        MR. LEFEBVRE:  No further questions.
10        We will review and sign the
11  deposition transcript.
12        (3:32 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
```

00085
1          CERTIFICATE OF COURT REPORTER
2          I, David A. Arsenault, Registered
3    Professional Reporter, do certify that the
4    deposition of RALPH G. McKENNA, in the matter of
5    McKenna v. First Horizon Home Loan, took place at
6    12:53 p.m. on Friday, January 14, 2005; that the
7    testimony of said witness was taken by me in
8    machine shorthand and thereafter reduced to writing
9    by means of computer-aided transcription; that said
10   transcription is a true record of the testimony
11   given by said witness; that the witness was sworn
12   by me, a Notary Public in and for the Commonwealth
13   of Massachusetts, with my commission expiring on
14   May 12, 2006; that I am neither counsel for,
15   related to, nor employed by any of the parties to
16   the action in which this deposition was taken, and
17   further that I am not a relative or employee of any
18   attorney or counsel employed by the parties
19   thereto, nor financially or otherwise interested in
20   the outcome of the action.
21
22          _____
23          David A. Arsenault
24   )

McKenna, Ralph G. - 01/14/2005          Page 85

00086
1          I N D E X
2          ------------
3          RALPH GERARD McKENNA
4    EXAMINATION BY
5    MR. PASQUARELLO          3
6    MR. LEFEBVRE          81
7
8
9
10          EXHIBITS MARKED
11   1          3
12   2          17
13   3          34
14   4 - 5          44
15   6          53
16   7          60
17
18   Exhibits copied by reporter.  Originals returned to
19   Daniel Pasquarello, Esq.; cc's sent to Marc
20   Lefebvre, Esq.
21
22
23
24

McKenna, Ralph G. - 01/14/2005          Page 86

00087
1          RALPH G. McKENNA
2          ERRATA/SIGNATURE PAGE
3    PAGE  LINE  CHANGE OR CORRECTION AND REASON
4    ____|___|_____
5    ____|___|_____
6    ____|___|_____
7    ____|___|_____
8    ____|___|_____
9    ____|___|_____
10   ____|___|_____
11   ____|___|_____
12   ____|___|_____
13   ____|___|_____
14   ____|___|_____
15   I have read the foregoing transcript of my
16   deposition taken on January 14, 2005.  Except for
17   any corrections or changes noted above, I hereby
18   subscribe to the transcript as an accurate record
19   of the statements made by me.
20   Signed under the pains and penalties of perjury.
21   Deponent:_____/___/2005
22          RALPH G. McKENNA
23
24

McKenna, Ralph G. - 01/14/2005          Page 87