# EXHIBIT 12

00001
```
 1    Exhibits 1 - 5   Vol. 1, Pgs. 1 - 89
 2        UNITED STATES DISTRICT COURT
 3         DISTRICT OF MASSACHUSETTS
 4    ----------------------------------------
 5   RALPH G. McKENNA, GLENROY A. DEANE,
 6   ILENE WILGOREN-DEANE, CHRISTOPHER J. LILLIE
 7   and LAURA A. LILLIE
 8        Plaintiffs
 9   vs.         Docket No. 04-10370 (RCL)
10
11   FIRST HORIZON HOME LOAN CORPORATION
12        Defendant
13    ----------------------------------------
14
15     DEPOSITION of ILENE WILGOREN-DEANE
16   Friday, January 14, 2005, 9:36 a.m.
17        Goodwin Procter LLP
18         Exchange Place
19          53 State Street
20         Boston, Massachusetts
21    ----------------------------------------
22   Reporter:  David A. Arsenault, RPR
23   Farmer Arsenault Brock LLC, Boston, MA
24          (617) 728-4404
```

00002
```
 1  PRESENT:
 2  Family and Consumer Law Center
 3    Marc D. Lefebvre, Esq.
 4    Two Dexter Street
 5    Pawtucket, Rhode Island  02860
 6    401-728-6060
 7    for Plaintiffs
 8
 9  Goodwin Procter LLP
10    Daniel J. Pasquarello, Esq.
11    Exchange Place
12    53 State Street
13    Boston, Massachusetts  02109
14    617-570-1000
15    for Defendant
16
17  Marked exhibits retained by court reporter.
18  Signature/errata page sent to Marc Lefebvre.
19
20
21
22
23
24
```

00003
```
 1        PROCEEDINGS - 9:36 a.m.
 2    --------------
 3        ILENE WILGOREN-DEANE, sworn
 4    --------------
 5    (Marked, Exhibit 1.)
 6        EXAMINATION
 7  BY MR. PASQUARELLO:
 8    Q.  Good morning.  My name is Dan
 9  Pasquarello.  I'm an attorney that represents First
10  Horizon in the lawsuit that you have brought
11  against First Horizon.  Do you understand why we
12  are here today?
13    A.  Yes, I do.
14    Q.  Have you ever had your deposition taken
15  before?
16    A.  Never.
17    Q.  Let me give you some preliminary
18  instructions on how we will proceed today.  It's
19  important to answer all of my questions audibly
20  without shakes or nods of the head.  It's also
21  important that you wait until I finish my question
22  before you start answering so we are not talking at
23  the same time.  It's difficult for the reporter to
24  take two people talking at once.
```

00004
```
 1        As you can see, there are drinks,
 2  coffee, water.  You can help yourself to that.  If
 3  you need a break at any time this morning, please
 4  let me know and we'll do that.  I only ask that if
 5  there's a question pending at the time, you answer
 6  the question first and then we will break.
 7        Do you understand these instructions?
 8    A.  Yes, I do.
 9    Q.  If you don't understand a question that I
10  ask you today, please tell me; otherwise, I'll
11  assume that you do.  If you don't, I'll try to
12  clarify the question.
13        Is there any reason today that you
14  cannot testify truthfully or completely?
15    A.  No.
16    Q.  Have you taken any medications today?
17    A.  No.
18    Q.  Have you consumed anything that might
19  affect your ability to understand and answer
20  questions?
21    A.  No.
22        MR. LEFEBVRE:  Can we get a
23  stipulation that it's going to be objections as to
24  form only?
```

00005
1       MR. PASQUARELLO: Objections as to
2 form only; everything else reserved, including
3 motions to strike.
4       MR. LEFEBVRE:  My client will read
5 and sign.
6       MR. PASQUARELLO: Fine.
7    A.  Irene Wilgoren-Deane.
8    Q.  Have you ever been known by any other
9 names?
10   A.  No.
11   Q.  What is your date of birth?
12   A.  12/5/65.
13   Q.  And your Social Security number?
14   A.  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.
15   Q.  Are you married?
16   A.  Yes.
17   Q.  How long have you been married?
18   A.  Eight years this past June.
19   Q.  Is this your first marriage?
20   A.  Yes.
21   Q.  Do you have any children?
22   A.  Yes, I do.
23   Q.  How many children do you have?
24   A.  Three.

Wilgoren-Deane, Irene – 01/14/2005          Page 5

---

00006
1    Q.  How old are they?
2    A.  Seven, five, and a year.
3    Q.  Very busy.
4    A.  To say the least.
5    Q.  What are their names?
6    A.  Salena, seven-year-old; Ariel is my five-
7 year-old; and Caleb is my one-year-old.
8    Q.  I think you told me a minute ago that you
9 have not been deposed before; is that correct?
10   A.  Correct.
11   Q.  What is the highest educational degree
12 that you have received?
13   A.  I'm in the midst of my bachelor's.  I
14 have an associate's degree and am getting my
15 bachelor's.
16   Q.  Can you walk through your educational
17 history.
18   A.  Avon High School.  I dropped out.  I got
19 my GED.  I went to Massasoit Community College.  I
20 got my two-year associate's there.  Since '96 I've
21 been working on my bachelor's.  I'm seven courses
22 away from my bachelor's and I changed my major.
23   Q.  When did you get your associate's degree?
24   A.  1996.

Wilgoren-Deane, Irene – 01/14/2005          Page 6

---

00007
1    Q.  Do you remember when you got your GED?
2    A.  Approximately '83, '84.
3    Q.  What are you studying for now for your
4 bachelor's?
5    A.  Accounting.
6    Q.  Before accounting, what were you majoring
7 in?
8    A.  A math major.
9    Q.  Are you currently employed?
10   A.  No, I am not.
11   Q.  Have you been employed in the past?
12   A.  Yes.
13   Q.  When was the last time you were employed?
14   A.  Wal-Mart.  October of '03 I left that job
15 because I was pregnant.
16   Q.  Like you did for your educational
17 history, could you walk through your employment
18 history.
19   A.  Burger King in high school.  Various
20 jobs:  Fernandes; D'Angelo's; Christies Market, I
21 was an assistant manager; Cumberland Farms, I was a
22 manager; a dry-cleaning place; Friendly's.  Not in
23 that order.  I had my own business, Little Debbie
24 Snack Cakes, distributorship for McKee.

Wilgoren-Deane, Irene – 01/14/2005          Page 7

---

00008
1    Q.  When was that?
2    A.  1991.
3    Q.  What kind of business is that?
4    A.  It's a distributorship for Little Debbie
5 Snack Cakes.  I was self-employed.
6    Q.  How long did you do that for?
7    A.  Approximately a year.  Also I worked at
8 Calder, Shaw's.
9    Q.  Are most of these jobs in a town or area?
10   A.  Yes.
11   Q.  Where?
12   A.  The Brockton area.  The route was in a
13 different place for the McKee Baking Company.  That
14 was everywhere.
15   Q.  Do you know what your annual household
16 income is?
17   A.  Last year or this year?
18   Q.  Both.
19   A.  Last year was approximately 40,000.  This
20 year is around a hundred.
21   Q.  Can you tell me what the source of that
22 income is?
23   A.  My husband's work.  My Social Security.
24 My husband owns a three-family house.  We have

Wilgoren-Deane, Irene – 01/14/2005          Page 8

00009
1  income from rental property.

2    Q.  Do you know what accounts for the jump

3  from last year to this year?

4    A.  Yes.

5    Q.  Can you tell me what that is?

6    A.  The rental income.

7    Q.  Is the rental property a property that

8  you've acquired in the past year?

9    A.  Yes, March.

10    Q.  What's the address?

11    A.  206 Winthrop Street, Brockton.

12    Q.  Did you say that was a three-family

13  house?

14    A.  Correct.  I do not own it, though.  My

15  husband and his mother do.

16    Q.  What does your husband do?

17    A.  Works in an electrical warehouse company,

18  inventory control.

19    Q.  How long has he been there?

20    A.  Six years.

21    Q.  What's the name of the business?

22    A.  Two names, Sonapar, Inc. is the big

23  company.  Northeast Electrical is the division.

24    Q.  You also mentioned Social Security

00010
1  income?

2    A.  Correct.

3    Q.  Is that disability?

4    A.  Disability.

5    Q.  What is that for?

6    A.  I have bipolar disorder.

7    Q.  How long have you been on disability?

8    A.  '93.

9    Q.  About how much of your household income

10  is that?

11    A.  I have a question.  Part of it is my

12  kids.  Are you talking just mine?  My kids don't go

13  on the tax.  $740 a month.

14    Q.  That does not include your kids.

15    A.  No.

16    Q.  Mrs. Deane, have you ever worked in the

17  real estate industry?

18    A.  No, I have not.

19    Q.  Have you ever worked in the mortgage

20  lending area?

21    A.  No, I have not.

22    Q.  Have any of your jobs involved

23  residential mortgages?

24    A.  No.

00011
1    Q.  Have you ever had any training regarding

2  residential mortgages?

3    A.  No.

4    Q.  Have you ever taken any courses about

5  selling or buying real estate?

6    A.  I believe I did right when I got my GED,

7  but I dropped out.  I never finished the course.  I

8  never showed up.  I got a failure.  I did take one

9  course.

10    Q.  Do you know where that was?

11    A.  Massasoit Community College.  That was my

12  first attempt at Massasoit.

