# EXHIBIT 13

00001
1 IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3 RALPH G. MCKENNA, GLENROY   )
   A. DEANE, ILENE          )
4 WILGOREN-DEANE, CHRISTOPHER )
   J. LILLIE, and LAURA A.   )
5 LILLIE,                    )
                             )
6   Plaintiffs,              )
                             )
7 VS.               ) NO. 04-10370-RCL
                             )
8 FIRST HORIZON HOME LOAN    )
   CORPORATION,              )
9                            )
   Defendant.      )

10

11        TELEPHONIC DEPOSITION OF

12         CHARLES COVINGTON

13         FEBRUARY 11, 2005

14

15

16        TELEPHONIC DEPOSITION of CHARLES

17 COVINGTON, produced as a witness at the instance of

18 the Plaintiffs, and duly sworn, was taken in the

19 above-styled and numbered cause on the 11th of

20 February, 2005, from 10:09 a.m. to 12:09 p.m., before

21 Audra B. Paty, CSR in and for the State of Texas,

22 reported by machine shorthand, at the offices of First

23 Horizon Home Loans, 4000 Horizon Way, in the City of

24 Irving, County of Dallas, State of Texas, pursuant to

25 Notice and the Federal Rules of Civil Procedure.

Covington, Charles - 02/11/05        Page 1

---

00002
1 A P P E A R A N C E S

2   FOR THE PLAINTIFFS:
      Mr. Christopher M. Lefebvre (Via Phone)
3     LAW OFFICES OF CLAUDE LEFEBVRE & SONS
      P.O. Box 479
4     Pawtucket, RI 02862

5

6 FOR THE DEFENDANT:
      Mr. Thomas M. Hefferon
7     GOODWIN PROCTER, L.L.P.
      901 New York Avenue, N.W.
8     Washington, D.C. 20001

9

10

11
   ALSO PRESENT:
12    Ms. Barbara Brown Eddy

13

14

15

16

17

18

19

20

21

22

23

24

25

Covington, Charles - 02/11/05        Page 2

---

00003
1 I N D E X

2 WITNESS                    PAGE

3 CHARLES COVINGTON

4 EXAMINATION BY MR. LEFEBVRE            4

5

6

7 EXHIBITS              IDENTIFIED

8 1 - Notice of Depositions            5

9 2 - Taberes Notice of Right to Cancel        33

10 3 - Notice of Right to Cancel FH 01047      35

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Covington, Charles - 02/11/05        Page 3

---

00004
1 PROCEEDINGS

2        CHARLES COVINGTON,

3 having been first duly sworn, testified as follows:

4        EXAMINATION

5 BY MR. LEFEBVRE:

6   Q. Good morning.

7   A. Hello.

8   Q. Hi. I'm Chris Lefebvre, and I'm here in

9 Rhode Island conducting a deposition on behalf of

10 Ralph McKenna, Glenroy Deane, Ilene Deane, and

11 Christopher and Laura Lillie regarding a federal

12 lawsuit that is pending in the United States District

13 Court for the District of Massachusetts.

14        And what is your name, sir?

15 A. Charles Stephen Covington.

16   Q. Now, I'm going to be asking you a series of

17 questions, and I just want to briefly go over the

18 ground rules. I'm going to assume that if you answer

19 my question, two things, number one, that you

20 understood the question, and, number two, that you

21 answered the question truthfully and honestly to the

22 best of your ability. Okay?

23 A. Okay.

24   Q. Now, have you ever been deposed before?

25 A. No.

Covington, Charles - 02/11/05        Page 4

00005
1 Q. This is the first time?
2 A. Yes.
3 MR. LEFEBVRE: Okay. Madam Court
4 Reporter, could we have the notice of deposition --
5 that I believe Mr. Hefferon should have a copy --
6 marked as an exhibit for this deposition?
7 MR. HEFFERON: I'm pulling it out, Chris.
8 MR. LEFEBVRE: Thanks, Tom.
9 MR. HEFFERON: Okay. Chris, I have the
10 notice of deposition. Like I said, it is my copy and
11 it has some highlighting on it, but we'll have the
12 court reporter mark it, and when we copy it, it will
13 just copy clean, I believe.
14 MR. LEFEBVRE: Beautiful.
15 MR. HEFFERON: All set. She is just
16 going to mark it now.
17 (Exhibit No. 1 marked.)
18 Q. Now, Mr. Covington, you have in front of you
19 what I believe has been marked as Plaintiff's Exhibit
20 1. I'm going to ask you if you have seen this
21 document before.
22 A. I have not seen this document before.
23 Q. Okay. I want you to take a moment. It is
24 not a very lengthy document. It should be really only
25 two substantive pages. Take a moment to look at it,

Covington, Charles - 02/11/05          Page 5

00006
1 and when you are done, let me know because I would
2 like to just ask you a few questions about it.
3 MR. HEFFERON: It is really the listing
4 here, the various topics that I have highlighted. And
5 he wants you to read them over quickly once to
6 yourself, and then he may ask you a question or two
7 about it.
8 A. Okay.
9 Q. Do you understand that this is what is
10 known -- what I'm doing today is conducting a 30(b)(6)
11 deposition of First Horizon Home Loans? You
12 understand that?
13 A. Yes, I understand it is a deposition. I
14 don't know about these citations, but, yes, I do
15 understand this is a deposition.
16 Q. Okay. Well, I want to make clear that
17 pursuant to this notice, I'm going to be asking First
18 Horizon --
19 MR. LEFEBVRE: Can we for the record
20 abbreviate when I say First Horizon that I'm referring
21 to the defendant in this case? Is that an acceptable
22 stipulation, Tom?
23 MR. HEFFERON: Sure.
24 Q. Mr. Covington, I want to make sure that you
25 understand that I'm conducting a deposition of First

Covington, Charles - 02/11/05          Page 6

00007
1 Horizon today.
2 A. Yes.
3 Q. Not of you. Do you understand that?
4 A. I understand that.
5 Q. Okay. And that it is my understanding you
6 have been designated by First Horizon to answer
7 various questions -- what we call areas of inquiry --
8 as outlined in the two-page notice of deposition,
9 which I believe you have just reviewed. Do you
10 understand that?
11 A. Yes.
12 Q. And you believe that you are competent and
13 knowledgeable to answer questions regarding the
14 various areas of inquiry contained in this notice of
15 deposition?
16 A. I believe so.
17 Q. Okay. Now, you are presently employed by
18 First Horizon, correct?
19 A. Yes.
20 Q. Can you tell me your capacity, what type of
21 work you do for First Horizon?
22 A. I am the director of quality control and
23 compliance for the company.
24 Q. Okay. Can you tell me, what does a director
25 of quality control and compliance do in a general

Covington, Charles - 02/11/05          Page 7

00008
1 sense?
2 A. Okay. I manage our quality control testing
3 review function. I manage our compliance function,
4 which is an advisory risk management type role. I
5 manage a fraud investigation group for the company. I
6 manage our HMDA data review and preparation and filing
7 function. And I also manage our broker approval
8 function for the company.
9 Q. Now, you are -- you actually work in Texas, I
10 assume?
11 A. Yes.
12 Q. At the corporate headquarters?
13 A. Yes.
14 Q. And how long have you held this title or had
15 this job?
16 A. Since August of 2001.
17 Q. Now, I'm going to call it in a general sense
18 the compliance quality control department. Is that a
19 separate area or a separate department of First
20 Horizon?
21 A. Well, collectively it is one department under
22 my management, which has those various operational
23 units.
24 Q. And how many people actually work under your
25 supervision?

Covington, Charles - 02/11/05          Page 8

00009
1   MR. HEFFERON: You mean directly or
2   indirectly?
3       Q.  Let's start directly first.
4       A.  Directly I have five managers and an
5   administrative assistant that report to me.
6       Q.  And how about indirectly that work under you?
7       A.  35 people.
8       Q.  Did you say 35?
9       A.  35.
10      MR. LEFEBVRE: Now, Tom, what I wanted to
11  do at this point --
12      Q.  Because I believe in simplifying things, Mr.
13  Covington.
14      MR. LEFEBVRE: I don't want to make this
15  deposition three hours long when we can probably get
16  it done in an hour.  What I would like to do is have a
17  stipulation, Tom, relative to the right to cancel that
18  when I ask questions about the right to cancel form,
19  that I'm referring to the form which was attached as
20  Exhibit D, H, and L of the amended complaint that has
21  been filed in this case.  Is that an acceptable
22  stipulation, Tom?
23      MR. HEFFERON: Yes.  I also point out
24  that we have produced those documents as well as part
25  of the loan files and also 1047, if you have it there,

Covington, Charles - 02/11/05        Page 9

00010
1   Chris, is the actual form.
2       MR. LEFEBVRE: I...
3       MR. HEFFERON: 1047.  Probably the last
4   document that we produced to you.
5       MR. LEFEBVRE: Oh, 1047, yes.  I saw
6   that.  That's basically the same as Exhibit, D, H, and
7   L, but it doesn't have the identifying information.
8       MR. HEFFERON: That's correct.  It does
9   actually have an address here of Pittsburgh,
10  Pennsylvania as a place.
11      MR. LEFEBVRE: You are right.  I saw
12  that.
13      MR. HEFFERON: Yeah, but, anyway, if you
14  wanted to mark 1047, you could do that.  I don't care
15  what you do.
16      MR. LEFEBVRE: I think we can have an
17  agreement that 1047 speaks for itself if we need it
18  somehow in some pleading before Judge Lindsey.  We can
19  attach it.  I don't think we need to mark it.
20      MR. HEFFERON: Okay.  But I'm putting it
21  before the witness so that when you are talking about
22  the right to cancel form that you described and I
23  guess is D, H, and L, I'm putting 1047 before the
24  witness in case he has to refer to it.
25      MR. LEFEBVRE: Certainly.  That's fine.

Covington, Charles - 02/11/05        Page 10

00011
1   MR. HEFFERON: Okay.  Go ahead.
2       Q.  Okay.  Now, Mr. Covington --
3       MR. HEFFERON: So just to make sure
4   Mr. Covington understands, so when he talks about the
5   right to cancel form, he is talking about this
6   document here that is before you, 1047, unless he
7   makes it clear otherwise.  And you should feel free --
8   and I'm sure Chris agrees with this -- if you are not
9   sure which form he is talking about, to ask him to
10  clarify.
11      THE WITNESS: Okay.
12      Q.  Can you tell me a little bit about the
13  residential foreclosure portfolio of First Horizon?
14  I'm mainly interested in getting a general sense about
15  the various depositions.  I understand through the
16  documents there is a retail and wholesale.  Can you
17  tell me the different divisions?
18      A.  I don't understand.  Residential foreclosure
19  division?
20      MR. HEFFERON: You said, foreclosure,
21  Chris.
22      Q.  I'm sorry.  I meant -- not foreclosure.  I
23  met consumer mortgages, refinances.
24      MR. HEFFERON: Lending?
25      Q.  Lending.

