# EXHIBIT 14

00001
```
 1              Volume I, Pages 1-77
 2              Exhibits: 1-2
 3         UNITED STATES DISTRICT COURT
 4         FOR THE DISTRICT OF MASSACHUSETTS
 5         --------------------------
 6  RALPH G. MCKENNA, GLENROY A. DEANE,
 7  ILENE WILGOREN-DEANE, CHRISTOPHER J.
 8  LILLIE, and LAURA A. LILLIE
 9         Plaintiffs
10  vs.        Docket No. 04-10370 (RCL)
11  FIRST HORIZON HOME LOAN CORPORATION
12         Defendant
13         --------------------------
14       DEPOSITION of GLENROY A. DEANE
15    Friday, February 18, 2005, 1:13 p.m.
16         Goodwin Procter LLP
17    Exchange Place, 53 State Street
18       Boston, Massachusetts
19  ------Reporter: Joan M. Cassidy, RPR, CRR------
20  jcassady@fabreporters.com   www.fabreporters.com
21       Farmer Arsenault Brock LLC
22    50 Congress Street, Suite 415
23       Boston, Massachusetts 02109
24    617.728.4404  Fax 617.728.4403
```

Deane, Glenroy A. - 02/18/2005                Page 1

00002
```
 1  APPEARANCES:
 2
 3    Family and Consumer Law Center
 4    Christopher M. Lefebvre, Esq. (via telephone)
 5    Two Dexter Street
 6    Pawtucket, Rhode Island 02860
 7    401-728-6060  Fax: 401-728-6534
 8    for Plaintiffs
 9
10    Goodwin Procter LLP
11    Daniel J. Pasquarello, Esq.
12    Exchange Place
13    53 State Street
14    Boston, Massachusetts 02109
15    617-570-1000  Fax: 617-523-1231
16    for Plaintiffs
17
18
19
20
21
22
23
24
```

Deane, Glenroy A. - 02/18/2005                Page 2

00003
```
 1         P R O C E E D I N G S
 2       MR. PASQUARELLO: Would you mark this,
 3  please.
 4       (Marked, Exhibit 1, Second revised
 5  notice of deposition of Glenroy A. Deane.)
 6       Glenroy A. Deane, Sworn
 7       DIRECT EXAMINATION
 8  BY MR. PASQUARELLO:
 9    Q. Good afternoon, Mr. Deane. My name is Dan
10  Pasquarello. I am an attorney who represents First
11  Horizon Home Loan Corporation in the lawsuit that
12  you have filed against it. We are here today to
13  take your deposition in the case; is that your
14  understanding?
15    A. Yes, it is.
16    Q. Okay. I want to just hand you what's been
17  already marked as Exhibit 1. It's the second
18  revised notice of your deposition stating that it
19  will take place today, February 18, at these law
20  offices. Did you receive that document?
21    A. (Witness reviews document.) Yes, I did.
22    Q. And you understand that that's why we are
23  here today?
24    A. Yes, I do.
```

Deane, Glenroy A. - 02/18/2005                Page 3

00004
```
 1    Q. Mr. Deane, could you please state your full
 2  name for the record.
 3    A. Glenroy Anderson Deane.
 4    Q. Have you ever been deposed before?
 5    A. No, I haven't.
 6    Q. Let me just provide some preliminary
 7  instructions.
 8       MR. LEFEBVRE: Excuse me, Dan. I don't
 9  mean to interrupt.
10       MR. PASQUARELLO: Yes.
11       MR. LEFEBVRE: This is Chris Lefebvre.
12  I am participating via telephone. I am having a
13  hard time hearing Mr. Deane, so I don't know if
14  there's a way of moving the speaker a little closer
15  to him or perhaps doing that and asking Mr. Deane to
16  just raise his voice just a little bit, because on
17  my end it's on max.
18       MR. PASQUARELLO: Okay. I have moved
19  the speakerphone closer to Mr. Deane. I think he
20  understands. He will try to speak up, and we've
21  increased the volume on this end for whatever that's
22  worth.
23       MR. LEFEBVRE: Okay, great.
24    Q. Mr. Deane, back to the preliminary
```

Deane, Glenroy A. - 02/18/2005                Page 4

00005
1   instruction, it's important for you today to answer
2   all of my questions verbally so that you don't
3   actually shake your head or nod to answer questions,
4   because the court reporter is taking down everything
5   that we say.
6       It's also important for you to wait
7   until I finish my questions before you start your
8   answers so that we're not both talking at the same
9   time.  If you need to take a break for any reason
10  today, just say so, and we'll proceed to take a
11  break at that time.  I only ask that if there's a
12  question pending that you haven't answered yet, that
13  you answer the question first and then we'll take a
14  break.
15  A.  Understood.
16  Q.  If you don't understand a question, tell
17  me, and I'll try to clarify that question;
18  otherwise, I'm going to assume that you do
19  understand the question.
20  A.  Understood.
21  Q.  Mr. Deane, is there any reason why you
22  can't testify truthfully and honestly today?
23  A.  No, there's not.
24  Q.  Have you taken any medications or consumed

Deane, Glenroy A. - 02/18/2005                 Page 5

00006
1   anything today that might affect your ability to
2   understand questions?
3   A.  No, I haven't.
4   Q.  Have you taken anything that might affect
5   your ability to answer questions?
6   A.  No, I haven't.
7   Q.  You've already stated your full name.  Have
8   you ever been known by any other names?
9   A.  No.
10  Q.  What's your date of birth?
11  A.  1/25/59.
12  Q.  And what's your Social Security number?
13  A.  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.
14  Q.  Mr. Deane, are you married?
15  A.  Yes, I am.
16  Q.  How long have you been married?
17  A.  Seven years.
18  Q.  What's your wife's name?
19  A.  Ilene Deane.
20  Q.  And Mrs. Deane is also involved in this
21  lawsuit?
22  A.  Yes, she is.
23  Q.  Have you had any other marriages?
24  A.  No, I haven't.

Deane, Glenroy A. - 02/18/2005                 Page 6

00007
1   Q.  Do you have any children?
2   A.  Three.
3   Q.  And how old are they?
4   A.  Seven, five, and 14 months.
5   Q.  Mr. Deane, have you ever had your
6   deposition taken before?
7   A.  No, I haven't.
8   Q.  What's your educational background in terms
9   of what's the highest degree --
10  A.  High school graduate.
11  Q.  And when did you graduate from high school?
12  A.  June of 1977.
13  Q.  Where did you go to high school?
14  A.  Hyde Park High School.
15  Q.  I'm sorry.  Could you repeat that?
16  A.  Hyde Park High School.
17  Q.  Is that in Boston?
18  A.  Yes, it is.
19  Q.  Did you ever attend college?
20  A.  No, I haven't.
21  Q.  Are you currently employed?
22  A.  Yes, I am.
23  Q.  What do you do?
24  A.  I work inventory control for an electrical

Deane, Glenroy A. - 02/18/2005                 Page 7

00008
1   distribution company.
2       MR. PASQUARELLO:  Chris, can you hear
3   this okay?
4       MR. LEFEBVRE:  I've got my ear to the
5   speaker.  I can hear you great.  I can even hear the
6   court reporter's fingers crunching as she takes down
7   everything, but I'm having a hard time hearing my
8   client.
9       THE WITNESS:  I'll speak louder.
10      MR. LEFEBVRE:  There we go.  Now, that I
11  just heard real great.  Very good.
12  Q.  Can you repeat your last answer.  Where do
13  you work?
14  A.  Northeast Electrical Distribution Company.
15  Q.  And what do you do for them?
16  A.  I work in inventory control.
17  Q.  Are they also known by the name Sonepar?
18  A.  Sonepar.  It's the parent company.
19  Q.  And how do you spell Sonepar?
20  A.  S-o-n-e-p-a-r.
21  Q.  You mentioned you are in inventory control.
22  What do you do in inventory control?
23  A.  Inventory the merchandise in the store.
24  Q.  Is it a full-time position?

