```
                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


RALPH G. McKENNA,            )
                             )
              Plaintiff      )
                             )
         -VS-                ) CA No. 04-10370-PBS
                             ) Pages 1 - 30
FIRST HORIZON HOME LOAN      )
CORPORATION,                 )
                             )
              Defendant      )



                         MOTION HEARING

              BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE
```

A P P E A R A N C E S:

CHRISTOPHER M. LEFEBVRE, ESQ., PO Box 479, Pawtucket, Rhode Island, 02862, for the Plaintiffs.

CATHLEEN M. COMBS, ESQ., Edelman, Combs & Latturner, 120 S. LaSalle Street, Chicago, Illinois, 60603, for the Plaintiffs.

U. GWYN WILLIAMS, ESQ. and ALISHA R. BLOOM, ESQ., Goodwin Procter, LLP, Exchange Place, Boston, Massachusetts, 02109, for the Defendant.

```
                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    November 16, 2007, 2:30 p.m.


                       LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                  United States District Court
                  1 Courthouse Way, Room 3205
                      Boston, MA  02210
                       (617)345-6787
```

b10d2020-e96f-4987-9432-2b47b703c2da

1          P R O C E E D I N G S

2          THE CLERK:  The case of Ralph McKenna V. First

3    Horizon Home Loan Corporation, Civil Action No. 04-10370,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6          MS. COMBS:  Good afternoon, your Honor.  Cathleen

7    Combs on behalf of the plaintiff.

8          MR. LEFEBVRE:  Along with Christopher Lefebvre.

9    Good afternoon.

10         MS. WILLIAMS:  Gwyn Williams for the defendant,

11   First Horizon, and with me is Alisha Bloom.

12         THE COURT:  Can I start off with -- first of all,

13   good afternoon.  Can I start off with a really basic

14   question?  I don't understand procedurally where we are in

15   this case.  You're both cross-moving for summary judgment,

16   and yet before the First Circuit was a class certification

17   issue.  So have people abandoned class cert?

18         MR. LEFEBVRE:  Not at all, Judge.  I think what has

19   happened is, the First Circuit has said quite clearly that

20   classwide rescission, you know, class seeking a rescission is

21   inappropriate.  We have subsequently filed an amended

22   complaint which seeks statutory damages, so --

23         THE COURT:  Yes, but typically you don't do summary

24   judgment before you do class cert, because if I rule against

25   the plaintiffs, then all you have is a ruling against a named

1    plaintiff.  If I rule against the defendants, then I go

2    through class cert.  And it's sort of -- I mean, in other

3    words, I need to deal with class cert first.  I've never

4    granted or denied summary judgment without first resolving

5    the class issue because of the -- I forget what the words

6    are.

7            MS. COMBS:  One-way intervention?

8            THE COURT:  Yes, okay, thank you.

9            MR. LEFEBVRE:  That's why I brought her.  She's

10   much smarter than I am, Judge.

11           THE COURT:  So unless there's a reason you're all

12   agreeing to just dismiss the class claims and just proceed

13   one by one, why am I here?

14           MS. COMBS:  Your Honor, although it traditionally

15   and often is handled that way, basically the impact is on the

16   defendants.  If they do not object, of course, the plaintiffs

17   would not.

18           THE COURT:  Let's say you win.  What does that get

19   you?  Do you want to do it this way?

20           MS. WILLIAMS:  We do, your Honor.

21           THE COURT:  Why?  And I just don't know of any case

22   I have ever resolved summary judgment before the class

23   issues, and I think there's some pretty strong First Circuit

24   law telling me not to.  So I'm perplexed.

25           MS. WILLIAMS:  I'll grant you, it is out of the

1    usual course, but there is no law that prevents you from

2    doing it.  We've had a lot of litigation with Ms. Combs and

3    Mr. Lefebvre's respective firms, not just with this

4    particular client.  We had the Plymouth Savings Bank and

5    Rodrigues matter before your Honor, if you'll remember back,

6    and there are other suits involving a similar type of issue;

7    and at this point, up until now, pretty much all the fighting

8    between the parties has been on class issues.

9              THE COURT:  Rescission, yes.

10             MS. WILLIAMS:  And rescission claim is obviously

11   the bigger piece of concern to the lender, as that's where

12   the bulk of the liability lies.  Statutory damages are

13   available, but they're capped at $500,000.  We've now been

14   litigating these types of cases for a number of years and

15   have only really reached at least partial resolution on the

16   class issues.  We've never in any of our cases actually

17   gotten to the merits of an issue.  And the parties jointly

18   felt like, in order to figure out settlement value of this

19   case and other cases, it was really time to get a ruling from

20   the Court on the actual --

21             THE COURT:  The basic cost.

22             MS. WILLIAMS:  Yes, because you can't keep fighting

23   forever over class certification without knowing whether that

24   makes sense to do, whether there's even a viable cause of

25   action or not.