13    Q.  Going back to your education, when did

14  you start at Massasoit the first time?

15    A.  '83 or '84, I'm not exactly sure.  It was

16  right after I got my GED.  I was there one

17  semester, not even.

18    Q.  When did you go back?

19    A.  In '93.

20    Q.  And that was a two-year program?

21    A.  Two years, but it was like three years.

22    Q.  Did you tell me where you were getting

23  your bachelor's right now?

24    A.  Bridgewater State College.  I'm currently

00012
1  on leave.  I took a leave.

2    Q.  How many credits away are you from your

3  degree?

4    A.  Seven classes.  Approximately 18 to 19

5  credits.

6    Q.  Have any of those courses been in real

7  estate?

8    A.  No.

9    Q.  Has your husband taken any courses in

10  buying or selling real estate?

11    A.  No, not that I'm aware of.

12    Q.  Do you know if he has had any training in

13  the real estate area?

14    A.  No.

15    Q.  Turning to this morning's deposition, can

16  you tell me what you did to prepare for the

17  deposition?

18    A.  I didn't prepare.  I talked to my lawyer

19  ten minutes last night and five minutes before I

20  walked in here.

21    Q.  Any other conversations with your lawyer

22  before last night for today's deposition?

23    A.  For today, no.

24    Q.  Before meeting with your lawyer today for

00013
1 this deposition, did you meet with anyone?

2    A.  No.

3    Q.  Did you review any documents to prepare

4 for the deposition?

5    A.  No.

6        (Pause.)

7    Q.  Mrs. Deane, other than your counsel, did

8 you discuss your anticipated testimony today with

9 anybody?

10    A.  No.

11    Q.  Can you tell me who your counsel is?

12    A.  Christopher -- I can't pronounce his last

13 name.  It's on the paper here.  Lefebvre.

14    MR. LEFEBVRE:  Close enough.

15    THE WITNESS:  Sorry.

16    A.  And some other law firm in Chicago,

17 Edelman, Combs, Latturner.

18    Q.  Let me hand you this document marked as

19 Exhibit 1.  Have you seen that before?

20    A.  Yes.

21    Q.  Do you understand what that document is?

22    A.  It tells me to come here for a

23 deposition.

24    MR. PASQUARELLO:  For the record,

**Wilgoren-Deane, Irene - 01/14/2005          Page 13**

---

00014
1 Exhibit 1 is a revised notice of deposition for

2 Mrs. Deane.  We have changed the start time from

3 later this afternoon to this morning.

4    Q.  Mrs. Deane, did you speak with anyone

5 from Edelman, Combs, Latturner & Goodwin to prepare

6 for this deposition?

7    A.  Not to prepare.  But I've spoken to, I

8 believe, Heather Piccirilli and a woman named

9 Melissa.

10    Q.  But not related to preparing for the

11 deposition?

12    A.  No.

13    Q.  Now, can you tell me how it is that you

14 came to hire your present attorney?

15    A.  I received a flier in the mail

16 mentioning, I believe it was something about if you

17 have been overcharged on closing costs or if you

18 have problems with a mortgage with First Horizon.

19 I called the attorney.

20    Q.  Do you remember when you received the

21 advertisement?

22    A.  I want to say January of '03.  I'm not

23 exactly sure of the date.  I know it wasn't long

24 after I had just done the closing.

**Wilgoren-Deane, Irene - 01/14/2005          Page 14**

---

00015
1    Q.  Between the time you closed your loan and

2 the time you received the advertisement, had you

3 had any problems with your loan?

4    A.  No.

5    Q.  Had you had any problems with First

6 Horizon during that time period?

7    A.  No.

8    Q.  I want to backtrack on the background

9 question.  Are you still receiving Social Security

10 disability income?

11    A.  Correct.

12    Q.  Do you still suffer from bipolar

13 disorder?

14    A.  Yes, I do.

15    Q.  With regard to your residential history,

16 can you tell me what your address is?

17    A.  51 Darby Road, Brockton, Mass.

18    Q.  How long have you lived there?

19    A.  Six years.

20    Q.  Who lives there with you?

21    A.  My husband Glen, my three children, and

22 my parents.

23    Q.  Can you tell me where you lived before

24 Darby Road?

**Wilgoren-Deane, Irene - 01/14/2005          Page 15**

---

00016
1    A.  106 Oak Lane, Brockton.

2    Q.  How long did you live there?

3    A.  There I believe we lived for two years,

4 approximately.  That's about it.

5    Q.  Before that?

6    A.  10 and 12 Bows Lane.  There was one other

7 place in between there.  Harvey Street in Brockton.

8 I don't remember the number.

9    Q.  Are all of these addresses in Brockton?

10    A.  No.  Bows Lane is in Avon.

11    Q.  Massachusetts?

12    A.  Correct.  Before Bows Lane I lived on

13 Elsie Road in Brockton, E.L.S.I.E.  It was 145

14 Elsie Road.

15    Q.  Was that also a family residence?

16    A.  That's where I was born.

17    Q.  Now, you own the home on Darby Road.

18 Have you owned any of these other properties?

19    A.  No.

20    Q.  At Oak Lane, did you rent that property?

21    A.  My parents owned it and we paid them a

22 mortgage, so to speak.  It was a parental thing.

23    Q.  Were you living with your husband at Oak

24 Lane?

**Wilgoren-Deane, Irene - 01/14/2005          Page 16**

00017

1    A.    Correct.  He wasn't my husband for most
2    of the time.
3    Q.    You said that you bought your house about
4    six years ago.  Do you remember when?
5    A.    November; this past November was six
6    years.  So it was '98.
7    Q.    Just to confirm, that's the first piece
8    of real property that you've owned?
9    A.    Correct.
10    Q.    Was it also the first piece of property
11    that your husband owned?
12    A.    Yes.
13    Q.    How much did you pay for the house when
14    you bought it?
15    A.    115, around there.
16    Q.    Did you take a mortgage?
17    A.    Yes, we did.
18    Q.    With whom?
19    A.    Chase Manhattan.
20    Q.    Do you remember what kind of mortgage it
21    was?
22    A.    A VA mortgage.
23    Q.    Do you remember anything about the
24    interest rate or the term on the mortgage?

00018

1    A.    The interest was in the 7s, I believe, or
2    8s.  The term was 30-year.
3    Q.    Was it a fixed or adjustable?
4    A.    Fixed.
5    Q.    Did you go to the closing for that
6    transaction?
7    A.    Yes, I did.
8    Q.    Were you represented by an attorney?
9    A.    I believe the attorney was for the
10    mortgage company.
11    Q.    You didn't have your own attorney?
12    A.    No.
13    Q.    Do you recall how long the closing took?
14    A.    Maybe an hour.
15    Q.    Can you tell me what happened at the
16    closing?
17    A.    We signed a bunch of documents.  They
18    handed a check to the Jacksons.  The real estate
19    agents, both of them were there.  We didn't get the
20    keys right away, because we were waiting to occupy.
21    I knew that they had to send some documents to file
22    right away.  We were getting money back at the
23    closing.  I remember that.
24    Q.    Were the Jacksons the people selling the

00019

1    house?
2    A.    Yes.
3    MR. LEFEBVRE:  Objection as to form.
4    Leading questions I'll object to for form purposes.
5    MR. PASQUARELLO:  It is technically a
6    cross.
7    MR. LEFEBVRE:  I know.
8    Q.    You mentioned real estate agents.  Did
9    you have your own real estate agent in the
10    transaction?
11    A.    Yes.
12    Q.    Did you ask any questions during the
13    closing?
14    A.    I don't remember exactly.  I might have.
15    Q.    But you don't remember what the question
16    was?
17    A.    No.
18    Q.    What about your spouse?
19    A.    No.  I handled everything.
20    Q.    Do you remember any particular documents
21    that you signed at that closing?
22    A.    I remember the price page on the money,
23    who is paying for what.  There was a lot of
24    documents.  I don't remember everything.

00020

1    Q.    Did you read any of the documents before
2    you signed them?
3    A.    Probably not.
4    Q.    Do you recall if you received any
5    documents that you had to sign before you actually
6    went to the transaction?
7    A.    I don't recall it.
8    Q.    Mrs. Deane, do you know what a right of
9    rescission is?
10    A.    Yes.
11    Q.    Can you tell me what that is?
12    A.    There's a time period where you can
13    choose to rescind -- ask to forget about the loan
14    and stop it.  I think it's a three-day period.
15    Q.    So do you understand that basically is a
16    right to cancel?
17    A.    Correct.
18    Q.    Do you know if you had a right to cancel
19    the loan you took out when you bought your house?
20    A.    I believe so.  It was probably one of the
21    documents.
22    Q.    And why do you believe that?
23    A.    Because I have the understanding that it
24    is always in the documents.

00021

1    Q.  That you always have a right to cancel?

2    A.  Right.

3    Q.  Tell me again what your understanding is

4  for how long that period applies.

5    A.  I believe it was two or three business

6  days.  I remember there were a certain amount of

7  days.  I don't remember exactly what it was.  I

8  remember it being business days.

9    Q.  Now, am I correct that you think you

10  always have that period, the same period, when you

11  have a right to cancel?

12    A.  That's what I believe, yes.

13    Q.  Did you want to cancel that transaction,

14  the loan, when you bought your house?