Covington, Charles - 02/11/05        Page 11

00012
1   A.  You are talking about the channels that we
2   originate loans?
3       Q.  Absolutely.
4       A.  Well, we have a retail origination channel.
5   We have a wholesale broker origination channel.  We
6   have a correspondent origination channel.  We have a
7   nonprime business, which is lending center that can be
8   an origination channel.  Consider that separately.
9   And then within that, we have telemarketing-type
10  origination channels, direct marketing, and things
11  like that, both inbound and outbound.
12      Q.  Okay.  Can you tell me in a general sense
13  about the retail channel?  And I'm talking about -- I
14  want to stay focused.  I'm talking about consumer
15  mortgage loans.  That's what I'm talking about.
16  Either refinance or purchase loans.
17      MR. HEFFERON: You mean how it is
18  organized?
19      MR. LEFEBVRE: Yes.
20      A.  Okay.  How it is organized?  It is organized
21  on a regional level.  We have 11 or 12 regions, and
22  within those regions, there are various branches.  And
23  within those branches, there is a branch manager to
24  whom the -- what we call relationship managers, loan
25  officers report to.  Is that what you had in mind?

Covington, Charles - 02/11/05        Page 12

00013
1  Q.  Yes.  Thank you.
2        And how about the wholesale?  That, I
3  assume, is different than the retail?
4     A.  It is fairly similar.  We don't have our --
5  from an organizational standpoint, retail and
6  wholesale report into the same senior executive.  So
7  within these regions, you'll have both retail branches
8  and wholesale branches.  And in a wholesale branch, it
9  is very similar.  We have a branch manager.  You don't
10  have relationship managers.  You have what we call
11  account executives who actually are the ones that sign
12  up new brokers, but a fairly similar structure
13  otherwise.
14     Q.  Just so I'm clear, why would a consumer --
15  let me withdraw the question.  So in the retail area,
16  you actually have what might be considered storefront
17  where, you know, people know it is a First Horizon
18  building and if you want a mortgage, you can go.
19  That's a retail division, correct?
20     A.  Well, in our retail -- we do have retail
21  offices that would accept, you know, walk-up customer
22  business.
23     Q.  Okay.
24     A.  Which would not be the case in wholesale, if
25  that's what you mean.

Covington, Charles - 02/11/05          Page 13

00014
1  Q.  Right.  Now, wholesale, I assume they must
2  deal with various independent mortgage brokers in the
3  particular region, correct?
4     A.  That's true.  Yes.
5     Q.  Okay.
6        MR. LEFEBVRE:  Tom, I'm having a hard
7  time hearing.  Hold on a second.  I'm just going to
8  make an adjustment.
9        MR. HEFFERON:  Okay.
10        MR. LEFEBVRE:  Okay.  Can you hear me
11  okay now?
12        MR. HEFFERON:  Yeah.
13        MR. LEFEBVRE:  You don't have a problem
14  on my end?
15        MR. HEFFERON:  No.
16        MR. LEFEBVRE:  I'm just having a little
17  bit of a problem.  I can hear you, Tom, very, very
18  well, but I'm having a hard time hearing
19  Mr. Covington.  I don't know if it is his location to
20  the speaker or not or maybe, Mr. Covington, if you
21  could just speak up a little bit for me, that might be
22  helpful and might expedite the process for me.
23        THE WITNESS:  Okay.
24        MR. HEFFERON:  Go ahead, Chris.
25     Q.  What state is First Horizon licensed to do

Covington, Charles - 02/11/05          Page 14

00015
1  business in the residential mortgage arena?
2        MR. HEFFERON:  Chris, let me just suggest
3  that because of the various rules about licensing, I
4  assume that you really just want to know where they
5  make loans.
6        MR. LEFEBVRE:  Absolutely.
7        MR. HEFFERON:  So why don't you just
8  answer that question, Steve.  Residential mortgage
9  loans.
10        MR. LEFEBVRE:  Absolutely.
11     Q.  That's what we are talking about for this
12  deposition, residential mortgage loans.  I want to
13  know where you pretty much do business.
14     A.  Well, we do business in most states.  We
15  don't have offices in every state, but in most states
16  in the U.S. we have offices.
17     Q.  Okay.  And how long has First Horizon
18  actually been doing residential mortgage?  How many
19  years now?
20     A.  Well, I mean, that's a complex question.
21  First Horizon is an aggregation of a lot of different
22  businesses that have been acquired over time and
23  really branded under the name First Horizon just
24  within the last few years.
25     Q.  When you say, few years, how many is it?

Covington, Charles - 02/11/05          Page 15

00016
1  A.  I think the name change occurred in -- let me
2  think for a second.  Well, 2000 I think is when we
3  went to the overall First Horizon branding.  Prior to
4  that these various companies were owned by First
5  Horizon, but they operated under their previous names.
6     Q.  Now, getting back to the retail and wholesale
7  segments, I assume that the documentation involving a
8  First Horizon residential mortgage is the same other
9  than, obviously, the interest rate and the consumer
10  and the property.  I'm talking about the form
11  documentation is the same in both divisions?
12        MR. HEFFERON:  You mean currently?
13        MR. LEFEBVRE:  Yes.
14        MR. HEFFERON:  Objection, compound
15  question.
16        Go ahead.  You can answer it.
17     A.  Well, I guess you mean -- what documents are
18  you talking about?  I don't -- disclosures or forms or
19  what do you mean?
20     Q.  Well, I guess what I'm asking is if there is
21  a residential mortgage closing that is generated from
22  the retail division, there is a set of documentation
23  that generally has to be signed by the homeowner when
24  they want to take out a mortgage with First Horizon,
25  correct?

Covington, Charles - 02/11/05          Page 16

00017
1  A. True, yes.
2    Q. And assume that another scenario, a mortgage
3  that ultimately is going to be generated, still a
4  consumer residential with First Horizon that comes
5  from the wholesale division, I assume there is also a
6  set of documentation that the consumer has to sign at
7  the time of the closing, correct?
8    A. Yes, some documents would be principally the
9  same. For example, we would use a standard conforming
10 Fannie Mae note. Other documents coming from
11 wholesale may be different because some of the
12 documents may have been generated by the wholesale
13 broker.
14   Q. Oh, okay. But in the retail division, is it
15 fair to say that all of the documentation is generated
16 by First Horizon or is that not a correct assumption?
17   A. Well, that depends on what you mean. We have
18 various origination systems that create documents and
19 there is flexibility given to our branches for what
20 system is selected, and there are some differences
21 among those systems.
22   Q. And can you explain to me what some of those
23 differences might be in a general sense?
24   A. Well, in a general sense we have our own
25 in-house origination system, which would generate a

00018
1  doc set that would look one way whereas we have some
2  doc prep vendors that would prepare documents for us
3  which may appear differently. In some states, I think
4  we have to have even attorneys prepare the documents
5  because of certain state laws and things like that.
6    Q. Okay. Now, I want to ask you a few questions
7  about the right to cancel form that we were talking
8  about earlier. It is my understanding reviewing
9  responses of First Horizon that the right to cancel
10 form, which is the subject of this litigation was --
11 began to be used by First Horizon in April of '03; is
12 that correct?
13   A. Yeah, the form was created in April of '03.
14 I think it was actually implemented in May of '03.
15   Q. And if you just take a look at the document
16 that you should in have in front of you -- and I'm
17 referring to the document that Tom referenced, the
18 number 1047 that was provided to me. Do you have that
19 in front of you?
20   A. Yes, I do.
21   Q. I noticed in the left-hand corner there is
22 some type of -- left-hand bottom corner.
23   A. Yes.
24   Q. There is some type of letter and numerical
25 combination which appears to me to be some type of

00019
1  identifying feature, CV6D016. Do you see what I'm
2  referring to?
3    A. Yes.
4    Q. Okay. Does that have any type of
5  significance, that code or combination of letters in
6  the 4/03 date thereafter?
7    A. I don't really know what that is. That is
8  probably a reference number for this doc residing on
9  our TMO system.
10   Q. Now, you said that this document was created
11 or -- in April of '03?
12   A. Created in April of '03, yes.
13   Q. Okay. And did you personally or anyone under
14 your supervision or control participate in the
15 creation of this document?
16   A. Yes.
17   Q. Okay. And First Horizon started to use this
18 document in May of '03, correct?
19   A. I believe so, yes.
20   Q. Okay. Now, earlier we were talking about the
21 retail division. Is it fair for me to assume that
22 this document, the number 1047, the right to cancel
23 that we have been talking about, would have been
24 utilized by all of the retail component of First
25 Horizon after May of '03?

00020
1    MR. HEFFERON: Objection, vague.
2    You can answer if you understand it.
3    A. Well, let me think about that.
4    Q. Do you understand what I'm asking?
5    A. Maybe repeat the question.
6    Q. Okay. We were talking about the retail
7  division. I just want to understand if there is
8  uniformity of documents throughout the retail consumer
9  residential mortgage division of First Horizon. So my
10 question is: Is it fair to say that after May of '03
11 that this right to cancel, which you have in front of
12 you, is the form that was utilized by all of the
13 retail branches or outfits of First Horizon?
14   MR. HEFFERON: Objection, asked and
15 answered.
16   Go ahead.
17   A. I would say that -- well, I think I would
18 have to answer no because we have various doc prep
19 vendors and other types of avenues in which closing
20 documents are prepared. So it wouldn't be -- I
21 couldn't say that this is the form that has been used
22 every single time, no.
23   Q. Oh, so some of the vendors that you were
24 talking about a little bit earlier, they may have used
25 a different version of the right to cancel?

00021
1  A.  Some potentially different version.
2     Q.  Okay.  I assume that the various versions
3  that may have been used of the right to cancel would
4  have been approved by First Horizon?
5     A.  Yes.
6     Q.  Okay.  And I assume that First Horizon would
7  have copies of the various right to cancel forms that
8  may have been used by those entities or divisions
9  within the retail division of First Horizon?
10        MR. HEFFERON:  During this period, you
11  mean?
12        MR. LEFEBVRE:  Yes.  I'm talking about
13  after May of '03.
14    A.  I'm assuming so.  I mean, do we have a handy
15  record of how it may have changed over time, I'm not
16  sure.  For sure, those disclosures would be in any
17  given loan file, and we do have a record of that.  So
18  from that standpoint, yes.
19    Q.  Okay.  Now, do you know why -- well, strike
20  that.
21        I assume before April of '03 that First
22  Horizon used a different notice of right to cancel
23  form for residential consumer mortgages.  Is that a
24  fair statement?
25    A.  That's true.