Deane, Glenroy A. - 02/18/2005                 Page 8

00009
```
 1   A.  Yes, it is.
 2   Q.  How long have you been there?
 3   A.  Six years.
 4   Q.  Do you have any sort of job title?
 5   A.  Inventory control.
 6   Q.  What is your annual income from that job?
 7   A.  $32,000 a year, probably.
 8   Q.  Is that approximate?
 9   A.  Yes.
10   Q.  Is that what it was for 2004?
11   A.  Yes, it was.
12   Q.  Do you have any other sources of income?
13   A.  No, I don't.
14   Q.  For your household are there any other
15   sources of income?
16   A.  My wife receives Social Security for
17   disability.
18   Q.  Does your wife work?
19   A.  No, she doesn't.
20   Q.  How long has she been receiving Social
21   Security for disability?
22   A.  About seven years.
23   Q.  Do you know what your overall household
24   income is annually?
```

00010
```
 1   A.  35,000, maybe.
 2   Q.  Do you have any income from any rental
 3   properties?
 4   A.  Yes, I do.
 5   Q.  How many rental properties do you own?
 6   A.  A three-family home.
 7   Q.  Just one home?
 8   A.  Yes, it's got three floors with three
 9   different incomes.
10   Q.  On an annual basis how much income do you
11   receive from that rental property?
12   A.  1350 each apartment.
13   Q.  Are all of the apartments rented?
14   A.  No, only two are right at the moment.
15   Q.  And that's 1350 per month per apartment?
16   A.  Per month.
17   Q.  How long have you owned that rental
18   property?
19   A.  A little over a year.
20   Q.  Do you remember when you purchased it?
21   A.  March of last year.
22   Q.  Do you own that property with anybody else?
23   A.  With my mother.
24   Q.  Do you split the income from that property
```

00011
```
 1   with your mother?
 2   A.  No, I don't.
 3   Q.  Do you keep all of the rental income?
 4   A.  Yes, I do.
 5   Q.  So for the past year, 2004 --
 6   A.  Yes.
 7   Q.  -- do you know how much income you received
 8   total from the rental property?
 9   A.  1350...  The first floor has been vacant
10   for about four months, so about nine months' worth
11   of the full house; do you know what I mean?
12   Q.  So before the vacancy on the first floor,
13   were all three apartments rented out?
14   A.  Yes, it was.
15   Q.  And has the rent you charged changed on any
16   of those apartments?
17   A.  No, it hasn't.
18   Q.  Any other sources of income?
19   A.  No.
20   Q.  Before you worked at Sonepar or
21   Northeast -- what was the name?
22   A.  Northeast Electric.
23   Q.  Before you worked at Northeast Electric,
24   what did you do?
```

00012
```
 1   A.  I was a truck driver for the Salvation
 2   Army.
 3   Q.  And how long did you do that for?
 4   A.  About three years.
 5   Q.  What did you do before that?
 6   A.  I worked various jobs.  I was self-employed
 7   at one time, worked for a bunch of temp agencies.
 8   Q.  Do you remember any of the jobs that you
 9   did?
10   A.  I was a painter, I was self-employed as a
11   painter; and most of the temp agencies were things
12   like warehouse jobs.
13   Q.  What period of time does this cover, the
14   various jobs you are describing?
15   A.  '91 to '94 was the Salvation Army; and
16   prior to that, the temp agencies, the late '80s.
17   Q.  How far do you want me to go back?
18   A.  Up to '91; does that cover it?
19   A.  Yes, yeah.
20   Q.  Okay.  Have you ever worked in the real
21   estate industry?
22   A.  No, I haven't.
23   Q.  Have you ever worked in the mortgage
24   lending area?
```

00013
1    A. No, I haven't.
2    Q. Have any of your jobs ever involved
3  residential mortgages?
4    A. No, they haven't.
5    Q. Have you ever had any training with regard
6  to residential mortgages?
7    A. No, I haven't.
8    Q. Any training with regard to refinancings?
9    A. No.
10   Q. Have you ever taken any courses about
11  buying or selling real estate?
12   A. No.
13   Q. How about your wife; has she ever worked in
14  the real estate industry?
15   A. No.
16   Q. Do you know if she's ever taken any
17  courses --
18   A. She hasn't.
19   Q. -- regarding -- just -- I know it's normal
20  conversation to try to anticipate my questions, but
21  just try to let me finish for the record.
22       Do you know if she's ever taken any
23  courses about buying or selling real estate?
24   A. No.

00014
1    Q. No, you don't know?
2    A. I don't know.
3    Q. A few questions about your wife's
4  employment history: Did she work before -- well,
5  has she worked in the past?
6    A. Yes, she has. She worked at a Wal-Mart on
7  a temp basis -- part-time, rather.
8    Q. Any other jobs of your wife that you
9  remember?
10   A. No.
11   Q. Mr. Deane, what did you do to prepare for
12  today's deposition?
13   A. Read my wife's deposition and followed
14  through some of the questions and the answers that
15  were asked to her.
16   Q. When you say your wife's deposition, do you
17  mean you read a transcript of her deposition?
18   A. Yes, I did. Yes, I did.
19   Q. When did you read that?
20   A. Yesterday and part of it this morning.
21   Q. Did you read anything else to prepare for
22  the deposition?
23   A. No, I haven't.
24   Q. Did you meet with anybody to prepare for

00015
1  the deposition?
2    A. No.
3    Q. Did you talk with any of your attorneys to
4  prepare for the deposition?
5    A. No.
6    Q. Besides your wife's transcript, did you
7  review any documents to prepare for the deposition?
8  And you may have answered this already, but I'll ask
9  it again.
10   A. No.
11   Q. Did you review your interrogatory responses
12  in this case?
13   A. I don't understand.
14   Q. Did you participate in preparing answers to
15  certain questions that First Horizon asked in the
16  litigation?
17   A. No.
18   Q. Did you discuss your anticipated testimony
19  today with anybody else?
20   A. No.
21   Q. Did you say no?
22   A. No.
23   Q. Other than your attorney, anybody else know
24  that you are being deposed in this case today?

00016
1    A. No.
2    Q. Did you speak with anybody from the law
3  firm of Edelman, Combs & Latturner to prepare for
4  the deposition?
5    A. No, I didn't.
6    Q. Just try to keep your voice up a little bit
7  so we can all hear you.
8        When did you first meet your attorney,
9  Mr. Lefebvre?
10   A. I never met him.
11   Q. Okay. When was the first time you spoke to
12  him?
13   A. Yesterday.
14   Q. That was the first time you had ever spoken
15  to him?
16   A. Yes.
17   Q. Have you ever spoken with any of your other
18  attorneys in this case?
19   A. No, I haven't. My wife takes care of
20  everything.
21   Q. Why don't we just put this on the record.
22  What is your wife's full name?
23   A. Ilene Wilgoren-Deane.
24   Q. All right. Mr. Deane, I have a few

00017
1  questions for you about your residential history.
2  Can you tell us what your current address is?
3    A.  51 Darby Road, Brockton, Mass.
4    Q.  And how long have you lived there?
5    A.  Six years.
6    Q.  Who do you live there with?
7    A.  My wife and my kids.
8    Q.  Does anybody else live there?
9    A.  My in-laws.
10   Q.  Is it a single-family home, or is it a
11  multiple-family home?
12   A.  Single-family home.
13   Q.  When you say your in-laws, who does that
14  include?
15   A.  That's my father-in-law and my
16  mother-in-law.
17   Q.  How long have they lived there?
18   A.  Three years.
19   Q.  What are your in-laws' names?
20   A.  Lois and Paul Wilgoren.
21   Q.  Before you lived at Darby Road in Brockton,
22  where did you live?
23   A.  Oak Street in a condominium complex.  I
24  don't remember the address number.

Deane, Glenroy A. - 02/18/2005          Page 17

00018
1    Q.  What town was it in?
2    A.  Brockton also.
3    Q.  And how long did you live there?
4    A.  A year.
5    Q.  Where did you live before Oak Street?
6    A.  Boston.
7    Q.  In Boston?
8    A.  Yes.
9    Q.  In a house, in an apartment?
10   A.  In a house.  Do you need the full address?
11   Q.  Do you remember the address?
12   A.  Yes, I do.
13   Q.  What is it?
14   A.  71 Astoria Street, Mattapan, Mass.
15   Q.  How long did you live there?
16   A.  About 20 years.
17   Q.  Do you own the Darby Road residence?
18   A.  Yes, I do.
19   Q.  Had you ever owned any real estate before
20  that house?
21   A.  Well, a condo.
22   Q.  You own the condo?
23   A.  I used to.  Not anymore.  I sold the condo.
24   Q.  That's the condo where you lived for one

Deane, Glenroy A. - 02/18/2005          Page 18

00019
1  year?
2    A.  Yes.
3    Q.  Any other real estate?
4    A.  No, no.
5    Q.  So the only properties you've owned are the
6  Oak Street condominium and the Darby Road house?
7    A.  Yes.
8    Q.  Okay.  Mr. Deane, do you remember when you
9  purchased the Darby Road house?
10   A.  November '98, I think, November of '98.
11   Q.  How much did you did pay for the house when you
12  bought it?
13   A.  112,000.
14   Q.  Did you take a mortgage?
15   A.  Yes, I did.
16   Q.  And who provided the mortgage?
17   A.  First mortgage... I don't remember the
18  name.  My wife dealt with them.  I don't recollect
19  the name of the place.
20   Q.  Do you know what kind of mortgage it was?
21   A.  Thirty-year mortgage.
22   Q.  Do you remember what the interest rate was?
23   A.  No, I don't.
24   Q.  Do you know if the interest rate was fixed