1    THE COURT:  So you both agree, because no one

2  raised it.  That's why I was sitting there thinking to

3  myself:  It's such an obvious point, there must be a reason

4  why, because you haven't dropped your class claims.

5    MS. COMBS:  No, we have not dropped our class

6  claims.  And we of course have no objection because the

7  one-way intervention is to our advantage.  But it's not

8  uncommon.

9    THE COURT:  So, I mean, I don't want you to --

10  suppose you lose.

11    MS. COMBS:  Then we --

12    MR. LEFEBVRE:  First Circuit.

13    THE COURT:  You appeal me.

14    MS. WILLIAMS:  Then we'll all go to the First

15  Circuit.

16    THE COURT:  You appeal me, or you'll just -- this

17  is what I don't want to happen is forum shopping until you

18  have another case and it's drawn to another judge.  So

19  whatever happens here, one side, if you lose, you go up and

20  get a ruling that at least controls in the circuit.  If you

21  win, you're stuck because you're stuck with it for a while.

22  You then come back for class cert, and the thing either

23  settles, or we'll just resolve it all the way through, and

24  then you go up to the First Circuit.

25    MS. COMBS:  Correct.

1          THE COURT:  And both sides understand that?

2          MS. COMBS:  Yes.

3          MS. WILLIAMS:  Yes, your Honor.

4          THE COURT:  Because what I would hate to see is,

5     like, I rule, and then you sort of figure, "All right, we'll

6     shoot the roulette through the random draw and come up with

7     another and another --"

8          MS. COMBS:  That's not our intention, your Honor.

9          THE COURT:  Good.  So you'll just go upstairs and

10    try and figure it out.

11         MS. COMBS:  Correct.

12         THE COURT:  So with that understanding, let's go.

13    It's actually cross-motions, so --

14         MS. WILLIAMS:  We filed first, but I don't --

15         MS. COMBS:  Go ahead.

16         MS. WILLIAMS:  Okay, okay.

17         The good news here, I think, if there is any good

18    news, is that I think the parties actually agree on more

19    issues here than they disagree.  I mean, we're actually all

20    on the same page in terms of what the issues are.  The bulk

21    of the law we agree on.  It really comes down to two key

22    legal issues, and in fact the Court need not reach the second

23    issue at all if the Court agrees with First Horizon's

24    argument on the first issue.

25         So I think the briefing lays out a lot of the

1  background of the law.  You obviously have some familiarity

2  already with it from our prior history in front of you.  I'm

3  not going to go through all that.  I just want to focus in on

4  these two key legal issues.

5       The first key legal issue is, under an objective

6  standard, is this form a clear and conspicuous disclosure of

7  the effects of rescission?  And the second question, should

8  you need to reach it, is whether this case should actually be

9  analyzed under a subjective standard instead of an objective

10  standard.  I'm going to talk to you about the objective

11  standard first without conceding on the subjective point, but

12  just because if you decide on the objective standard, we may

13  never need to reach the morass that you get into a little bit

14  if you get to the, should it really be a subjective

15  standard?

16       So under the objective standard, the way the

17  analysis works is quite clear.  You look at the form.  It's

18  in our materials.  It's a little bit hard to read.

19       THE COURT:  Actually, that's the one page I have

20  yellow stickied.

21       MS. WILLIAMS:  Okay, I blew it up a teeny bit, if

22  you'd like a copy that's a little bit more readable.

23       THE COURT:  As we all age --

24       MS. WILLIAMS:  I have the same problem.  I handed

25  it to my secretary and said, "Could you jigger this on the

1  photocopier, please."

2          MR. LEFEBVRE:  You didn't change any of the words,

3  I hope.

4          MS. WILLIAMS:  I promise I didn't change any of the

5  words.

6          THE COURT:  This is the over-fifty version.

7          MS. WILLIAMS:  And it's not that much better, but

8  it's the best you can get and still have it be on one page.

9  There you go.  You can have one too.  I see Cathy's got her

10 reading glasses on already.

11         So if you look at the form, really the critical

12 issues here are the second and third paragraphs, the second

13 paragraph being, it starts, "If you cancel the transaction,"

14 the third paragraph starting, "For new transactions involving

15 us."