15    A.  The one with Chase Manhattan?

16    Q.  Yes.

17    A.  No, I did not.

18    Q.  Did you ever try to cancel it?

19    A.  No.

20    Q.  Do you remember if you received a notice

21  of your right to cancel that transaction?

22    A.  No.  I don't remember.

23    Q.  Other than the refinance that is at issue

24  in this case, have you ever refinanced before?

00022

1    A.  Yes.

2    Q.  How many times have you refinanced?

3    A.  Not including the first Chase, I

4  refinanced one time, I believe, to Wells Fargo, and

5  then the First Horizon.

6    Q.  So two refinances?

7    A.  Right.  But I've also had a second

8  mortgage and an equity loan.

9    Q.  Let's try to take those one at a time.

10  The refinance with Wells Fargo, was that the first

11  refinance transaction?

12    A.  Yes.

13    Q.  These are all on the Darby Road home?

14    A.  Correct.

15    Q.  Do you remember when the Wells Fargo

16  transaction was?

17    A.  I want to say approximately two years or

18  one year.  One or two years after we bought the

19  house, maybe longer.  I had Chase for a while.  I'm

20  not sure.

21    Q.  What was the reason for the refinance?

22    A.  Better rate.

23    Q.  Any other reason?

24    A.  I might have consolidated some debt.

00023

1    Q.  Do you remember what the rate was?

2    A.  In the 7s.

3    Q.  And this is with Wells Fargo?

4    A.  I believe so, yes.

5    Q.  Do you know what the refinance amount

6  was -- I'm sorry -- what the loan amount was when

7  you refinanced?

8    A.  No, I don't remember.

9    Q.  And then after Wells Fargo you then

10  refinanced with First Horizon?

11    A.  Correct.

12    Q.  No other refinances other than that?

13    A.  No.

14    Q.  For the Wells Fargo refinance, did you go

15  to the closing for that transaction?

16    A.  Yes.

17    Q.  Did you ask any questions?

18    A.  I don't remember.

19    Q.  Did your spouse ask any questions?

20    A.  No.

21    Q.  Let me ask you this blanket question,

22  since you brought this up earlier that you usually

23  handle these issues.  Has your spouse asked

24  questions at any of these transactions?

00024

1    A.  No.  He always refers everything to me.

2    Q.  Did you sign documents in that

3  transaction?

4    A.  Yes.

5    Q.  Did you read any of the documents before

6  you signed them?

7    A.  I scanned them, but I don't think I read

8  them.

9    Q.  Were you represented by an attorney at

10  the transaction?

11    A.  No, I was not.

12    Q.  Did anybody explain to you what the

13  documents were at the transaction?

14    A.  I believe so.

15    Q.  Do you know -- first, who was there?

16    A.  The mortgage broker that we went through,

17  and the lawyer for the bank.

18    Q.  Who was it that explained what the

19  documents were?

20    A.  It must have been the lawyer, I believe.

21  It could have been both, I mean, the mortgage guy

22  and him.

23    Q.  Did you have a right to cancel that loan?

24    A.  I believe so.

00025
1    Q.  Do you know if you received a notice of a
2  right to cancel that loan?
3    A.  I believe so.
4    Q.  Do you still have all the documents from
5  that loan?
6    A.  I'm not sure.  Some things of that I
7  can't find them.  I've been looking.
8    Q.  You did look for documents from that
9  loan?
10    A.  Yes.
11    Q.  Then you did provide whatever you could
12  find to your attorneys?
13    A.  Yes.
14        MR. PASQUARELLO:  Off the record.
15        (Discussion off the record.)
16    Q.  Mrs. Deane, we were just discussing this
17  off the record, but if there are other documents
18  that might exist that you don't have, you don't
19  have a problem signing a release for those
20  documents?
21    A.  Not at all.
22    Q.  Thank you.  You mentioned earlier a
23  second mortgage and an equity loan.  Which came
24  first?

00026
1    A.  The Household Finance second, I believe
2  was with the Wells Fargo.  I'm sorry, it was with
3  the Chase.  I got it before the Chase because Wells
4  Fargo paid it off, I believe.
5    Q.  Do you recall when that second mortgage
6  was?
7    A.  No.
8    Q.  How much was it for?
9    A.  I want to say 30,000.  I'm not sure of
10  the amount.
11    Q.  Do you remember what the proceeds were
12  used for?
13    A.  Yeah, to pay off debt.
14    Q.  Did you understand that your house was
15  collateral for that loan?
16    A.  Correct.
17    Q.  Was there a closing transaction for that?
18    A.  We met in the office.  I believe so.  I
19  guess.
20    Q.  Again, did you have an attorney?
21    A.  No.
22    Q.  Who was present?
23    A.  The lady from Household Finance and me
24  and my husband.

00027
1    Q.  Did you read any of the documents before
2  you signed them?
3    A.  No.
4    Q.  Did you think you had a right to cancel
5  that loan?
6    A.  I don't remember.  I assume.
7    Q.  Do you remember if you received a notice
8  regarding a right to cancel that loan?
9    A.  I don't remember.
10    Q.  Did you look for any documents from that
11  loan?
12    A.  Yes.  I looked for all documents.
13    Q.  Could you find any?
14    A.  If I did, I gave all my documents to my
15  lawyers.
16    Q.  The same question about a release?
17    A.  No problem.
18    Q.  I just want to be clear.  Is the bank
19  called Household Finance?
20    A.  It is a finance corporation.
21    Q.  But it was before you originally
22  refinanced your loan?
23    A.  Yes.
24    Q.  You think the Wells Fargo paid this off?

00028
1    A.  Yes.
2    Q.  When did you take the equity loan out?
3    A.  Just recently.
4    Q.  With whom did you take the equity loan?
5    A.  Fleet, which is now Bank of America.
6    Q.  And when was that?
7    A.  May of '03, I'm sorry, May of '04.
8    Q.  Did you go to a closing transaction?
9    A.  Yes.
10    Q.  Again, who attended?
11    A.  The bank person, my husband and I.
12    Q.  Where was this transaction?
13    A.  The local Fleet branch on Crescent Street
14  in Brockton.
15    Q.  How much was the equity loan for?
16    A.  46 one.
17    Q.  What was the reason for that loan?
18    A.  Remodeling my kitchen.
19    Q.  Home improvement?
20    A.  Yes.
21    Q.  Do you know what the rate is on that
22  loan?
23    A.  It is variable in the 3s.
24    Q.  You say it is variable.

00029
1   A.  3 point something right now.  I think it
2  is 5.
3   Q.  That's the rate?
4   A.  Yes.
5   Q.  Do you know how it varies?
6   A.  .5 minus prime.
7   Q.  What is the term on that, if you know?
8   A.  I believe it is 15.
9   Q.  15 years?
10   A.  Mm-hmm.
11   Q.  Did you read any documents before you
12  signed them?
13   A.  Probably.
14      (Telephone rings.)
15      (Pause.)
16      MR. PASQUARELLO:  Mr. McKenna,
17  another plaintiff in the case, has just arrived.
18  We'll take a break so Mr. Lefebvre can meet with
19  him.
20      MR. LEFEBVRE:  That's fine.
21      (A recess was taken.).
22   Q.  Mrs. Deane, I just want to remind you
23  that you are still under oath.  We were talking
24  about the equity loan with Fleet.  Do you still

00030
1  have that loan?
2   A.  Yes.
3   Q.  I may have asked you this before, but
4  since we just had the break, were you represented
5  by an attorney at the closing?
6   A.  No, I was not.
7   Q.  Did you read through any of the documents
8  before you signed them?
9   A.  Probably.
10   Q.  Did you understand that you had a right
11  to cancel that loan or not?
12   A.  I had a right to cancel.
13   Q.  Is it the same right that you described
14  to me earlier?
15   A.  Yeah, I believe so.
16   Q.  For all of these loans that we just
17  discussed, the Wells Fargo refinance, the second
18  mortgage, and the equity loan, did you ever try to
19  cancel any of those loans?
20   A.  No, I did not.
21   Q.  Did you ever want to cancel any of those
22  loans?
23   A.  No.
24   Q.  Did you ever have a problem with any of

00031
1  the companies servicing those loans?
2   A.  Household Finance I found out later,
3  through a class action, I guess, that they had
4  overcharged us fees.
5   Q.  Did you receive any money back from that
6  class action?
7   A.  Yes.
8   Q.  Did you participate in any way in that
9  transaction?
10   A.  No.  I just got a notice and a check.
11   Q.  Do you remember what sort of fees were
12  overcharged?
13   A.  No.
14   Q.  Do you remember what the check was for?
15   A.  1500.
16   Q.  $1500?
17   A.  12 to 1500.  I'm not sure exactly.  I
18  couldn't tell you the exact amount.
19   Q.  When was this that you received the
20  check?
21   A.  Way after I refinanced and got rid of it.
22  Probably a year before I did the First Horizon.
23   Q.  So when you say the refinancing, you mean
24  after you refinanced with Wells Fargo?