Covington, Charles - 02/11/05          Page 21

00022
1     Q.  Okay.  Can you -- are you familiar with the
2  form that was used prior to April of '03?
3        MR. HEFFERON:  You mean the predecessor
4  to the form 1047?
5        MR. LEFEBVRE:  Absolutely, yes.
6     A.  Yes, I am.
7     Q.  Okay.  Can you tell me about that form in a
8  general sense, how it may be different from 1047?
9     A.  The previous form had a selection check box
10  type of presentation where depending on the rescission
11  right, there was a requirement for an affirmative
12  checking of a box.
13    Q.  So just so I'm clear, looking at paragraph
14  number 1 of document 1047, would it be fair to say
15  that there would be some type of marking either to
16  reflect that either the first two paragraphs apply or
17  paragraph one or the second paragraph applied
18  depending on the nature of the refinancing?
19    A.  I don't have that document in front of me.
20  Are we going to look at that document?
21        MR. LEFEBVRE:  It was not produced.  We
22  never had it.  We had asked for some form documents,
23  Tom.
24    Q.  Otherwise, if I had the document, I would
25  gladly have referred you to it, sir.

Covington, Charles - 02/11/05          Page 22

00023
1  MR. HEFFERON:  Why don't you actually ask
2  him his recollection of how -- the format of the check
3  boxes --
4        MR. LEFEBVRE:  Sure.
5        MR. HEFFERON:  -- as to that difference.
6        MR. LEFEBVRE:  Sure.
7     Q.  You can answer Tom's question and pretend
8  it's mine.
9     A.  Okay.  Yeah, I mean, the way that form was
10  designed, is was a check box -- there was a check box
11  that would be checked depending on the rescission
12  rights that the customer had.  So it was -- if you
13  have these rights, you would check this box.  If you
14  have those rights, you would check that box to denote
15  the rights that were available to the customer.
16    Q.  Okay.  Now, do you know why there was -- why
17  the form changed?
18    A.  Yes.
19    Q.  Okay.  Can you tell me why?
20    A.  We became aware -- actually, it was brought
21  to my attention from our legal department that there
22  was some concern about the form and the checking of
23  the boxes.  And in looking at the form -- and whether
24  the boxes are being checked.  And from an operational
25  perspective, after looking at the form, we felt like

Covington, Charles - 02/11/05          Page 23

00024
1  would it not be better operationally if we had a form
2  which removed the boxes, which in our viewpoint was
3  just removing one less opportunity for a branch to
4  make a mistake.  They could check a wrong box.  They
5  could not check a box at all.  We are always trying to
6  simplify the process so we get it right.  So our
7  thought was, if we eliminate the boxes, maybe we would
8  eliminate an opportunity to make a mistake.
9     Q.  Okay.  And from your recollection, the prior
10  form, the content of the prior form was the same in
11  relation to paragraph 1?  That is, looking at 1047,
12  paragraph -- well, what is identified as number one on
13  the document says, your right to cancel, and
14  underneath that there are four separate paragraphs.
15  Do you see what I'm talking about?
16    A.  Yes.
17    Q.  Okay.  The prior form, prior to April of '03,
18  still had four paragraphs in this area identified as
19  your right to cancel; is that correct?
20        MR. HEFFERON:  If you recall.
21    A.  I believe so.  I don't have that form in
22  front of me.  But if you say so, I will concede that,
23  I guess.
24    Q.  Well, and I'm not trying to trick you.  I
25  recall seeing it in a few other cases that I had

Covington, Charles - 02/11/05          Page 24

00025
1  brought against First Horizon. And my recollection
2  was that it was the same paragraph just with a box.
3  Either the first two paragraphs apply to the
4  transaction or the last two paragraphs.
5     A. Okay.
6     Q. Is that your recollection?
7     A. Yes.
8     Q. Okay. So who made the final decision to
9  change the form? Was that your decision or did
10  someone with you make that decision?
11     A. The final decision -- the ultimate decision
12  was made by our, at that time, head of production
13  operations.
14     Q. And what was his or her name?
15  A. Annalee Myers.
16     Q. Did you say Annmarie?
17     A. Annalee.
18     Q. Annalee. And her position is what -- or was
19  what when this form was changed?
20     A. At the time, she was executive vice president
21  over origination risk management.
22     Q. And is she still employed with the company
23  now?
24     A. Yes.
25     Q. And what is her capacity now?

Covington, Charles - 02/11/05          Page 25

00026
1     A. She is now in branch -- I guess it would be
2  considered kind of branch support. She has dropped
3  off the risk management role and really just branch
4  support now.
5     Q. Okay. Now, you were talking about the prior
6  form. Would you agree with me that but for the area
7  to check off in the first paragraph its first
8  portion of the right to cancel, was the prior form
9  similar to 104? that you have in front of you?
10     MR. HEFFERON: Objection, vague.
11  Chris, he doesn't have the form in front
12  of him, and I think it is unfair to ask him how they
13  compared them. Besides, you have the form because you
14  have written letters to my client in the past and sued
15  my client about the form. So it seems --
16     MR. LEFEBVRE: Well, I know that, Tom,
17  and I'm not trying to be difficult, but we had asked
18  for sample forms in discovery, and they were objected
19  to. And I'm just, you know, trying to probe this
20  individual's recollection. If it becomes an issue, we
21  can deal with it then.
22     MR. HEFFERON: Yeah. You know, I think
23  at this point if he doesn't have the form in front of
24  him and all he is giving you is his personal -- not
25  the company's testimony, his personal recollection, it

Covington, Charles - 02/11/05          Page 26

00027
1  is just -- I mean, one can take out the form and take
2  out this form and just compare them, but go ahead.
3     MR. LEFEBVRE: Well, Tom, just to follow
4  up, so if, in fact, there -- you mentioned that I had
5  brought some other lawsuits. Would it be fair for me
6  to assume that the forms that were attached to the
7  other two complaints that I have filed, I believe in
8  the Rhode Island Federal District Court, would have
9  been indicative of the form that was used in
10  residential consumer mortgage closings prior to April
11  of '03?
12     MR. HEFFERON: I think the answer to that
13  is that those forms -- are you referring to the Morin
14  case and Tabares case?
15  MR. LEFEBVRE: Exactly, yes.
16     MR. HEFFERON: I'll have to write you a
17  letter after this deposition, but I believe the answer
18  is, yes, that that form is indicative of the
19  predecessor to form recognizing the witness' prior
20  testimony already that there may well be and were, in
21  fact, other forms out there, but in terms of --
22     MR. LEFEBVRE: Right. That's fair. Now,
23  do you have access -- is there a printer or a scanner
24  there if I actually -- I mean, I have the Tabares file
25  literally right at the corner of my desk. I could fax

Covington, Charles - 02/11/05          Page 27

00028
1  a copy of that and maybe that may assist Mr. Covington
2  in answering my questions. Is that a problem if I
3  were to do that?
4     MR. HEFFERON: No, you can do that.
5     MR. LEFEBVRE: Can you tell me where I'm
6  going to send it to? Do you want me to scan it,
7  e-mail it? I don't know what facilities you have
8  right available to you.
9     MR. HEFFERON: Hold on a second. Fax it.
10     (Recess 10:38 to 10:42.)
11     MR. LEFEBVRE: Madam Court Reporter,
12  could you please read the last question back before
13  the discussion about the fax?
14     (Record read.)
15  MR. LEFEBVRE: Okay. Thank you.
16     Q. Mr. Covington, the form -- the right to
17  cancel form used prior to April of '03, had New
18  Century ever received any complaints from either
19  mortgage brokers or consumers about the content of the
20  right to cancel form used at that time?
21     MR. HEFFERON: You mean First Horizon?
22     Q. First Horizon. I'm sorry.
23     A. Okay. Have we ever received any complaints
24  about that form prior to the issue being brought to my
25  attention that we talked about earlier?

Covington, Charles - 02/11/05          Page 28

00029

1 Q. No, I guess what I'm -- let Me withdraw the
2 question. You told me that in April the form was
3 changed. I guess during the time frame when the other
4 form was in existence, had you received any complaints
5 from either brokers or consumers about the content of
6 the right to cancel form that was used?
7     A. Not that I'm aware of.
8     Q. Not that you are aware of?
9     A. No.
10    Q. And you said that you had received some
11 correspondence from your legal department about the
12 form, correct?
13        MR. HEFFERON: Objection. I don't think
14 that's what he said.
15 Q. All right. Can you tell me how the legal
16 department got involved with the new form 1047, if at
17 all?
18        MR. HEFFERON: You mean in terms of
19 initiation of the change?
20        MR. LEFEBVRE: Exactly.
21    A. Yes. I think what I said is it was brought
22 to my attention by the legal department that we had an
23 issue with the form. And, apparently, it was -- I
24 believe it was -- I have learned today that it was you
25 that had complained about the design of the form

00030

1 and --
2        MR. HEFFERON: And don't talk about what
3 your lawyer told you about the form.
4        THE WITNESS: Right.
5     A. And then stemming from that, then, as I said
6 earlier, we thought we would re-evaluate the form and
7 if the check boxes were problematic, could we design a
8 form that would be easier and better for our branches
9 to execute and fulfill the rescission requirements,
10 and that was how we came to design this form.
11    Q. Okay. Now, who at First Horizon actually
12 reviewed the 1047 right to cancel form before it was
13 decided to implement it in its residential mortgage
14 foreclosing packet?
15 MR. HEFFERON: Objection.
16        You mean reviewed after it was drafted
17 and before it was implemented?
18        MR. LEFEBVRE: Right.
19        MR. HEFFERON: Go ahead, if you know.
20    A. That would have been Annalee Myers. If you
21 want to separate the drafters and designers from the
22 approvers and reviewers.
23    Q. And that's what I'm getting at. I'm really
24 asking for who the approvers of this form are.
25    A. The ultimate approvers of the form would have

00031

1 been Annalee Myers. She was head of -- this is a
2 branch operations issue, and she was head of branch
3 operations at that time.
4     Q. Now, was the form -- and I'm talking about
5 1047. Was the form reviewed by any state or federal
6 regulatory agency prior to its implementation, if you
7 know?
8     A. In other words, are you asking did we submit
9 it to them for their review?
10    Q. Yes.
11    A. We did not submit it to any of those type of
12 individuals for review.
13    Q. Did the board of directors of First Horizon
14 have to review this form?
15 A. No.
16    Q. Were they aware that the form had changed?
17 When I say, they, I'm referring to the board of
18 directors.
19    A. I don't know if they were aware of this issue
20 or not.
21        MR. LEFEBVRE: Okay. Now, Tom, I want to
22 just briefly talk about -- prior to this deposition we
23 discussed the stipulation and the discovery. To make
24 it simple, I'm assuming that numerosity for purposes
25 of the class definition as outlined in the amended

00032

1 complaint is not being contested by First Horizon at
2 this time?
3        MR. HEFFERON: That's correct.
4        MR. LEFEBVRE: Okay.
5     Q. Now, Mr. Covington, do you know how many
6 loans subsequent to April of '03 -- and I'm referring
7 to nonpurchase money refinance transactions that were
8 secured by a consumer's residence -- had this loan
9 form executed at the time of closing?
10    A. I do not know specifically how many have this
11 form.
12    Q. Okay. You are aware that this lawsuit was
13 filed in February of 2004?
14    A. I was not aware of that. I guess I'm aware
15 of that now.
16    Q. Okay. Would you agree that there were more
17 than 100 nonpurchase money loans that were secured by
18 residence -- principal residences that had a form 1047
19 executed at the time of closing?
20    A. Yes, I would believe that would be true.
21    Q. Okay. Same question, but instead of 100,
22 250?
23    A. I would believe that to be true.
24    Q. And not to belabor it, but just one final
25 number, 500. Do you think there were 500 people,