Deane, Glenroy A. - 02/18/2005          Page 19

00020
1  or adjustable?
2    A.  No, I don't.
3    Q.  When you purchased the house, were you
4  represented by an attorney?
5    A.  Yes, I was.
6    Q.  Do you remember the attorney's name?
7    A.  No.
8    Q.  Do you know if that attorney represented
9  anybody else at the closing?
10   A.  No, I don't.
11   Q.  Did you have to pay the attorney?
12   A.  Yes, I did.
13   Q.  Did you go to the closing when you bought
14  the home?
15   A.  Yes, I did.
16   Q.  Do you remember how long it took?
17   A.  Say an hour, maybe.
18   Q.  Can you tell me what happened at the
19  closing transaction, generally speaking?
20   A.  I signed a bunch of papers for the sale of
21  the home.
22   Q.  Did you ask any questions?
23   A.  No, I didn't.
24   Q.  Did your spouse ask any questions?

Deane, Glenroy A. - 02/18/2005          Page 20

00021
```
 1   A.  Yes, she did.
 2   Q.  Do you remember any of the questions she
 3 asked?
 4   A.  No, I don't.
 5   Q.  Did you sign any of the documents at the
 6 closing?
 7   A.  Yes, I did.
 8   Q.  Do you remember any of the documents you
 9 signed?
10   A.  No, I don't.
11   Q.  Did your wife sign documents at the
12 closing?
13   A.  Yes, she did.
14   Q.  Do you remember any of the documents she
15 signed?
16   A.  No, I don't.
17   Q.  Did you read any of the documents at the
18 closing before you signed them?
19   A.  Yes, I did.
20   Q.  How would you say -- how would you classify
21 how you read them?  Did you read them closely, or
22 did you scan them?  What would you say?
23   A.  Well, me and my wife read them together
24 thoroughly.
```

Deane, Glenroy A. - 02/18/2005          Page 21

00022
```
 1   Q.  Did you do that for each document that you
 2 signed?
 3   A.  Yes, we did.
 4   Q.  And did your wife also do that for each
 5 document that you signed?
 6   A.  Yes, she did.
 7   Q.  And we're still talking about when you
 8 bought your home in 1998.
 9   A.  I understand.
10   Q.  Okay.  After the closing for that house,
11 did you go back and read any of the documents that
12 you signed?
13   A.  No, I didn't.
14   Q.  Did your wife?
15   A.  I don't know.
16   Q.  Mr. Deane, do you know what a right of
17 rescission is?
18   A.  No, I don't.
19   Q.  Do you know what a right of cancellation
20 is?
21   A.  No, I don't.
22   Q.  When you purchased your home in 1998, did
23 you think that you had a right to cancel that
24 transaction?
```

Deane, Glenroy A. - 02/18/2005          Page 22

00023
```
 1   A.  Yes.
 2   Q.  And did you think that at the time of the
 3 closing?
 4   A.  Yes.
 5   Q.  For how long did you think you had a right
 6 to cancel?
 7   A.  What do you mean, "for how long"?
 8   Q.  I'll try to clarify.  Did you think there
 9 was some time period during which you would have to
10 say whether or not you wanted to cancel?
11   A.  I don't know what kind of answer you want.
12 Just -- that's kind of a weird question.  Why would
13 I --
14   Q.  Do you understand the question?
15   A.  Yes, I do, but the answer -- you know what
16 I mean?  How can I answer that?
17   Q.  Let me try again.
18   A.  I understand what you are saying, just it's
19 either -- do I have a time frame to cancel; is that
20 what you are asking?  Was there a time frame in
21 there?
22   Q.  Right, your understanding.  What was your
23 understanding?
24   A.  I could cancel anytime.  That was my
```

Deane, Glenroy A. - 02/18/2005          Page 23

00024
```
 1 understanding.  There was no time frame.
 2   Q.  So did you think that, say, a year after
 3 you bought the house, you could go back and cancel?
 4   A.  Generally, yes, I think so.
 5   Q.  And if you did want to cancel, do you know
 6 how that process would have worked?
 7   A.  No, but I would have found out through a
 8 lawyer.
 9   Q.  Okay.  Now, that original mortgage on your
10 house, did you ever try to cancel that?
11   A.  No.
12   Q.  Did you ever want to cancel that?
13   A.  No.
14   Q.  Do you remember if you received at that
15 closing in 1998 any notice telling you about a right
16 to cancel?
17   A.  I don't remember.
18   Q.  Mr. Deane, do you think that there is
19 always a right to cancel a mortgage transaction?
20   A.  Yes.
21   Q.  Do you think there's always a right to
22 cancel a refinancing transaction?
23   A.  Yes.
24   Q.  Now, with regard to a refinancing
```

Deane, Glenroy A. - 02/18/2005          Page 24

00025
1  transaction, the same question about a time period:
2  Q. Do you think there is some time period during which
3  you have to express your desire to cancel?
4  A. I would assume within six months to a year
5  you can cancel anything through the proper
6  procedures.
7  Q. And is that your understanding for all
8  refinancing transactions?
9  A. Yes.
10  Q. Other than the refinance that is at issue
11  in this lawsuit, did you ever refinance the mortgage
12  on your home?
13  A. Other than the first refinancing?
14  Q. Other than the refinancing with First
15  Horizon, which we will talk about later –
16  A. Okay.
17  Q. -- did you ever refinance the mortgage on
18  your home?
19  A. Yes.
20  Q. When did you do that?
21  A. I don't remember the date.  My wife took
22  care of that.
23  Q. Have you ever taken out any equity loans on
24  your house?

00026
1  A. Not to my understanding, no.
2  Q. Okay.  Other than your house on Darby Road
3  and the three-family rental property that you own,
4  do you own any other real property?
5  A. No.
6  Q. What's the address for the rental property?
7  A. 206 Winthrop Street.
8  Q. And you said you purchased that around
9  March of last year?
10  A. Yes.
11  Q. And you purchased that with your --
12  A. With my mother.
13  Q. Your mother.  So is your mother also on the
14  deed for that property?
15  A. Yes, she is.
16  Q. Is anybody else on the deed?
17  A. No.
18  Q. Is your wife on the deed?
19  A. No.
20  Q. Do you plan to put your wife on the deed
21  for that property?
22  A. Yes.
23  Q. When do you plan to do that?
24  A. I don't have a time frame.

00027
1  Q. Did you go to the closing when you
2  purchased that property?
3  A. Yes, I did.
4  Q. Were you represented by an attorney?
5  A. Yes, I was.
6  Q. Do you remember the attorney's name?
7  A. No, I don't.
8  Q. Who else was at the closing for the
9  purchase of the rental property?
10  A. The prior owner.
11  Q. Anybody else?
12  A. Myself, my wife, and my mother.
13  Q. And the attorney?
14  A. Yes.
15  Q. Anybody other than that?
16  A. No.
17  Q. Did you review any of the documents before
18  you signed them?
19  A. My wife took care of all that.  I just
20  signed.
21  Q. So your wife reviewed the documents –
22  A. Yes, she did.
23  Q. -- first?  Did she explain to you what the
24  documents were?

00028
1  A. She did.
2  Q. Did the attorney explain to you what the
3  documents were?
4  A. Yes, he did.
5  Q. Did you understand what the documents were
6  before you signed them?
7  A. At that time I did.
8  Q. Do you remember how long your wife took to
9  review the documents before she would explain it to
10  you?
11  A. Each document or all of them?
12  Q. Let's say just one document; how long would
13  it take for her to typically review the document
14  before she explained it to you?
15  A. Three to five minutes each one.  They were
16  very lengthy, lengthy documents.
17  Q. Would it depend how long the document was?
18  A. Yes.
19  Q. Okay.  Did she review those documents
20  carefully before she explained them to you?
21  A. Yes, she did.
22  Q. Did she also explain what the documents
23  were to your mother?
24  A. Yes, she did.