16         Now, the second paragraph gives what's called the

17 general right of rescission and explains what happens if you

18 rescind.  The First Circuit has held in the Doral case that

19 this type of disclosure, this second paragraph -- and in fact

20 the plaintiffs have conceded this point in their briefs --

21 that this would suffice as a disclosure of the effects of

22 rescission under either of the two types of refinancing

23 situations; either, on the one hand, where you're refinancing

24 with a wholly new lender, or, on the other hand, where you're

25 refinancing with your same lender you already have, but

1    you're just taking out more credit than you had before.

2          So the question for this case then becomes:  Is the

3    inclusion of the third paragraph, does that somehow undo what

4    would otherwise be a sufficient disclosure under the law?

5          Now, to answer this question about this critical

6    third paragraph, you have to start with what the First

7    Circuit has held in the Doral case.  The First Circuit has

8    rejected the standard espoused by the Seventh Circuit and

9    also by the Third Circuit of the hypertechnical nature, and

10   the First Circuit has explicitly held that perfect notice is

11   not required.  This is in line with a number of other

12   circuits, including the Fifth Circuit, which has worded it

13   as:  The question is not whether the form is capable of

14   semantic improvement.  The question is whether it

15   sufficiently discloses the right.  And the Second Circuit has

16   also similarly said:  It's okay to require the borrower to

17   exercise some degree of care and scrutiny, care and study to

18   understand this.  Mortgage refinancings are complex

19   transactions.  All of this is a little bit hard.

20         So you'll see in the third paragraph that it

21   references the fact that the lender, First Horizon, already

22   has a security interest in the borrower's home.  That would

23   not be the case, obviously, if you were going from a

24   different lender to First Horizon.  So a borrower reading

25   this who was not in that circumstance would reasonably

1    understand that this paragraph does not apply to them.

2            Using that analysis, this form then is a clear and

3    conspicuous disclosure of the effects of rescission, which is

4    really the only issue that we need deal with here.

5            Now, that's the objective standard issue.  If you

6    were to judge this case under a subjective standard, there is

7    no liability that can be found here because the plaintiffs,

8    each of these individual plaintiffs were not in fact

9    confused.

10           Now, in the briefs, Mr. Lefebvre and Ms. Combs

11   argue somewhat with us over the language of the individual

12   plaintiffs' deposition testimony.  I'm not going to quibble

13   over that here today.  You've got the transcripts attached to

14   our materials.  The Court can read them and decide whether

15   you agree with our reading that they already understood their

16   right or not.  Instead, I just want to focus for you here on

17   the legal issue about why this should be judged on the

18   subjective standard.

19           THE COURT:  It should be on the subjective?

20           MS. WILLIAMS:  That's our position.

21           THE COURT:  Not on an objective?

22           MS. WILLIAMS:  We think we -- argument number

23   one --

24           THE COURT:  I thought you thought you won on the

25   objective.

1          MS. WILLIAMS:  We do.

2          THE COURT:  But you're saying, even if I went to

3     the subjective, you win?

4          MS. WILLIAMS:  No.  I'm saying we should win under

5     an objective standard.  If you disagree with us, though, and

6     say, "No, I don't find this form objectively to be clear and

7     conspicuous disclosure," then our argument is, "But, your

8     Honor, these people actually already understood their right."

9     So under that subjective standard, it doesn't matter that the

10    form -- in other words, their actual understanding excuses,

11    if you will, something that's a technical violation of the

12    statute.

13         So our first argument is:  It complies with the

14    statute.  It's not a problem on its face.  The second

15    argument is:  Well, even if it doesn't comply with the

16    standard on its face, their actual understanding excuses any

17    violation, which would be in accordance with the First

18    Circuit's holding about not following hypertechnical

19    standards.

20         THE COURT:  Did Judge Lindsay rule on this precise

21    point?

22         MS. WILLIAMS:  No, he did not, your Honor.  He only

23    ruled on the class certification point.

24         THE COURT:  And no court has ruled on this precise

25    language?

b10d2020-e96f-4987-9432-2b47b703c2da

1          MS. WILLIAMS:  No, not that I'm aware of.

2          THE COURT:  And, as I understand it, it was a

3    merging of two forms, right?

4          MS. WILLIAMS:  That's correct, your Honor.  There

5    are two forms that are published by the Federal Reserve bank

6    called the H-8 and the H-9 forms.  If you use those forms --

7    and they're actually published in CFR, they're cited in our

8    briefs -- if you use either of those forms, every court has

9    held that that basically provides a safe harbor; you can't be

10   held liable if you use those forms; they are by law a clear

11   and conspicuous disclosure.

12         However, every court has also held, and the

13   regulations specifically state, that a lender is allowed to

14   vary from using the forms as long as it remains a clear and

15   conspicuous disclosure.  And in fact industry practice is

16   quite common, for one reason or another, that forms get

17   varied in some fashion.