00032
1   A.  Correct.  It was in between there.
2   Q.  Did you participate as a plaintiff in any
3  way in that lawsuit?
4   A.  No.
5   Q.  Did you ever offer any testimony
6  regarding that lawsuit?
7   A.  No.
8   Q.  At the closing for the Fleet equity loan,
9  did anybody explain to you what the documents were?
10   A.  She went over them, yeah.
11   Q.  Did you understand what the documents
12  were before you signed them?
13   A.  Yes.
14   Q.  I believe you told me this already.  Is
15  it correct that you do not own any other real
16  property than your current house?
17   A.  Me?
18   Q.  You personally.
19   A.  No, I do not.
20   Q.  Other than your house and the rental
21  property that you described earlier that your
22  husband bought with his mother, does your husband
23  own any other real property?
24   A.  He's on the deed of his mother's

00033
1  condominium.
2      Q.  Do you know the address for the
3  condominium?
4      A.  402 Regency Lane.
5      Q.  Is that in Brockton?
6      A.  Abington, Mass.
7      Q.  How long has he been on the deed, if you
8  know?
9      A.  Maybe six months.
10     Q.  Has he been on the deed since the
11 purchase of the condominium?
12     A.  No.  The purchase was December 2 of '03.
13 It took us approximately six months to get the
14 lawyer and redo and add him to the deed.
15     Q.  Did your husband attend the closing
16 transaction?
17     A.  No, he did not.
18     Q.  Do you know if he reviewed any of the
19 documents from the closing transaction?
20     A.  He did not.
21     Q.  Have you?
22     A.  Yes.
23     Q.  What documents did you review from the
24 closing?

00034
1      A.  I was at the closing.  I looked over
2  everything before my mother-in-law signed it.
3      Q.  Did you explain what the documents were
4  to your mother-in-law?
5      A.  Briefly.  Just that I was familiar with
6  them.
7      Q.  Did you read through the documents before
8  you explained them?
9      A.  I had a brief knowledge of what they
10 were.
11     Q.  Did your mother-in-law have a right to
12 cancel that transaction?
13     A.  Yes.
14     Q.  Did you explain that to her?
15     A.  Yes.
16     Q.  How did you explain that to her?
17     A.  That if she found anything wrong with the
18 documents after reading them or if she wanted to
19 change her mind, that she had the opportunity to
20 cancel that within a certain time by midnight,
21 whatever the date was.
22     Q.  Do you remember what the cancellation
23 period was?
24     A.  No, I do not.

00035
1      Q.  Do you know if it was different or the
2  same from cancellation periods that you have had in
3  other transactions?
4      A.  It seemed the same.  I can't for sure say
5  without looking at the document.
6      Q.  When you explained that she had a right
7  to cancel, what was your understanding of what
8  would happen if she cancelled?
9      A.  She would have to find another loan and
10 she wouldn't get the property.
11     Q.  So is it correct that your understanding
12 that everything about the transaction would be
13 cancelled?
14     A.  Correct.
15     Q.  Is that what you explained to her?
16     A.  Yes.
17     Q.  How is your mother-in-law's health?
18     A.  Very good.
19     Q.  How is her mental health?
20     A.  Fine.
21     Q.  How old is she?
22     A.  63.
23     Q.  Had she purchased real estate before?
24     A.  Many years ago.

00036
1      Q.  Other than this closing transaction for
2  your mother-in-law's condominium and the closing
3  transactions for your personal loans that we walked
4  through, have you attended any other real estate
5  closing transactions?
6      A.  No.
7      Q.  Am I right that you didn't have an
8  attorney or your mother-in-law didn't have an
9  attorney at that closing?
10     A.  No, the attorney for the bank was there.
11     Q.  Did the bank attorney also explain what
12 the documents were?
13     A.  Yes.
14     Q.  Did your mother-in-law try to cancel that
15 loan?
16     A.  No.
17     Q.  Do you know what bank the loan was with?
18     A.  Yes, Brockton Credit Union.
19     Q.  Mrs. Deane, can you tell me generally
20 what your understanding is of what happens at a
21 refinancing transaction?
22     A.  The bank doing the refinancing has the
23 payoff amount for your old bank plus any extra
24 money going to pay off debt or whatever, or a check

00037
1  back to the person. You're changing the loan note
2  from that bank to the new bank.
3      Q.  All right. Other than your current
4  mortgage that is at issue in this lawsuit, have you
5  ever tried to cancel a loan transaction?
6      A.  No.
7      Q.  Some questions about your household
8  management. Who handles the finances?
9      A.  I do.
10     Q.  Do you pay the bills?
11     A.  Yes, I do.
12     Q.  Do you pay the mortgage?
13     A.  Yes, I do.
14     Q.  How do you pay the mortgage?
15     A.  Online banking with my bank.
16     Q.  Is that how you've always paid your
17  mortgage?
18     A.  Probably the last couple of years.
19  Before that I would write a check.
20     Q.  For the First Horizon mortgage has it
21  always been through online banking?
22     A.  Always.
23     Q.  Who opens the mail at home?
24     A.  I do.

00038
1      Q.  Do you handle communications with
2  creditors?
3      A.  Yes.
4      Q.  Does that include First Horizon?
5      A.  Yes.
6      Q.  Have you had any communications with
7  First Horizon?
8      A.  They just called asking me to refinance
9  offering me more services, and I say no, good-bye.
10     Q.  Just marketing solicitation?
11     A.  Yeah.
12     Q.  Before you refinanced with First Horizon,
13  do you remember what your monthly payment was? I
14  suppose that would be to Wells Fargo?
15     A.  I believe it was 14-something, but that's
16  with escrow and all the other stuff. I think it
17  was 14. Approximately a $200 difference.
18     Q.  How did you make your payment to Wells
19  Fargo?
20     A.  Online. I believe I was doing it online
21  or by check.
22     Q.  Which bank do you do the online banking
23  with?
24     A.  Brockton Credit Union.

00039
1      Q.  Did you ever fall behind in your mortgage
2  payments?
3      A.  Never.
4      Q.  Is that for all of your mortgages?
5      A.  Correct.
6      Q.  For your second mortgage with Household,
7  did you ever fall behind on any of those payments?
8      A.  No.
9      Q.  How did you make those payments?
10     A.  By check.
11     Q.  Do you remember what the rate was on that
12  second mortgage?
13     A.  It was pretty high. I want to say 10,
14  11. It might have even been more.
15     Q.  You told me earlier that you paid that
16  off when you refinanced with Wells Fargo?
17     A.  Correct.
18     Q.  Mrs. Deane, have you ever filed for
19  bankruptcy?
20     A.  No, I have not.
21     Q.  Has your husband?
22     A.  No.
23     Q.  Now, with regard to your refinance with
24  First Horizon, who decided to refinance?

00040
1      A.  I did.
2      Q.  Was your husband involved?
3      A.  He agreed to sign papers and go with my
4  opinion.
5      Q.  When was that that you made that
6  decision?
7      A.  I believe it was November of '02 maybe.
8  No, '03. It couldn't have been -- I was pregnant.
9  It was in November of '03, I believe.
10     Q.  Around the time that you actually
11  refinanced with First Horizon?
12     A.  Yeah.
13         MR. PASQUARELLO: We can agree that
14  it was November of 2003? It is in the documents.
15         MR. LEFEBVRE: I think the documents
16  will speak for themselves.
17     Q.  Why did you want to refinance at that
18  time?
19     A.  A better rate, consolidated some debt.
20     Q.  What sort of debt were you consolidating?
21     A.  Paid off our pool, cars, I think one of
22  our cars, my husband's car. Various credit cards.
23     Q.  You said it was a better rate. Do you
24  know what the difference was in the rate that you

00041
```
 1  were getting?
 2     A.  I want to say a half a point, if not
 3  more.
 4     Q.  Is that an important factor to you?
 5     A.  Yeah.
 6     Q.  Let me just make the question more clear.
 7  Is getting a better rate an important factor in
 8  deciding whether or not you want to refinance?
 9     A.  Yes.
10     Q.  How would you rank that factor against
11  other factors in deciding to refinance?
12     A.  It's the most important.
13     Q.  That's the most important factor?
14     A.  I would think so.
15     Q.  Did you end up with a lower payment after
16  you refinanced?
17     A.  No.
18     Q.  Did you have a higher payment because you
19  were consolidating debt?
20     A.  Correct.
21     Q.  Do you know what your new payment is?
22     A.  Mm-hmm.
23     Q.  What is it?
24     A.  1695.94.
```

00042
```
 1     Q.  Just to step back to the Wells Fargo
 2  loan, was that a fixed or adjustable rate?
 3     A.  Fixed.
 4     Q.  Can you tell me what the rate was?
 5     A.  6 nine, it was high.  Maybe 7.  Somewhere
 6  around there.
 7     Q.  What's your rate with First Horizon?
 8     A.  6 even.
 9     Q.  Do you remember what the principal
10  balance on your Wells Fargo loan was which you
11  refinanced?
12     A.  No.
13     Q.  Can you tell me how long you had the
14  Wells Fargo loan when you refinanced?
15     A.  I want to say over a year or two.
16     Q.  How is it that you chose First Horizon?
17     A.  Complete Mortgage, John Cecciline called,
18  solicited.  I was putting applications in for
19  refinancing with a few people.  He seemed to come
20  up with the best rate.  I went with him.
21     Q.  So you contacted First Horizon through
22  another company?
23     A.  Correct.
24     Q.  Do you know where Complete Mortgage was
```