00033
1  residential nonpurchase money loans secured by their
2  principal residence that had form 1047 in their packet
3  subsequent to '03?
4      A.  Yes.
5      Q.  Okay.
6          MR. HEFFERON:  Chris, we have the other
7  form now.
8          MR. LEFEBVRE:  Oh, you do?  Oh, great.
9      Q.  Now, Mr. Covington --
10         MR. LEFEBVRE:  Why don't we mark that,
11 Tom?
12         MR. HEFFERON:  Which one?
13         MR. LEFEBVRE:  I guess that would be 2.
14         MR. HEFFERON:  The Tabares one?
15 MR. LEFEBVRE:  Yeah.  You know what, Tom,
16 it probably makes sense since we have been referring
17 to it, why don't we also have the court reporter
18 mark --
19         MR. HEFFERON:  1047?
20         MR. LEFEBVRE:  Yeah.
21         MR. HEFFERON:  Okay.  She'll mark that as
22 3.
23         (Exhibit Nos. 2 and 3 marked.)
24         MR. HEFFERON:  Okay.  Now, of course,
25 Chris, what we have done here is we have marked as

00034
1  Exhibit 2 what you faxed in from the Tabares file, and
2  on the assumption that I'm operating under certainly
3  that although Tabares is an existing lawsuit, that you
4  are not trying to take discovery of Tabares through
5  this case, but you are just using this form because
6  you want to ask him things about Exhibit 3 and how it
7  is different and...
8          MR. LEFEBVRE:  Absolutely that's a fair
9  statement.  That is not my intention.  I think
10 having -- you raised the issue I had used the form,
11 and I think it makes sense -- or I had seen the form,
12 rather, and it makes sense to have Mr. Covington have
13 both so we are not speculating how -- the April of '03
14 changes to the form versus what the form was before.
15     Q.  Mr. Covington, you have both forms in front
16 of you, correct?
17     A.  Yes.
18     Q.  Okay.  Looking at Exhibit 2, which I believe
19 is a notice of right to cancel in a transaction --
20 consumer transaction that is totally unrelated to this
21 case, does that form appear to be the -- indicative of
22 the right to cancel form that was utilized by First
23 Horizon prior to the changes that were implemented in
24 April or May of '03?
25     A.  Yes.

00035
1      Q.  Okay.  Now, you also have -- we have just
2  marked Exhibit 3, which is the First Horizon form 1047
3  which is the form that is part of this lawsuit, the --
4  of this lawsuit.  Having looked at both forms, other
5  than the little line contained in Exhibit 2, is there
6  any difference between the content of paragraph one,
7  which states, your right to cancel, the paragraphs
8  below that?  Are they both the same in Exhibit 2 and
9  Exhibit 3?
10         MR. HEFFERON:  He is going to have to --
11 he is going through it right now so...
12         MR. LEFEBVRE:  All right.  Take a minute.
13         THE WITNESS:  Does he want me to read it
14 word for word and answer that?
15 MR. HEFFERON:  Yeah, if there is any
16 differences.  And when you find any differences, you
17 should probably then recite them at that point rather
18 than trying to remember them.
19     A.  I don't see any differences in that
20 paragraph, the first paragraph.
21         MR. HEFFERON:  The first paragraph of
22 section 1.
23     Q.  Okay.  So basically both forms, Exhibit 2 and
24 3, have the four separate paragraphs underneath?
25     A.  Yes.

00036
1      Q.  And the Exhibit 2 just has a line to either
2  apply the first two paragraphs or the second two
3  paragraphs contained in the big paragraph number one?
4          MR. HEFFERON:  No, Chris.  Because you
5  are not here, you didn't see what he did.  He actually
6  just testified there is no difference between the
7  first of the four paragraphs.
8          MR. LEFEBVRE:  Oh, I'm sorry.  Okay.
9          MR. HEFFERON:  If you were here, you
10 would have seen that.  If you want him to compare all
11 of the four paragraphs --
12         MR. LEFEBVRE:  Yeah, I would like him to
13 compare all of the four paragraphs under the generic
14 paragraph number 1 called your right to cancel.
15 MR. HEFFERON:  He is looking at the
16 second one.
17         MR. LEFEBVRE:  Okay.  Sorry.
18         THE WITNESS:  Okay.  We want to talk
19 about the second paragraph?
20         MR. HEFFERON:  Sure.
21     A.  I don't see any difference in the wording
22 absent on Exhibit 3, there is not a place to mark or
23 check that paragraph.
24         MR. HEFFERON:  Okay.  Why don't you go on
25 to the third paragraph.

00037

1 A. Well, we are going to have to parse through
2 this. This paragraph is going to have some
3 differences. The first sentence is different between
4 the two. The second sentence -- the second sentence
5 seems to be the same. The third sentence appears to
6 be the same. The fourth sentence is the same, and the
7 last sentence of that paragraph, the fifth sentence,
8 is the same.
9    Q. Okay.
10       MR. HEFFERON: Do you want him to look at
11 the last?
12       MR. LEFEBVRE: Yeah, please.
13       MR. HEFFERON: Look at the fourth
14 paragraph.
15 A. Okay. I believe the fourth paragraph is the
16 same between the two notices.
17    Q. So other than you -- you mentioned there was
18 a slight change in one of the sentences, the four
19 paragraphs contained in the big paragraph number one,
20 pretty close between the two forms, correct?
21       MR. HEFFERON: Objection to the
22 characterization. He testified that there was
23 differences. You added the slight and pretty close
24 characterizations.
25       MR. LEFEBVRE: Okay. All right.

Covington, Charles - 02/11/05       **Page 37**

00038

1 MR. HEFFERON: As well as the lines. He
2 pointed out the lines are not there.
3       MR. LEFEBVRE: Right. Okay.
4    Q. Now, Mr. Covington, looking at Exhibit 2, the
5 Tabares right to cancel, is it fair to say -- or I
6 want to make sure I understand your testimony -- that
7 it was brought to your attention that there was some
8 problems about checking off the line, which line
9 applies?
10 A. Yes.
11    Q. Okay. Can you be more specific when you say
12 problem? What was the problem that you became aware
13 of?
14 A. These boxes or lines not being checked.
15    Q. Okay. And are you familiar with what is
16 known as the H-8 right to cancel model form under
17 Truth in Lending?
18 A. Yes.
19    Q. And are you familiar with what is known as
20 the H-9 form.
21 A. Yes.
22    Q. And what is your understanding of the H-9
23 form? What type of transaction is the H-9 form
24 utilized in?
25 A. If I can look at this. The H -- the H-9 form

Covington, Charles - 02/11/05       **Page 38**

00039

1 is used when you are refinancing a loan already
2 secured by the creditor and there is an increase of
3 that credit amount.
4    Q. Okay. And how about the H-8 form?
5 A. H-8 is where you have no existing lien on the
6 property and the refinancings occur, you use this
7 right of rescission form meaning that the customer has
8 the right to rescind the entire amount of the money
9 versus just the new amount under H-9.
10    Q. Okay. Now, looking at Exhibit 2, the Tabares
11 form, is it fair to say that when this form was
12 utilized by First Horizon at the time of the actual
13 closing, it was standard practice and procedure to
14 have the closing individual to check off one of the
15 two lines, either the line that begins if you cancel
16 the transaction, the second subparagraph of -- big
17 paragraph one or the third subparagraph which begins
18 if you cancel the new transaction?
19 A. Well, I'm not exactly sure I know what you
20 mean by the closing individual. That could be -- are
21 you talking about the closer in our branch who
22 prepares these documents or the title agent or the
23 closing attorney that executes them with the customer?
24    Q. You told me there was a problem with these
25 boxes.

Covington, Charles - 02/11/05       **Page 39**

00040

1 MR. HEFFERON: Objection. He testified
2 that you had claimed there was a problem with these
3 boxes.
4       MR. LEFEBVRE: Okay. That's a fair
5 question.
6    Q. Well, were you aware that there were any
7 problems with these boxes but for me?
8 A. No.
9    Q. Okay. So I was the only person who ever
10 lodged a complaint -- when I say, myself, myself on
11 behalf of my client -- that there was a problem with
12 boxes not being checked?
13 A. To my knowledge, yes.
14    Q. Oh, okay. Other than this lawsuit that is
15 pending in Massachusetts, has anyone filed any type of
16 complaint relative to the content of Exhibit 3?
17       MR. HEFFERON: Define what you mean by
18 filed a complaint.
19    Q. Well, has it been brought to the attention of
20 New Century that there were any type of problems with
21 the right to cancel the contents of the right to
22 cancel form, which is referenced in Exhibit 3, the
23 form they are using now?
24       MR. HEFFERON: You referred to New
25 Century again.

Covington, Charles - 02/11/05       **Page 40**

00041
1  MR. LEFEBVRE: I'm sorry. You know who I
2  have got on my mind, right?
3         MR. HEFFERON: Apparently. Maybe you
4  should spend your time suing them and not First
5  Horizon.
6         MR. LEFEBVRE: I'll comment after the
7  testimony about that.
8     Q.  I meant First Horizon. I'm sorry.
9         MR. HEFFERON: So the question is: Other
10 than this lawsuit, is Mr. Covington aware of other
11 complaints being made concerning Exhibit 3?
12    A.  I am not aware of any other complaints
13 concerning Exhibit 3.
14    Q.  Okay. Now, where are the -- after a loan is
15 closed -- and, once again, I'm staying focused on
16 residential consumer either purchase loans or
17 refinancing -- where are the loan files actually kept?
18        MR. HEFFERON: Objection, compound.
19        I think it might be helpful to the
20 witness if you say when in time, Chris. Where did
21 they eventually go or where are they kept in the
22 process.
23        MR. LEFEBVRE: I want to focus -- I mean,
24 obviously, in this lawsuit, there has been an issue
25 about document retrieval.