00029
1   Q.  Did your mother review the documents for
2   herself?
3   A.  No.
4   Q.  So is it correct that both you and your
5   mother were relying on what your wife told the two
6   of you about the documents?
7   A.  Yes.
8   Q.  Mr. Deane, did your mother recently buy a
9   condominium?
10  A.  Yes, she did.
11  Q.  Did you go to the closing transaction for
12  that?
13  A.  No.
14  Q.  Did your wife go to the closing transaction
15  for that?
16  A.  Yes, she did.
17  Q.  Do you know if your wife reviewed documents
18  for your mother during that transaction?
19  A.  I don't know.
20  Q.  Did she tell you that she reviewed
21  documents for that transaction?
22  A.  No, she didn't.
23  Q.  Is there a mortgage on the rental property?
24  A.  Yes, there is.

Deane, Glenroy A. - 02/18/2005          Page 29

00030
1   Q.  And who provided the mortgage?
2   A.  I don't know the name, to be honest with
3   you.
4   Q.  Do you make mortgage payments on the rental
5   property?
6   A.  Yes, I do.
7   Q.  Who do you make the payments to?
8   A.  I don't know.  My wife handles all my
9   business affairs.
10  Q.  So your wife makes the payments?
11  A.  Yes, she does.
12  Q.  Have you ever tried to cancel the mortgage
13  you have on the rental property?
14  A.  No.
15  Q.  Have you ever wanted to cancel that?
16  A.  No.
17  Q.  If you did want to cancel that, do you
18  think that you could?
19  A.  I don't see why not.
20  Q.  Have you ever refinanced the mortgage on
21  the rental property?
22  A.  No.
23  Q.  Mr. Deane, what's your understanding of
24  what happens in a refinancing transaction?

Deane, Glenroy A. - 02/18/2005          Page 30

00031
1   A.  My understanding?  A refinance is trying to
2   get money on the loan that you owe to put into the
3   home.  That's why you usually refinance, to upgrade
4   my house.
5   Q.  Do you believe that you get a new loan
6   during a refinancing transaction?
7   A.  Yes.
8   Q.  And what happens to the old loan?
9   A.  What do you mean what happens, if you are
10  refinancing?
11  Q.  Yes.
12  A.  I'm assuming they pay off the old loan and
13  I am going to get a new loan with the place I'm
14  refinancing with.
15  Q.  Okay.  Other than receiving money --
16  A.  Do you mean the whole total mortgage or a
17  loan of a certain amount?  Is that what you are
18  asking me?
19  Q.  I'll try to ask another question.
20  A.  Okay.
21  Q.  Other than receiving money from the lender
22  to use for whatever purpose --
23  A.  Okay.
24  Q.  -- are there any other reasons you wanted

Deane, Glenroy A. - 02/18/2005          Page 31

00032
1   to refinance?
2   A.  No.
3   Q.  Does the interest rate that's available
4   have any effect on whether or not you want to
5   refinance?
6   A.  It does.
7   Q.  And how does that affect your decision?
8   A.  If it helps my loan to be less per month, I
9   would do that.  But I don't do it, you know what I
10  mean, because I stay with what I have right now.
11  Q.  So is it correct that if you could get a
12  better interest rate, you would want to refinance?
13  A.  Possibly, yes.
14  Q.  Okay.  Other than your current mortgage,
15  have you ever tried to cancel a mortgage loan?
16  A.  No.
17  Q.  Mr. Deane, at home who opens the mail?
18  A.  My wife.
19  Q.  Does she manage the finances?
20  A.  Yes, she does.
21  Q.  Does she pay the bills?
22  A.  Yes, she does.
23  Q.  Does she pay the mortgage?
24  A.  Yes, she does.

Deane, Glenroy A. - 02/18/2005          Page 32

00003
1    Q.  How does she pay the mortgage?
2    A.  Through the bank.  We have a savings
3  account that's set up to pay our bills.
4    Q.  Does she do that automatically, or does she
5  write checks?
6    A.  She does it on the computer, on the
7  computer.
8    Q.  Does your wife handle the communications
9  with creditors?
10    A.  Yes, she does.
11    Q.  Do you know who makes the mortgage
12  payments to right now?
13    A.  No, no, I don't.
14    Q.  Do you know who holds the loan on your
15  house?
16    A.  No, I don't.
17    Q.  Do you manage any of the finances at home?
18    A.  No.
19    Q.  Before you refinanced, do you know what
20  your monthly mortgage payment was?
21    A.  On which home, on the --
22    Q.  I'm just talking about Darby Street right
23  now.
24    A.  Oh.  I think it was around $1200.

Deane, Glenroy A. - 02/18/2005          Page 33

00014
1    Q.  Before the refinance?
2    A.  I think.
3    Q.  After the refinance do you know what your
4  mortgage payment was?
5    A.  No.
6    Q.  Did you ever fall behind on your mortgage
7  payments on the Darby --
8    A.  No, no.
9    Q.  -- Street home?  Again, just try to let me
10  finish the question before you start your answer.
11        Other than your mortgage, have you taken
12  out any other loans using your home as collateral?
13    A.  No.
14    Q.  Mr. Deane, am I correct that you don't know
15  who holds your mortgage on your present house?
16    A.  I don't.
17    Q.  Okay.  Do you know if you have any loans
18  with Fleet Bank?
19    A.  No, I don't.
20    Q.  Have you ever had any loans with Chase Bank
21  for your current house?
22    A.  I think so.
23    Q.  Do you know which loan that was?
24    A.  No, I don't.

Deane, Glenroy A. - 02/18/2005          Page 34

00035
1    Q.  For your current house did you ever have a
2  loan with Wells Fargo?
3    A.  I don't remember.
4    Q.  For your current house did you ever have a
5  loan with Household Finance?
6    A.  Yes, we did.
7    Q.  When was that?
8    A.  Maybe four years ago.
9    Q.  Do you remember what that loan was for?
10    A.  No.
11    Q.  For your current house have you ever had a
12  loan with First Horizon?
13    A.  Yes.
14    Q.  When was that?
15    A.  I think that was the first loan we had.
16  I'm not too sure on dates.
17    Q.  When you say "first loan," do you mean when
18  you purchased the house?
19    A.  No, the first financing, refinancing, was
20  First Horizon, if I'm not mistaken, I think.  I'm
21  not too sure.
22    Q.  And tell me again, how many times have you
23  refinanced?
24    A.  Twice.

Deane, Glenroy A. - 02/18/2005          Page 35

00036
1    Q.  You think the first was with First Horizon?
2    A.  Yes, I think.  I'm not too sure.
3    Q.  Do you know when that was?
4    A.  I don't remember the dates.
5    Q.  Who was the other refinance with?
6    A.  Household Finance.
7    Q.  And those are the only two refinances you
8  remember?
9    A.  That I can recollect.
10    Q.  All right.  Did you go to a closing
11  transaction for the loan with Household Finance?
12    A.  Yes, I did.
13    Q.  Who else went to that?
14    A.  Me and my wife.
15    Q.  Anybody else?
16    A.  No.
17    Q.  Did you review any of the documents at that
18  closing?
19    A.  I don't remember.
20    Q.  Do you remember if you signed any of the
21  documents at that closing?
22    A.  I did do that.
23    Q.  Did your wife explain to you what the
24  documents were at that closing?

Deane, Glenroy A. - 02/18/2005          Page 36

00037
1    A. I don't remember.
2    Q. Did anybody else explain to you what the
3    documents were at that closing?
4    A. I don't remember.
5    Q. Did you think that you had a right to
6    cancel that loan?
7    A. Yes.
8    Q. And, again, for how long did you think you
9    had the right to cancel?
10    A. Six months to a year period.
11    Q. Do you know what the terms of the Household
12    Finance loan were?
13    A. No, I don't.
14    Q. Do you know what the interest rate was?
15    A. No.
16    Q. Do you know what the purpose of the loan
17    was?
18    A. No.
19    Q. Were you represented by an attorney for
20    that loan?
21    A. I'm not sure. I don't remember if he was
22    there or not.
23    Q. Mr. Deane, have you ever filed for
24    bankruptcy?