18         So what First Horizon did here was try to take

19   these two circumstances and put it together in one form, and

20   that's what arises here.  Most of the case law about these

21   forms has arisen out of the circumstance where a lender was

22   still using two forms but used the wrong one in the wrong

23   circumstance.  That's the more typical situation.  That was

24   the situation in Doral.

25         So in terms of a subjective standard, the place I'd

b10d2020-e96f-4987-9432-2b47b703c2da

1    like to start -- we spent a lot of time arguing in our briefs

2    about this SJC case Killeen and how that provides a

3    subjective standard.  Just to remind you, these claims

4    actually arise under the Massachusetts version of TILA.

5    Massachusetts is one of five states that's been granted

6    permission by the Federal Reserve Bank to opt out of TILA, so

7    the claims actually arise under the Massachusetts version.

8    But before I talk to you about Killeen, I actually want to

9    suggest, first, that it's not so clear, I think, that even if

10   only federal law applied, that it would necessarily be

11   governed by an objective standard as the plaintiffs have

12   said.

13           The key case in this jurisdiction on the subjective

14   versus --

15           THE COURT:  You're urging me to do a subjective

16   standard in this case?

17           MS. WILLIAMS:  I am, subjective meaning that their

18   actual understanding --

19           THE COURT:  So you would actually like me to follow

20   a subjective standard because the deposition transcript is so

21   clear?

22           MS. WILLIAMS:  That's right, your Honor.

23           THE COURT:  You don't think it should be an

24   objective standard because of this Killeen case?  Is that

25   it?  You think I should follow state law?

1          MS. WILLIAMS:  Yes, but I would also suggest --

2     that's right.  I'd also suggest that that would be in

3     accordance or is not contrary to the First Circuit law.  The

4     key case in the First Circuit on this, do you apply an

5     objective or subjective standard, is a case from 2006 called

6     Palmer which is another one of Mr. Lefebvre's cases, I

7     believe.

8          MR. LEFEBVRE:  One of my favorites.

9          MS. WILLIAMS:  He cites it whenever he has the

10    chance, understandably.  In Palmer, the First Circuit held --

11    it rejected an argument to a request to apply a subjective

12    standard and applied the objective standard.  That case,

13    however, was a case where -- and so that case is usually

14    cited, and Mr. Lefebvre has cited it for the fact that, well,

15    the First Circuit follows an objective standard; that's it,

16    it's federal law, objective standard.

17         However, that case is almost 180 degrees different

18    from this case.  In that case, it was the borrower who was

19    claiming that they wanted their actual understanding to

20    govern.  So the First Circuit held that the form was actually

21    compliant under TILA; on its face, the form was fine.  The

22    borrower is saying, "Yeah, but I didn't understand it.  I

23    personally didn't get it."  And the court says, "No, that

24    doesn't matter.  We're not using your subjective

25    understanding.  We're using this objective standard."

1           Now, that makes sense under TILA because the

2    purpose of the statute, one of the main purposes of the

3    statute is to encourage compliance with these disclosure

4    requirements by lenders.  And so in that circumstance, that

5    holding furthers the intent of TILA because if you had a

6    circumstance where an otherwise compliant form you could

7    still be held liable on, it doesn't give the lender -- the

8    lender can't do anything better than comply with the law.  It

9    would create a windfall of liability for the plaintiff

10   without actually furthering any compliance-related goals for

11   the lender because they're already complying with the law.

12   It just doesn't make sense to impose liability there.

13           Here in this case, which is the reverse situation

14   where the lender is arguing for the standard, to follow an --

15   I have to do this slowly so I say the right words because

16   otherwise it comes out all wrong -- to follow an objective

17   standard, as the plaintiffs would have it, is actually what

18   would create the windfall.  These plaintiffs understood their

19   rights already, and there is no need to hold the lender to

20   strict liability, essentially under a hypertechnical

21   standard, for this form where the plaintiffs in fact

22   understood what their rights were.  You needn't worry about a

23   compliance incentive here.  A lender like First Horizon makes

24   tens of thousands of loans, and they have every incentive

25   already, including other suits filed by Mr. Lefebvre, to get

1    the form right.  Surely no lender would purposely have the

2    wrong form, hoping to escape liability by the fact that

3    they'd only be sued by somebody who just coincidentally

4    happened to understand their rights.  There's nothing that

5    would suggest --

6            THE COURT:  Well, how have courts gone about

7    deciding if something is objectively clear?

8            MS. WILLIAMS:  Just by looking.  It's a reasonable

9    consumer standard, and you look at the form, and the finder

10   of facts as a reasonable --

11           THE COURT:  Is it a fact-finding, or is it a

12   legal -- I always get confused in these.