00043
```
 1  located?
 2     A.  Rhode Island.
 3     Q.  Did you meet with somebody from Complete
 4  Mortgage?
 5     A.  Never.  Always on the phone.
 6     Q.  Did you ever meet with anybody from First
 7  Horizon?
 8     A.  No.
 9     Q.  Did you ever speak with anybody from
10  First Horizon before the loan closed?
11     A.  I talked to a lawyer.  No.  The lawyer's
12  office was the only other person that I spoke to.
13     Q.  Do you remember when it was that you
14  applied to refinance?
15     A.  Maybe a month or two prior to closing.
16     Q.  Do you know how much you applied to
17  borrow?
18     A.  I think it was 240.  I know I went for
19  the max equity loan.
20     Q.  What do you mean by max equity?
21     A.  The appraisal compared to the max equity
22  in paying off my house and getting cash back.
23     Q.  Do you know what the appraisal value was?
24     A.  3-something, I believe.
```

00044
```
 1     Q.  Do you know what the limit is for the
 2  maximum?
 3     A.  80 percent.
 4     Q.  That's what you wanted to take out?
 5     A.  Yes.
 6     Q.  During the application process do you
 7  remember receiving any disclosures about your loan?
 8     A.  I got a lot of papers.
 9     Q.  Did you read any of those papers?
10     A.  Some of them.
11     Q.  Did you read anything about a right to
12  cancel your loan?
13     A.  Probably.
14     Q.  When did you get approved for the loan?
15     A.  Two weeks prior, maybe, three weeks prior
16  to the closing.  I had a preapproval almost right
17  away.
18     Q.  You told me a minute ago that the rate is
19  6 even.  What is the term on the loan?
20     A.  30 years.
21     Q.  Is it a fixed rate?
22     A.  Yes.
23     Q.  About how much money did you get out on
24  top of your loan payoff amount?
```

00045
1    A.   Do you mean cash or do you mean debt?

2    Q.   Both.  Let me break it down this way.

3  Did you receive cash back at the closing?

4    A.   Yes.

5    Q.   How much, approximately?

6    A.   I believe it was about 5,000.  I'm not

7  sure.  There were a lot of figures there.

8    Q.   How much debt did you consolidate?

9    A.   A lot.

10       MR. PASQUARELLO:  Let me mark this as

11  Exhibit 2.

12       (Marked, Exhibit 2.)

13    Q.   Mrs. Deane, I'm handing to you what has

14  been marked as Exhibit 2.  It is Bates labeled FH

15  416.  Do you recognize this document?

16    A.   Yes, I do.

17    Q.   Do you know what the document is?

18    A.   The settlement charges.

19    Q.   Do you recognize this as the HUD 1

20  settlement statement from your loan?

21    A.   Correct.

22    Q.   If I could direct your attention to the

23  right side of the document, Line 1501, there's an

24  amount there for a payoff to Wells Fargo?

Wilgoren-Deane, Irene – 01/14/2005        Page 45

---

00046
1    A.   Mm-hmm.

2    Q.   Is that the correct amount, the 186,

3  approximately?

4    A.   It must be.  I signed the document.

5    Q.   Okay.  The payoff to Ford credit on the

6  line below, is that for your car?

7    A.   My husband's car.

8    Q.   Then a payoff to First USA Bank for about

9  $9,000?

10    A.   Correct.

11    Q.   What sort of debt was that?

12    A.   Credit card.

13    Q.   Two lines lower, also to First USA for

14  $7,000?

15    A.   Correct.

16    Q.   In between a payment to Orifex?

17    A.   That's the pool.

18    Q.   A payment for the swimming pool.

19    A.   Yes.

20    Q.   On the payoffs for the credit card, were

21  there any business expenses on either of those

22  cards?

23    A.   No.

24    Q.   Those were all personal charges?

Wilgoren-Deane, Irene – 01/14/2005        Page 46

---

00047
1    A.   Yes.

2    Q.   At the bottom of the document, Line 1604

3  it looks like cashout of $5,000?

4    A.   Correct.

5    Q.   Is that your husband's signature and your

6  signature?

7    A.   Yes, it is.

8    Q.   And the date on the document is November

9  24, 2003?

10    A.   Yeah.

11    Q.   The document is also signed by someone

12  named Elliot Cohen?

13    A.   Yes.

14    Q.   Do you know who Mr. Cohen is?

15    A.   The lawyer for the bank, I believe.

16    Q.   Was he at the closing?

17    A.   Yes, he was.

18    Q.   Was anybody else at the closing?

19    A.   No.  My children running in and out,

20  maybe.

21    Q.   Where was the closing?

22    A.   My home.

23    Q.   In Brockton?

24    A.   Yes.

Wilgoren-Deane, Irene – 01/14/2005        Page 47

---

00048
1    Q.   Was it you and your husband and

2  Mr. Cohen?

3    A.   Correct.

4    Q.   Your children might have been running

5  about the house at the time.  Anybody else there?

6    A.   No.

7    Q.   You mentioned that your parents live with

8  you?

9    A.   Yes.

10    Q.   Were they present during the closing?

11    A.   No, they were not present, but they were

12  probably in the house.

13    Q.   Were you seated around a table at the

14  closing?

15    A.   Yes.

16    Q.   So was it just the three of you during

17  the closing procedure?

18    A.   Yes.

19    Q.   Were your parents anywhere where they

20  could hear what was happening at the closing?

21    A.   No.

22    Q.   Just try to let me finish the questions

23  before you answer them.

24       What time of day was the closing?

Wilgoren-Deane, Irene – 01/14/2005        Page 48

00049
1   A.  Early evening.
2   Q.  Was it after your husband finished work?
3   A.  Correct.
4   Q.  So he didn't have to take off any time.
5   A.  No.
6   Q.  How long did the closing take?
7   A.  Half an hour.
8   Q.  Had you met Mr. Cohen before?
9   A.  No.
10  Q.  Had you spoken to him before?
11  A.  No.  I'm sorry, on his way there, for
12  directions.
13  Q.  Was that the only time?
14  A.  Yes.
15  Q.  There was no one there from First Horizon
16  or Complete Mortgage; is that right?
17  A.  No.
18  Q.  No, there was no one there?
19  A.  No, there was no one there.
20  Q.  Thanks.  Did you receive any of the
21  documents before the closing?
22  A.  Yes.  There were a couple of sets.  There
23  was confusion on what was getting paid off and what
24  wasn't.  The office had different ones than I did

00050
1   not want paid off.  There was confusion on what was
2   being paid.
3   Q.  When you say sets of documents, do you
4   mean that you received a set of all of the
5   documents for the closing?
6   A.  I don't know if it was all of them.  I
7   know it was a good amount of documents.
8   Q.  Let me show you the amended complaint.
9   I'm not going to mark this as an exhibit.  In the
10  amended complaint, just showing your counsel here,
11  Pages 5 and 6, in the section relating to the Deane
12  plaintiffs, there are references to Exhibits E
13  through H.  I want to show you Exhibits E through
14  H.
15      MR. LEFEBVRE:  There's no H.  It goes
16  G and then I.  I have it here.
17      MR. PASQUARELLO:  That looks right.
18  Q.  Take a look at H.
19  A.  A look.
20  Q.  Those documents that you just looked at
21  are a note, a mortgage, a truth in lending
22  disclosure statement and a notice of right to
23  cancel.
24      Do you recall if you received those

00051
1   four documents before the closing in the set that
2   you received?
3   A.  I don't know if it was in the set.  I
4   know that I saw them the day of closing for sure.
5   I mean, there were a lot of papers that went
6   through my hands.
7   Q.  So you don't recall whether or not you
8   got those documents before the closing.
9   A.  No.
10  Q.  Mrs. Deane, how did the closing begin?
11  A.  There was a lot of conflict about the
12  money that Complete Mortgage was getting.  I even
13  stopped the closing at one point and called John
14  Cecciline.
15  Q.  Could you spell his name for us?
16  A.  I do not know how.
17      (Discussion off the record.)
18  A.  I was not happy with this man.
19  Q.  What did you call Mr. Cecciline about?
20  A.  Trying to find the exact amount here, it
21  was an extra $900, a loan origination fee.
22  Q.  On Exhibit 2?
23  A.  Correct.  That was supposed to be $1,000.
24  The extra processing fee of 250, he charged extra

00052
1   money for their mistakes.  From the time I applied
2   for the mortgage I gave him these five things to
3   pay off.  They kept switching them to different
4   creditors.  I kept explaining to them that I didn't
5   want the other creditors paid off.  I wanted these
6   specific ones, because they were the higher
7   interest.  They kept trying to tell me that didn't
8   matter.  I was still getting the same amount of
9   money.  I said no, it does matter.  These were the
10  ones that I wanted.  They said they were going to
11  redo the pact a couple of times and he was going to
12  charge me extra for the rewriting fees.  I told him
13  that was not my fault.  If you changed it that's
14  your problem.  He said there wasn't going to be a
15  problem.  When we sat down to do the closing they
16  were on here.  He promised me he would give me the
17  money back after closing.
18  Q.  This is Mr. Cecciline?
19  A.  Correct.
20  Q.  When did he make the promise?
21  A.  On the phone while the lawyer was right
22  there.  No, he did not give me the money.  Sorry.
23  Q.  That wasn't my question.  The lawyer was
24  Mr. Cohen?