00042
1     Q.  And I want to know where do they ultimately
2  go, Mr. Covington.
3         MR. HEFFERON: Go ahead.
4     A.  Ultimately, they -- we maintain all of our
5  loan records on an imaging system. So there -- our
6  permanent record is maintained on imaging, so they are
7  on electronic media.
8     Q.  Okay. And can you tell me what -- let's back
9  up a minute. So is there any paper, actual hard paper
10 file, kept anywhere?
11    A.  There may be some kept for a period of time.
12 The branches sometimes keep a backup copy. There may
13 be a paper copy in our post-closing area here or
14 there, but officially our record retention is through
15 this electronic media storage mechanism.
16    Q.  Okay. Tell me a little bit about the
17 electronic storage. What actually is electronically
18 stored, the entire closing file or certain portions of
19 the closing file?
20    A.  The entire loan file.
21    Q.  Okay. And what documents would -- in a
22 general sense would be included in the entire closing
23 file?
24    A.  All documents related to the loan.
25    Q.  So would it be fair to say that the note,

00043
1  mortgage, HUD 1 statement, right to cancel form, would
2  be included in the file that is ultimately imaged?
3     A.  Yes.
4     Q.  Now, is there some type of computer system
5  that allows access to retrieve the files?
6     A.  Yes.
7     Q.  Can you tell me what that -- tell me about
8  that computer system. Does it have a particular name?
9     A.  We call it Workflow. It is a web-based
10 browser.
11    Q.  And does that computer system allow you to
12 retrieve individual documents that can be identified?
13 For example, let me give you a hypothetical. If you
14 wanted a right to cancel form -- to look at a right to
15 cancel form in a loan -- three-year-old loan that was
16 originated and closed in the state of Nebraska, could
17 you punch a code in and have that document be
18 retrieved, or would you have to pull up the whole
19 closing file?
20    A.  You have to access the entire file.
21    Q.  Okay. So someone would have to -- and I just
22 want to understand. It is not a trick question.
23 Someone would actually have to pull up the whole file
24 on a screen and manually move the mouse or whatever to
25 the particular document you are looking for?

00044
1     A.  That's correct.
2     Q.  Okay. And where is the imaging actually
3  done? Is it done in a central location or done by the
4  individual branches or --
5     A.  You mean now or historically because that
6  procedure has changed over time.
7     Q.  All right. Let's talk about what the
8  procedure was two years ago.
9     A.  I don't know for sure. Back in that time, it
10 was a mix of some branches did their scanning at the
11 branch; others sent their documents in to our
12 post-closing area here in Dallas. So it was a
13 mishmash of some branches were on -- we call that
14 distributive capture. I mean, they have scanning
15 material -- scanning machines in their branches. They
16 do the scanning themselves. Others didn't. So it is
17 just a mishmash. We have now gone to primarily a
18 totally a decentralized scanning process where now all
19 of the branches scan their own documents by and large.
20 It is not exactly perfect because every once in a
21 while a file may get missed. They can still send it
22 into our back office for scanning and trailing
23 documents are scanned here. So, I mean, that's not
24 exact, but that's principally how it works.
25    Q.  And when did that change? When was that

00045
```
 1  change?
 2     A.  We probably completed the rollout of
 3  distributing capture concept, I would say -- I would
 4  say in '03.  I don't know the dates exactly.  It was a
 5  phased rollout over time.  We do a few branches a
 6  month kind of thing, but I would say throughout '03,
 7  if I recall.
 8     Q.  Okay.  But regardless of -- right now the
 9  goal is that every file is ultimately scanned,
10  correct?
11     A.  Yes, every -- the question is, do we scan
12  every file?  Yes, we do.
13     Q.  Okay.  Now, I want to --
14        MR. LEFEBVRE:  Tom, do you have that
15  packet of the -- I'm sorry.  I'm having a mental
16  block.  The documents you produced about quality
17  control that we talked about prior to the deposition?
18        MR. HEFFERON:  Yes, we do.
19        MR. LEFEBVRE:  Okay.
20        MR. HEFFERON:  Can we take -- Chris,
21  before we move on, can we take a break?
22        MR. LEFEBVRE:  Okay.  Sure.
23        (Recess 11:04 to 11:23.)
24        MR. HEFFERON:  Mr. Covington does have
25  the documents numbered First Horizon 936 through First
```

00046
```
 1  Horizon 1043.
 2     Q.  Okay.  Great.  Just during the break I went
 3  back just so I can wrap up a few loose ends.  I'm
 4  going to hold off for a minute.  I want to go back to
 5  some of the areas of inquiry.
 6        Mr. Covington, just so I'm clear, does
 7  First Horizon have all of the nonpurchased money
 8  mortgage files available on its imaging system for the
 9  period February 1st, 2000 through February 1st, 2004?
10     A.  Yes, we should.  I mean, could I say that
11  every single loan we have originated is on the imaging
12  system during that period of time, I couldn't say
13  that, but they certainly should be and our expectation
14  is that they are.
15     Q.  Okay.  Now, earlier you had -- I had asked
16  you some questions about what we have called
17  numerosity, you know, the number of potential members
18  of this potential class action.  And I had asked
19  you -- I had used the number 500, if there were 500 --
20  at least 500 people who received the form referenced
21  in Exhibit 3, and I believe you said yes; is that
22  correct?
23     A.  Yes, that's true.
24     Q.  All right.  Now, if I wanted to know how many
25  people actually received the Exhibit 3, the form
```

00047
```
 1  referenced in this lawsuit, which is the subject of
 2  this lawsuit during the four-year period prior to the
 3  filing of the lawsuit, what would I have to do to
 4  retrieve that information?
 5     A.  If you wanted to know specifically who
 6  received this notice?
 7     Q.  If I want to know how many -- first, let's be
 8  real simple so there is no trick.  If I want to know
 9  how many First Horizon customers who had a nonpurchase
10  money mortgage during that four-year period, went to a
11  closing, wherever the closing was, and received this
12  form, the form that we have been talking about at
13  length this morning, Exhibit 3, what would I have to
14  do to get that information?
15  MR. HEFFERON:  And the period for this
16  deposition that the discovery is directed towards is
17  the 1st of February 2000 through the 1st of February
18  2004?
19        MR. LEFEBVRE:  Yeah, I believe in our
20  complaint -- the complaint was filed in February, and
21  I believe all of the discovery was during that time
22  frame going back four years, obviously, because the
23  Massachusetts nuance and three years for everyone
24  else.
25        MR. HEFFERON:  Okay.  So I just want to
```

00048
```
 1  make sure I'm clear.  The class period you are
 2  conducting discovery about goes from February 1, 2000,
 3  to February 1, 2004?
 4        MR. LEFEBVRE:  Well, Massachusetts only
 5  goes to 2004.  Everyone else goes to 2003.  I stand
 6  corrected.  I'm looking at the amended complaint, Tom.
 7        MR. HEFFERON:  Okay.
 8        MR. LEFEBVRE:  I'm looking at the class
 9  definition, and what we did is -- bear with me one
10  second because there is no sense wasting time on
11  irrelevant issues.
12        MR. HEFFERON:  Yeah, I'm trying to make
13  sure that the witness when giving his testimony about
14  this case talks about the period of time you want to
15  conduct discovery about.
16        MR. LEFEBVRE:  Okay.  In our class
17  definition, our class definition is defined --
18     Q.  And this is the period I'm asking the
19  question, Mr. Covington, about, getting access to the
20  right to cancel form, for all natural persons
21  involving nonpurchase money loans secured by their
22  residence on or after three years prior to the filing,
23  so the filing was February of 2004, and for four years
24  prior to the filing for just Massachusetts residents.
25  So three years for every other state but
```

00049
1  Massachusetts. So February 1, 2001 to February 1st of
2  2004 for every state but Massachusetts.
3           MR. HEFFERON: Okay. And so your
4  question, Mr. Covington, is if -- if he was to assign
5  some of the tasks of figuring out how many people
6  there were who got this form between February 1 of '01
7  to February 1 of '04 in all 49 states except
8  Massachusetts plus Massachusetts for February '00 to
9  February of '04, how would he do that?
10          MR. LEFEBVRE: Brilliant question.
11          MR. HEFFERON: Okay. Go ahead.
12     A.  Well, if you wanted to know for sure, we
13  would need to review all of those files.
14     Q.  And how would you actually go about doing
15  that?
16     A.  We would have to pull up each individual loan
17  file and review the notice of right to cancel that was
18  provided.
19     Q.  Okay. So just so I'm clear, there is no
20  computer software as part of this imaging system that
21  could help you somehow correlate and group various
22  documents in the particular loan files during the
23  period that we just placed before you?
24     A.  No, there is not. Just so you'll understand,
25  the documents appear like PDF files. They are

**Covington, Charles - 02/11/05          Page 49**

00050
1  basically photographs of the document, so they are not
2  electronic in themselves. They are images. They are
3  photographs. It is an imaging system. They appear
4  like what a PDF file would appear to you to look like.
5     Q.  Okay. That helps. Thank you. Just a few
6  more follow-up questions before we get on to the other
7  packet of documents.
8           Exhibit 2, what I'm going to call the
9  Tabares form and the form that was utilized prior to
10  April of '03, how long has that form been in
11  existence, if you know?
12     A.  I don't know exactly how long this form has
13  been in existence.
14     Q.  More than a year?
15     A.  Well, I see that it has got a date of ?-01,
16  so I would assume it is at least from that time
17  period.
18     Q.  Okay. Now, just so I'm clear, I was looking
19  through my notes. When you told me originally -- you
20  talked about the different -- what I'm going to
21  characterize as lending division, retail, wholesale,
22  and I believe you mentioned correspondent lending?
23     A.  Yes.
24     Q.  And I don't know what that is. Could you
25  tell me what correspondent lending is?

**Covington, Charles - 02/11/05          Page 50**

00051
1  A.  Correspondent loans are loans that are
2  originated and closed and funded by a third party, and
3  then we buy the loan, the entire whole loan in what we
4  call a closed loan purchase. So they are purchase
5  transactions. They are not originations meaning we
6  are not doing the underwriting on the loan. We are
7  just buying the loan, the originated loan.
8     Q.  Oh, okay.
9     A.  So they are funded and closed on the
10  documents of that corresponding lender.
11     Q.  Okay. So First Horizon wouldn't have
12  anything to do with the preparation of the documents
13  that were utilized in any of the correspondent loans;
14  is that correct?
15  A.  I wouldn't say that entirely because we have
16  our documents on doc prep vendors, and I believe some
17  of the correspondence to make it easy for them, if
18  they want to go out and obtain our closing documents,
19  they can do that. So there is that option or
20  capability to them, I believe.
21     Q.  Okay. Fine. And then just one final point.
22  When you were talking about the retail and the
23  wholesale lending division, I had asked you about, you
24  know, Exhibit 3, the form, the right to cancel form,
25  and you mentioned that there could be some variations

**Covington, Charles - 02/11/05          Page 51**

00052
1  based on the loan originators in those two divisions.
2  Did I understand your testimony correct?
3     A.  I think that what I was saying is that
4  rather -- if a document was on our front-end system,
5  which we call TMO -- versus one of these doc prep
6  vendors, therein could be some differences in the
7  document.
8     Q.  And what does TMO stand for?
9     A.  It actually stands for The Mortgage
10  Originator.
11     Q.  Okay. I couldn't hear the first one. It
12  didn't come over the telephone.
13     A.  The. The. The Mortgage Originator.
14     Q.  Okay. So The Mortgage Originator was a
15  program utilized by First Horizon to generate what I'm
16  going to call in a generic sense closing documents?
17     A.  Yes.
18     Q.  Okay. And The Mortgage Originator would
19  have -- if it were used, would have generated Exhibit
20  3, the form 1047?
21     A.  Yes.
22     Q.  Okay. Now, if you didn't use TMO, you could
23  use some other type of software? Is that what you are
24  telling me?
25     A.  Yes.