Deane, Glenroy A. - 02/18/2005          Page 37

00008
1    A. No.
2    Q. Now, I want to ask you some questions about
3    the refinance with First Horizon. Okay?
4    A. Okay.
5    Q. Who made the decision to refinance?
6    A. Me and my wife.
7    Q. When did you make that decision?
8    A. You mean date-wise or --
9    Q. Just as best you can remember (nodding).
10    A. I don't remember the dates, but --
11    Q. You don't remember the dates?
12    A. No.
13    Q. Do you remember what season it was?
14    A. It was winter.
15    Q. Okay. Do you remember what year it was?
16    A. I want to say three to four years ago,
17    maybe.
18    Q. Okay. And at the time of the refinance
19    with First Horizon, who held the loan?
20    A. I don't know.
21    Q. Do you know which creditor got paid off as
22    a result of the refinance?
23    A. No, I don't.
24    Q. Okay. Now, for your current mortgage do

Deane, Glenroy A. - 02/18/2005          Page 38

00039
1    you know what the interest rate is?
2    A. No.
3    Q. Do you know what your monthly payment is?
4    A. Right now it's a little over 14.
5    Q. Do you know if your interest rate is fixed
6    or adjustable?
7    A. No.
8    Q. When you refinanced with First Horizon, do
9    you know what the principal balance was on the loan
10    that you had before that?
11    A. No, I don't.
12    Q. No?
13    A. No.
14    Q. Do you know how long you had the original
15    loan before you refinanced with First Horizon?
16    A. About two years.
17    Q. How did you choose First Horizon, if you
18    did?
19    A. I don't remember.
20    Q. Have you ever met with anyone from First
21    Horizon?
22    A. I think we did.
23    Q. Do you know who that was?
24    A. No, I don't remember the name.

Deane, Glenroy A. - 02/18/2005          Page 39

00040
1    Q. Do you remember when that meeting took
2    place?
3    A. The day of the signing.
4    Q. Okay. Do you mean the closing transaction
5    for the refinance?
6    A. Yes.
7    Q. Do you know when you applied to refinance?
8    A. A couple months prior to the signing of the
9    closing with First Horizon. Maybe two months prior
10    to that.
11    Q. Do you know how much you applied to borrow?
12    A. No.
13    Q. Do you know when you received approval for
14    your loan application?
15    A. I want to say maybe two weeks prior to
16    signing.
17    Q. And how did you learn about that?
18    A. I think it was a phone call.
19    Q. When you refinanced with First Horizon, did
20    you receive any extra money on top of paying off
21    your previous mortgage?
22    A. I don't think so.
23    Q. Do you know if you paid off any debt with
24    the proceeds from the refinance with First Horizon?

Deane, Glenroy A. - 02/18/2005          Page 40

00041
```
 1    A.  I don't think so.
 2    Q.  Do you know if you paid off any credit
 3  cards?
 4    A.  Probably.
 5    Q.  Any car payments or car loans, do you
 6  know -- let me rephrase that.  Do you know if any
 7  car loans or car payments were paid off with
 8  proceeds from the refinance?
 9    A.  I don't know.
10    Q.  Mr. Deane, do you know what or who Orifac
11  is, O-r-i-f-a-c?
12    A.  Never heard of it.  Is it a person or a
13  business or --
14    Q.  I just wanted to know if you'd heard of it.
15        From the refinancing with First Horizon,
16  did you use any proceeds to pay off business
17  expenses?
18    A.  No.
19    Q.  Now, at the refinancing were you
20  represented by an attorney?
21    A.  Yes, we were.
22    Q.  What was your attorney's name?
23    A.  I don't remember his name.
24    Q.  Did that attorney represent anybody else at
```

00042
```
 1  the closing?
 2    A.  Other than Horizon?
 3    Q.  I'm sorry?
 4    A.  Other than Horizon?  Or what do you mean,
 5  "anybody else"?
 6    Q.  Did you have your own personal attorney at
 7  the closing transaction?
 8    A.  No, it was just the attorney from Horizon.
 9    Q.  Did you think that attorney was your
10  attorney?
11    A.  Yes.
12    Q.  Is there a reason why you thought that?
13    A.  That's who we were dealing with at the
14  time, Horizon.
15    Q.  Where did you go for the closing,
16  Mr. Deane?
17    A.  It was at the Brockton courthouse on
18  Belmont Street.  Belmont Street?
19    Q.  All right.  Who was there?
20    A.  *Me and my wife, the attorney from Horizon,
21  and there was one other person there.  I don't
22  remember who it was.
23        MR. PASQUARELLO:  Could you read that
24  back.
```

00043
```
 1    *(Answer read)
 2        MR. PASQUARELLO:  I'm sorry, the answer
 3  before that.
 4        (The following portion of the record was
 5        read:
 6        "QUESTION:  Where did you go for the
 7        closing, Mr. Deane?
 8        "ANSWER:  It was at the old Brockton
 9        courthouse on Belmont Street.  Belmont
10        Street?")
11    Q.  What time of day was it?
12    A.  It was in the afternoon.
13    Q.  Did you have to take off from work?
14    A.  I left work early that day.
15    Q.  How long did the closing take?
16    A.  About two hours.
17    Q.  Had you ever met the attorney at that
18  closing before?
19    A.  No.
20    Q.  Had you ever spoken to that attorney before
21  the closing?
22    A.  No.
23    Q.  Now, do you think that that attorney worked
24  for First Horizon?
```

00044
```
 1    A.  Yes.
 2    Q.  Was there anybody else there who you
 3  thought worked for First Horizon?
 4    A.  No.
 5    Q.  Did the attorney tell you that he worked
 6  for First Horizon?
 7    A.  Yes.
 8    Q.  Let me back up.  Was the attorney a man or
 9  a woman?
10    A.  A man.
11    Q.  And you don't know his name?
12    A.  I don't remember his name.
13    Q.  Mr. Deane, did you receive any of the
14  documents that you signed at the closing before you
15  went to the closing?
16    A.  No.
17    Q.  Did you review any of the documents that
18  you signed at the closing before you went to the
19  closing?
20    A.  No.
21    Q.  At the closing did you receive any
22  instructions from the attorney?
23    A.  Pertaining to what?
24    Q.  Did you receive any instructions at the
```

00045
1 closing about the closing process?

2    A. Somewhat.

3    Q. What do you remember?

4    A. I don't remember anything, but he said

5 things, legal -- you know, legal documents need to

6 be signed, and he explained a few things.

7    Q. Did you ask any questions during the

8 closing?

9    A. No.

10    Q. Did your wife ask any questions during the

11 closing?

12    A. Yes.

13    Q. Sorry?

14    A. Yes.

15    Q. Do you remember what she asked?

16    A. No.

17    Q. How many questions did she have?

18    A. A lot.

19    Q. Your wife had a lot of questions?

20    A. Yes.

21    Q. Do you remember what any of the questions

22 were about?

23    A. No.

24    Q. To whom did she ask the questions?

00046
1    A. To the attorney representing Horizon.

2    Q. Do you remember any of the documents that

3 you signed at the closing, Mr. Deane?

4    A. No.

5    Q. Do you remember signing a mortgage?

6    A. Possibly. I don't remember.

7    Q. If you don't remember, it's fine. I don't

8 want you to guess.

9    A. I don't remember.

10    Q. Do you remember signing a note at the

11 closing?

12    A. No.

13    Q. Do you remember signing a truth in lending

14 disclosure statement at the closing?

15    A. No.

16    Q. Do you remember signing a notice of right

17 to cancel at the closing?

18    A. No.

19    Q. Did you read any of the documents before

20 you signed them?

21    A. No.

22    Q. Did you review any of the documents before

23 you signed them?

24    A. No.

00047
1    Q. Did you understand what the documents were

2 before you signed them?

3    A. Somewhat.

4    Q. Okay. How did you understand what the

5 documents were?

6    A. 'Cause I went through the procedure with my

7 other company prior to that, the other refinancing

8 company, so I had a general knowledge of what I was

9 doing.

10    Q. So you had been to previous real estate

11 closing transactions?

12    A. Yes, when I bought my home.

13    Q. *And is it accurate that you generally

14 understood what was going to happen at the closing

15 transaction?

16    A. Say that again.

17       MR. PASQUARELLO: Can you read that

18 back.

19       *(Question read.)

20    A. I wouldn't say that. I understand -- my

21 wife explained to me what we were doing. Just

22 general knowledge of signing paperwork on my own.

23    Q. Did your wife explain to you what the

24 documents were before you signed them?

00048
1    A. She probably did.

2    Q. Again, I don't want you to guess. I

3 mean --

4    A. I'm not guessing.

5    Q. Okay. So did she explain what the

6 documents were to you?

7    A. No.

8    Q. No, she didn't?

9    A. No.

10    Q. Okay. I just --

11    A. I don't want to lie to you.

12    Q. And none of us wants you to. I just want

13 to remind you that you are under oath --

14    A. I understand that.

15    Q. -- as if you were in a courtroom. Okay?

16    A. Yes.

17    Q. Mr. Deane, did you understand there was a

18 waiting period between the time of the closing and

19 when you would receive any money from the loan?

20    A. No.

21    Q. Do you remember when you received any money

22 from the refinancing transaction?

23    A. No, I don't.

24    Q. After the refinancing when was your first

00049
1   payment due?