13           MS. WILLIAMS:  It's a little bit of an either/or.

14   These cases --

15           THE COURT:  It's like a mixed question.

16           MS. WILLIAMS:  These cases are very routinely,

17   though, decided on summary judgment motions.  That is quite

18   common.  As a matter of fact, I think pretty much every case

19   that we -- the vast majority of the cases that either side

20   has --

21           THE COURT:  What if I think it's clear?

22           MS. WILLIAMS:  Well, if you think --

23           THE COURT:  Well, but there's evidence in the

24   record that the reason why they didn't do -- I forget what it

25   was -- the check-offs differently is because a lot of the

1    lenders were getting it wrong.  So it's obvious that some

2    people were getting it wrong, but I think it's clear.  In

3    other words, it's always a -- wasn't that the evidence, that

4    the reason you changed the form was the old way was confusing

5    to your own people?

6            MS. WILLIAMS:  Well, that's what Mr. Lefebvre has

7    said.  We take issue with that.  And, again, the deposition

8    transcripts are attached to the pleadings so that you can

9    look at it for yourself, your Honor; but a representative of

10   First Horizon testified -- you're right remembering-- that

11   prior to this form, they used a form that was fairly

12   similar.  The wording is a little bit different, but it had a

13   place where either the lender, agent of the lender or the

14   closing agent, could check off which of the two rights

15   applied.  And a 30(b)(6) representative of First Horizon

16   testified that the company changed from that form to this

17   form because of the possibility of confusion.  He did not

18   testify -- there's no evidence in the record that employees

19   of First Horizon were in fact getting the form wrong,

20   checking off the wrong box or doing it incorrectly.  The

21   company made a decision on a policy basis that it wanted to

22   eliminate the possibility of confusion by getting the form

23   wrong and go to this form, which didn't require any action by

24   anybody in the circumstance; it was the same form for all

25   transactions.

1          THE COURT:  All right, let me just jump because as

2     you heard, I thought we had this little slam-dunk hearing

3     right before you, and it suddenly turned complicated, and I

4     have a big hearing afterwards.  So, Mr. Lefebvre, let me turn

5     to you.

6          MR. LEFEBVRE:  Sure, Judge.  And I like the way

7     Ms. Williams framed the issue, whether you're going to adopt

8     the objective standard, and I think the answer is

9     "absolutely."  And I think that the First Circuit has given

10    you a road map on how to deal with the issues presented on

11    both sides.

12         THE COURT:  Well, how do you think this should be

13    read, the third paragraph here?

14         MR. LEFEBVRE:  Oh, how should it be read?  Well, it

15    should be read exactly what it says:  For new transactions --

16    and the record in this case, every single one of the named

17    plaintiffs never had a prior loan with First Horizon.  They

18    were with Bank A and now came to Bank B, First Horizon.  So

19    how should it be read?  Okay, for a new transaction, I can

20    cancel this transaction, but I can only cancel the increase

21    in the amount of credit.  Hhm, what does that mean?  I had a

22    loan with Bank A for $100,000.  Now I just refinanced because

23    I wanted some money to pay college tuitions, so now I have a

24    loan of $120,000.  So that means I can only cancel for

25    $20,000.

1           That's wrong.  This isn't a question of, is it

2    confusing, is it misleading?  We'll go one step farther:

3    It's wrong.  That is an absolute wrong statement.  These

4    plaintiffs all had the right to rescind the entire

5    transaction.  And what Paragraph 3 does is, it gives them the

6    restrictive right to rescind, which is known as the H-9.

7    That's wrong.  It doesn't apply here.  So I'm just asking you

8    to --

9           THE COURT:  So you think -- well, no.  You think

10   the "involving us" is really the confusing language.

11          MR. LEFEBVRE:  "For new transactions involving us,"

12   the "involving us" can only be First Horizon.  I mean, this

13   is their form.  They prepared it.  And it says, "You can

14   cancel the new transaction, but it only applies to the

15   increased amount of credit."  Well, let's look at the facts.

16   All of these borrowers had a loan when they went to refinance

17   in a lower amount, took out more credit; and under the law,

18   it's undisputed they had the right to rescind the entire

19   loan.  Paragraph 3 says, "No.  You can only rescind a less

20   amount."

21          THE COURT:  In fairness, so the dispute here is

22   whether the "involving us" is so unclear as to not be clear

23   and conspicuous?

24          MR. LEFEBVRE:  Well, Judge, I'm not so sure that

25   it's not clear.  I mean, I think the words --

1       THE COURT:  You could read it, "If you already had

2   a loan with us and you're just getting an increase," so you

3   can read it two ways is what you're saying.