00053
1   A.  Yes.
2   Q.  Did Mr. Cohen hear the conversation?
3   A.  Correct.
4   Q.  Was he on the speakerphone?
5   A.  No.  He heard my side.
6   Q.  He heard half of the conversation?
7   A.  Correct.
8   Q.  He couldn't hear what Mr. Ceccilino was
9 saying?
10   A.  Correct.
11   Q.  Did Mr. Ceccilino work for Complete
12 Mortgage?
13   A.  Yes.
14   Q.  That's who you were speaking with?
15   A.  Yes.
16   Q.  You mentioned a minute ago that the loan
17 origination fee was supposed to be $1,000?
18   A.  Correct.
19   Q.  How did you come to that conclusion?
20   A.  It was in the predocuments.  The
21 estimate, the good-faith estimate.
22   Q.  You reviewed that before the closing?
23   A.  Yes.
24   Q.  And you also mentioned something about,

00054
1 was it the processing fee?
2   A.  Yes.  There was an extra processing fee
3 to Complete Mortgage, 250, 30?  the line number is.
4   Q.  Did that also vary from the number on the
5 good-faith estimate?
6   A.  Yes, it wasn't there, I believe.
7   Q.  So it was a new item?
8   A.  Right.
9   Q.  So you noticed these two items when you
10 got the document in closing?
11   A.  Correct.
12   Q.  Did you go ahead and pay these items?
13   A.  Yes, I did.
14   Q.  And you were not reimbursed later; is
15 that right?
16   A.  No, I was not.
17   Q.  All right.  Did Mr. Cohen say anything
18 about this at the closing?
19   A.  Not really.  I think he just kind of sat
20 back.  He did talk to John after me.
21   Q.  Did he say anything after he spoke to
22 Mr. Ceccilino?
23   A.  Just going over the documents, that I
24 recall.  I don't remember anything else being said.

00055
1   Q.  How long did this conversation take?
2   A.  Five minutes, not even.
3   Q.  Was this at the beginning, the end, the
4 middle of the closing?  When did this happen?
5   A.  As soon as he showed me this paper.  I
6 want to say at the beginning.
7   Q.  So when you received the settlement
8 statement, you reviewed it?
9   A.  Correct.
10   Q.  Did you review the other papers that you
11 received?
12   A.  I went over them.
13   Q.  Would you say that you reviewed them all
14 in the same manner?
15   A.  Yeah.
16   Q.  Did Mr. Cohen explain to you what the
17 documents were at the closing?
18   A.  Yes.
19   Q.  Did he do that for all the documents?
20   A.  I believe so.
21   Q.  Did he give you any instructions about
22 the documents?
23   A.  Explain instructions.  Where to sign?
24 Where to sign and what they were, yeah.

00056
1   Q.  Other than your phone call to
2 Mr. Ceccilino, did you ask any questions during the
3 closing?
4   A.  No.
5   Q.  Did you have questions about any other
6 documents?
7   A.  I think I asked what the application was
8 doing there or something.  I didn't realize that it
9 had to be part of the closing.  The application was
10 there.  I was like, what's this?
11   Q.  Was your husband aware of the differences
12 between the documents that you were describing to
13 me a minute ago?
14   A.  He knew that I had been back and forth on
15 the phone arguing saying you've got to pay off the
16 original ones that I told you and that some of the
17 documents we got before were different from what we
18 are seeing here, yes.
19   Q.  Did he know that based on you telling
20 him?
21   A.  Yes.
22   Q.  He didn't know that based on reviewing
23 the documents.
24   A.  No.

00057

1    Q.   Were the creditors that were paid off the
2  correct creditors?
3    A.   Yes.
4    Q.   So that was corrected?
5    A.   Yes.
6    Q.   You mentioned the application.  We were
7  looking at the settlement statement.  Do you
8  remember receiving any other documents at the
9  closing?
10   A.   A lot.
11   Q.   The documents we just looked at as
12 exhibits to the amended complaint, do you remember
13 seeing all of those at the closing?
14   A.   Yes.
15   Q.   Do you remember signing them?
16   A.   Yes.  Or initialing.  Some of them were
17 just initials.
18   Q.   And did you understand what the documents
19 were when you received them?
20   A.   To the best of my ability, with the
21 wording.
22   Q.   Did your understanding also come from
23 what Mr. Cohen was saying?
24   A.   Yes.

00058

1    Q.   And from your reviewing of the documents?
2    A.   More from what he was saying to me.
3    Q.   Besides the settlement statement, the
4  application and the exhibits we looked at, do you
5  remember any other documents that you got at the
6  closing?
7    A.   Payment vouchers for the first few
8  payments.  I think there were envelopes.  I'm not
9  sure if the copy of the appraisal was there, but I
10 think it was.  Something to do with the appraisal.
11 A credit check.  That's really it.
12        (A recess was taken.)
13   Q.   We are back on the record.  You were
14 still under oath.
15        Did you understand at the closing
16 that there was a waiting period before you would
17 get the money?
18   A.   Correct, yes I did.
19   Q.   When did you receive the money?
20   A.   I know I got an overnight delivery.  What
21 day was that on?  A couple of days, two days, three
22 days.  I'm not sure of the exact days.
23   Q.   After the closing?
24   A.   Correct.

00059

1    Q.   Do you remember when your first payment
2  was due on the new loan?
3    A.   January 2004, I believe.
4    Q.   After the closing up until the time that
5  you filed suit, were you happy with the servicing
6  on the loan?
7    A.   I was not happy with John Cecchine and
8  the incidents that occurred with the underwriting.
9    Q.   Is that because of the confusion or the
10 conflict that you described during the closing?
11   A.   Yes.
12   Q.   Other than that, were there any problems
13 with the loan?
14   A.   No.
15   Q.   Mrs. Deane, when was it that you first
16 decided that you wanted to cancel the loan?
17   A.   After speaking to my attorney, after
18 hiring him.
19   Q.   So is it correct that before you hired
20 your attorney you had no desire to cancel the loan?
21   A.   Correct.
22   Q.   Do you know when you hired your attorney?
23   A.   I know it was a few months after the
24 closing.  I do not know exactly the date.

00060

1    Q.   You mentioned receiving a flier earlier
2  this morning.
3    A.   Correct.
4    Q.   I want to show you a document.  Could you
5  tell me if that's the flier that you received?
6    A.   Correct.  But there was also something
7  else I thought that said First Horizon on it.  It
8  might have been on the outside?  Was it folded?  I
9  remember seeing First Horizon.  I saw this and I
10 said, oh, my God, I have that bank.
11   Q.   So do you think there was another page?
12   A.   It might have been on the outside, like
13 on the bottom.  I'm not sure.  I remember seeing
14 the name First Horizon.
15   Q.   But do you remember seeing this?
16   A.   I remember this exactly, yes, I do.  It
17 might have been two papers together, but definitely
18 I got this.
19        MR. PASQUARELLO:  Why don't we mark
20 this as Exhibit 3.
21        (Marked, Exhibit 3.)
22        MR. PASQUARELLO:  For the record,
23 Exhibit 3 is a document entitled Legal
24 Advertisement, with a Bates label of ECL&G 6.

00061
1     Q.  Before you received this advertisement,
2  had you had any contact with Mr. Lefebvre's office?
3     A.  No.
4     Q.  After you received the advertisement, how
5  long did it take you to decide you wanted to cancel
6  the loan?
7     A.  I believe I decided on the phone when I
8  spoke to him.
9     Q.  During your first conversation?
10    A.  First or second.
11    Q.  Now, did you do anything to inform First
12  Horizon that you wanted to cancel or did your
13  attorney take care of it?
14    A.  No, I believe my attorney took care of it
15  from then on.
16    Q.  Do you know how he expressed your desire
17  to cancel?
18    A.  With a motion or something to the court.
19  I remember signing something.
20    Q.  You remember signing something to the
21  court?
22    A.  To file a claim, I believe, or to let
23  them know.  I believe it was a notice of intent or
24  something, maybe.

Wilgoren-Deane, Irene - 01/14/2005          Page 61

00062
1     Q.  Did you ever see any letters from your
2  counsel to First Horizon?
3     A.  I believe so.
4        MR. PASQUARELLO:  Can we mark this as
5  Exhibit 4.
6        (Marked, Exhibit 4.)
7     Q.  Mrs. Deane, I'm handing you what's been
8  marked as Exhibit 4.  It is Bates ECL&G 377.  Have
9  you seen that document before?
10    A.  Yes, I have.
11    Q.  The letter is dated March 15, 2004.  Did
12  you see the letter before it was sent?
13    A.  Yes.
14    Q.  Did you review the letter with your
15  attorney?
16    A.  Not with him.  I got a copy of it and
17  probably either by fax or he sent it to me.  I'm
18  not sure.
19    Q.  Did you receive that at the time that he
20  sent it or before he sent it?
21    A.  Before he sent it.
22    Q.  To First Horizon?
23    A.  Yes.
24    Q.  Did you review it before it was sent out?

Wilgoren-Deane, Irene - 01/14/2005          Page 62

00063
1     A.  Yes.
2     Q.  Did you have any changes or comments to
3  the letter?
4     A.  I'm not sure if I can answer.  The
5  conversation with him at this point, he was my
6  lawyer.  That's private, I guess.
7     Q.  I'll move on.  From reviewing the letter,
8  did you understand that First Horizon had some
9  period of time to respond to the letter?
10    A.  I don't see anything here that says time.
11  Yes, 20 days, yes.  Okay.
12    Q.  I understand you are reading the letter
13  now?
14    A.  Yes, I am.
15    Q.  Did you understand it at the time that
16  you reviewed it?
17    A.  Yes.
18    Q.  Had you already decided to file a lawsuit
19  when this letter was sent?
20    A.  I don't know if it was to file a lawsuit.
21  But the conversation --
22        MR. LEFEBVRE:  If it relates to
23  privilege.
24    A.  Privilege.