**Covington, Charles - 02/11/05          Page 52**

00053
1  Q. And do you know what the other types of
2  software were during the time frame that we are
3  talking about, either three years prior to the lawsuit
4  or four years in Massachusetts?
5     A. There were -- that's a multiple question, a
6  complex questions. There were various front-end
7  systems we used during that time, and we also used
8  Guardian, which is a doc prep vendor also. So it
9  could be a mix of any of those things.
10    Q. Okay. Now, focusing just on the right to
11 cancel form -- either Exhibit 3 or we called it
12 1047 -- would either -- using the front end or the
13 Guardian -- what I'm going to call software -- made
14 any substantive changes to the right to cancel form?
15 MR. HEFFERON: Objection.
16       You mean using -- are you asking him
17 whether or not those other front-end systems and/or
18 Guardian used Exhibit 3?
19    MR. LEFEBVRE: Yes.
20    MR. HEFFERON: Okay.
21    MR. LEFEBVRE: Thank you.
22    A. Our system, TMO, used Exhibit 3, and I'm not
23 exactly sure because I haven't really looked at it
24 this closely under this exercise to see if Guardian's
25 notice was the exact same, but it could be somewhat

00054
1  different. There could be some variations to it.
2     Q. Okay. Could Guardian have used a notice of
3  right to cancel that was similar to Exhibit 3?
4     A. Well, I guess what I'm saying is, is Guardian
5  would have programmed into their system those
6  documents in principal. There could be some minor
7  format changes, but we submit the documents to them
8  for use -- for use for our purposes.
9     Q. Okay. And, finally, the variations that
10 could have been in existence or were in existence
11 during the time frame of this litigation, I assume
12 that you do have some file or folder or some computer,
13 document that could produce the different right to
14 cancel forms that were used or generated during the
15 time frame of this lawsuit?
16    A. I do not have such a file.
17    Q. Okay. Now, and I'm not talking about you
18 personally. I'm asking the same question, but more
19 direct to First Horizon. Is there someone at First
20 Horizon that does?
21    A. I don't know. Sherri Rye, our office person,
22 does person, may have such a file, but I'm not sure.
23    Q. And her name is Sherri?
24    A. Rye.
25    Q. And what is her capacity at First Horizon?

00055
1  A. At the time, she was over policies and
2  procedures.
3     Q. Okay. When you say at the time, are you
4  talking about either the three-year window prior to
5  the lawsuit or four-year window?
6     A. Yes.
7     Q. Okay. Where is Sherri now?
8     A. She still works for the company.
9     Q. I assume in a different capacity?
10    A. Somewhat different capacity. Now she manages
11 our documents.
12    Q. Okay. Fine. Now, I assume -- is it fair to
13 say that you are the person that is most familiar with
14 the regulatory compliance in relation to TIL for
15 nonpurchase money loans during the time frame of this
16 lawsuit?
17       MR. HEFFERON: Objection, speculation
18 about what other people know.
19    Q. Okay. Are you -- let me say, are you one of
20 the persons that is knowlegable about the compliance
21 procedures of First Horizon during this time period?
22    A. Yes.
23    Q. Okay. Are you familiar with the documents
24 that have been produced to me which your attorney
25 referenced, I believe, documents 936 through 1000,

00056
1  whatever the ending number is?
2     A. Yes, I have got them here.
3     Q. Okay. I assume you have seen these documents
4  before?
5     A. Yes.
6     Q. Okay. Now, I notice -- let me ask you this:
7  There are a lot of areas in the document that have
8  been redacted.
9     A. Yes.
10    Q. Okay. And is it fair to say that the
11 redacted areas deal with compliance outside of the
12 Truth in Lending area?
13    A. They deal with compliance outside of the
14 right of rescission rights of the Truth in Lending.
15    Q. So basically what has been produced to me are
16 the documents that deal with Truth in Lending
17 compliance, correct?
18    A. Well, what you have been provided deal with
19 right of rescission under Truth in Lending.
20    Q. Okay. That's a fair correction. I notice on
21 number 941 and 943 -- 941 is earmarked as retail
22 closing disclosure and 943 is wholesale disclosures.
23    A. Uh-huh.
24    Q. Does this deal with regulatory compliance?
25 What is the nature of these documents? What do they

00057
1  deal with?

2     A.  These deal with regulatory compliance.

3     Q.  Is there different regulatory compliance

4  issues for retail versus wholesale closings?

5     A.  There are different procedures, yes.

6     Q.  Can you tell me what the different procedures

7  are in a general sense?

8     A.  The different procedures are:  In a wholesale

9  transaction, we don't actually interact with the

10  customer.  The wholesale broker does.  So there are

11  some disclosures that are delivered by the broker,

12  which a less disclosure requirement on it; whereas, in

13  retail, we are dealing with the customer from the very

14  beginning, and we have all disclosure requirements.

15  Q.  Okay.  Now, I'm looking at document 949

16     A.  949.  Okay.  949.  All right.  Got that.

17     Q.  I want to make sure that I understand Section

18  1 of document First Horizon 000949, review cycle.

19     A.  Yeah.

20     Q.  Am I correct in assuming that the quality

21  control of these files, the nonpurchase money loans,

22  are done usually within 60 days after, let's say, the

23  loan is complete?

24     A.  They are completed within -- we do the QC

25  work on a monthly cycle basis.  So the reviews and

00058
1  everything and the reporting of it is complete within

2  60 days of month end of the closing month in which we

3  are quality control reviewing.

4     Q.  Okay.  Can you walk me through the -- in

5  relation to the TIL rescission, the quality control

6  steps First Horizon goes though to ensure that there

7  is compliance with the right to cancel issue in the

8  loan?

9        MR. HEFFERON:  Chris, let me just jump

10  in.  I don't know if there is any difference, but

11  since this deposition is about the period '00 to '04,

12  February 1, '00 to February 1 of '04, I don't know

13  if -- your question was really a current question, but

14  I'm assuming that you really wanted to find out what

15  was done at that prior time.

16        MR. LEFEBVRE:  That's a good point.  I

17  didn't clarify.  That's the time frame and that may

18  lead to a follow-up question.

19        MR. HEFFERON:  That's fine.  I just want

20  to make sure the witness understands that his

21  testimony should be about what you did from February

22  '00 to February of '04.

23        MR. LEFEBVRE:  That's the hard part, not

24  seeing the facial expression when I ask a question

25  that is horrible and the witness doesn't know.  What

00059
1  I'm talking about, when you are sitting there, you can

2  kind of tell it is time to try again.

3        MR. HEFFERON:  Yeah, and it is hard for

4  the witness to remember sometimes that the discovery

5  in the case is limited to the four-year window up

6  until the filing of the complaint.  So I want to make

7  sure his testimony is relevant.  So go ahead.

8     Q.  After you have heard the lawyer speak, Mr.

9  Covington, do you understand what I have asked you?

10     A.  I think you were asking me, if I recall, what

11  was our QC procedures around right of rescission

12  notices.

13     Q.  Right.  During the time frame of this

14  lawsuit, which was three years prior to February of

15  '04 or possibly four years for Massachusetts?

16     A.  Okay.  Yes, the materials you have been

17  provided show what those procedures were, but in

18  brief, what we would do is we would review a sample of

19  files to see if the rescission notice was there.  We

20  would check to make sure that the rescission period,

21  the three-day rescission period, was observed based

22  upon the funding of a loan.  We would review the

23  notice to see if it was complete primarily focusing on

24  signatures and dates, make sure the dates were there,

25  the dates were correct and was executed by the

00060
1  borrowers.  I mean, that was the principal steps.

2     Q.  Now, I assume that during the period prior to

3  April 3rd when -- what I'm calling Exhibit 2, the

4  Tabares right to cancel form was in use, that you were

5  checking to make sure that one of the lines was

6  checked off in the two paragraphs that have lines?

7        MR. HEFFERON:  Objection.  I don't know

8  how that is relevant to this case, Chris.

9        MR. LEFEBVRE:  Well, I'm just asking.

10        MR. HEFFERON:  Well, I know, but, again,

11  we talked about the fact that...

12        MR. LEFEBVRE:  Fine, Tom.  Fine.  That's

13  not a problem.

14        MR. HEFFERON:  Yeah.  Okay.

15  MR. LEFEBVRE:  I can live without that

16  answer.

17        MR. HEFFERON:  Okay.  Fine.  Thank you.

18  I appreciate that.

19     Q.  And then after you do your quality control, I

20  gather looking at 949, that reports are generated?

21     A.  Uh-huh.

22        MR. HEFFERON:  You have to say yes or no.

23  You can't just say uh-huh.

24     A.  I'm sorry.  Could you repeat the question?

25     Q.  I assume based upon the documents that I

00061

1 reviewed that after you do your quality control that

2 certain reports are generated?

3    A.  Yes.

4    Q.  And is it fair to say that those reports --

5 what has been provided to me as document 988 through

6 document 1043 would be a sample quality report for the

7 various time frames contained in the document?

8    A.  Yes.

9    Q.  Now, who sees the quality control reports,

10 documents 988 through 1043?  Who saw them during the

11 time period of this lawsuit?

12    A.  Well, to keep it simple, if you look on

13 document 949 under L, it has the list of the people we

14 distribute the report to.

15    Q.  Okay.

16    A.  From the president and CEO all the way down

17 to the branch managers and other operation managers,

18 even external parties.  That's the listing of who gets

19 the report.

20    Q.  Now, has there been any changes to the

21 quality control procedures that you have just briefly

22 outlined for me over the past few moments subsequent

23 to the filing of the lawsuit relative to the TIL

24 disclosure?

25        MR. HEFFERON:  Changes in the quality

00062

1 control procedures?

2        MR. LEFEBVRE:  Yes.

3        MR. HEFFERON:  Go ahead.

4    A.  We have changed our QC procedures because we

5 have changed our compliance procedures.

6    Q.  Okay.  And what changes have been made to the

7 compliance procedures?

8        MR. HEFFERON:  Object to that question

9 because it is beyond the scope of the case, so I don't

10 think it is relevant to what the discovery in the case

11 is about.

12        MR. LEFEBVRE:  Are you instructing him

13 not to answer?

14        MR. HEFFERON:  No, I'm not going to

15 instruct him not to answer, but...

16        MR. LEFEBVRE:  You have made your

17 objection.

18        MR. HEFFERON:  Yeah, I know, but you are

19 asking about what happened after June of '04 -- or

20 after February of '04.  So I'm going to object to that

21 on the grounds that it is not within the scope of the

22 case.

23        MR. HEFFERON:  You can answer.

24    Q.  You can answer.

25        MR. HEFFERON:  The question is:  What

00063

1 quality control procedures have changed?

2    A.  Well, I mean, we are constantly tweaking and

3 enhancing our procedures, so there is a variety of

4 changes.  Everything from sample sizes to new

5 regulations coming on, like the Fact Act, for example,

6 where we have -- now have testing surrounding and

7 those types of things.