2      A.   I don't remember.

3      Q.   Do you remember how the payment was made?

4      A.   No.

5      Q.   Do you know who the payment was made to?

6      A.   Horizon, I assume.

7      Q.   Have you ever missed any payments on the

8   loan?

9      A.   No.

10     Q.   Have you ever fallen behind on any payments

11  on the loan?

12     A.   No.

13     Q.   Have you ever been unhappy with the

14  servicing for the loan?

15     A.   Up till now.

16     Q.   Did you say "not until now"?

17     A.   Up till now.

18     Q.   Okay.  Before this lawsuit was filed --

19     A.   Yes.

20     Q.   -- were you ever unhappy with the servicing

21  on the First Horizon loan?

22     A.   No.

23     Q.   Are you now unhappy with the servicing on

24  the First Horizon loan?

00050
1      A.   Yes.

2      Q.   Why?

3      A.   I'm here today going through this

4   deposition, which my wife takes care of all my

5   financial stuff.  I don't know why I'm here.  Do you

6   know what I mean?  I thought we'd been through this

7   already.

8      Q.   Do you understand what the issues in the

9   lawsuit are?

10     A.   Somewhat I do.

11     Q.   Can you tell me what your understanding is?

12     A.   There was some misunderstanding of the

13  cancellation of the loan, I think, some legal

14  misunderstanding, so...

15     Q.   Okay.  Have you ever had any problems in

16  making payments on the loan --

17     A.   Not to my recollection.

18     Q.   -- with First Horizon?

19     A.   Not to my recollection, no.

20     Q.   Okay.  Mr. Deane, when did you first decide

21  that you wanted to cancel this loan with First

22  Horizon?

23     A.   I don't remember.

24     Q.   Did you make the decision to cancel on this

00051
1   loan?

2      A.   Me and my wife did.

3      Q.   Did you and your wife make the decision to

4   cancel before or after you spoke to an attorney?

5      A.   I don't remember.

6      Q.   Do you remember when you hired an attorney?

7      A.   No.

8      Q.   Do you know what your attorney's name is?

9      A.   No.

10     Q.   How did you and your wife come to the

11  conclusion that you wanted to cancel your loan?

12     A.   What do you mean?

13     Q.   Okay.  For what reason did you want to

14  cancel the loan?

15     A.   I don't know.  You'll have to talk to my

16  wife on that legal issue.

17     Q.   All right.  Is it safe to say that your

18  wife had more input in the decision to cancel the

19  loan than you did?

20     A.   Yes.

21     Q.   Was she the one who came to the conclusion

22  to cancel the loan?

23     A.   We discussed it and we came to the

24  conclusion together.

00052
1      Q.   Did she have the initial idea and then you

2   agreed with her?

3      A.   Yes.

4      Q.   Before you decided that you wanted to

5   cancel the loan, did you see any legal

6   advertisements from your attorneys?

7      A.   No.

8           MR. PASQUARELLO:  Why don't we take a

9   short break.  We've been going for about an hour

10  now.  Okay, Chris?

11          MR. LEFEBVRE:  Sounds good.  I'm here.

12          MR. PASQUARELLO:  Okay.  Five minutes or

13  so?

14          MR. LEFEBVRE:  Sure.

15          (Recess.)

16  BY MR. PASQUARELLO:

17     Q.   Mr. Deane, we are back on the record.  I

18  want to show you a document that was marked as

19  Exhibit 4 at your wife's deposition.  The Bates

20  label is ECL&G 377.  Mr. Deane, have you ever seen

21  that document before?

22     A.   (Witness reviews document.)  No.

23     Q.   Do you know what it is?

24     A.   No.

00053
1    Q. That's fine, you can hand it back.
2        Mr. Deane, when did you and your wife
3 decide that you wanted to file this lawsuit?
4    A. I don't remember the exact date.
5    Q. Can you give me an approximate date?
6    A. Maybe two months ago.
7    Q. Do you know when the complaint was filed in
8 this case?
9    A. No, I don't.
10   Q. Now, let's go back to the closing
11 transaction on the refinancing with First Horizon.
12 At the closing did you believe that you had a right
13 to cancel the loan?
14   A. Yes, I did.
15   Q. And what was your understanding at the
16 closing of your right to cancel?
17   A. What is my understanding?
18   Q. Yes.
19   A. If I want to cancel, I can cancel.
20   Q. If you wanted to cancel, when would you
21 have had to cancel by?
22   A. I wasn't given a time frame, but I was
23 assuming, like I said, six months to a year you can
24 cancel.

Deane, Glenroy A. - 02/18/2005          Page 53

00054
1    Q. So at the closing for the refinancing with
2 First Horizon, it was your understanding that you
3 could cancel the loan within six months to a year,
4 is that right?
5    A. That's what I thought.
6    Q. Do you remember reviewing any documents
7 about your right to cancel?
8    A. No.
9    Q. Do you remember if your wife explained to
10 you anything about your right to cancel at the
11 closing?
12   A. No.
13   Q. No, you don't remember or no, she didn't?
14   A. No, I don't remember.
15   Q. All right. Now, at the closing again, what
16 was your understanding about what would happen if
17 you did decide to cancel it?
18   A. I don't remember.
19   Q. Did you have an understanding as to how a
20 cancellation would work?
21   A. I had my own understanding. I don't know
22 if it's the legal one.
23   Q. That's what I want to know. What was your
24 understanding?

Deane, Glenroy A. - 02/18/2005          Page 54

00055
1    A. I would have to go through a procedure with
2 a lawyer to cancel, take legal steps.
3    Q. Did you think you had to have a lawyer do
4 that?
5    A. Yes.
6    Q. And did you understand that if you took
7 those steps, your whole loan would be cancelled?
8    A. Yes.
9    Q. And is that your understanding today?
10   A. Yes.
11   Q. And is it your understanding today that if
12 you cancel your loan, you get all of the money back
13 from the loan?
14   A. I really don't know what the outcome is
15 going to be, to be honest with you.
16   Q. Mr. Deane, can you tell me what it is you
17 think that First Horizon did wrong?
18   A. Well, me and my wife discussed it, and we
19 said there was some legal issue about cancellation.
20 I'm not fully concerned -- sure what it is, but...
21   Q. Is that everything that you think First
22 Horizon did wrong?
23   A. I'm not sure. I don't know the full
24 details. I haven't been into it in big detail, so I

Deane, Glenroy A. - 02/18/2005          Page 55

00056
1 can't really give you a correct answer.
2    Q. With respect to the documents that you
3 signed at the refinancing transaction, did you read
4 any of them before the closing?
5    A. No.
6    Q. And these questions are about the
7 refinancing transaction with First Horizon. Okay?
8    A. I understand.
9    Q. Did you read any of the documents that you
10 signed after the closing?
11   A. No.
12   Q. Did you read -- I'm sorry. Did you review
13 any of the documents that you signed after the
14 closing?
15   A. No.
16   Q. Did you review any of the documents that
17 you signed before the closing?
18   A. No.
19   Q. After the closing did your wife review any
20 of the documents that you signed?
21   A. I don't remember.
22   Q. Now, after the closing but before you
23 received any money on the loan, did you want to
24 cancel the loan?

Deane, Glenroy A. - 02/18/2005          Page 56

00057
1   A. No.
2   Q. In the three months after the closing
3   transaction for the loan with First Horizon, did you
4   want to cancel the loan?
5   A. I don't remember.
6   Q. In the six months after the closing
7   transaction for the loan with First Horizon, did you
8   want to cancel the loan?
9   A. I don't remember.
10  Q. *Do you now want to cancel the loan that
11  you have with First Horizon?
12  A. Do I have a loan with them still?  I
13  thought we --
14  Q. If you have a loan -- well, go ahead and
15  answer.  I'm sorry.
16  A. No, that's all right.  Say what you were
17  saying.
18       MR. PASQUARELLO:  Would you read back
19  the question.
20       *(Question read.)
21  A. Yes.
22  Q. When did you reach that decision?
23  A. A couple months ago.
24  Q. Can you tell me what your claim is against

Deane, Glenroy A. - 02/18/2005          Page 57

00058
1   First Horizon in this lawsuit?
2   A. My wife has the claim.
3   Q. Can you tell me what it is?
4   A. I don't know exactly what it is.
5   Q. Do you also have a claim in this lawsuit
6   against First Horizon?
7   A. I assume so since my signature's on the
8   paperwork.
9   Q. Mr. Deane, are you a plaintiff in this
10  lawsuit?
11  A. Yes, I am.
12  Q. And can you tell me what your claim is in
13  the lawsuit against First Horizon?
14  A. Didn't I just answer that?  You're asking
15  me the same questions over and over.
16  Q. Just try to answer the question.
17  A. I don't know right now.
18  Q. Do you believe that First Horizon violated
19  a law?
20  A. Yes.
21  Q. What law is that?
22  A. The law on the cancellation of the loan.
23  Q. Do you know what it's called?
24  A. No.