4       MR. LEFEBVRE:  Correct.  And in fact, Judge --

5       THE COURT:  That's what you're saying is that it

6   could be read:  If in fact you have $100,000 with First

7   Horizon, right, and then you get an extra $20,000, you're

8   only going to cancel out the extra $20,000, right?  So if you

9   read it that way, this is a hundred percent accurate.  What

10  you're saying is that it could be read a completely different

11  way.

12      MR. LEFEBVRE:  Right.

13      THE COURT:  That if it's the first time you ever

14  dealt with this company --

15      MR. LEFEBVRE:  Which it is on this record,

16  undisputed.  And I'll go one step further, Judge.  I think

17  the First Circuit has a decision, Bonds V. Fleet.  The First

18  Circuit says, if a form -- and they looked to TILA -- is

19  subject to two different meanings -- and just in our colloquy

20  now, your Honor correctly pointed out the two possible

21  meanings to this form -- it violates TILA.  So, I mean, I

22  think --

23      THE COURT:  I just want to refine it.  It's not

24  necessarily wrong.  It just depends how you construe

25  "involving us."

1    MR. LEFEBVRE:  Right, but if it is subject to two

2    possible interpretations --

3    THE COURT:  And so can I turn to you and ask, would

4    you agree that that statement of law is something -- not that

5    this is, because I know your position is it isn't -- if

6    something's susceptible to two interpretations, that it isn't

7    clear and conspicuous under TILA?  And then that's probably

8    why you're back-dropping into the subject.

9    MS. WILLIAMS:  Well, can I give you a "yes but"?

10    I'm going to give you a "yes but," if I may.

11    THE COURT:  Okay.

12    MS. WILLIAMS:  I do agree that that's correct, but

13    the problem I have with the analysis that Mr. Lefebvre has

14    given is that he's taking some of the language of this out of

15    context, and the law also clearly says that you can't take

16    bits and pieces out of context; you have to read the whole

17    thing to decide whether or not there are two possible

18    interpretations.  So the analysis that we would give has you

19    do that, which is by reading Paragraph 2, which describes

20    just what Mr. Lefebvre was complaining about, that you can

21    cancel your transaction and you get the whole thing

22    canceled.  So you read that, and you say, "Oh, okay, I had a

23    loan with Lender A.  Now I've come to First Horizon, and I've

24    gotten a loan with First Horizon for more money."  I read

25    Paragraph 2, and I say, "Aha, if I want to cancel this, I can

b10d2020-e96f-4987-9432-2b47b703c2da

1  cancel my whole First Horizon loan."  That is an accurate

2  statement of the law.  The First Circuit has agreed that that

3  would be a sufficient disclosure.

4        Now the question is whether when you proceed to

5  Paragraph 3 if that confuses you.  Now, your Honor has been

6  focusing in on the "involving us," asking is that the

7  confusing piece?  Well, I think you have to keep reading, and

8  you have to get to the end of the next line where it's

9  describing how this affects the security interests we already

10 have on your home.  The borrower that we've just been talking

11 about, First Horizon doesn't already have a security interest

12 in their home.  They would read that and think, "This

13 paragraph doesn't apply to me.  It's Paragraph 2 that governs

14 my rights."

15       THE COURT:  Okay, so that's the comeback, which is,

16 yes, "involving us" by itself might be unclear; but when you

17 read to the end of the sentence, it clarifies it.

18       MS. WILLIAMS:  Exactly, if you read the whole

19 thing, you'd understand.

20       MR. LEFEBVRE:  But, Judge, it may be understandable

21 to a federal jurist, to the Federal Reserve Board Chairman,

22 but the standard for Truth in Lending is the ordinary

23 consumer.

24       THE COURT:  Well, have you taken a survey and

25 seen -- I mean, this is why I asked the original question,

1    which is, suppose I read the whole thing in the context of

2    the whole thing, and I think, "Well, I understand it."  All

3    right, so you say, "Well, Joe Blow won't."  Well, how do I

4    know that?

5             MR. LEFEBVRE:  Well, the law suggests that the

6    standard is objective, that the trial court has to look at

7    the form and come out of his or her shoes as a federal judge,

8    learned, knowledgeable, and become the ordinary consumer.

9    And your Honor does that all the time when you look at FDCPA

10   claims and other issues.  You know, you look at a collection

11   letter as a judge, and you can say, "Oh, I understand that

12   they can't come arrest me.  They have to sue me."