Wilgoren-Deane, Irene - 01/14/2005          Page 63

00064
1        MR. LEFEBVRE:  Privileged
2  conversations between --
3        MR. PASQUARELLO:  I don't think it is
4  a privileged communication at all.  It is whether
5  she decided.
6        MR. LEFEBVRE:  All right.
7        Whether you in your mind decided.
8     A.  I agreed to go forth with whatever he
9  thought was necessary.
10    Q.  Did the response from First Horizon
11  matter one way or the other as to whether you were
12  going to go forward with this lawsuit?
13    A.  I was relying on my lawyer.
14    Q.  Do you know when the amended complaint
15  was filed in this lawsuit?
16    A.  I probably have a document on it, but I
17  don't remember the exact dates, no.
18    Q.  Mrs. Deane, can you tell me what it is
19  that you think First Horizon did wrong in this
20  case?
21    A.  They were unclear often on the notice to
22  cancel, two paragraphs.  One paragraph said the
23  right to cancel the whole loan.  The other one said
24  something to the effect, going off the top of my

Wilgoren-Deane, Irene - 01/14/2005          Page 64

00065
1  head, just the amount, change the amount. It was
2  unclear as to what it was saying when it was
3  brought to my attention.
4     Q.  Have you told me everything that you
5  think First Horizon did wrong?
6     A.  Yeah, I guess.
7     Q.  When is it that you came to that
8  conclusion?
9     A.  When the paragraphs, we read them
10 together, my lawyer and I, and saw where it was
11 very unclear.
12    Q.  So this is based on a meeting or
13 conversations that you had with your lawyer?
14    A.  The first conversation with my lawyer.
15    Q.  Is it correct, then, that before you met
16 with your lawyer you weren't claiming that First
17 Horizon had done anything wrong?
18    A.  I wasn't sure. I was very uncomfortable
19 with the whole closing because of everything that
20 had gone on. So I did not know. I had a gut
21 something was wrong.
22    Q.  Let me ask you a question. When you say
23 everything that had gone on, can you tell me what
24 you're referring to?

Wilgoren-Deane, Irene - 01/14/2005          Page 65

00066
1     A.  To the closing. To me it felt like a
2  shady thing that was going on with the closing and
3  the money and everything. It felt very
4  uncomfortable. So it left a bad feeling with me.
5     Q.  Now, in particular, are you describing
6  your conversations with Mr. Ceccolino that day?
7     A.  And Mr. Cohen. Just his nonchalant to
8  kind of step back out of it.
9     Q.  Did all of this relate to the charges
10 that you were telling me earlier, the questions
11 that you had about some of the fees?
12    A.  Yes.
13    Q.  Did any of that relate to other documents
14 besides the settlement statement?
15    A.  No.
16    Q.  You mentioned to me that you reviewed
17 some of the documents that you reviewed at the
18 closing; is that correct?
19    A.  Mm-hmm.
20    Q.  Do you recall reviewing the notice of
21 your right to cancel at the closing?
22    A.  Looking at it and signing, but I do not
23 remember reading specifically word for word, no.
24    Q.  Is it correct that at the closing that

Wilgoren-Deane, Irene - 01/14/2005          Page 66

00067
1  you understood that you had a right to cancel the
2  loan?
3     A.  Correct.
4     Q.  Was it your understanding that if you
5  cancelled the loan, the whole transaction was
6  cancelled?
7     A.  Correct.
8     Q.  And that was your understanding at the
9  closing?
10    A.  Correct.
11       (Marked, Exhibit 5.)
12    Q.  Mrs. Deane, this is Exhibit 5. It is the
13 notice of right to cancel. It is Bates labeled FH
14 439. Could you look at the bottom of that document
15 and tell me if that's your signature?
16    A.  Yes, it is.
17    Q.  Is that also your husband's signature?
18    A.  Yes, it is.
19    Q.  Since you've retained an attorney you
20 told me you have a different understanding of this
21 document?
22    A.  Correct.
23    Q.  Can you tell me what your understanding
24 is of the document now?

Wilgoren-Deane, Irene - 01/14/2005          Page 67

00068
1     A.  It will be a minute for me to find the
2  spot. "If you cancel the transaction, the
3  mortgage/deed of trust is also cancelled." And
4  then the next paragraph it says: "If you cancel
5  the new transaction, your cancellation will apply
6  only to the increase in the amount of credit." To
7  me that's conflicting.
8     Q.  Anything else?
9     A.  "If you cancel the mortgage, lien, or
10 security interest as it applies to the increased
11 amount is also cancelled."
12    Q.  Is the only claim that you are making
13 against First Horizon related to this particular
14 form?
15    A.  Yes.
16    Q.  Mrs. Deane, you allege in the amended
17 complaint that your right to cancel was somehow
18 limited. Can you explain what that means?
19    A.  Limited to the fact that those two can be
20 misconstrued, they conflict with each other, that
21 it wasn't explained, he didn't go over it word for
22 word with me, the lawyer.
23    Q.  Who is he?
24    A.  The lawyer.

Wilgoren-Deane, Irene - 01/14/2005          Page 68

00069
1    Q.   Your lawyer?
2    A.   No.  Cohen.
3    Q.   At the closing.
4    A.   Correct.
5    Q.   Do you believe now that First Horizon
6    violated some particular law?
7    A.   I believe that that document is wrong or
8    not the correct one.
9    Q.   But you didn't believe that at the time
10   of the closing; is that right?
11   A.   I didn't know.
12   Q.   And am I correct that you've come to that
13   conclusion since you've retained your counsel?
14   A.   Correct.
15   Q.   Have you ever heard of the Truth in
16   Lending Act?
17   A.   Yes.
18   Q.   Have you reviewed any parts of that act
19   as it relates to your case here?
20   A.   No, I have not.
21   Q.   Do you understand that there is a portion
22   of this lawsuit that is a class action?
23   A.   Yes.
24   Q.   Were you asked to make any of your claims

00070
1    on behalf of a class?
2    A.   After discussion with my lawyer it was
3    decided that I would not be --
4    Q.   Hold on one second.  You don't have to
5    tell me the substance of conversations that you
6    have had with your lawyer.
7         Did you ever want to make your claims
8    on behalf of a class?
9    A.   No.
10   Q.   Mrs. Deane, have you suffered any damages
11   as a result of this closing transaction?
12   A.   Just that I was misled in the document.
13   What are you talking about?  Emotional, maybe.
14   Q.   Any financial damages?
15   A.   Not right that I can see.
16   Q.   Do you know what damages you're seeking
17   in this lawsuit?
18   A.   To rescind -- damages?  I know that the
19   money would go to the principal of my mortgage.
20   Q.   Which money are you talking about?
21   A.   The money that I've paid so far on my
22   mortgage.
23   Q.   Do you know what damages you are seeking
24   A.   I believe it is the money plus maybe

00071
1    lawyer fees.  I'm not sure of that.
2    Q.   You mentioned rescission a moment ago.
3    A.   Yes.
4    Q.   What is your understanding of how
5    rescission works?
6    A.   At that point my mortgage will be
7    cancelled and I will be asked to get a new mortgage
8    from someone else.  And First Horizon's will be
9    paid off.
10   Q.   So do you understand that you will have
11   to return the principal amount of the mortgage to
12   First Horizon?
13   A.   Correct.
14   Q.   Are you prepared to do that?
15   A.   Yes, I am.
16   Q.   And do you realize that would have to
17   take place within a certain amount of time?
18   A.   I'm not sure of the time frame, no.
19   Q.   Have you made any arrangements for
20   alternative financing?
21   A.   Not yet.
22   Q.   Have you talked to any mortgage brokers?
23   A.   They are calling me all the time.  Not
24   specifically, because I don't know the time frame

00072
1    of this.
2    Q.   Have you discussed interest rates with
3    anybody?
4    A.   Oh, yeah.
5    Q.   Do you know what sort of rate you could
6    get right now?
7    A.   Approximately the same or better, lower.
8    Q.   Do you know on what sort of loan that
9    would be?
10   A.   30-year fixed, probably.
11   Q.   Now, does the interest rate that's
12   available have any effect on your decision whether
13   or not to rescind?
14   A.   No.
15   Q.   If you couldn't get a better interest
16   rate than you have now, would you still want to
17   rescind?
18   A.   Yes.
19   Q.   Can you tell me why?
20   A.   Because I'm not happy with the way things
21   went.
22   Q.   Does your decision to rescind depend in
23   any way on the deal you could get in refinancing at
24   the time?

00077
1 arrest.

2 Q. You told me one charge was in '81. That

3 was the driving charge?

4 A. Yes.

5 Q. Were the other two in '90 at the same

6 time?

7 A. The exact same time.

8 Q. Were they related?

9 A. Yes.

10 Q. You don't know what the third one was?

11 A. I'm trying to remember.

12 Q. The driving charge, where was that?

13 A. Brockton District Court, I believe.

14 Q. What about the other two charges?

15 A. It started in Stoughton and ended up in

16 Dedham.

17 Q. Did you go to court?

18 A. Yes.

19 Q. What court?

20 A. Stoughton originally and a venue change

21 to Dedham -- not venue change. I can't remember

22 what they call it. They changed it to Dedham.

23 Q. Were you convicted of any of these

24 charges?