8    Q.  Okay.  Any substantive changes in relation to

9 TIL rescission or TIL in general?

10        MR. HEFFERON:  Objection, relevance.

11 Also vague.  I don't know what you mean by

12 substantive.  I don't know that the witness knows.

13    Q.  Do you understand my question?

14    A.  Are you asking me have we changed how we

15 quality control the right of rescission notice

16 document?

17    Q.  Yes.

18    A.  Yes, we have.

19    Q.  Can you tell me how?

20        MR. HEFFERON:  Same objection.

21 Continuing objection.

22        MR. LEFEBVRE:  I understand, Counsel.

23        MR. HEFFERON:  And also object to it on

24 the grounds of subsequent remedial measures.

25    A.  Well, we have different documents now, so

00064

1 there is different quality control standards around

2 those documents, different procedures because there is

3 different rescission notices being used now.

4    Q.  Anything else?  I didn't mean to cut you off.

5    A.  No, that is the substantive piece of it.

6    Q.  Okay.  Now, I'm looking at document 945.  You

7 mentioned -- or alluded about the size of the sample.

8 Can you just explain -- I'm having a hard time

9 understanding Subsection C.  Am I reading that to say

10 that 105 files are tested for the retail area and 65

11 for the wholesale?  I don't know how to interpret

12 those numbers.

13    A.  That's true.  The review type is compliance.

14 The area -- the category is closed loans for retail.

15 We do some testing around nonclosed loans, denials and

16 things, so that's a differentiation there.  Closed

17 loans for retail, closed loans for wholesale.  We use

18 a statistically based random sampling approach, and

19 based on that random sampling approach, these are the

20 target, our kind of estimated populations we look at

21 each month.  They are not exact.  It depends on

22 various factors when you do random statistically

23 sampling, but those are kind of target samples.

24    Q.  So the random sample would be naturally the

25 states that First Horizon did business in during the

00065
1  few months prior to the quality control being
2  conducted?
3      A.  Yes.  We randomly sample all of our loan
4  production.
5      Q.  So this 105 figure and the 65 figure, that's
6  on a monthly basis that this sampling is done?
7      A.  Yes.
8      Q.  Okay.  Now, Mr. Covington, do you have the
9  nonredacted documents in front of you or do you just
10  have what has been provided to me?
11      MR. HEFFERON:  He just has what has been
12  provided to you.  I do have the nonredacted regulatory
13  compliance plan and origination quality control
14  report.  I do not have the nonredacted documents
15  higher up in this stack.  That is I don't have the
16  nonredacted 936 through 944.
17      MR. LEFEBVRE:  Okay.  All right.  Fine.
18      MR. HEFFERON:  And if you have further
19  questions about redaction, Chris, I'm sure we can tell
20  you what it was we redacted, but my belief is that
21  Mr. Covington testified accurately, that is that we
22  redacted things that did not relate to the TIL
23  rescission.
24      MR. LEFEBVRE:  Okay.  And he doesn't have
25  the full thing in front of him, in any event, if I

**Covington, Charles - 02/11/05          Page 65**

00066
1  were to ask him some questions about a particular
2  page, correct?
3      MR. HEFFERON:  Correct.  But I can
4  certainly tell you the answer to that.
5      MR. LEFEBVRE:  Okay.  If it becomes an
6  issue, most certainly I can follow up with a letter if
7  there is substance that piques my subsequent
8  curiosity.
9      MR. HEFFERON:  Or just call New Century.
10      Q.  Mr. Covington, document 989.  This is the
11  statistics original quality control report for June of
12  '03?
13      A.  Yes.
14      Q.  Okay.  I want to -- I have to confess I was
15  not a math person.  I got a D in algebra and just
16  about flunked basic math in the fifth grade.  So I'm
17  not good with numbers.  Can you just try to interpret
18  for me the -- appear to be 1, 2, 3, 4 categories of
19  statistics, right of rescission notice missing,
20  rescission period not observed, notice of right to
21  cancel, and expiration date and then various numbers.
22  Could you just walk me through each line so I
23  understand what this data means?
24      MR. HEFFERON:  Go ahead.
25      A.  Lines or columns or both?

**Covington, Charles - 02/11/05          Page 66**

00067
1      Q.  Why don't we go through, for example, TIL
2  notice of rescission, notice missing.  I see goal 5
3  percent.  What does that mean?
4      A.  What we do is we have set up various quality
5  control testing steps for auditors, and each one of
6  these steps is what you are seeing here.  In other
7  words, this is the aspect of compliance that the QC
8  auditor is testing for.  And what they are testing for
9  here is based on their observance of the file, is
10  there a notice or is there not a notice.
11      Q.  Okay.
12      A.  We manage under a risk management
13  perspective.  Like any company, we have tolerances and
14  benchmarks upon which we try to achieve, and that's
15  what this goal is, 5 percent error rate.  The next is
16  the error rate for the aggregate company.  The small
17  number, the 251, is the number of files we looked at
18  to derive that error rate.  And then all of the other
19  percentages running across towards the right is a
20  breakdown of error rates by each of our regions.  And
21  the number underneath each region name is the number
22  of files looked at for that region.
23      Q.  Okay.  So like CA at the top -- I assume if
24  it says 12, you looked at -- they reviewed 12 files
25  from California?

**Covington, Charles - 02/11/05          Page 67**

00068
1      A.  That's correct.
2      Q.  And then what is the E1 region?
3      A.  That is New England 1 -- at the time -- the
4  regions have all changed now, but at the time, that
5  was New England 1 and New England 2.
6      Q.  E1 and E2?
7      A.  Yes.
8      Q.  And that would comprise all of the New
9  England states?  You actually did business in all of
10  them?
11      A.  I don't know.  I mean, principally, I can't
12  recall.  I would have to go and look and see what
13  exactly states that was all in, but, yeah, it was the
14  New England states.
15      Q.  And then I see Mass?
16      A.  No, that is Mid-Atlantic.
17      Q.  Oh, all right.  Mid-Atlantic.  Midwest?
18      A.  Midwest.
19      Q.  Nebraska?
20      A.  Northeast, which is lower down than New
21  England.
22      Q.  Okay.
23      A.  Northeast is more like Pennsylvania, New
24  Jersey, Baltimore, Maryland, that area.
25      Q.  Northwest?

**Covington, Charles - 02/11/05          Page 68**

00069

1 A. Northwest.

2 Q. SA?

3 A. South Atlantic.

4 Q. Southeast?

5 A. Southeast.

6 Q. Southern?

7 A. Which is Texas. And then Southwest, which is

8 like Arizona, New Mexico, Utah.

9 Q. They won't let me out of Rhode Island, so

10 that's why I'm a little unfamiliar with these.

11      MR. HEFFERON: Are you angry there is no

12 category for RI?

13      MR. LEFEBVRE: There wouldn't be very

14 many of them.

15 Q. So, for example, just looking at the first

16 line we were talking about under Midwest MW 37, then I

17 see a 3.03 percent. What is that, please?

18 A. That would mean -- that's the percentage of

19 errors of missing right of rescission notices in that

20 region. So the denominator is -- well, it is not

21 exact here, but there is a denominator somewhere

22 around 37.

23 Q. Okay.

24 A. And the number of files missing, dividing

25 that out, you get to a 3.03 percent error rate.

Covington, Charles - 02/11/05          Page 69

---

00070

1 Q. Of files that didn't have a right to

2 rescission?

3 A. Yes.

4 Q. And that same analysis would comply for the

5 other categories? For example, I see on the second

6 line, rescission period not observed. Pretty much

7 that was not an issue according to this report over

8 all of the regions?

9 A. That's true.

10 Q. And then notice of right to cancel not

11 completed correctly. Under the Northeast one, there

12 was a problem in 10 percent of the sample that you

13 used?

14 A. New England 1.

15 Q. Well, it is E1, which I believe you told me

16 was New England one.

17 A. Yeah, it is New England 1. That was 10

18 percent, yes.

19 Q. And the bottom -- the last expiration date is

20 inaccurate. There was no problem in any of the

21 regions based on this statistical sampling during the

22 time frame contained in this report?

23 A. That's correct.

24 Q. Now, I was looking at document 988. It

25 appears that -- are these done monthly? Is this

Covington, Charles - 02/11/05          Page 70

---

00071

1 report a monthly report?

2 A. Yes.

3 Q. It is. And you generate these reports

4 every -- you were generating them monthly during the

5 period prior to the lawsuit?

6 A. Yes. Well, this QC testing procedures didn't

7 start until I will say mid '02.

8 Q. Okay. And then I gather that the rest of

9 these reports, these regions are still consistently

10 the same and the explanation relative to percentages

11 that you just testified are all similar based on the

12 particular inquiry contained in the report?

13 A. The percentages and how we calculate it are

14 still the same. The regions have all changed. We

15 have a lot more regions now, and most of them aren't

16 even called this anymore. There is no New England 1,

17 New England 2 anymore, for example.

18 Q. Okay.

19      MR. LEFEBVRE: Tom, if I take five

20 minutes just to review a few notes, I don't really

21 have much else and we can wrap this up.

22      MR. HEFFERON: Okay.

23      (Recess 11:56 to 11:58.)

24      MR. LEFEBVRE: Tom, just so -- I want to

25 put this on the record. The individual that

Covington, Charles - 02/11/05          Page 71

---

00072

1 Mr. Covington identified that may have copies of some

2 of the variations, either from the TMO software or

3 front end or Guardian, I assume that you can look into

4 that and if there are such forms available, that you

5 would produce those?

6      MR. HEFFERON: Yes, I can do that.

7 Q. And then just one other question,

8 Mr. Covington. Was TMO the predominant software used

9 during the time frame referenced in this complaint?

10 A. It was the predominant one, I would say, yes.

11 Q. When I say, predominant, used 70 percent of

12 the time? I mean, because everyone could have a

13 different definition of predominant. Let me ask you

14 what is your definition of predominant?

15 A. I would say it was -- let me think about that

16 for a second.

17 Q. Sure.

18 A. I would say if all of our regions were using

19 different systems, TMO was being used -- I wouldn't

20 say half of them were using it. I would say something

21 less than half were using it, would be my guess.