Deane, Glenroy A. - 02/18/2005          Page 58

00059
1   Q. When did you first believe that?
2   A. After I discussed it with my wife.  She
3   somewhat explained it to me.
4   Q. When did that discussion take place?
5   A. A couple months ago.
6   Q. Mr. Deane, were you asked to make any
7   claims on behalf of a class?
8   A. Not to my recollection, no.
9   Q. Can you tell me specifically what it is
10  about your right to cancel that is at issue in this
11  lawsuit?
12  A. No.
13  Q. *Do you think that there was something
14  wrong with the notice of right to cancel that you
15  received?
16  A. Repeat the question.
17       MR. PASQUARELLO:  Can you read that
18  back.
19       *(Question read.)
20  A. Yes.
21  Q. What is that?
22  A. The way the whole process was taking place.
23  That's the understanding I have.
24  Q. Can you tell me what you mean by that?

Deane, Glenroy A. - 02/18/2005          Page 59

00060
1   What about the process?
2   A. It wasn't done correctly.  That's the
3   understanding I got.
4   Q. Okay.  What process are you talking about?
5   A. The process of Horizon towards my loan.
6   Q. Anything in particular about your loan?
7   A. No.
8       MR. PASQUARELLO:  Would you mark that as
9   Exhibit 2, please.
10      (Marked, Exhibit 2, Notice of right to
11  cancel.)
12      MR. PASQUARELLO:  Chris, I'm marking as
13  Exhibit 2 the notice.
14      MR. LEFEBVRE:  Notice of what, the right
15  to cancel?
16      MR. PASQUARELLO:  Yes.
17      MR. LEFEBVRE:  Okay.
18      MR. PASQUARELLO:  It's Bates-labeled
19  FH439 --
20      MR. LEFEBVRE:  Okay, no problem.
21      MR. PASQUARELLO:  -- and was marked as
22  Exhibit 5 to Mrs. Deane's deposition.
23  Q. Mr. Deane, have you ever seen that document
24  before?

Deane, Glenroy A. - 02/18/2005          Page 60

00061
1   A. (Witness reviews document.)
2   Q. Strike that. Let me ask you a different
3   question. On the bottom of the document, is that
4   your signature?
5   A. Yes, it is.
6   Q. Do you remember signing this document?
7   A. No.
8   Q. Okay. What is the date next to your
9   signature?
10  A. 11/18/03.
11  Q. Did you write that date in on that
12  signature line?
13  A. If that's my signature, I did.
14  Q. Is it your handwriting for the date?
15  A. Yes.
16  Q. Do you remember signing this document on
17  November 18, 2003?
18  A. No.
19  Q. Do you remember any explanation about this
20  document on November 18, 2003?
21  A. No.
22  Q. Do you think that's the date that the
23  closing transaction took place?
24  A. Yes.

Deane, Glenroy A. - 02/18/2005          Page 61

00062
1   Q. At the closing transaction did your wife
2   explain anything to you about this document?
3   A. I don't remember. We signed a lot of
4   papers.
5   Q. Mr. Deane, with this document in front of
6   you, do you know what this is?
7   A. It says, "Notice of right to cancel."
8   Q. Have you ever read this document before?
9   A. No.
10  Q. Have you ever reviewed this document
11  before?
12  A. No.
13  Q. Do you think there's any problem with this
14  document?
15  A. I'd have to read it and give an answer.
16  Q. Okay.
17  A. I just can't answer that without reading
18  it. Isn't that the whole reason for me being here,
19  about the notice?
20  Q. At the closing did you have any
21  understanding about what this document was?
22  A. No.
23  Q. All right. But you did believe that you
24  could cancel the loan if you wanted to?

Deane, Glenroy A. - 02/18/2005          Page 62

00063
1   A. Yes.
2   Q. Mr. Deane, why don't you take a minute to
3   review the top part of the document, which is
4   Section 1.
5   A. (Witness reviews document.)
6   Q. Have you had a chance to read through
7   Section 1 of the document?
8   A. I just did.
9   Q. After reading the document, do you
10  understand that it provides a right for you to
11  cancel the loan?
12  A. Right now I do because I just read that.
13  That's what it says in the document.
14  Q. Do you understand that there's a time
15  period for you to exercise your right to cancel?
16  A. (Witness reviews document.) It says here
17  three business days.
18  Q. Okay. Now, after reading through the
19  document, is it your understanding that you can
20  cancel the loan, or you could have canceled the
21  loan?
22  A. No. Within three business days --
23  Q. Right.
24  A. -- or after three business days?

Deane, Glenroy A. - 02/18/2005          Page 63

00064
1   Q. Whatever your answer is.
2   A. No.
3   Q. After reading the document what's your
4   understanding about what happens if you want to
5   cancel?
6   A. By this document it's too late because
7   they're saying it's three business days.
8   Q. *I understand that. Just reading it today,
9   if you had three business days, what's your
10  understanding as to what would happen if you wanted
11  to cancel?
12  A. Repeat the question.
13  MR. PASQUARELLO: Could you read that
14  back.
15  *(Question read.)
16  A. It would be canceled within three business
17  days. That's my understanding.
18  Q. Okay. And is it the same understanding
19  about the cancellation process that you described to
20  me earlier?
21  A. What cancellation process are you talking
22  about? Are you talking about the document in front
23  of me?
24  Q. Is it your understanding that if you

Deane, Glenroy A. - 02/18/2005          Page 64

00065
1  canceled, the whole loan would be canceled?

2  A.  Yes.

3  Q.  Okay.  Mr. Deane, have you suffered any

4  damages as a result of the conduct that you allege

5  is wrong in this lawsuit?

6  A.  Any damages?  No.

7  Q.  Mr. Deane, what is your understanding as to

8  how the rescission process works?

9  A.  I don't fully understand it.

10  Q.  Let me rephrase it.  What is your

11  understanding as to how the cancellation process

12  would work if you are able to cancel your loan?

13  A.  I don't fully understand the process.

14  Q.  If you're allowed to cancel the loan, do

15  you think that you would have to return any money to

16  the lender?

17  A.  I don't know.

18  Q.  Have you made any arrangements for

19  alternative financing, Mr. Deane?

20  A.  For what?

21  Q.  For your loan.

22  A.  No.

23  Q.  Have you talked to any mortgage brokers?

24  A.  No.

Deane, Glenroy A. - 02/18/2005          Page 65

---

00066
1  Q.  Have you discussed interest rates on

2  available loans with anybody?

3  A.  No.

4  Q.  Do you have any idea what sort of an

5  interest rate you could get if you wanted to

6  refinance?

7  A.  No.

8  Q.  Does the interest rate that's available

9  have any effect on your decision about whether you

10  want to cancel?

11  A.  It might.

12  Q.  Is it your understanding that you would

13  have to return to the lender the principal balance

14  of your loan if you cancel?

15  A.  No.

16  Q.  No, that's not your understanding?

17  A.  Yes, that's not my understanding.

18  Q.  So do you believe that you would be able to

19  keep the amount that was provided to you under the

20  loan that you are trying to cancel?

21  A.  Yes.

22  Q.  *What remedy are you seeking in this case?

23  A.  Explain further "ravity," the word

24  "ravity."

Deane, Glenroy A. - 02/18/2005          Page 66

---

00067
1  Q.  Remedy.

2  A.  Remedy.  I thought you said "ravity."

3  Q.  No, sorry.

4      MR. PASQUARELLO:  Could you just read

5  back the question.

6      *(Question read.)

7  A.  Some closure so I don't have to go through

8  this again.  What else?

9  Q.  What do you mean by "closure"?

10  A.  Closure about this loan and all the issues

11  and problems we're having here.

12  Q.  *Just can you explain to me what you mean

13  by "closure"?

14  A.  Come to a conclusion.  Let's conclude it,

15  what's going on here.  My wife has to take care of

16  it.  Like I said, I don't even know why you guys

17  have me here.  My wife takes care of all my

18  financial stuff.  I assumed when she came here

19  everything was enough -- that was enough, not me

20  coming here and going through a two-hour deposition.

21  Is it necessary?**

22      MR. LEFEBVRE:  Mr. Deane, this is Chris

23  again.

24      THE WITNESS:  Yes.

Deane, Glenroy A. - 02/18/2005          Page 67

---

00068
1      MR. LEFEBVRE:  It might just help -- it

2  appears that you are getting frustrated.