13            THE COURT:  Well, let's say, if something has a

14   likelihood of confusion in trademark law, typically there's a

15   survey.  I mean, actually, typically somebody goes out and

16   does a survey, and would they think that Toys "R" Us are the

17   same as, you know, somebody who's a knockoff?  So I'm just

18   simply saying, it comes up in other areas of the law.  And

19   you would say, well, would a reasonable, qualified police

20   officer understand the law in a particular way?  And if I put

21   myself in the shoes of a police officer, that's true.  I

22   mean, as I'm looking at it, if you read the whole thing, you

23   might come out one way; but if you're not that literate or

24   you don't speak English that well, you could come out another

25   way.

1          MR. LEFEBVRE:  And, Judge, and that raises an

2     interesting point.  Remember, this form -- you know, the

3     Federal Reserve Board had two separate forms, the H-8 and the

4     H-9, and there was immunity had he chosen the right form.

5     So, you know, First Horizon created this form.  And I think

6     the more colloquy we have, I think when you go back and you

7     look at the First Circuit, Bonds V. Fleet, if something is

8     subject to two different interpretations, it violates TILA.

9          And I think a very good case, which isn't a hundred

10    percent identical but pretty darn close, is the recent Handy

11    case from the Seventh Circuit.  Now, the First Circuit in

12    Doral cited in a footnote disfavorably to the standard that

13    the Seventh Circuit looks at; hypertechnicality in the

14    Seventh Circuit, "Jeez, we got you" type of analysis versus

15    clear and conspicuous.  But if you read the footnote where

16    the First Circuit cites to Handy, Handy was a case where the

17    borrower received the H-8 form and the H-9 form.

18         So it had a perfect H-8 form and an H-9, two

19    different forms, and the Seventh Circuit said that's

20    confusing.  And the First Circuit recognized that the facts,

21    those specific facts in Handy were different than the facts

22    in Doral.  But that's pretty close because that's really what

23    you have here.  You have an H-8 and an H-9, because that's

24    really the only difference, Judge.  The second and third

25    paragraph, that's the only difference.  You take the second

1    paragraph out, you have the H-9 form.  You take the third

2    paragraph out -- they put them together.  Pretty good -- I

3    don't think you could get a better picture-perfect textbook

4    example of a form that could lead the ordinary, average

5    consumer to be confused.  And I think --

6          THE COURT:  All right, so the second question is,

7    assume that you win that, her primary point actually is I

8    should follow state law and apply a subjective standard, not

9    primary but a major point she's making.

10          MR. LEFEBVRE:  And, Judge, I think we've argued

11   ad nauseum in our opposition.

12          THE COURT:  You have.

13          MR. LEFEBVRE:  But I think you really have to look

14   at Killian.  Killian isn't really a case that dealt with this

15   point directly.  First Horizon takes certain statements from

16   the SJC out of context in a very factually-driven scenario,

17   and also a presimplification case, presimplification, which I

18   think makes a difference.

19          And also, Judge, look at 93A.  You know, the MCCDA

20   is a Mass. consumer protection statute, 93A.  My

21   understanding of the law from looking at a violation under

22   93A is an objective standard, so why would there be a

23   different standard when you look at the MCCDA?

24          THE COURT:  93A is an objective standard?

25          MR. LEFEBVRE:  Objective standard.  If something is

1    a violation, look --

2            THE COURT:  No, no, no.  There are some things that

3    are strict liability, but most is so outrageous --

4            MR. LEFEBVRE:  Well, forms, Judge, if you're

5    looking at a form, the court makes an analysis looking at the

6    document, the collection letter, the Truth in Lending

7    disclosure.

8            THE COURT:  It is true that if under the consumer

9    laws, if there's a direct violation of a consumer regulation,

10   you can consider it.  But if it's not a direct violation,

11   it's not objective.  It's whether something is outrageous,

12   raises eyebrows, you know, the whole --

13           MR. LEFEBVRE:  But I'm focusing pretty much in this

14   type of an example.  If a form violates 93A, a contract, a

15   collection letter, that's going to be an objective standard.

16           THE COURT:  Well, we don't need to get there

17   because -- I'm not sure I agree.  I've just been through this

18   in a big pharmaceutical case, so it's not as

19   straightforward.  But, in any event, you would say that

20   Killian doesn't stand for the proposition that it's a

21   subjective standard?

22           MR. LEFEBVRE:  And it's a presimplification case,

23   and I think --

24           THE COURT:  What do you mean by --

25           MR. LEFEBVRE:  Before the Regulation Z and all the

Page 27

1  changes to Regulation Z, which is pretty much the body of law

2  which all the Federal Courts operate.  Remember, Judge, if

3  you find --

4       THE COURT:  But aren't we adopting the local rules,

5  so don't the local --

6       MR. LEFEBVRE:  You're talking about the MCCDA?

7       THE COURT:  Yes.

8       MR. LEFEBVRE:  But if you find the subjective

9  standard, Judge, then in Massachusetts the standard would be

10 different than in every other Federal Court in the country

11 that doesn't have this particular statute.