00078
1 A. I'm not sure what is meant to be a

2 conviction. The operating under the influence was

3 changed to a driving to endanger. It was pleaded.

4 The other two charges it was continued without a

5 finding on the marijuana charge for a year and the

6 other two were dismissed.

7 Q. Did you ever have to serve any time in

8 prison or jail?

9 A. No.

10 Q. Have you been involved in responding to

11 First Horizon's discovery requests?

12 A. Yes.

13 Q. Can you describe what your involvement

14 has been?

15 A. I received a list and went over it, I

16 believe, with Melissa. I handed you some of the

17 questions and gave her as many documents as I could

18 find. I mailed them.

19 Q. Were you shown a copy of the

20 interrogatory requests?

21 A. Yes.

22 Q. Were you shown a copy of the document

23 requests?

24 A. Yes.

00079
1 Q. What did you do to collect documents?

2 A. I went through every document I had.

3 Q. Was there a particular location that you

4 searched?

5 A. Yes.

6 Q. Where is that location?

7 A. My desk.

8 Q. Anyplace else?

9 A. A box of documents that I put away that I

10 might need some day that I thought might be

11 important.

12 Q. Do you keep a file on this case?

13 A. No.

14 Q. Do you keep a file on your mortgage with

15 First Horizon?

16 A. No.

17 Q. Do you keep a file on any of your

18 previous mortgages?

19 A. Yeah. I had the folders from closings.

20 I believe I turned them over.

21 Q. But you didn't have one for First

22 Horizon?

23 A. If I did, I gave it to them.

24 Q. Do you know of any documents from First

00080
1 Horizon on your mortgage that you have not

2 produced?

3 A. I know I agreed if I find any paper to

4 get them.

5 Q. Do you know any other members of the

6 potential class action?

7 A. No.

8 Q. Do you know any other plaintiffs in this

9 lawsuit?

10 A. Just the name that was on the paper. I

11 don't know them personally.

12 Q. Have you ever met any other plaintiffs?

13 A. No, except my husband.

14      (Discussion off the record.)

15 Q. Mrs. Deane, we are back on the record. I

16 have a few more questions and then we will wrap up.

17      The legal advertisement that you

18 received, you mentioned that you thought you saw

19 something about First Horizon. Can you explain

20 that for me?

21 A. I thought I saw either on that paper or

22 on another paper attached to it that it said any

23 dealerships with First Horizon or anyone with a

24 mortgage with First Horizon.

00081
1  Q.  So you think it was something in the
2  mailing with the advertisement that you reviewed?
3  A.  I think it might have been on the
4  outside, like on the address part.
5  Q.  When you say the outside, do you mean the
6  envelope itself?
7  A.  Yes.  I don't think it was an envelope.
8  I think it was folded.
9  Q.  You're not sure if the dealing
10  advertisement came in an envelope?
11  A.  Yes.
12  Q.  Do you know what the date of the closing
13  was on the condominium that your husband and
14  mother-in-law purchased?
15  A.  March.
16  Q.  Of this year?
17  A.  Yes.
18  Q.  And does your husband have three tenants
19  in that house?
20  A.  Two, at the present.
21  Q.  Does that mean one of the floors is
22  vacant?
23  A.  Correct.
24  Q.  Did you attend the closing transaction to

00082
1  that house?
2  A.  I was there, but I wasn't sitting at the
3  table with them.  I was taking care of my baby.
4  Q.  Where was that closing transaction?
5  A.  In Canton at the lawyer's office.
6  Q.  Do you know what the lawyer's name was?
7  A.  Not offhand.  It is on the tip of my
8  tongue.
9  Q.  Was this your husband's lawyer?
10  A.  No.
11  Q.  Who did the lawyer represent?
12  A.  The mortgage companies.
13  Q.  Do you know who the mortgage companies
14  are?
15  A.  Yes.  One is Chase.  I'm not sure of the
16  other one.  They were turned.  They were bought
17  out.
18  Q.  Do you know what the purchase price was
19  for the house?
20  A.  Yes, 401.
21  Q.  You said it is 206 Winthrop Street.  Is
22  that Brockton?
23  A.  Yes.
24  Q.  You told me that your mother-in-law also

00083
1  owns it.  Does anybody else own the house?
2  A.  No.  I have the papers to be put on the
3  deed, but I haven't filed them yet.
4  Q.  So you will be put on the deed?
5  A.  Eventually, yes.
6  Q.  Did you review any paperwork at the
7  closing?
8  A.  I might have.  I did look at the stuff
9  that was being transferred as far as the renting,
10  the interest that had to be turned over, the money
11  for the apartments, the security deposits.  I
12  looked at that stuff.
13  Q.  Did you explain anything to your husband
14  about the transaction?
15  A.  I might have.
16  Q.  What about to your mother-in-law?
17  A.  No.
18  Q.  Do you know if there was a right to
19  cancel that transaction?
20  A.  I believe there always is.  I didn't see
21  it.
22  Q.  Did you have any conversations with
23  either your mother-in-law or your husband about a
24  right to cancel that transaction?

00084
1  A.  No.
2  Q.  Do you know if either of them has tried
3  to cancel that mortgage?
4  A.  No, they have not.
5  Q.  Thank you for your time today.  That's
6  all I have.
7  MR. LEFEBVRE:  I have a couple of
8  questions.
9  EXAMINATION
10  BY MR. LEFEBVRE:
11  Q.  I'm referring you to Exhibit 5, which is
12  the notice of right of cancellation.  Now, is it
13  true or is it not true that at the closing that
14  took place on November 24, 2003 Mr. Cohen went over
15  the notice of right of cancellation with you?
16  A.  He said this is it.  He didn't go over it
17  word for word, no.
18  Q.  Do you remember him going over the third
19  paragraph in the notice of right to cancel?
20  A.  No.
21  Q.  How much time did you spend reviewing
22  this notice of right to cancel with Mr. Cohen at
23  the closing?
24  A.  None.  Just signed it.

00085

1   1   Q.  Did he, prior to executing the document,

2  did he have you refer to the third paragraph to

3  review?

4        MR. PASQUARELLO:  Objection to the

5  form.

6   Q.  How much time did you spend on the third

7  paragraph of this document reviewing that with

8  Mr. Cohen?

9        MR. PASQUARELLO:  Objection to the

10  form.

11   A.  None.

12   Q.  After the closing, how many conversations

13  did you have with Mr. Cohen relative to this right

14  to cancel?

15   A.  None.

16   Q.  How many conversations did you have with

17  anyone representing First Horizon Home Loan or its

18  agent relative to this right of cancellation?

19   A.  None.

20   Q.  After you left the closing how upset were

21  you relative to how the closing took place?

22   A.  Extremely.

23   Q.  This feeling of being upset, how long did

24  you continue being upset relative to how long the

---

00086

1  transaction itself took place?

2   A.  Months.

3   Q.  And when you made contact with

4  Christopher Lefebvre, were you still upset about

5  what happened at the closing?

6   A.  Yes.

7        MR. LEFEBVRE:  I have no further

8  questions.

9        MR. PASQUARELLO:  All set.

10    (12:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

00087

1      CERTIFICATE OF COURT REPORTER

2     I, David A. Arsenault, Registered

3  Professional Reporter, do certify that the

4  deposition of ILENE WILGOREN-DEANE, in the matter

5  of McKenna v. First Horizon Home Loan, took place

6  at 9:36 a.m. on Friday, January 14, 2005; that the

7  testimony of said witness was taken by me in

8  machine shorthand and thereafter reduced to writing

9  by means of computer-aided transcription; that said

10  transcription is a true record of the testimony

11  given by said witness; that the witness was sworn

12  by me, a Notary Public in and for the Commonwealth

13  of Massachusetts, with my commission expiring on

14  May 12, 2006; that I am neither counsel for,

15  related to, nor employed by any of the parties to

16  the action in which this deposition was taken, and

17  further that I am not a relative or employee of any

18  attorney or counsel employed by the parties

19  thereto, nor financially or otherwise interested in

20  the outcome of the action.

21

22     _____

23     David A. Arsenault

24

---

00088

1     I N D E X

2     -----------

3     ILENE WILGOREN-DEANE

4  EXAMINATION BY

5  MR. PASQUARELLO    3

6  MR. LEFEBVRE    84

7

8

9

10     EXHIBITS MARKED

11  1     3

12  2     45

13  3     60

14  4     62

15  5     67

16

17  Exhibits copied by reporter.  Originals returned to

18  Daniel Pasquarello, Esq.; cc's sent to Marc

19  Lefebvre, Esq.

20

21

22

23

24

00089
1       ILENE WILGOREN-DEANE

2       ERRATA/SIGNATURE PAGE

3   PAGE   LINE   CHANGE OR CORRECTION AND REASON

4   _____|____|_____

5   _____|____|_____

6   _____|____|_____

7   _____|____|_____

8   _____|____|_____

9   _____|____|_____

10  _____|____|_____

11  _____|____|_____

12  _____|____|_____

13  _____|____|_____

14  _____|____|_____

15  I have read the foregoing transcript of my

16  deposition taken on January 14, 2005.  Except for

17  any corrections or changes noted above, I hereby

18  subscribe to the transcript as an accurate record

19  of the statements made by me.

20  Signed under the pains and penalties of perjury.

21  Deponent:_____ /___/2005

22      ILENE WILGOREN-DEANE

23

24

**Wilgoren-Deane, Irene - 01/14/2005          Page 89**