22 Q. During the time frame of this lawsuit?

23 A. Yes.

24      MR. HEFFERON: State the time frame for

25 the witness, Chris, so that he has it in his mind when

Covington, Charles - 02/11/05          Page 72

00073
1  he answers the question.
2      MR. LEFEBVRE: Oh, do you want me to
3  restate it?
4      MR. HEFFERON: Yeah. Would you do it
5  again?
6      MR. LEFEBVRE: Oh, sure.
7      MR. HEFFERON: And would you use dates?
8  Q. I'm talking about February of 2001 to
9  February of 2004 for all states but Massachusetts,
10 which, obviously, is one year prior, which is February
11 of 2000 to February of 2004.
12     MR. HEFFERON: And the question is: Was
13 TMO the predominant software program used during that
14 period?
15 A. Well, to answer that question correctly, the
16 way it was, is that in the earlier part of that time
17 frame, we had multiple front-end systems and then we
18 migrated the entire company onto TMO in the later part
19 of that time frame. So if you weigh all of that out,
20 I would say, yeah, it was probably -- was predominant
21 from a chronological standpoint.
22     Q. Okay. That gives me some idea. Just a
23 couple of final questions.
24        Do you know -- and I'm talking about
25 nationally -- how many nonpurchase money mortgages

**Covington, Charles - 02/11/05        Page 73**

00074
1  were originated by First Horizon during the calendar
2  year that ended December 31st, 2001? Do you have a
3  good guesstimate?
4      A. I know how many loans we originated for
5  the calendar year 2001?
6      Q. Nonpurchase loans.
7      A. Yeah. I don't know. I would have to go back
8  and pull out some reports. I really don't know. I
9  mean, our production back in that day is materially
10 less than it is today for sure.
11     Q. Same question, but instead of the calendar
12 year 2001, how about the calendar year 2003. Is that
13 information more readily available?
14     A. Yeah. I would be making up a number. I
15 could cobble together a number for you, but I don't
16 know what that is.
17     Q. I don't want you to guess. Let me ask you
18 this: For the calendar year 2001, do you believe that
19 First Horizon originated more than 5,000 loans?
20     MR. HEFFERON: Of that type?
21     MR. LEFEBVRE: Of nonpurchase money
22 mortgages?
23     A. Yes.
24     Q. And for 2002, more than 5,000?
25     A. Yes.

**Covington, Charles - 02/11/05        Page 74**

00075
1  Q. And in 2003 more than 5,000?
2      A. Yes.
3      Q. For 2003 more than 10,000?
4      MR. HEFFERON: Objection. The witness
5  says he doesn't know, Chris. I don't want to play
6  this game.
7      MR. LEFEBVRE: Okay. That's fine.
8      Q. Couple of final questions. Mr. Covington, we
9  were talking about the compliance, and I had asked you
10 a question about, you know, the time frame. And I was
11 looking at Exhibit 949 -- what has been marked -- not
12 exhibit -- 949 you were talking to me about the review
13 cycle. Do you have that document in front of you?
14     MR. HEFFERON: He does, yes.
15 Q. Okay. After this review of the TIL
16 disclosure is done, is there any other type of review,
17 any other type of compliance for right to rescind?
18     MR. HEFFERON: Objection, vague.
19 A. I guess I would -- do you mean is there any
20 other type of QC work done?
21 Q. Yes.
22 A. Within our QC process or separate from our QC
23 process?
24 Q. How about both? Within and separate.
25 A. Well, if this helps, within our QC process,

**Covington, Charles - 02/11/05        Page 75**

00076
1  we have an auditor review the files, and every
2  exception that is cited gets a second review.
3      Q. Okay.
4      A. And then it is sent to the branch to have the
5  branch have an opportunity to dispute the finding.
6  They are given a due process there. So arguably you
7  could say each one of these findings is reviewed three
8  times from that perspective. That's within our QC
9  cycle. Outside of our QC cycle, I'm not exactly sure
10 what is done in postclosing reviews. They may or may
11 not do something. I'm not sure, but I don't think it
12 probably involves -- if they do something, my
13 impression would be it is to see if the document is
14 there. It is probably more of a completeness review
15 than anything else.
16     Q. Is it fair to say that most of the quality
17 control review is done within six months -- a six
18 month window from the time that the loan is actually
19 closed?
20     A. That's true. It is done within a 60-day
21 frame of when the loan is closed.
22     Q. Right. And assume there is those situations
23 where there is some multiple review. Six months would
24 be on the high side, correct?
25     A. Well, all the QC process steps I mentioned,

**Covington, Charles - 02/11/05        Page 76**

00077
1  that's all done within that 60-day time frame.

2      Q.  Oh, it is?

3      A.  Yes.

4      Q.  So pretty much 60 days is the window?

5      A.  Yes.

6      Q.  As outlined in subparagraph I?

7      A.  Yes.

8      Q.  Okay.  I'm just trying to understand.  I

9  would like you to look at document 916, which was a

10  document produced involving one of the named

11  plaintiffs' loans, not the loan subject of this

12  lawsuit, but another loan that was -- involved First

13  Horizon.  Do you have those two documents in front of

14  you?

15  MR. HEFFERON:  916?

16      MR. LEFEBVRE:  Yeah, 000916.

17      MR. HEFFERON:  No, because you didn't

18  tell me to go to it.

19      MR. LEFEBVRE:  I'm sorry.

20      MR. HEFFERON:  What is it?

21      MR. LEFEBVRE:  That's the letter dated

22  October 20th, 2004 regarding the Lillie home equity

23  line which starts out -- and I'll read the first two

24  sentences, Tom.  First Horizon routinely reviews and

25  audits loans for accuracy, completeness, and

00078
1  compliance with applicable law.  An error was made in

2  the information that was provided to you regarding

3  your home equity line of credit mortgage loan.  We

4  recently discovered that the federal Truth in Lending

5  disclosures provided to you were not in technical

6  compliance with federal disclosure statutes and

7  recollections.  Are you familiar with that form, Tom?

8      MR. HEFFERON:  Well, you should ask the

9  witness if he is.

10      Q.  Well, do you know what letter I'm talking

11  about?

12      A.  I believe I do.

13      Q.  Okay.  Do you know what document I'm

14  referring to, Mr. Covington?

15  MR. HEFFERON:  I think he just said he

16  believes he does.

17      A.  I believe I do, yes.

18      Q.  Now, it is my understanding that the Lillie

19  home equity loan, which I believe is the subject of

20  this correspondence, was closed well over a year prior

21  to the mailing of this notice.  And I'm just

22  wondering -- I'm just trying to understand.  I thought

23  you told me quality control was done within 60 days.

24  I'm just wondering why the Lillies would have received

25  this notice almost 14 months after the loan was

00079
1  closed.

2      A.  That review was not conducted by my quality

3  function, which we have been discussing, but rather it

4  was done by an operational review at our parent bank

5  in Memphis.

6      Q.  And is that operational review standard

7  practice, or is it -- well, answer that question.  Was

8  it part of standard practice?

9      A.  Let me think about that.  They have a

10  standard practice of reviewing rights of rescissions

11  for the HELOC loans.

12      Q.  The HELOC is?

13      A.  Yeah, home equity line of credit.  We call

14  them HELOCs.  Home equity line of credit.

15  Q.  Okay.  I have to confess.  I had no idea what

16  you were talking about.  Okay.  But you would agree

17  that when you review the home equity loans, isn't that

18  usually done shortly after the closing of the loan?

19      MR. HEFFERON:  You mean when First

20  Horizon does?

21      Q.  First Horizon, yes.

22      A.  Yes.

23      Q.  Okay.  So I guess I'm trying to understand.

24  I guess what I'm saying is, I see the materials would

25  seem to suggest 60 days, and I understand this was

00080
1  done by a different -- did you say a different

2  department of First Horizon?

3      A.  Different department of our -- that resides

4  at our parent bank in Memphis.

5      Q.  Now let me ask you this:  Was the Lillies'

6  file, the HELOC file, reviewed because a lawsuit was

7  filed, or was it part of just standard review, if you

8  know?

9      MR. HEFFERON:  You mean, the review that

10  resulted in this letter you described?

11      MR. LEFEBVRE:  Absolutely.

12      MR. HEFFERON:  The question is:  The

13  review that resulted in this letter, was this as a

14  result of this lawsuit or something else?

15  A.  No, this was in relation to something else.

16      Q.  Okay.  And not because the Lillies had been

17  named plaintiffs in the lawsuit?

18      A.  That's correct.

19      Q.  And you said the result of something else.

20  Can you tell me what the something else was, if you

21  know?

22      A.  We had discovered some other issues related

23  to Truth in Lending compliance, not right of

24  rescission related, but TIL disclosure related, which

25  is the subject of that letter.

00081
1  Q.  Okay.  And I assume that -- well, strike

2  that.

3        Were there many other individuals other

4  than the Lillies that received this similar letter?

5        MR. HEFFERON:  I'm going to object and

6  instruct him not to answer, Chris.  That has nothing

7  to do with this lawsuit.  I think you have established

8  that this letter Lillie got had nothing to do with

9  this lawsuit.  So other aspects, are not -- I'm not

10  going to let him get into.

11        MR. LEFEBVRE:  Mr. Covington, I

12  appreciate your patience, and I am done.

13        I assume he is going to read and sign,

14  Tom?

15  MR. HEFFERON:  Yes, he will.  He will

16  read and sign in the ordinary course.  And I have no

17  questions for you, Mr. Covington.

18        (Deposition adjourned at 12:09 p.m.)

19

20

21

22

23

24

25

                    **Covington, Charles - 02/11/05**          **Page 81**

---

00082
1        CHANGES AND SIGNATURE

2  WITNESS NAME:  CHARLES COVINGTON  FEBRUARY 11, 2005

3  PAGE LINE CHANGE        REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

                    **Covington, Charles - 02/11/05**          **Page 82**

---

00083
1        I, CHARLES COVINGTON, have read the

2  foregoing deposition and hereby affix my signature

3  that same is true and correct, except as noted above.

4

5        _____

6              CHARLES COVINGTON

7

8

9

10  THE STATE OF _____)

11  COUNTY OF _____)

12        Before me, _____, on this

13  day personally appeared CHARLES COVINGTON, known to me

14  (or proved to me under oath or through

15  _____) (description of identity card or

16  other document) to be the person whose name is

17  subscribed to the foregoing instrument and

18  acknowledged to me that they executed the same for the

19  purposes and consideration therein expressed.

20        Given under my hand and seal of office this

21  _____ day of _____, 2005.

22

23

24

25        NOTARY PUBLIC IN AND FOR
          THE STATE OF _____
   My commission expires:  _____

                    **Covington, Charles - 02/11/05**          **Page 83**

---

00084
1  STATE OF TEXAS )

2  COUNTY OF DALLAS )

3        I, Audra B. Paty, Certified Shorthand

4  Reporter, in and for the State of Texas, certify that

5  the foregoing deposition of CHARLES COVINGTON was

6  reported stenographically by me at the time and place

7  indicated, said witness having been placed under oath

8  by me, and that the deposition is a true record of the

9  testimony given by the witness.

10        I further certify that I am neither counsel

11  for nor related to any party in this cause and am not

12  financially interested in its outcome.

13        Given under my hand on this the ____ day of

14  _____, 2005.

15

16

17        Audra B. Paty, Certified
          Shorthand Reporter No. 5987
          Dickman Davenport, Inc.
18        Firm Registration #312
          1010 Two Turtle Creek Village
19        3838 Oak Lawn Avenue
          Dallas, Texas 75219
20        (214) 855-5100  (800) 445-9548
          e-mail:  abp@dickmandavenport.com
21        My commission expires 12-31-05

22  Time used by each party:
      Mr. Lefebvre - 1:36
23  Mr. Hefferon - 0:00

24

25

                    **Covington, Charles - 02/11/05**          **Page 84**