3      THE WITNESS:  I am.

4      MR. LEFEBVRE:  And certainly I

5  understand, but Mr. Pasquarello is being a

6  gentleman, and he has a job to do.  And I know it's

7  frustrating, so maybe I might make this suggestion

8  just to help expedite the process, which I'm sure

9  would be good for you.  I know it would be wonderful

10  for me.  Why don't you just listen to his questions.

11  If you don't know the answer, you can just tell him,

12  "I don't know the answer.  I don't know."  And

13  that's an acceptable answer.  Okay?

14      THE WITNESS:  I'm doing that.

15      MR. LEFEBVRE:  All right.

16      THE WITNESS:  He's asking me the same

17  thing over and over in different phrases.  Believe

18  me, I'm doing that.

19      MR. LEFEBVRE:  I know.  I am sitting

20  here listening to the same questions.  Just listen

21  to his recent question.

22      Dan, might I suggest you ask or repeat

23  your last question so we can move this along.

24      MR. PASQUARELLO:  We can do that.  And

Deane, Glenroy A. - 02/18/2005          Page 68

00069
1   let me just note that we're almost done, if that
2   helps everybody involved.
3          MR. LEFEBVRE:  Oh, that sounds great.
4          MR. PASQUARELLO:  Could you read back
5   the last question.
6          (Record read from * to **)
7   Q.   I'll ask another question.
8   A.   Do you have to?  Go ahead.
9   Q.   Mr. Deane, what is it that you hope to gain
10  from this lawsuit, if anything?
11  A.   Didn't I just answer that?
12  Q.   Just try to answer the question.
13  A.   What answer do you want?
14  Q.   I want you to just provide your answer.
15  A.   I just gave you an answer to the question.
16  Q.   This is a different question.
17  A.   No, it's not.  It's the same question.
18         MR. LEFEBVRE:  Mr. Deane, just -- if you
19  don't know the answer, if you don't know what you
20  want, it's okay to say you don't know what you want.
21  A.   I don't know what I want, to give you an
22  answer.  How's that?
23  Q.   Okay.  This question is about refinancing
24  in general.  Okay?  If you're only able to receive

00070
1   or to get an interest rate that's higher than the
2   rate that you have on a loan, would you still want
3   to refinance?
4   A.   No.
5   Q.   Mr. Deane, have you ever been a party in a
6   lawsuit before?
7   A.   No.
8   Q.   Have you ever been a witness in a lawsuit
9   before?
10  A.   No.
11  Q.   Have you ever testified in court before?
12  A.   No.
13  Q.   Have you ever been a defendant in a
14  criminal case?
15  A.   Yes.
16  Q.   When was that?
17  A.   1989.
18  Q.   And what did that case involve?
19  A.   Assault and battery.
20  Q.   Were you convicted of that charge?
21  A.   Yes.
22  Q.   And when were you convicted?
23  A.   May of '89.
24  Q.   Have you been convicted of any other

00071
1   crimes?
2   A.   No.
3   Q.   Did you have to serve any jail time for
4   that?
5   A.   Yes, I did.
6   Q.   How long was that?
7   A.   Eighteen months.
8   Q.   And where did you serve that time?
9   A.   Plymouth House of Correction.  Can I ask
10  you a question?
11  Q.   You can ask your attorney a question.
12  A.   I'm asking you a question.
13  Q.   Go ahead.
14  A.   What does that have to do with this?
15         MR. LEFEBVRE:  You know what,
16  Mr. Deane -- it's Chris Lefebvre again -- I know
17  sometimes lawyers can be very irritating, and I know
18  it sounds like Mr. Pasquarello is asking personal
19  questions.  Unfortunately, the law allows him to ask
20  certain questions.  It's no big deal.  And like Dan
21  said a couple minutes ago, he's almost done.  So if
22  you just let him finish his job, you'll be on your
23  way home sooner rather than later.
24         THE WITNESS:  I will.

00072
1          MR. LEFEBVRE:  Thank you.
2          THE WITNESS:  You're welcome.
3   Q.   That was in Plymouth, Massachusetts?
4   A.   Yes, it is.
5   Q.   Mr. Deane, were you involved at all in the
6   process of responding to First Horizon's discovery
7   requests in this case?
8   A.   No.
9   Q.   Was it your wife who was involved?
10  A.   Yes.
11  Q.   Do you keep a file at home about this case?
12  A.   My wife probably does but I don't.
13  Q.   Do you know if the documents in that file
14  have been produced?
15  A.   I don't know.
16  Q.   Does your wife keep files about your real
17  estate transactions on the Darby Street home?
18  A.   Yes, she does.
19  Q.   Do you know if the documents from that file
20  have been produced?
21  A.   I don't know.
22  Q.   Did you look for any documents about your
23  mortgage loan with First Horizon?
24  A.   No.

00073
1    Q. Did your wife look for them?

2    A. I don't know.

3    Q. Do you know any other plaintiffs in this

4 case besides your wife?

5    A. No.

6    Q. Have you ever talked to any other

7 plaintiffs in this case besides your wife?

8    A. No.

9    Q. Do you know whether or not this case is a

10 class action case?

11    A. No, I don't know.

12    Q. Do you know what a class action is?

13    A. No.

14    Q. Mr. Deane, do you want to be a plaintiff in

15 this case?

16    A. Yes.

17    Q. You do. Have you ever expressed doubts

18 about being a plaintiff in this case?

19    A. No.

20       MR. PASQUARELLO: Why don't we go off

21 the record for about two minutes, and I'll wrap up.

22       MR. LEFEBVRE: Great.

23       (Recess.)

24       MR. PASQUARELLO: We're back on the

00074
1 record. Mr. Deane, thank you for your time today.

2 I don't have any other questions.

3       THE WITNESS: Thank you.

4       MR. LEFEBVRE: Oh, that's good news.

5 Have a safe trip home.

6       MR. PASQUARELLO: Any questions, Chris?

7       MR. LEFEBVRE: No, no questions from

8 this end.

9       MR. PASQUARELLO: Okay.

10       (Whereupon the deposition was concluded

11 at 2:56 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

00075
1       CERTIFICATE OF COURT REPORTER

2       I, Joan M. Cassidy, Registered

3 Professional Reporter and Certified Realtime

4 Reporter, do certify that the deposition of Glenroy

5 A. Deane, in the matter of R. McKenna, et al. v.

6 First Horizon, on February 18, 2005, was

7 stenographically recorded by me; that the witness

8 provided satisfactory evidence of identification, as

9 prescribed by Executive Order 455 (03-13) issued by

10 the Governor of the Commonwealth of Massachusetts,

11 before being sworn by me, a Notary Public in and for

12 the Commonwealth of Massachusetts; that the

13 transcript produced by me is a true and accurate

14 record of the proceedings to the best of my ability;

15 that I am neither counsel for, related to, nor

16 employed by any of the parties to the above action;

17 and further that I am not a relative or employee of

18 any attorney or counsel employed by the parties

19 thereto, nor financially or otherwise interested in

20 the outcome of the action.

21

22

23 3/2/05       _____

24       Joan M. Cassidy, RPR, CRR

00076
1       I N D E X

2

3       EXAMINATIONS

4 Glenroy A. Deane

5    BY MR. PASQUARELLO          3

6

7       EXHIBITS MARKED

8    1, Second revised notice of          3

9 deposition of Glenroy A. Deane

10   2, Notice of right to cancel          60

11

12

13

14

15

16

17

18

19

20

21

22

23

24 Original exhibits returned to Attorney Pasquarello

00077
1                    Glenroy A. Deane
             SIGNATURE PAGE/ERRATA SHEET
2   PAGE   LINE    CHANGE OR CORRECTION AND REASON

3  ____|____|____ _____

4  ____|____|____ _____

5  ____|____|____ _____

6  ____|____|____ _____

7  ____|____|____ _____

8  ____|____|____ _____

9  ____|____|____ _____

10 ____|____|____ _____

11 ____|____|____ _____

12 ____|____|____ _____

13  I have read the transcript of my deposition taken on February 18, 2005.
      Except for any corrections or changes noted above I hereby subscribe to the
14  transcript as an accurate record of the statements made by me.

15  _____DATE_____

16  Deponent, Glenroy A. Deane

17  On this _____ day of _____, 200___, before me, the undersigned

18  notary public, personally appeared Glenroy A. Deane, who presented

19  satisfactory evidence of identification, to wit, _____,

20  and signed this document in my presence.

21

22  _____

23        NOTARY PUBLIC

24  My commission expires_____


                Deane, Glenroy A. - 02/18/2005              Page 77