12      THE COURT:  That puts me in an odd position

13 because -- I mean, it's an interesting federalism issue.  We

14 allow certain state rules to be the standard, and then don't

15 you have to follow the state court's construction of those

16 rules?

17      MR. LEFEBVRE:  But I would suggest to you, Judge, I

18 don't think there is a case on point that says that it's the

19 subjective standard, and I think --

20      THE COURT:  So you're just saying I shouldn't read

21 Killian that way?

22      MR. LEFEBVRE:  Right.  Killian is not a case that

23 deals with that issue directly on point, Judge.  They've

24 taken a sentence, dicta, out of a factual -- taken it out of,

25 as Judge Selya would say, its contextual moorings and placed

Page 28

1    it in a position to try to convince you --

2         THE COURT:  No, he would never have said that.  He

3    would have said it in words that we'd all have to look up,

4    so --

5         MR. LEFEBVRE:  That's what he said.  I quoted him.

6    Thank you, Judge.

7         MS. COMBS:  I just want to add one thing.  I can't

8    emphasize the fact that this is a presimplification case.

9    Truth in Lending was changed in the early '80s, and the case

10   law that is presimplification is not followed, and this case

11   has not been followed.  And so I think it's an overstatement

12   to say that this is the law of Massachusetts because the case

13   law, presimplification just is not applicable anymore.

14        THE COURT:  Well, let me ask you this one

15   question:  If I took Killian as the law of the day, would it

16   be true that it would be the only state in the country where

17   it didn't have an objective standard?

18        MS. WILLIAMS:  Well, first of all, there are only

19   five states that have --

20        THE COURT:  Right, but has any other Federal Court

21   under federal law applied a subjective standard?

22        MS. WILLIAMS:  No court that I'm aware of has

23   applied a subjective standard, but since the Palmer case,

24   there is a District Court case from the Eastern District of

25   Pennsylvania called Johnson.  It's actually just from this

b10d2020-e96f-4987-9432-2b47b703c2da

1    summer.  It's in our materials, Johnson V. Chase Manhattan,

2    which actually -- it's published in Westlaw, 2007 Westlaw,

3    203, 3833.  It's July of 2007.  And in that case, it actually

4    explicitly recognizes that Palmer leaves open the question of

5    whether actual knowledge by a borrower may excuse essentially

6    what would otherwise be an on-the-form violation.  In other

7    words, what it's saying is, it has not decided if the

8    subjective understanding of a borrower comes into play at

9    that point.

10          Now, this Johnson V. Chase Manhattan case goes on

11   to rule against the lender, but that's hardly surprising

12   because it's in the Third Circuit, which follows the

13   hypertechnical standard that the First Circuit has rejected.

14          THE COURT:  Do all these cases just pop up on your

15   computer every time a case comes down on one of these?

16          MS. WILLIAMS:  Well, let me tell you, I've got them

17   all memorized at this point.

18          THE COURT:  You seem to know them very well.  All

19   right, so thank you.  I will take this under advisement, and

20   you actually answered my key question, which is, I kept

21   reading this over and over and said, "Why am I doing this

22   before class cert?"  And it's actually very commendable

23   because sometimes I get entangled in these difficult class

24   cert issues when actually it's a narrow merits issue that

25   should just be resolved one way or another, and then we could

1    probably settle a class or have it just go away.  So I

2    actually commend you, but I have to say it's the first time

3    I've ever done it before deciding a class issue, and the

4    First Circuit has got some dicta discouraging it.  But, look,

5    if you can waive your Fifth Amendment right, I guess you can

6    waive this.  Thank you.

7              (Laughter.)

8         MS. WILLIAMS:  Thank you.

9         MR. LEFEBVRE:  Thank you.

10        MS. COMBS:  Thank you, your Honor.

11             (Adjourned, 3:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7

8           I, Lee A. Marzilli, RPR, CRR, do hereby certify

9   that the foregoing transcript, Pages 1 through 30 inclusive,

10  was recorded by me stenographically at the time and place

11  aforesaid in Civil Action No. 04-10370, Ralph G. McKenna V.

12  First Horizon Home Loan Corporation, and thereafter by me

13  reduced to typewriting and is a true and accurate record of

14  the proceedings.

15          In witness whereof I have hereunto set my hand this

16  16th day of May, 2008.

17

18

19

20

21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, RPR, CRR
            OFFICIAL COURT REPORTER
23

24

25